UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 22-20552-CR-GAYLES/TORRES

UNITED STATES OF AMERICA

v.

DAVID RIVERA,

        Defendants.

_____/

**DAVID RIVERA'S RESPONSE IN OPPOSITION
TO THE UNITED STATES' EX PARTE APPLICATION FOR
SECOND POST-INDICTMENT PROTECTIVE ORDER
AND REQUEST FOR EVIDENTIARY HEARING**

The Government has filed an Application for a Second-Post Indictment Protective Order

("Second Application") seeking to restrain three properties it claims are directly traceable to the

charged offenses under 21 U.S.C. § 853(e). [1] For eight months, these properties were identified by

the Government as substitute assets, including in the Indictment returned by the grand jury.

Following the Indictment, the Government recorded *lis pendens* on the properties, also identifying

them as substitute assets. It was only **after** and clearly because Chief Magistrate Judge Torres

ruled that the *lis pendens* were improper and should be dissolved that the Government filed this

application for protective order and sought to restrain the properties stating, for the first time, that

they are directly traceable to the charged offenses. The Government, however, has erred again.  As

a matter of law and fact, it cannot establish a nexus between Rivera's New Smyrna Beach property

---

[1] Having reached a settlement with Esther Nuhfer regarding the two properties she owns which the
government had sought to restrain with a second protective order the Second Application and this response
now pertain only to Rivera's New Smyrna Beach property.

and any count of the Indictment, as required by Rule 32.2.  Fed. R. Crim. P. 32.2(b)(1)(A).  Thus, the property remains, at best, a substitute asset which the Government can only seek to forfeit at the end of the case, if it is successful at trial and can then meet the requirements of 18 U.S.C. § 853(p).

As the government's Second Application and its exhibits show and as explained below, this case involves bank accounts in which allegedly tainted funds are commingled and fungible with innocent funds. Under § 853, the Government cannot restrain substitute assets pretrial; it can only restrain assets directly traceable to the charged offenses. This Circuit has held, in *In re Rothstein, Rosenfeldt, Adler, P.A.*, 717 F.3d 1205, 1212-1215 (11th Cir. 2013), that commingled funds "which cannot be divided without difficulty"[2] and properties purchased with these funds are not forfeitable proceeds or property derived from proceeds. They are not directly traceable to the offense. Therefore, the Government must resort to the substitute asset provision of § 853(p) in order to satisfy a forfeiture judgment.

Here, even according to the Government's analysis, the property it is trying to restrain were purchased with purported tainted funds that have been commingled with **un**tainted, clean funds in multiple bank accounts. The fact of the commingling of the funds is not a disputed fact. Beyond the mere commingling of innocent funds with alleged proceeds, there were numerous, in fact hundreds of intervening deposits and withdrawals made to the bank accounts used to purchase the property after the purported tainted funds were deposited into the accounts.  In the case of Rivera's

---

[2] The plain meaning of the statutory phrase "without difficulty," found in both the relevant case law and statute, 18 U.S.C. § 853(p)(1)(E), discussed in detail *infra.* in the text, indeed the Miriam Webster Online Dictionary definition of the adverb "without" is "lacking or absent". In other words, absent difficulty.

#101681658v2

New Smyrna property, there are six (6) commingled bank accounts involved in the government's so called "tracing." The combination of these facts makes the fungible, commingled funds impossible to divide "without difficulty". The Government's stated use the First-In, First-Out ("FIFO") accounting methodology to assume that the funds used to purchase the properties are tainted does not and cannot alleviate this impediment. In fact, as Rivera will demonstrate below with on-point legal authority as well as expert analysis, the government's resort to such "legal fiction", FIFO accounting methodologies is proof in and of itself that the commingled funds cannot be divided "without difficulty".  Accordingly, the New Smyrna property owned by Mr. Rivera is not directly traceable. The Government can only seek to forfeit New Smyrna as a substitute asset under the substitute asset provision of § 853(p). Its application for protective order as to New Smyrna fails.

Under the unique facts of this case, if the court does not feel that the papers and exhibits establish the failure of the government's Second Application, we request an evidentiary hearing which, in such event, will be necessary for the Court in deciding whether the commingled funds used to purchase the properties can be divided without difficulty.

## I.      Background

In November 2022, a federal grand jury returned an indictment charging Mr. Rivera and Ms. Nuhfer with conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371, failure to register as foreign agents in violation of 22 U.S.C. §§ 612(a) and 618(a)(1), money laundering conspiracy under 18 U.S.C. § 1956(h), and engaging in transactions in criminally derived property in violation of 18 U.S.C. § 1957. [D.E. 3]. The Government claims that Mr. Rivera and Ms. Nuhfer engaged in political activities in the United States on behalf of the

government of Venezuela. The indictment specifies that the Government is seeking a judgment of at least $23,750,000 from Mr. Rivera and Ms. Nuhfer.

To satisfy this potential money judgment, the Government, having had Mr. Rivera's and Ms. Nuhfer's bank records for years and presumably reviewed them, identified in the indictment four properties and a brokerage account as being connected to the Defendants' alleged unlawful activity, i.e., directly traceable, tainted assets. The indictment also identified the following properties (among others) as "substitute property" under § 853(p):

- 3663 S. Atlantic Ave., Unit 20C, New Smyrna Beach, Florida 32169

- 9425 S.W. 38th Street, Miami, Florida 33165

- 82 Tingler Lane, Marathon, Florida 33050

[D.E. 3, p. 33]. These are referred to as the "subject properties."

In December 2022, the Government recorded *lis pendens* on the subject properties "[p]ursuant to 21 U.S.C. § 853(p)" (the substitute asset provision). [D.E. 55-1 at 6-7, 13-14].

Since filing a limited notice of appearance for the purpose of litigating the release of the substitute assets, the defense has spent a great deal of time, money, and energy litigating whether the Government could restrain these properties pre-trial that were not tied to the charged offenses. This litigation is important and time-sensitive because Rivera intends to use the New Smyrna and Oviedo, Florida properties to retain undersigned counsel and file his permanent appearances so that the case may move forward.[3]  The Court, too, has spent a great deal of time and energy reviewing and considering these matters. On July 6 and 7, 2023, Chief Magistrate Judge Edwin

---

[3] Because the government has not asserted traceability as to Oviedo, only the New Smyrna property is involved in this part of the litigation.

4

Torres issued a 23-page order and supplemental order explaining that the Government's attempt to restrain these substitute properties was unlawful and ordered the *lis pendens* on the properties to be dissolved. [D.E. 75, 77].

The Government has had Rivera's bank records and the closing files for the New Smyrna property, we believe, since at least July 2017 when their grand jury subpoenas for bank and real estate records were served. They secured the indictment in November 2022 after at least five years of investigation and, without doubt, tracing efforts. The indictment has a forfeiture section which delineates both allegedly traceable and substitute assets. They asked for and secured an indictment listing New Smyrna as a substitute asset. Obviously, the forfeiture unit at the USAO could not trace New Smyrna to the alleged criminal activity pre-indictment "without difficulty" or it would have done so. Only after losing its argument that the substitute properties could be restrained pretrial, did the Government file a new *ex parte* application asking the Court to no longer consider New Smyrna a substitute asset under § 853(p), but rather as directly connected to the charged offenses under § 853(a). [D.E. 79]. The Government failed to explain why it waited so long to change its position and why it did so only after losing the argument that the properties should be restrained as substitute assets, merely stating it discovered the assets were directly traceable to the charged offenses "upon further investigation." [D.E. 79, p. 4].

The Court granted the Government's *ex parte* application for a protective order and found there was probable cause that the subject properties were tainted assets under § 853(a) and should be restrained. [D.E. 82].

When Rivera and Nuhfer learned that the *ex parte* application was filed and the protective order granted, they immediately moved the Court to vacate the order and allow them a chance to dispute the probable cause determination. [D.E. 85].  At a hearing to discuss the motion, the Court

5

expressed frustration with the Government's floundering as to why it didn't bother to notify the Court when it "discovered" the properties were tainted assets and instead waited until after it had lost before Chief Magistrate Judge Torres. Stating that the Government's behavior seemed to waste the Court's and defense's time and reeked of "gamesmanship," the Court granted the Defendants' motion, vacated the protective order, and gave Rivera and Nuhfer an opportunity to respond to the Government's application for protective order. [D.E. 93].

## II.     Argument and Memorandum of Law

The Government's application for protective order fails to demonstrate the subject property is directly traceable to the charged offenses under § 853(a). At most, the untainted funds in the bank accounts used to purchase the subject properties were commingled with so-called tainted funds which cannot be divided without difficulty from untainted funds. Thus, they are not traceable proceeds and must be treated under the substitute asset provision, § 853(p) as mandated in §853(p)(1)(E) in the case of commingled funds which cannot be divided "without difficulty". Following Supreme Court precedent, Judge Torres recently held, substitute properties cannot be restrained pretrial. Therefore, the Government's attempt to restrain the subject properties pretrial through a protective order fails.

### A.     The subject properties are not directly traceable to the charged offenses under § 853(a) and must be treated as substitute assets under § 853(p).

Title 21 U.S.C. § 853(e) permits the Government to apply to the Court for a protective order to preserve the availability of property described in subsection (a) for forfeiture. 21 U.S.C. § 853(e). Property described in subsection (a) includes "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as a result of" a violation of certain criminal offenses. 21 U.S.C. § 853(a)(1). In other words, property described in subsection (a)

6

#101681658v2

includes tainted assets – those assets that are directly traceable to the charged offense or properties acquired with directly traceable funds.

Before trial, the Government can seek a protective order to restrain only tainted assets (assets that are directly traceable to the offense) to preserve their availability for forfeiture, but the Government can**not** restrain substitute assets pretrial. *See* Judge Torres' Order on Defendants' Joint Motion for Release of Lis Pendens on Substitute Assets, D.E. 75. ("[N]either state nor federal law grants [the Government] the authority to constrain innocent [(substitute assets)] in this manner prior to trial and conviction."). It is only at the conclusion of a case, if there is a conviction, that the Court can order the forfeiture of any other property of a defendant pursuant to § 853(p)(2), which is referred to as "substitute property."

Here, where the Government is attempting to restrain the subject property pretrial through a pretrial protective order, it would need to show that they are directly traceable to the charged offenses. The Government, however, cannot make that showing because even under its own analysis the subject properties were purchased with so-called tainted funds that were commingled with untainted funds into fungible bank accounts and the combination of those funds cannot be divided without difficulty. In this situation, Congress has mandated in § 853(p)(1)(E) that they can only resort to New Smyrna as a substitute asset.

Section 853(p)(1) describes the circumstances which require the Government to resort to substitute property. It includes instances where proceeds (tainted funds or assets acquired with tainted funds) cannot be found (§ 853(p)(1)(A)), are no longer available (§ 853(p)(1)(B) or (C)), have considerably reduced in value (§ 853(p)(1)(D)), or "ha[ve] been commingled with other property which cannot be divided without difficulty (§ 853 (p)(1)(E))." In the event that any of

7

these conditions exist, "the court shall order the forfeiture of any other property of the defendant, up to the value of" proceeds the person obtained. § 853(p)(2).

With regard to § 853(p)(1)(E) – tainted proceeds commingled with other property that cannot be divided without difficulty – the Eleventh Circuit has held that these funds are not forfeitable proceeds. *Rothstein*, 717 F.3d at 1214. Further, if the commingled funds were used to purchase other properties, the acquired properties are not forfeitable either because they are not "properties derived from proceeds." *Id.* at 1215. Therefore, "once a defendant has commingled laundered funds with untainted funds—whether in a bank account or in a tattered suitcase—such that they 'cannot be divided without difficulty,' … the government must satisfy its forfeiture judgment through the substitute asset provision." *United States v. Voigt*, 89 F.3d 1050, 1088 (3d Cir. 1996); *Rothstein*, 717 F.3d at 1214-15 (holding that commingled funds that cannot be divided without difficulty must be treated under the substitute asset provision).

In *Rothstein*, the Eleventh Circuit first addressed the question of when property becomes commingled to the point that it cannot be "divided without difficulty" and must be treated through the substitute asset provision. The Court looked to two Third Circuit decisions, *Voigt* and *Stewart* that addressed this issue.

In *Voigt*, the district court entered a judgment finding that items of jewelry were forfeitable as directly traceable to money laundering activity. *Voigt*, 89 F.3 at 1088. On appeal, the Third Circuit vacated the forfeiture order finding that the jewelry was not directly traceable because it was purchased with funds from an account that contained money laundering proceeds that had been commingled with other funds, and there had been "numerous intervening deposits and withdrawals" between the deposit of the tainted money and the purchase of the jewelry. *Id*. The Court found that the tainted and clean funds used to purchase the jewelry could not be divided

8

without difficulty and thus the jewelry could only be forfeited as a substitute asset under 853(p). *Id*. The Court found that to hold otherwise would overlook the plain terms of the Congressionally mandated substitute asset provision, despite the Government's policy arguments that this would encourage money launderers to commingle funds. *Id*. at 1085-86.

The Court further noted the difficulty the Government faces when trying to treat commingled assets as directly traceable to the offense:

> Where the property involved in a money laundering transaction is commingled in an account with untainted property, however, the government's burden of showing that money in the account or an item purchased with cash withdrawn therefrom is "traceable to" money laundering activity will be difficult, **if not impossible**, to satisfy. While we can envision a situation where $500,000 is added to an account containing only $500, such that one might argue that the probability of seizing "tainted" funds is far greater than the government's preponderance burden (50.1%), such an approach is ultimately unworkable. (emphasis added)

*Id.* at 1087.

By contrast, in the later case of *United States v. Stewart*, 185 F.3d 112, 129 (3d Cir. 1999), the Third Circuit found that tainted money in a bank account could be separated from clean funds without difficulty in the simple occasion of an account with no other deposits or significant withdrawals and where the account was frozen upon the deposit of the tainted funds.  There, proceeds could be easily traced and were directly forfeitable as proceeds of a money laundering violation. In *Stewart*, $3 million dollars traceable to money laundering was transferred to an account and then frozen, which previously contained $160,000. *Id.* The government sought to forfeit the tainted funds in the account. *Id.*

The Court noted the differences from the facts in the *Voigt* case.  Significantly, the Court noted that there were not the intervening withdrawals and deposits into the account with the commingled funds that existed in *Voigt*. In *Stewart*, the $3 million of proceeds was deposited into

9

a single account which contained $160,000 of untainted funds. Almost immediately after the transfer of proceeds, the account was frozen. *Id.* Following the proceeds deposit, only one withdrawal was made, with the permission of the Government, in order for Stewart to pay his attorney. *Id.*

Thus, the Court found no difficulty in separating out the tainted $3 million from the untainted $160,000 and modified the forfeiture order so that it was directly traceable to the offense rather than of a substitute asset. *Id.* at 130.

Turning back to the *Rothstein* case, there, the Eleventh Circuit considered whether Ponzi-scheme money deposited into a single large law firm bank account and commingled with legitimate funds was directly traceable to the offense like in *Stewart* or whether it was more like the commingled funds in *Voigt* that could not be divided without difficulty. *Id.* at 1213-14.

The accounts at issue in *Rothstein* received billings from some 70 lawyers and the commingling went on for four years. *Id.* at 1213. The Government provided an affidavit from an FBI agent detailing the transfers in and out of the accounts, but the agent admitted this didn't include every fact known to him. *Id.* The agent used an accounting methodology known as "the lowest intermediate balance rule" ("LIBR") to attempt to divide tainted and untainted money. *Id.* This approach finds that an account contains the "traceable proceeds" of the tainted deposit so long as the balance has not fallen below the amount of the tainted deposit. *Id.*

The Court disagreed with the Government and found that it was "far more appropriate to apply the Third Circuit's rule in *Voigt*, which involved a single and less active account, than the exception to that rule it lays out in *Stewart*." *Id.* And, "if ever there was a case where commingled proceeds 'could not be divided without difficulty' and that therefore required the Government to seek forfeiture pursuant to the statute's substitute property provisions, §§ 1963(m) and 853(p), this

10

#101681658v2

is that case." *Id.* at 1214. "[T]o conclude otherwise would render the substitute asset provision a nullity." *Id*. Thus, the account was not directly traceable to the offense; however, the Government could move to amend the judgement to reflect that Rothstein's interest in the bank accounts was forfeitable as a substitute asset. *Id.*

Further, the Court noted that the district court "expressed frustration" with the LIBR method used and found that the LIBR tracing method was a "legal fiction" but the parties all agreed to use it so the district court had honored that agreement. *Id.*[4]

Here, the rule in *Voigt* (and in *Rothstein*) that commingled funds must be treated through the substitute asset provision applies. The so-called tainted funds deposited into the bank accounts used to purchase the subject property cannot be divided from other clean funds without difficulty. In addition to the analysis below, we would demonstrate this fact at an evidentiary hearing if necessary.

First, like the jewelry purchased with commingled funds from just a single bank account in *Voigt*, the Government seeks to restrain a property that was purchased with what are indisputably commingled funds. For example, the key Wells Fargo account 5988, from which funds were transferred to purchase New Smyrna was used for over 1 ½ years with deposits and withdrawals of admittedly clean funds before and after any so-called proceeds were deposited. Exhibit "A", Declaration of CPA Stanley Foodman.  Second, attached as Exhibit "A-1" to the Foodman Declaration is a spreadsheet showing the deposits and withdrawals in the six accounts including the Wells Fargo 5988 account from November 30, 2017, to March 15, 2019, the date of the second

---

[4] Rivera has not and does not agree to the use of the 'first in first out" ("FIFO") accounting methodology employed by agent George in this case.

11

of two allegedly tainted transfers[5] used to purchase the property, a period some fifteen months.[6] There were 236 transactions in the 5988 account over that period. *Id.*  Third, the alleged proceeds flowed through, not one (1) as in both the *Rothstein* and *Voight* cases, but six (6) commingled accounts (with many additional transactions in those accounts) over several years in this case before being purportedly used to purchase the real property. *See* Second Application, Ex. "A", Declaration of Agent Stephan George, Subpart A ¶¶ 15-24 and the chart exhibit to his Declaration. The Government's tracing chart for the New Smyrna property appears to fit the very definition of "cannot be divided without difficulty" with its multiple accounts, banks, entities, and arrows.  *Id.* Fourth, unlike the single account in *Stewart*, the numerous accounts through which alleged proceeds flowed here were not frozen shortly after the supposed tainted funds were deposited. They were never frozen.  Accordingly, the commingled funds that were ultimately used to buy the subject properties cannot be divided out without difficulty.

Further, IRS-CI Special Agent Stephan George states that the Government's forensic accountants (not himself) employed the First-In First-Out ("FIFO") methodology "when specific identification of funds could not be made." [DE 79, p. 10, n. 3].[7] In other words, when the

---

[5]The first allegedly tainted transfer used to purchase the property, $15,000, was just eight days earlier on March 7, 2019.

[6]The Wells Fargo 5988 account contained $652,155 in allegedly tainted funds starting on September 6, 2018, at which point there were $2,778.50 in untainted funds in the account. There were untainted fund deposits of $5,800 on 9/17/2018 and $252,476.83 on 10/15/2018.  There were more than 230 transactions.  *See* Ex. "A" Foodman Declaration, Ex. "A-1" (Spreadsheet).

[7]The Government has not provided any affidavits, reports, or analyses by the actual forensic accountants who reportedly performed the examination upon which it and Agent George relies.

#101681658v2

commingled funds could not be divided without resort to an accounting assumption or without difficulty. This assumption that funds withdrawn are directly traceable because of FIFO is a legal fiction just like the LIBR method used in *Rothstein* and does not actually address whether the purported tainted funds can be separated from other funds without difficulty under § 853(p). The resort to FIFO is transparently an accounting device used to overcome the government's manifest inability to trace New Smyrna to the alleged offenses pre-indictment. *See* Ex. "A" Foodman Affidavit providing the history of FIFO as an inventory accounting methodology and stating, in pertinent part, that "FIFO, like other accounting methodologies such as LIFO, FILO and LIBR, are only accounting assumptions useful in certain limited and recognized accounting processes where such assumptions suffice but do not work to divide commingled bank accounts for the actual tracing of portions of fungible funds within the accounts to other accounts or purchases".

Now let's take a look at the government's tracing through the somewhat different but instructive lens of money laundering cases. In effect, by arbitrarily selecting FIFO this has allowed the government to ignore the fact, reflected in Agent George's own spreadsheet for the IAC WF 5988 account, that there was over $200k in untainted funds in the account at the time of the so called tainted $126k proceeds transfer which ended up in the Champion Title closing account for New Smyrna. For "involved in" money laundering purposes, the government must prove that assets allegedly which were purchased with money from commingled accounts are sufficiently "involved in" the money laundering offense. *United States v. Loe*, 248 F. 3d 449 , at 467 (5th Cir. 2001) where the Court held,

> As this Court has noted money is fungible. The commingling of assets has placed courts in the difficult position of separating "clean" from "dirty" funds. Although **any accounting method employed to this end inevitably exhibits certain "arbitrary" characteristics**, a rule of decision is necessary. In *United States v. Davis* [226 F. 3d

13

#101681658v2

> 346, 347 (5th Cir. 2000] we stated the following rule for section 1957 cases involving commingled accounts: "When the aggregate amount withdrawn from an account containing commingled funds exceeds the clean funds, individual withdrawals may be said to be of tainted money, even if a particular withdrawal was less than the amount of clean money in the account." **Davis also implies the converse--that where an account contains clean funds sufficient to cover a withdrawal, the Government can not prove beyond a reasonable doubt that the withdrawal contained dirty money.** 248 F. 3d at 466-467.

The Court in *Loe* reversed the money laundering convictions because the counts in question involved transactions "originating in a $776,742 transfer from an account containing $2,205,000. Of the $2,205,000, only $470,790.22 was fraudulently obtained. Since there was enough clean money in the account to cover the $776,742 transfer, the rule of *Davis* mandates reversal of counts 22-24." In our case, as both the government's and Stanley Foodman's spreadsheets show, the 5988 account had over $200,000 in clean money at the time of the relevant alleged tainted money transfers as well. Admittedly, the government's burden of proof for a protective order is different than in the *Loe* and *Davis* cases. But *Rothstein, Voight* and Congress in § 853(p)(1)(E) have set out the rule to be applied in forfeiture cases involving commingled funds and that rule controls this case. Because the funds directly traceable to the offense used to buy the subject properties cannot be separated without difficulty, the Government must operate under the substitute asset provision of § 853(p). The Government cannot restrain substitute assets pretrial and thus its protective order fails.

There are two additional significant problems with the government's so called "tracing." First, it's position that the May 25, 2017, transfer of $3,750,000 from Raul Gorrin's Julius Baer account in Switzerland is part of the alleged FARA crimes in the indictment is, to put it directly, provably wrong. That transfer to Esther Nuhfer's Communication Solutions Account ending in

14

#101681658v2

8305 at JP Morgan Chase Bank was for Nuhfer's consulting services in connection with a contract her company had just entered into with Gorrin for her assistance in expanding Gorrin's Globovision television enterprise in the United States. A copy of that contract is attached as Exhibit "B". Moreover, discovery recently provided by the government in the form of the relevant Julius Baer Gorrin account records show that zero PDVSA or CITGO connected money was in the account at the time of the cited transfer. However, because only $25,000 of those allegedly tainted funds have been traced by agent George into Rivera's IAC JPMC 1682 account, this is far from a significant contributor, even putting aside the overwhelming commingling problems inherent in the government's multi-account tracings, in this case. Should the Court conduct an evidentiary hearing, Rivera does intend to put the government to its proof that the Gorrin transfer is tainted.

Second, as shown on agent George's chart, the allegedly traceable $141,894 makes up less than ½ of the $285,874 cash invested in the purchase of the New Smyrna property creating a possible proportionality issue for the government as to that property.

> **B.     If required, a tracing hearing is appropriate for the Court to determine that the subject property is not directly traceable to the charged offenses and is instead a substitute asset under § 853(p).**

This Court has permitted the defense to respond to the Government's application for protective order and dispute the Government's assertion that the New Smyrna property is directly traceable to the charged offenses. The defense has retained a forensic accounting expert, Stanley Foodman, CPA, to review the Government's tracing analysis and the numerous bank accounts. We have included both Mr. Foodman's Declaration and his spreadsheets to the New Smyrna related accounts as Exhibit "A". While we believe we have shown that the purported tainted funds used to purchase the subject properties cannot be "divided" from other funds "without difficulty" sufficiently for the Court to conclude that the New Smyrna property must be treated as a substitute

asset, if necessary, an evidentiary hearing allowing both Mr. Foodman and the Government's and relevant witnesses accountants and/or agents to testify regarding the tracing issues and to address any questions is requested.

The Government, ignoring the fact that all of its authority involves cases where a probable cause determination as to forfeitability had already been made, either by a grand jury or by a court, has argued that a tracing hearing is only permitted *post-restraint* and where the defendant first shows a need for the funds at issue to retain counsel citing cases such as *United States v. Kaley*, 579 F.3d 1246, 1252 (11th Cir. 2009). ("[T]his Court clearly held that a defendant whose assets *are restrained* pursuant to a criminal forfeiture charge in an indictment, rendering him unable to afford counsel of choice, is entitled to a pretrial hearing only if the balancing test enunciated in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), is satisfied.")(emphasis added) and *United States v. Bissell*, 866 F.2d 1343, 1349 (11th Cir. 1989) ("These restraining order provisions do not, on their face, require a hearing either prior to, or after, the imposition of restraints on defendants' assets.") The statute's legislative history reveals that while Congress did not intend for there to be a hearing prior to the issuance of a restraint, the district court does retain authority to hold a post-restraint hearing. S. Rep. No. 225, 98th Cong., 1st Sess. 191, 203, reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3386.").

The Government also relies heavily on *United States v. Bissell*, 866 F.2d 1343, 1347 (11th Cir. 1989). There, Bissell and his co-defendants were charged with conspiring to import cocaine. *Id.* The indictment contained several forfeiture counts pursuant to § 853, in which the grand jury found that all assets derived from the narcotics offenses were subject to forfeiture. *Id.* The Government obtained *ex parte* restraining orders to freeze assets in bank accounts pending trial. *Id.* After being found guilty at trial, on appeal, Bissell and his co-defendants argued that the *ex*

16

*parte*, pretrial restraint on their assets was unconstitutional. *Id.* at 1348. The defendants conceded that the assets restrained pretrial were traceable to the offense, but they argued the restraint prevented them from hiring the counsel of their choice. *Id.* at 1350-51.

The government's cited cases all involve a situation where a probable cause determination was already made (either by a grand jury or a Court) that the property was directly traceable to the charged offense before the Government moved for a protective order. Here, the exact opposite is true: the grand jury in this case has determined by its indictment that there is probable cause that the New Smyrna property is a substitute asset and, as such, is *not* directly involved in the lawsuit. Here, there is no probable cause determination that the New Smyrna property is directly traceable to the offenses, and we have shown that no such finding can be made. Under these circumstances, there is simply no requirement of a showing of need.

As Judge Torres points out in his recent order at DE 75, citing to abundant federal case law, it does not matter whether or not the defendant has a financial need for restrained property, an improper *lis pendens* should be removed. *See* D.E. 75, p. 9 ("[W]hether *Luis* requires a bona fide showing of financial necessity [is] immaterial if the Government cannot show that either federal or state law authorizes the pretrial recording of *lis pendens* on substitute assets in the first place. And here, the Government cannot make that showing."); *see also Luis v. United States*, 578 U.S. 5, 12-13 (2016) (internal citation omitted) ("Property seized by the United States that is not loot, contraband, or otherwise tainted belongs to the defendant, pure and simple.").

The Court has allowed the defense to respond to the Government's application for protective order. There are no exigent circumstances requiring an immediate restraint, and, if a hearing would be helpful to the Court, it should be ordered.

17

## CONCLUSION

In sum, because the funds used to purchase the subject property consisted of commingled funds in numerous accounts transferred over several years which cannot be divided out without difficulty, the New Smyrna property is not a traceable, forfeitable asset.  At best, the New Smyrna property is a substitute asset, and the Government must operate under the substitute asset provision. The Government cannot restrain substitute assets pretrial and thus its Second Post-Indictment Protective Order fails.

Dated: October 2, 2023.

Respectfully submitted,

**JONES WALKER LLP**
201 S. Biscayne Blvd., Suite 3000
Miami, FL 33131
Telephone: (305) 679-5700
Facsimile: (305) 679-5710
By:    /s/ Edward R. Shohat
       Edward R. Shohat
       Florida Bar No. 152634
       eshohat@joneswalker.com
       for Defendant Rivera

18

#101681658v2