UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CR-20552-DAMIAN/TORRES

UNITED STATES OF AMERICA

vs.

DAVID RIVERA and
ESTHER NUHFER,

      **Defendants.**
_____/

### GOVERNMENT'S MOTION TO QUASH TRIAL SUBPOENA
### DIRECTED TO WHITE HOUSE CHIEF OF STAFF SUSAN WILES

The United States of America, by and through undersigned counsel, respectfully moves this Court to quash a Rule 17 trial subpoena that defendants David Rivera and Esther Nuhfer purported to serve on White House Chief of Staff Susan Wiles through the White House Counsel's office on December 22, 2025.

In their accompanying letter to the White House Counsel (Govt. Ex. A), defense counsel state that they expect Ms. Wiles to be on the witness stand for one to two days at the trial presently set to begin on March 16, 2026, and that Ms. Wiles "should set aside at least that amount of time to be in Miami." Govt. Ex. A at 2. They further assert that they expect her "trial testimony will focus on her employment at Ballard Partners" and that they intend to ask Ms. Wiles "about extensive communications between herself and others regarding U.S. lobbying work that Ballard Partners had been contracted to perform during 2017-2018 for Venezuelan businessman Raul Gorrin," who is referred to in the superseding indictment as "Foreign Individual 1" and is the

1

owner of a Venezuelan television network known as "Globovision."  Id. at 1.[1]

Nowhere in their letter, however, do defendants acknowledge that, although Ms. Wiles was employed at Ballard Partners in 2017 and 2018 and designated as a lobbyist to work, in part, on Ballard Partners' representation of Globovision (for which Ballard Partners filed a registration statement and reports with the federal government under the Lobbying Disclosure Act disclosing that the firm received $150,000 per quarter for its services), she has no apparent connection to any of the allegations in the superseding indictment concerning defendants' activities as unregistered agents of the Government of Venezuela (for which defendants, in contrast, were to receive $50 million over a mere three months).  Indeed, the superseding indictment does not reference Ms. Wiles at any point, despite describing defendants' unlawful scheme in considerable detail.

The reason for that is simple—Ms. Wiles, as demonstrated by the evidence produced to defendants in discovery in the criminal case, does not appear to have interacted at all with Rivera or Nuhfer with respect to the unlawful lobbying scheme described extensively in Count 1 of the superseding indictment and, as such, her anticipated testimony is not relevant to their activities and certainly would not be "***material and favorable***" to the defense—*i.e.*, the controlling legal standard defendants must satisfy in order to have this Court enforce their subpoena.  See United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982) (emphasis added).  Indeed, defendants fail to allege in their letter any facts that link Ms. Wiles' anticipated testimony to the core issues in this case—that is, defendants' lobbying and other political activities undertaken at the behest of the Government of Venezuela, and their willful failure to register with the U.S. Attorney General as foreign agents in connection therewith.

---

[1] Defendants' Rule 17 subpoena is limited to requiring Ms. Wiles to testify at trial. It does not require the production of documents for their potential use at trial.

For these and the other reasons set forth below, this Court should quash defendants' Rule 17 subpoena. Alternatively, this Court should at the very least hold enforcement of the subpoena in abeyance pending a more extensive factual record to be developed at trial that would allow this Court to better assess the potential relevance (or lack thereof) of her testimony based on the actual defense the defendants pursue at trial.[2]

## Factual Background

A. The Superseding Indictment

In December 2023, a grand jury in this District returned the superseding indictment charging Rivera and Nuhfer with conspiring to violate the Foreign Agents Registration Act (FARA) (Count 1) and a substantive violation of FARA (Count 2). ECF 122. The FARA charges relate to defendants' participation in a scheme to engage in unregistered political activities in the United States on behalf of the Venezuelan government, and to covertly represent that government's interests before U.S. officials, in order to influence U.S. foreign policy and garner support for the normalization of U.S.-Venezuela relations. An essential aspect of defendants' conduct in this regard was their intent to conceal from outside scrutiny that their lobbying and other efforts were done at the behest of the Venezuelan government, which was controlled at the time by President Nicolás Maduro Moros ("Maduro"). Consistent with that intent, and knowing

---

[2] In their letter, defendants, as they have throughout the pre-trial proceedings, take pains to avoid describing in any detail their anticipated defense at trial. However, from Rivera's deposition testimony in the related civil litigation in the Southern District of New York and the pleadings in that case, and from defense counsel's communications with the Department of Justice in their efforts to have the charges dismissed, it appears that they may argue at trial that (a) any of their lobbying activities to normalize relations between the United States and Venezuela were not engaged in at the direction of the Government of Venezuela and (b) that the $50 million contract with PDV USA had nothing to do with these matters but instead was entered into for the sole purpose of compensating Rivera for providing business and public relations advice to the CITGO Petroleum Corp. to help it somehow improve its public image in the United States.

3

that registration would entail the public disclosure that their activities were instituted at the direction of the Maduro government, Rivera and Nuhfer willfully failed to register as foreign agents as FARA required. ECF 122 pp. 5–28.

As compensation for their efforts, Venezuelan officials, including Venezuela's then Foreign Minister Delcy Rodriguez, ordered executives with the CITGO Petroleum Corporation ("CITGO"), a wholly owned U.S. subsidiary of Petróleos de Venezuela, S.A. ("PdVSA"), the Venezuelan state oil company, to enter into a purported consulting contract with Interamerican Consulting, Inc. ("Interamerican"), Rivera's wholly-owned corporation. The signed consulting contract, dated March 21, 2017, between Interamerican and PDV USA, Inc. ("PDV USA"), a non-operating U.S. subsidiary of PdVSA that CITGO personnel used from time to time to execute directives from PdVSA or the Venezuelan government, provided that PDV USA would pay Interamerican a total of $50 million through a series of payments over the course of three months.[3] As the indictment alleges (ECF 122 p.11), and as the government's evidence will show, a significant purpose of the Interamerican-PDV USA agreement (apart from compensating the FARA scheme's participants) was to create the false appearance that Rivera was providing consulting services to PDV USA and/or CITGO, thereby helping to conceal defendants' status as unregistered foreign agents of the Venezuelan government.

As the superseding indictment further describes, defendants' efforts to normalize relations between the U.S. and Venezuela involved in part communications and meetings (to varying degrees) with several U.S. government officials including Congressman Pete Sessions, Senator

---

[3] Defendants, through Interamerican, ultimately received a lesser sum of $20 million. The first three transfers of $5 million each in March and April 2017 were from a PDV USA bank account, and the final wire transfer of $5 million in October 2017 was from a PdVSA account with the Russian financial institution Gazprom Bank.

Marco Rubio, and White House Advisor Kellyanne Conway. A purpose in engaging in these lobbying activities was to garner political support in the U.S. for a formal peace process between the two countries that would have also had the support of opposition groups in Venezuela and would have required the Maduro regime to agree to hold free and fair elections in return for Maduro and other regime members obtaining relief from prosecution and economic sanctions imposed by the U.S. Defendants, however, concealed from the U.S. officials and politicians they were lobbying that they were in fact being compensated at the direction of the Maduro regime through PdVSA for their activities as unregistered foreign agents.

      B.      <u>Defendants' Subpoena, Letter and Related Background Events</u>

As previously noted, the superseding indictment does not refer to Ms. Wiles for good reason. This is due to the fact that, based on the government's investigation in this matter, Ms. Wiles appears to have played no role in any of the relevant events.

In particular, Ms. Wiles (a) had no involvement in setting up (and did not attend) any of the meetings with Congressman Sessions or Senator Rubio that took place in April 2017, July 2017, and April 2018, that are described in the superseding indictment; (b) was in no way involved in Rivera's and Nuhfer's unsuccessful efforts in June 2017 to arrange for Kellyanne Conway to travel to Miami on Raul Gorrin's ("Gorrin") private jet so that they could seek to enlist her support in their efforts to normalize relations with Venezuela; and (c) did not set up or participate in any of the meetings described in the superseding indictment with Venezuelan government officials including Maduro, his wife, and Delcy Rodriguez, all of which were arranged by defendants. In short, to the government's knowledge (and defendants do not claim otherwise), Ms. Wiles had nothing to do with the offense conduct described in the superseding indictment.

Similarly, the government obtained through search warrants and other means literally tens

of thousands of Rivera's and Nuhfer's contemporaneous emails and text messages from January 2017 through December 2018 (the time period encompassing the conspiracy to violate FARA charged in Count 1 of the superseding indictment), and yet not a single one to the government's knowledge involves Rivera and Nuhfer communicating with Ms. Wiles about any of their activities as unregistered foreign agents working for the Maduro regime.  At best, Ms. Wiles is referenced from time to time in Ballard Partners' promotional materials that are attached to some of the emails sent or received by defendants.  Indeed, as a result of the lack of Ms. Wiles involvement in anything to do with the central facts of this matter, the government never even interviewed her during its investigation.

In tacit recognition of Ms. Wiles irrelevance to the core facts of this case, defendants instead focus on her employment with Ballard Partners in 2017 through 2018 and Ballard Partners' representation starting in June 2017 of Globovision, the Venezuelan media conglomerate owned by Gorrin.  In contrast to Ms. Wiles (who rejoined Ballard Partners in approximately 2017), Gorrin is a significant player in the events alleged in the superseding indictment.  At the time of the relevant events, Gorrin was known to be a corrupt Venezuelan businessman who was infamous in South Florida for, in part, spending a significant portion of his illicit wealth on luxury homes and other items in South Florida.  Indeed, in May 2014, Gorrin, as one of the owners of Globovision, was denounced on the Senate floor by then-Senator Rubio for having caused Globovision to become a "propaganda arm of the Venezuelan government" during a Senate hearing on Venezuelan human rights abuses.  With respect to the pending charges, Gorrin (Foreign Individual 1 in the superseding indictment) essentially served as the link between Rivera and Nuhfer and the Venezuelan government officials – including Delcy Rodriguez – who approved the $50 million contract and therefore plays a prominent role in the superseding indictment's

description of the relevant events.

At the same time Gorrin engaged in the unlawful lobbying campaign orchestrated by defendants, he also sought to raise Globovision's profile in the U.S. through various business ventures including efforts to do business with AT&T and Comcast, among others. However, Ballard Partners' representation of Globovision with respect to those efforts is not central to the core events discussed in the superseding indictment and, in fact, is not referenced in any way in the superseding indictment. At most, Ballard Partners' representation of Globovision is collateral background information that may or may not be touched upon at trial. In some ways defense counsel concede as much in their letter in acknowledging that Ballard Partners did not file its federal lobbying registration statement for Globovision until June 20, 2017, well after Rivera signed the $50 million consulting contract with PDV USA on March 21, 2017, and after a number of the initial unregistered lobbying and related activities had already taken place including, in part, Congressman Sessions meeting with Delcy Rodriguez in New York City in April 2017 and defendants' efforts in April and May 2017 to set up a meeting between Venezuelan government officials and executives with the Exxon Mobil Corporation.[4] Indeed, the tenuous nature of Ms. Wiles connection to any of the relevant events is further highlighted by defense counsel's acknowledgement in their letter that it was not until October 1, 2017, that Ms. Wiles "was added to the Ballard Partners lobbying registration to lobby the White House on behalf of Globovision."

To justify the issuance of their Rule 17 subpoena, defendants' letter states that Ms. Wiles is "best positioned" to explain Ballard Partners' lobbying activities for Globovision involving email correspondence with a number of individuals including Hugo Perera, Brian Ballard,

---

[4] Defendants incorrectly state in their letter that Ballard Partners filed its registration statement in July 2017. In fact, it was filed in June 2017 with an effective date of June 13, 2017.

Sylvester Lukis, Otto Reich, Harry Sargent, and Raul Gorrin.  Tellingly, however, they omit to state in their letter that some of these same individuals – including Brian Ballard (the founder and lead partner of Ballard Partners) and Sylvester Lukis – were all employees of Ballard Partners during the relevant time period and that Brian Ballard and Sylvester Lukis, both of whom defendants have already served with subpoenas, were listed on all of Ballard Partners' quarterly registration filings along with two other employees (Daniel McFaul and Rebecca Benn) as working on the Globovision lobbying engagement from June 2017 through July 2018 when the relationship was terminated.   Yet, for some reason, defendants claim that Ms. Wiles, the current White House Chief of Staff, is "best positioned" to explain Ballard Partners lobbying activities on behalf of Globovision while at the same time failing to identify any reasons why the "explanation" of Ballard Partners' lobbying in this regard would somehow exculpate defendants for willfully acting and conspiring to act as unregistered agents of the Venezuelan government.[5]

## Argument

This Court should quash defendants' Rule 17 trial subpoena for Ms. Wiles because they have not through their letter established (and presumably cannot establish) that her testimony is material and favorable to their defense, and therefore their subpoena fails as a matter of law.

Although the Sixth Amendment guarantees a criminal defendant the right "to have compulsory process for obtaining witnesses in his favor," U.S. Const. amend. VI, the Supreme

---

[5] The government's discovery in this case included copies of a document production from Ballard Partners. That production consisted of thirty-three .pdf files containing different categories of items broken down by subject matter and/or individual.   For example, the production included for Brian Ballard four .pdf files for his calendar entries, emails, and text messages and for Sylvester Lukis twelve .pdf files for his calendar, emails, and text messages including text messages with Rivera and Nuhfer.   By contrast, the production included only two .pdf files for Ms. Wiles for her calendar entries (listing only one Globovision meeting in February 2018) and her emails.

8

Court has recognized that this right does not entitle a defendant "to secure the attendance and testimony of any and all witnesses" he might wish to testify at trial. United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982). Rather, by its terms, the Sixth Amendment guarantees a defendant "compulsory process for obtaining *witnesses in his favor*." Id. (emphasis in original).

Consequently, a defendant who seeks to compel a witness's attendance at trial must "make some plausible showing of how their testimony would [be] both material and favorable to his defense." Id.; see also United States v. North, 910 F.2d 843, 889 (D.C. Cir. 1990) (applying this standard to affirm the district court's quashing of Oliver North's trial subpoena to former President Ronald Reagan in a prosecution of obstruction-related offenses arising from the Iran Contra affair); United States v. Naghdi, 953 F.2d 1389 at *1-2 (9th Cir. 1992) (affirming district court's refusal to enforce Rule 17 subpoenas to several high level government employees where defendant failed to make a plausible showing as to the nature of their anticipated testimony in support of his purported public authority defense, which the court found to be otherwise "inherently incredible").

In determining materiality, at least one district court has found that "in the Sixth Amendment context . . . evidence is material if its exclusion might prejudice the outcome of the defendant's case." United States v. Rosen, 520 F. Supp. 2d 802, 811 (E.D. Va. 2007) (enforcing defense Rule 17 subpoenas to the then-Secretary of State and other high-level current and former officials based on defendants providing the court with specific information concerning how their anticipated testimony would relate to the actual defense the defendants intended to pursue at trial). Moreover, where a defendant does not have access to a proposed witness, "a defendant need not explain precisely how a witness may testify; rather, events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality." Id. Mere speculation, however, that a witness's testimony

9

would be favorable to the defense is insufficient to compel the enforcement of a subpoena *ad testificandum*. Id.[6]

Here, the only connection defendants allege between Ballard Partners' representation of Globovision and the necessity of Ms. Wiles' testimony is their assertion that such representation is relevant to place Gorrin's "activities in full context." Defendants, however, fail to explain why that is so—indeed, the government did not allege or even suggest in the superseding indictment (nor will it at trial) that Ballard Partners' representation of Globovision was improper or somehow related to Rivera's and Nuhfer's activities as unregistered agents of the Venezuelan government. Indeed, it appears from the government's review of the Ballard Partners' document production (including the .pdf files of Ms. Wiles emails and calendar entries) and other materials obtained during its investigation that Ms. Wiles' role in Ballard Partners' representation of Globovision was limited to efforts to coordinate an initial introductory meeting between Globovision and ATT executives.

Defendants' effort to further claim some basis of relevancy between Ballard Partners' representation of Globovision and the $3.75 million that Nuhfer received from Gorrin in May 2017 to further their activities as unregistered foreign agents is even more absurd. One has nothing to do with the other – absent defendants' self-serving claims to the contrary – as reflected in the gross disparity in the amount of compensation involved such that one of the premier lobbying firms in the U.S. was to receive $150,000 per quarter from Globovision, while Nuhfer was to receive an

---

[6] In addition, the testimony that a defendant seeks to elicit at trial must also be consistent with the Federal Rules of Evidence such as relevancy determinations under Rule 401 and not be subject to exclusion under Rule 403 on grounds that its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Id.

upfront lump sum payment of $3.75 million for allegedly similar lobbying activities based on a one-page contract between Nuhfer's and Gorrin's companies.

More fundamentally, defendants fail to identify any reason why the "context" of Ballard Partners' engagement by Globovision would somehow exculpate them with regard to the relevant offenses in the indictment, which arose from their willfully acting as unregistered agents of the Government of Venezuela. Nor do defendants explain why they must have testimony specifically from Ms. Wiles regarding the Globovision engagement when there are various other individuals (including at least two employees of Ballard Partners who the defense has already served with trial subpoenas) with knowledge of the engagement, and greater involvement in it than Ms. Wiles.

Finally, it is worth noting the timing of defendants' belated efforts to subpoena Ms. Wiles to testify at trial. In their recent motion for a continuance (ECF 313 and 320) and at the status conference held on January 16, 2026, defendants attempted to justify their eleventh hour issuance of trial subpoenas to several current or former government officials including Secretary of State Marco Rubio on grounds that they had assumed that the government would call such individuals to testify at trial based on their inclusion on the No Contact list provided by the government to pre-trial services and therefore defendants would have the opportunity to cross-examine them at trial. However, Ms. Wiles had never been included on the No Contact list nor had the government ever represented to defense counsel that she would be called by the government as a witness at trial. Yet defendants, who had received the pertinent discovery including Ballard Partners' production as early as August 2024, waited more than a year to issue their subpoena to Ms. Wiles who coincidently became the White House Chief of Staff in the interim and who they now claim is in the best position to explain matters relating to Ballard Partners' representation of Globovision.

**Conclusion**

For the foregoing reasons, this Court should quash the Rule 17 subpoena issued to White House Chief of Staff Susan Wiles.  At the very least, this Court should hold enforcement of the subpoena in abeyance pending a more extensive factual record to be developed at trial that would allow this Court to better assess the potential relevance (or lack thereof) of her testimony based on the actual defense the defendants pursue at trial.  Defendants have no entitlement under the law to enforcement of a subpoena against a sitting White House Chief of Staff in the present context, in which they have not even articulated what their defense is to the pending charges, let alone identified facts establishing that the testimony sought would be material and favorable to that defense.

                                          Respectfully submitted,

                                          JASON A. REDING QUIÑONES
                                          UNITED STATES ATTORNEY

By:    /s/ Harold E. Schimkat
        Harold E. Schimkat, AUSA
        Roger Cruz, AUSA
        Court ID No. A5500567
        Fla. Bar No. 157971
        99 N.E. 4th Street, 4th Floor
        Miami, Florida 33128
        Office: (305) 961-9298
        Cell: (786) 378-4344
        Harold.schimkat@usdoj.gov

                                                            &

David J. Ryan
Trial Attorney, National Security Division
Special Bar ID No. A5503306
District of Columbia Bar No. 888325195
950 Pennsylvania Ave., NW, Room 7700
Washington, DC 20530

Tel: (202) 353-7842
David.ryan2@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on February 5, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

       /s/   Harold E. Schimkat
Harold E. Schimkat