UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 22-CR-20552-DAMIAN/TORRES

UNITED STATES OF AMERICA

vs.

DAVID RIVERA
ESTHER NUHFER

_____/

**DEFENDANTS' RESPONSE TO THE GOVERNMENT'S
MOTION TO QUASH THE SUSIE WILES SUBPOENA**

The government's motion to quash Susie Wiles' subpoena should be denied.

**ARGUMENT**

**I.      The Government Lacks Standing To Object To Ms. Wiles' Subpoena Since
The Defense Is Not Asking For Any Testimony Related To Her Role In
Government And Only As A Private Citizen.**

As a threshold matter, the government lacks standing to move to quash this subpoena. *See*

*United States v. Tomison*, 969 F. Supp. 587 (E.D. Cal. 1997) (holding that the government did not

have standing to move to quash a subpoena issued to a third party because a party only has standing

to move to quash when the subpoena infringes upon the movant's legitimate interests). The

subpoena is directed to Ms. Wiles personally, not to the White House or any executive agency,

and it seeks testimony solely concerning her prior employment at Ballard Partners, before she

assumed any government office. Ordinarily, only the subpoenaed witness has standing to move to

quash a subpoena issued to a third party, absent a claim of privilege or personal right held by the

moving party. *Id.* The government has asserted no executive privilege, deliberative-process

privilege, or other institutional interest that would give it standing here. If Ms. Wiles believes the

subpoena is unduly burdensome or otherwise improper, it is incumbent upon her—not the

prosecution—to raise those objections. The fact that she has not done so gives the Court ample reason to deny the government's motion.

## II.       Ms. Wiles' Testimony Is Material, Favorable, And Necessary To The Defense.

In the event that the Court finds that the government has standing to litigate Ms. Wiles' subpoena, the motion to quash should be denied. The Sixth Amendment guarantees a defendant the right to compel witnesses "in his favor" to testify, which encompasses evidence that is material and favorable to the defense. Under the standard articulated in *United States v. Valenzuela-Bernal*, a defendant "must at least make some plausible showing of how [the witness's] testimony would have been both material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 859 (1982).

In other words, the defense must explain not only what it expects the witness to say, but also how that testimony would help establish a defense theory or rebut the prosecution's case. The defense easily meets that burden here.

Ms. Wiles' expected testimony is highly relevant. The government's contention that Ms. Wiles is peripheral to the events at issue is belied by the government's own discovery. The government produced to the defense over 400 pages of Ms. Wiles' emails and portions of her calendar from her time at Ballard Partners. That production alone demonstrates that the government viewed Ms. Wiles as sufficiently involved in relevant Ballard Partners activities to warrant extensive disclosure. Having produced that material, the government cannot now credibly argue that her testimony is immaterial or unnecessary.

Nor can the government plausibly maintain that other Ballard Partners witnesses can substitute for Ms. Wiles. The government has identified and intends to rely on testimony from at least one Ballard Partner witness, Brian Ballard, in its own case. If the government may call a Ballard witness to advance its narrative, fundamental fairness and the Sixth Amendment require

that the defense be permitted to call a Ballard witness whose testimony supports the defense theory. The right to compulsory process does not permit the government to curate which Ballard Partners witnesses may testify based on whether their testimony helps or hurts the prosecution.

Ms. Wiles' testimony is directly material to rebutting the government's core theory that work associated with Raul Gorrin necessarily equated to acting as an agent of the Maduro government. Lobbying disclosure reports filed by Ballard Partners in 2017 list Susan Wiles as a registered lobbyist on behalf of Globovision, a company whose President was Raul Gorrin. Those same disclosures state that Ballard Partners, through Ms. Wiles and others, was lobbying the White House.

Discovery produced by the government further shows that, during this same period, Ballard Partners was actively engaged in efforts to provide Gorrin and Globovision with access to senior U.S. officials, including communications and coordination relating to meetings involving the Trump Administration and Vice President Pence. Ms. Wiles appears repeatedly in those communications, including emails reflecting her involvement in arranging meetings and responding to inquiries about Globovision's status and ownership.

This evidence makes Ms. Wiles uniquely positioned to testify about the nature, scope, and legitimacy of Ballard Partners' lobbying efforts on behalf of Globovision (and Raul Gorrin). Her testimony will shed critical light on whether those efforts were understood and treated as lawful lobbying for a private media company, rather than covert advocacy on behalf of the Venezuelan government. That testimony goes directly to the defense theory that association with Gorrin does not establish agency for Maduro, and that lawful lobbying channels were openly used during the relevant period.

Ms. Wiles' testimony is also material to a second central issue: the government's allegation that $3.75 million paid to Communications Solutions ("CS") in 2017 was part of a criminal

conspiracy to act as an agent of the Maduro government, and the inclusion of those funds in the government's forfeiture counts.

The defense contends that the CS–Globovision contract was directed toward legitimate business development efforts, including expanding Globovision's distribution on U.S. media platforms such as AT&T, Comcast, DirecTV, and Dish. Discovery produced by the government shows that during the same period, Ms. Wiles was engaged in parallel efforts on behalf of Globovision to pursue relationships with U.S. media companies, including AT&T.

This overlap is critical. Ms. Wiles may corroborate that efforts to expand Globovision's presence on U.S. platforms were genuine commercial initiatives undertaken by multiple actors, including a major U.S. lobbying firm, and not a sham or pretext for political influence on behalf of the Maduro government. Her testimony may further support the defense position that the CS contract and the subsequent repayment to Gorrin were unrelated to the charged conspiracy and instead reflected legitimate business dealings consistent with Globovision's broader U.S. expansion strategy.

Given Ms. Wiles' presence on the Ballard Partners lobbying registration, her direct involvement in communications with U.S. companies and officials, and the volume of discovery reflecting her role, the defense reasonably expects her testimony to address these issues. Excluding her testimony would deprive the jury of critical context necessary to evaluate whether the government's characterization of these transactions is accurate, or whether the evidence instead supports the defense's lawful-business explanation.

This testimony is both material and favorable. It is material because it goes to the heart of the disputed issue in this trial: whether the Defendants were willfully acting as unregistered agents of a foreign government (as the prosecution claims) or whether their conduct was aligned with lawful, registered lobbying activities.

The government argues that Ms. Wiles has "no apparent connection" to the specific FARA violations charged, but this misconstrues the materiality requirement. A witness's testimony need not by itself establish innocence; it is enough that it has a logical connection to a plausible defense and is non-cumulative. Here, Ms. Wiles' connection to the case is both apparent and significant. She dealt with the same key players (Gorrin and Globovision) during the same timeframe as the alleged offense. Far from being tangential, her experiences are directly relevant to rebutting the government's theory that any work involving Gorrin was inherently under the table or for the Venezuelan regime. This is not a fishing expedition—the defense has proffered concrete details of what her testimony will cover and why it matters. In *Washington v. Texas*, the Supreme Court noted that the Compulsory Process Clause is violated when a defendant is arbitrarily barred from obtaining testimony that is "relevant and material" and "vital to the defense." *Washington v. Texas,* 388 U.S. 14, 16 (1967).

That is exactly the nature of Ms. Wiles' testimony here: relevant (it deals with Gorrin and the nature of representation, core issues in dispute), material (it tends to prove the defense's lawful explanation and negate criminal intent), and vital (no other witness can provide this perspective).

Moreover, Ms. Wiles' testimony is not cumulative of other evidence. Ms. Wiles is uniquely positioned to testify about certain high-level communications and coordination that occurred. She was the point person registered to lobby the White House. Thus, she can speak to interactions with White House officials or National Security Council staff that no other witness can fully recount. Brian Ballard may testify in general about the firm's engagement, but he might not have been personally involved in the day-to-day lobbying efforts or specific conversations that Ms. Wiles handled. In *Valenzuela-Bernal*, the Court cautioned that a defendant's showing of materiality should indicate the testimony is not "merely cumulative to the testimony of available witnesses." 458 U.S. 858, 873 (1982). Here, there is no danger of cumulation, Ms. Wiles can offer the firsthand

knowledge she possesses. The absence of her testimony would leave a critical gap in the narrative that the defense is entitled to present.

In sum, the defense has amply demonstrated that Ms. Wiles' testimony meets the "material and favorable" standard. This is precisely the scenario the Compulsory Process Clause contemplates: a defendant seeking to present a witness who can help the jury see the facts in a light favorable to the defense's theory. The Court should therefore reject the government's contention that her testimony would not be material. On the contrary, preventing the jury from hearing Ms. Wiles would deprive Defendants of evidence that could substantially bolster their case. The law entitles the defense to put such evidence before the factfinder, and no valid reason has been shown to deviate from that principle here.

### III.     Ms. Wiles' High-Ranking Position Does Not Immunize Her From Testifying, Especially Given The Demonstrated Need For Her Unique Evidence.

The government next argues that, because Ms. Wiles currently serves as White House Chief of Staff, her subpoena should be quashed due to her high-level position. This argument misstates the law. There is no categorical immunity that shields a sitting government official, even one as prominent as a White House Chief of Staff, from being compelled to testify in a criminal proceeding. To be sure, courts exercise special caution with high-ranking officials, but the law requires only that the party seeking such testimony demonstrates a specific, extraordinary need for it. When that need exists and the testimony is relevant, the official can be called to testify, provided any reasonable accommodation is made. Here, the defense has shown exactly that kind of need. Ms. Wiles' testimony is indispensable to the defense, and no one else can fill her role. Therefore, her government position alone cannot be a bar to enforcing the subpoena.

As a starting point, the notion that high-ranking officials are above the obligation to give evidence has been soundly rejected by the Supreme Court. In *United States v. Nixon*, the Court

held that President Nixon could not quash a subpoena duces tecum for tapes, explaining that "neither the doctrine of separation of powers nor the generalized need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." 418 U.S. 683, 706–07 (1974). The President's broad interest in secrecy had to yield to the "demonstrated, specific need for evidence in a pending criminal trial" and "the fundamental demands of due process of law in the fair administration of criminal justice." *Id.* at 685. In other words, no person, not even the President, is categorically above the law. If the leader of the Executive Branch must comply with a subpoena when the evidence is critical, then a fortiori a Chief of Staff or other senior official must also comply when a comparable showing of need is made.

Likewise, in *Clinton v. Jones*, the Supreme Court rejected the argument that a sitting President is immune from civil litigation while in office. *See* 520 U.S. 681 (1997). The Court recognized that the President is subject to the same laws as other citizens and highlighted that courts have the power to manage litigation in a manner respectful of the President's duties without stopping the proceedings altogether. Notably, the Court observed that federal courts may direct appropriate process even at the President himself, citing *Nixon* as an example. The Court further noted that concerns about burdening a high official "are appropriate matters for [the trial] court to evaluate in its management of the case, and the high respect owed the Presidency is a matter that should inform the conduct of the entire proceeding," but these factors do not warrant an outright bar on judicial process. *Id.* at 683. In short, even the President can be required to participate in legal proceedings, and the remedy for legitimate scheduling and duty-related concerns is judicial case management—not immunity. By extension, a Chief of Staff (who is a senior aide) not a constitutional officer, cannot claim a higher privilege than the President whom she serves. There is simply no rule that she cannot be called to testify if her testimony is material to a criminal case.

To be fair, the government is correct that courts have developed a doctrine to discourage unnecessary or harassing subpoenas directed at high-level government officials. This doctrine, rooted in cases like *United States v. Morgan*, recognizes that high officials have weighty responsibilities and that compelling their testimony in every routine case could impede governmental functions. 313 U.S. 409 (1941). The Eleventh Circuit applied this principle in *In re United States* (Kessler), a case the government presumably relies upon. 985 F.2d 510 (11th Cir. 1993) (per curiam). There, criminal defendants alleging selective prosecution subpoenaed the Commissioner of the FDA (Dr. David Kessler) to testify about why others weren't prosecuted. The Eleventh Circuit issued a writ of mandamus quashing that subpoena, emphasizing that "in order to protect officials from the constant distractions of testifying in lawsuits, court have required that defendants show a special need or situation compelling such testimony." *Id.* at 512 (quoting *Sweeney v. Bond*, 669 F.2d 542, 546 (8th Cir. 1982)). The court noted two crucial factors in quashing Dr. Kessler's subpoena: (1) Alternative sources could provide the information, indeed, other FDA officials with direct knowledge had already testified, making the Commissioner's testimony cumulative and of marginal value; and (2) Dr. Kessler lacked personal involvement in the events at issue: he became Commissioner years after the investigations in question and had no first-hand knowledge of the defendants' case. In those circumstances, the court found no "special need" or "extraordinary circumstances" to justify burdening a high-ranking official, and thus mandamus was granted. *Id.* at 512.

Crucially, the flip side of *In re United States* (Kessler) is that when a high-ranking official does have unique personal knowledge essential to a case, and there are no adequate substitutes, then compelling testimony is permissible (and sometimes necessary). Courts do not extend the high-ranking official doctrine to protect officials from testifying to events they personally witnessed or participated in, especially where failure to obtain that testimony would seriously

prejudice the defense. *See id.* at 513 (recognizing that the doctrine applies absent "extraordinary circumstances" or "special need"). The circumstances here are a textbook example of when a high-ranking official's testimony should be allowed.

First, unlike in *In re United States* (Kessler), Ms. Wiles was directly involved in the relevant events. She is not being asked to testify about agency policies or someone else's decisions.    She will be testifying about her own actions and communications in connection with Globovision's lobbying efforts. Importantly, these actions occurred before she assumed her current high office. She was a private lobbyist at the time. Thus, we are not probing her conduct as Chief of Staff or any sensitive matters of governance. We are asking about factual matters that she personally handled, which happen to bear on the issues at trial. This removes much of the rationale for the high-office doctrine, which is intended to prevent disruption of governmental operations and protect the mental processes behind official decisions. Here, Ms. Wiles' knowledge was acquired in a private capacity. Eliciting her testimony about these matters does not intrude on any deliberative process of the White House.

Second, the defense has demonstrated a "special need" for Ms. Wiles' testimony in that no other witness can provide the same evidence. Here, we cannot get the full story without Ms. Wiles. We have indeed subpoenaed others from Ballard Partners. Brian Ballard and perhaps other firm members can give background, but Ms. Wiles was the one registered to lobby the White House for Globovision and likely the one who spoke to White House personnel or coordinated strategy to assist Gorrin's company. Only Ms. Wiles can testify to the substance of those communications or the understanding between the lobbyists and Gorrin's team. Her perspective is singular. This is the epitome of an extraordinary circumstance justifying the testimony of a high official. By contrast, in *In re United States* (Kessler) the Eleventh Circuit explicitly noted that two other FDA officials had already provided the information the defense wanted, making the Commissioner's testimony

unnecessary. Here, even if Mr. Ballard or others testify, the absence of Ms. Wiles would leave important details unrevealed. We anticipate that the government will portray any contacts with U.S. officials by Gorrin's associates in a sinister light. Ms. Wiles can directly counter that narrative by describing how those contacts were part of legitimate lobbying performed openly. No one else in the Ballard firm had her specific role, so no one else's testimony can substitute for hers.

Third, complying with this subpoena does not pose the kind of threat to government functions that the high-office doctrine guards against. The doctrine is chiefly concerned with preventing senior officials from being constantly dragged into court to explain their decisions, which would be "distracting" and inhibit their ability to govern. But here, there is only one trial, and one official being called for, at most, a few hours of testimony about facts within her knowledge. This is not a situation where numerous cases will open the floodgates to interrogating the Chief of Staff on broad policy matters. It is a single, narrowly tailored inquiry in a criminal case where the Constitution's truth-seeking function is at its zenith. Moreover, the topic of Ms. Wiles' testimony—her lobbying work on behalf of a private client—is outside the scope of her current governmental duties. Thus, her appearance will not set any precedent for officials being called to justify their official conduct. It will merely show that when a high-ranking official happens to possess critical evidence, she, like any citizen, can be called upon to provide it in court. This is fully consistent with *United States v. Nixon* and *Clinton v. Jones*, which make clear that high rank does not equal absolute immunity from subpoenas.

Fourth, it bears emphasizing that the public has an interest in ensuring that trials—especially criminal trials—are decided on all the relevant facts. The credibility and fairness of the judicial process would be undermined if courts reflexively shield officials regardless of the necessity of their testimony. Our judicial system has mechanisms (as discussed in the next section) to accommodate the schedules and responsibilities of officials. What it does not countenance is a

"do not disturb" sign on relevant evidence. Here, the Court's task is to balance the need for Ms. Wiles' evidence against the burdens of compliance. We submit that the balance tips strongly in favor of the defense: the need is great and genuine, and the burden can be minimized (and is certainly not so onerous as to outweigh Defendants' right to a fair trial). In sum, Ms. Wiles' position does not exempt her from the fundamental duty of every person to give testimony when summoned. The defense has shown "extraordinary circumstances" and a "special need" for her testimony, and thus the motion to quash on this basis should be denied.

Finally, the government's position is also fundamentally inconsistent with its own trial strategy. The government has affirmatively represented that it intends to call the Secretary of State, Marco Rubio, as a witness in its case-in-chief. In other words, the government has no objection to coordinating trial testimony from the highest-ranking executive branch officials when it advances the prosecution's narrative but seeks to block defense access to a senior official whose testimony undermines it. The Sixth Amendment does not permit such one-sided invocation of high-ranking official concerns. Compulsory process applies with equal force to both sides, and the government cannot selectively deploy senior officials as witnesses while shielding others from scrutiny.

### IV. The Timing Of The Subpoena And Ms. Wiles' Schedule Do Not Justify Quashing The Subpoena.

The government's final argument appears to be that, even if material and relevant, enforcing the subpoena would be "inappropriate" because of the timing stating that Ms. Wiles was subpoenaed while serving in a top White House role on what may be short notice before trial. This argument is unpersuasive. The defense has acted diligently and in good faith in issuing the subpoena, and any timing or scheduling concerns can be addressed by the Court without depriving the defense of critical evidence. Courts do not quash subpoenas merely due to inconvenience; rather, they expect the parties to cooperate and find solutions. Here, the defense stands ready to

accommodate Ms. Wiles' official obligations. Unless the government can show that compliance would be truly "unreasonable or oppressive"—a high bar under Rule 17—the subpoena should be enforced.

Further, the subpoena to Ms. Wiles was served in a timely fashion, many months before trial. She will not be called until the defense case, most likely in mid-April. The subpoena was issued on December 22, 2025, giving the parties enough time to litigate the issue and the Court enough time to rule on it.

Respectfully, the Court can take measures to minimize any disruption to Ms. Wiles' duties. The defense is willing to: (1) schedule Ms. Wiles' testimony for a specific date certain (and narrow time window) that the Court, the parties, and Ms. Wiles determine works best, even if that means structuring the trial sequence out of normal order; (2) take her testimony after hours if that would mitigate interference with her White House responsibilities; and (3) ensure that her testimony lasts less than one day.

Importantly, "timing" itself is not a recognized ground to quash a subpoena in the criminal context. Rule 17(c)(2) allows quashing of a subpoena that is "unreasonable or oppressive," but courts interpret that to mean undue hardship or irrelevance—not simply that the witness finds it inconvenient or that the subpoena arrives during a busy period. If it were otherwise, any crucial witness could seek to avoid testimony by claiming their schedule is too full. That is not the law. Instead, courts assess whether the party issuing the subpoena has been abusive or dilatory (which we have not), and whether the testimony sought is crucial (which it is). Here, enforcing the subpoena will cause at most a temporary inconvenience to Ms. Wiles, which this Court can mitigate. That inconvenience is greatly outweighed by the need to ensure the jury hears all relevant evidence. As the Supreme Court observed in *Nixon*, the "constitutional need for production of relevant evidence in a criminal proceeding is specific and central to the fair adjudication of a

particular criminal case and the administration of justice" and requires that even significant persons yield to compulsory process when the evidence is important. *United States v. Nixon*, 418 U.S. 683, 713 (1974).

The *Nixon* Court rejected an argument that complying with a subpoena would unduly burden the President's ability to function, noting that absent a specific showing of military or diplomatic secrets, a generalized claim of burden or confidentiality must give way to a specific need for evidence. By analogy, the generalized assertion that Ms. Wiles is very busy with her White House duties cannot overcome Defendants' specific need for her testimony and the fundamental fairness of the trial.

It is also worth noting that Ms. Wiles herself has not moved to quash or asserted any privilege (the motion comes from the government). There is no claim of executive privilege or national security preventing her from testifying, and the topics of her testimony do not involve classified or sensitive state secrets. This further diminishes any justification for quashing the subpoena. The government's concern seems to be more about optics and timing than any legal prejudice. While we appreciate the government's desire not to disrupt the functioning of the Executive Branch, calling one witness for a brief period, with notice and planning, is hardly a crisis. Federal courts have handled far more delicate situations—such as requiring cabinet officials, sitting senators, or governors to testify or be deposed—by arranging schedules rather than canceling the obligation to testify.

For example, in the Fulton County special grand jury investigation recently, Senator Lindsey Graham was compelled to testify despite his position and initial timing objections, with courts finding that the subpoena was justified and could proceed with appropriate limitations. *In re: Subpoena to Non Party Lindsey O. Graham*, No. 1:22 cv 03027 LMM (N.D. Ga. Order Aug. 15, 2022; Sept. 1, 2022). If a sitting U.S. Senator (shielded by the Speech or Debate Clause for

legislative acts) can be made to appear before a grand jury on matters not legislatively privileged, certainly a White House aide can be called to a criminal trial when her testimony is as directly relevant as it is here. The key in Senator Graham's case, as in ours, is that "extraordinary circumstances" existed—the need for his testimony on specific communications—which overrode the general rule against questioning high officials. The courts simply carved out any truly protected matters (e.g., legislative acts) and compelled his appearance. Here, there is no analogous privilege at issue for Ms. Wiles, so there is even less reason to quash. We are simply dealing with scheduling, which as discussed is manageable.

Finally, quashing the subpoena on timing grounds would prejudice the Defendants' substantial rights. We cannot emphasize enough that Ms. Wiles is a critical defense witness. Disallowing her testimony would impair the Defendants' ability to present a complete defense, which raises due process concerns. The remedy for any perceived lateness is not to slam the door on the evidence, but, at most, to grant a reasonable continuance if the government truly needs more time to respond (for instance, if the government claimed surprise, which it cannot credibly do here since Ms. Wiles' role was known to them). The government has been aware of Ballard Partners' involvement all along. Indeed, it presumably interviewed or could have interviewed the same witnesses. There is no unfair surprise, only perhaps an inconvenience that the defense is actually going to present this evidence. That tactical inconvenience to the prosecution is not a valid reason to bar evidence. Our system prefers to resolve cases on their merits, before a fully informed jury. Here, there is nothing arbitrary or improper regarding timing—we simply followed where the evidence led and did so within the pretrial timeframe.

The government's motion leans on cases that are clearly distinguishable. We have already shown how *Valenzuela-Bernal* is a far cry from this scenario. That case dealt with unknown testimony of deported witnesses and required the defendant to at least articulate how the missing

testimony would help. By contrast, here the defense has detailed exactly how Ms. Wiles' testimony will aid the defense, satisfying even the strictest reading of *Valenzuela-Bernal*. If anything, *Valenzuela-Bernal* supports the defense: the Supreme Court there acknowledged that the showing of materiality may be based on "agreed facts" or reasonable inferences about the testimony, and it explicitly did not decide what showing is required to subpoena witnesses within the United States. Certainly, when a witness is available and the defense can proffer their testimony in detail, the bar is met.

The government's invocation of the high-ranking official doctrine is also unavailing for the reasons discussed. *Morgan* involved a court inquiring into a Cabinet Secretary's mental processes in an administrative decision, nothing like the fact testimony sought here. *Kessler* and similar cases (*Simplex Time Recorder Co. v. Sec'y of Labor,* 766 F.2d 575 (D.C. Cir. 1985); *In re Office of Inspector Gen.,* 933 F.2d 276 (5th Cir. 1991); *Sweeney v. Bond*, 669 F.2d 542 (8th Cir. 1982)) all stand for the uncontroversial proposition that you shouldn't bother high officials if you don't really need their testimony. But we really need Ms. Wiles' testimony. Unlike in those cases, we are not seeking to question an official about why they took some official action (which could often be gleaned from documents or lower-level employees). We seek to hear a first-person account of events she witnessed that no document or deputy can relate. And notably, some of those cases recognize exceptions. For instance, *Sweeney* (which *In re United States* (Kessler) cites) allowed that a governor could be made to testify upon a showing of "specific need." *Id.* at 546. We have shown a specific need here. The government has not cited, nor are we aware of, any case where a court quashed a subpoena for a high-ranking official who had personal, material knowledge of the events central to a criminal case. On the contrary, when such situations have arisen, courts have found ways to secure the testimony while mitigating burdens.

Lastly, the government's concern about the "timing" coinciding with Ms. Wiles' service as Chief of Staff seems to hint at an argument that this is politically sensitive or meant to harass. Let us be clear: the purpose of the defense in subpoenaing Ms. Wiles is not political; it is purely to defend our clients against serious charges. We did not choose Ms. Wiles as a witness; the facts did. Gorrin chose to hire Ballard Partners and to have Ms. Wiles on his account. The government chose to allege a broad conspiracy that by implication tars all work with Gorrin as illegal. Given those choices, we must have the opportunity to elicit testimony from the person most able to refute that implication. That it happens to be the current Chief of Staff is a coincidence of timing and her career path. We would pursue this testimony regardless of her current title. There is nothing untoward in ensuring the jury hears from a witness of such importance. Indeed, insulating her from testifying because she is now prominent would be a dangerous precedent. It would allow individuals to avoid legal obligations simply by attaining high office. The courts have rejected that concept time and again, including former presidents Nixon and Clinton. *See e.g.*, *United States v. Nixon,* 418 U.S. 683, 706–07 (1974); *Clinton v. Jones*, 520 U.S. 681 (1997).

## CONCLUSION

In conclusion, the Court should refuse to quash the subpoena to Ms. Wiles. The defense has shown that her testimony is highly material and favorable to core issues in the case, thereby satisfying the *Valenzuela-Bernal* standard. We have distinguished the government's authorities and demonstrated that the so-called high-ranking official doctrine is no bar where, as here, extraordinary circumstances and unique knowledge are present. We have also addressed any logistical concerns by proposing sensible accommodations, following the guidance of cases like *Clinton v. Jones* that stress managing (rather than eliminating) the participation of officials in litigation.

Fundamentally, quashing this subpoena would deprive the jury of evidence that is necessary for a fair determination of the truth. As the Supreme Court admonished in *United States v. Nixon*, a generalized interest in convenience or confidentiality "must yield to the demonstrated, specific need for evidence in a pending criminal trial." *United States v. Nixon*, 418 U.S. 683, 713 (1974). The need for Ms. Wiles' testimony has been demonstrated here. The interests of justice and the Defendants' constitutional rights compel that the subpoena be enforced. The defense therefore respectfully urges the Court to deny the government's motion to quash, and to direct that Ms. Wiles comply with the subpoena, under such scheduling conditions as the Court deems appropriate to balance all interests.

Respectfully submitted,

**MARKUS/MOSS PLLC**
40 N.W. Third Street, PH1
Miami, Florida 33128
Tel: (305) 379-6667
markuslaw.com

By:    /s/ David Oscar Markus
       David Oscar Markus
       dmarkus@markuslaw.com

       /s/ A. Margot Moss
       A. Margot Moss
       mmoss@markuslaw.com
       *for Defendant Nuhfer*

       /s/ Melissa Madrigal
       Melissa Madrigal
       mmadrigal@markuslaw.com
       *for Defendant Nuhfer*