UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 22-20552-CR-DAMIAN/TORRES

UNITED STATES OF AMERICA,

v.

DAVID RIVERA and ESTHER NUHFER,

    *Defendants.*
_____/

### ORDER ON MOTION TO QUASH TRIAL SUBPOENA DIRECTED TO WHITE HOUSE CHIEF OF STAFF SUSAN WILES

This matter is before the Court upon the Government's Motion to Quash Trial Subpoena Directed to White House Chief of Staff Susan Wiles [D.E. 330]. The Defendants oppose the Motion [D.E. 337], to which the Government has replied [D.E. 350]. The Motion is thus ripe for disposition. After review of the briefing, record, and relevant authorities, and for the reasons set forth below, the Government's Motion is **GRANTED**.[1]

---

[1] On February 05, 2026, the Honorable Melissa Damian referred this matter to the Undersigned Magistrate Judge for disposition. [D.E. 335]

## I.   BACKGROUND

On December 22, 2025, counsel for defendants David Rivera and Esther Nuhfer (together, the "Defendants") issued trial subpoenas on White House Chief of Staff Susan Wiles ("Ms. Wiles") and Secretary of State and National Security Adviser Marco Rubio ("Secretary Rubio") [D.E. 330 at 15]. Defendants want Ms. Miles to testify about her prior work as a lobbyist at Ballard Partners, where she lobbied U.S. Government officials on behalf of Venezuelan businessman Raul Gorrin ("Gorrin"), the owner of the media company Globovision, who is also a central figure in the alleged scheme underlying the case. 'D.E. 330 at 16]. Defendants estimate Ms. Wiles will need to set aside 1-2 days for testimony in Miami, plus additional time before the trial. [D.E. 330 at 16].

Neither Ballard Partners nor Ms. Wiles are a party to this case. While Ballard Partners' and the Defendants may have represented Venezuelan individuals and business around the same time period (2017-2018), the superficial connection ends there. Ballard Partners lobbied for Globovision, for which it took the necessary steps to register its employees under the Foreign Agent Registration Act. [D.E. 330 at 16]. These Defendants, however, are accused of illegally lobbying on behalf of the Venezuelan government: they lobbied for that scorned government without

registering even after conducting research on FARA and modeling their contract on guidance found on the Department of Justice ("DOJ") website.[2]  [D.E. 122 at 6-7].

The defense argues that Ms. Wiles's testimony would serve three purposes. It would first provide the full context of Gorrin's activities [D.E. 330 at 16]. When understood in context, this testimony would, second, clear Defendants of guilt-by-association with Gorrin and suspected co-conspirator/government witness Hugo Perera. [D.E. 337 at 5]. Defendants then could show the true reason Gorrin paid the Defendants and Perera $3.75 million: "[T]o expand Globovision onto ATT and Comcast broadcast platforms." [D.E. 330 at 16].[4]  This would show that these payments were for legitimate media lobbying. And, third, Defendants contend that Ms. Wiles, as Globovision's principal point-of-contact at Ballard Partners, is "best positioned" to explain several email exchanges and conversations between Gorrin, Ballard Partners employees, and other third party witnesses that the Government may call as witnesses at trial. *Id.*

Unconvinced, the Government filed the pending motion to quash Ms. Wiles's subpoena. The motion argues that the Defendants' motivation for seeking her

---

[2]  The Defense team acknowledges that Globovision agreed to pay Ballard Partners $50,000 per month to lobby the White House on government and telecommunication issues [D.E. 330 at 16], as indicated in the FARA registration.

[4]  The superseding indictment alleges that the Defendants' illegal activities were memorialized through a contract guaranteeing them $50,000,000 in exchange for lobbying the U.S. government [D.E. 122 7], well surpassing the $3.75 million the Defendants recognize in their response [D.E. 337 at 3].

testimony amounts to little more than a fishing expedition, and that the testimony will be unnecessary and burdensome [D.E. 330 at 5-11].

In response, Defendants counter on three fronts: (1) the Government does not have standing to press the motion because it is not the party ordered to testify and cannot claim harm or prejudice required by Rule 17(c) [D.E. 337 at 1]; (2) Ms. Wiles's testimony is material, helpful and necessary to their defense [D.E. 337 at 2-5]; and (3) Ms. Wiles's status as a government official does not by itself bar her from testifying, especially given her unique knowledge of the supposedly relevant business activities at Ballard Partners.

## II.     ANALYSIS

### A.     *Standing*

Rule 17 of the Federal Rules of Criminal Procedure governs the procedure for issuing trial subpoenas – the primary tool criminal defendants use to exercise their compulsory process rights. But to guard against possible abuse of the subpoena power, the rule allows for motions to quash when "compliance [with the subpoena] would be unreasonable or oppressive." Fed. R. Crim. P. 17(c). The first question presented here is whether the government has standing to seek that relief when the subpoena is directed at a high-ranking political appointee. Defendants say no; the government lacks standing to move on behalf of a private citizen whose testimony is limited to her pre-government work at Ballard Partners between 2017 and 2018. [D.E. 337 at 1]. It does not concern her work as Chief of Staff. The Government thus

has no direct prejudice from her testifying and any personal burden on her is for her to make individually.

The Defendants' position has some support. As a general rule a party lacks standing to challenge a subpoena directed at a third party, unless the movant has a claim of privilege or a proprietary interest in the subpoenaed material or testimony. *See United States v. Rainieri*, 670 F.2d 702, 712 (7th Cir. 1982) ("A party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests."); *United States v. Nachamie*, 91 F. Supp. 2d 552, 558 (S.D.N.Y. 1992) (citations omitted) ("A party generally lacks standing to challenge a subpoena issued to a third party absent a claim of privilege or a proprietary interest in the subpoenaed matter."); *United States v. Tomison,* 969 F. Supp. 587, 596 (E.D. Cal. 1997) (citations omitted) ("A party only has standing to move to quash the subpoena issued to another when the subpoena infringes upon the movant's legitimate interests.").

Yet Ms. Wiles is not just any private witness. She is the White House Chief of Staff for the President of the United States. As such she is the most senior political appointee in the President's Administration. No one in the federal government, save the President himself, bears more administrative responsibility for ensuring that the President will "take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3. President Reagan would agree with that assessment as he described his Chief of Staff as the "secret to our success" by being at his side in the hard work of governing

and managing the demands of his administration.[5] President Obama described his Chief of Staff as being responsible for the day-to-day "grunt work" of the Office.[6] Hence over time the Chief of Staff has become the second most powerful and important person in the operation of the Federal Government.[7]

Indeed, Defendants provide no case law or authority suggesting that the Government, given its substantial interest in the day-to-operations of the Executive Branch, lacks standing to protect its Chief of Staff from a disruptive subpoena. The Government has a very tangible interest whenever any legal proceeding would disrupt Ms. Wiles's work duties. Defendants here would like to take two days of her time to testify in this case. As a result it is quite unpersuasive to claim that the Government has no standing to intervene on her behalf to seek Rule 17 protection.

That point is reenforced by how the subpoenas were served: the Defendants directed them not to Ms. Wiles's private residence or personal attorney, but to the White House Counsel's office at 1600 Pennsylvania Avenue, N.W., Washington, DC 20500. [D.E. 330 at 15]. That choice of address speaks for itself. Whatever the

---

[5] Remarks Announcing the Resignation of James A. Baker III as Secretary of the Treasury and the Nomination of Nicholas F. Brady Delivered at 4:30 p.m. in the Briefing Room at the White House, Aug. 5, 1988 (reprinted by The American Presidency Project, Univ. of Cal. Santa Barbara) (available at
https://www.presidency.ucsb.edu/node/254816).

[6] "Is the White House Chief of Staff Washington's Second Most Powerful Job?" (published Sept. 1, 2025 by GovFacts.org) (available at
https://govfacts.org/government/federal/presidency/eop/is-the-white-house-chief-of-staff-washingtons-second-most-powerful-job/ ).

[7] *Id.*

Defendants say about limiting her testimony to private matters, the subpoena landed on the Government's desk.

And even if this court were to treat Ms. Wiles as a true non-governmental third party, the case law still cuts against the Defendants. Take, for instance, the Seventh Circuit case, *Raineri*, involving a defendant convicted in trial court on several charges involving a facility used for prostitution, making false and material declarations before a grand jury, and threatening a grand jury witness, 670 F.2d at 705. Raineri appealed his conviction in part arguing that the trial court erred in quashing his subpoena to recall an earlier witness. *Id.* at 712. He also argued that the government lacked standing to bring that motion because it was not the party required to comply with the subpoena. *Id.* The Seventh Circuit disagreed because litigating parties have standing to quash a third-party subpoena if it "infringes upon the movant's [(i.e., the Government's)] legitimate interests." *Id.* As the Court put it, the "prosecution's standing rested upon its interest in preventing undue lengthening of the trial, undue harassment of its witnesses, and prejudicial over-emphasis on [the witness]'s credibility." *Id.*; *cf.* Fed. R. Evid. 403 (providing additional avenues to effectuate the judiciary's interest in balancing the harms of lengthy trials against minimally beneficial evidence: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly confusing the issues.").

Those interests are squarely at issue here. The Government's interests map directly onto those recognized in *Raineri*, specifically in preventing undue delay. First, the Government has already partially agreed to the Defendants' requested continuance amidst concerns that the United States' intervention in Venezuela could inflame jury bias in Miami and prejudice the Defendants. [D.E. 313]. Further delay caused by scheduling the White House Chief of Staff at trial serves no one.

Second, as discussed below, Defendants have not shown that Ms. Wiles has a direct connection to this case, thereby further supporting the Government's inherent interest in protecting a sitting Chief of Staff against undue harassment over a case that she has little to do with. Third, relatedly, the thinness of that connection, especially where she is not mentioned once in the superseding indictment, strongly implicates the Government's interest in preventing a senior White House official/peripheral witness from being forced to testify at a Miami trial, and whose appearance would generate far more heat than light.

As a result the Court finds that Ms. Wiles is sufficiently integral to the Government that she is not a true-third party in the sense the Defendants suggest. And even if she were, compelling her travel more than a thousand miles from her post in Washington D.C. to testify would harm the Government's legitimate interests, both institutionally and within the confines of this case. The Government has ample standing to prosecute its motion to quash the subpoena.

### B.     *The Subpoena is not "Material, Favorable and Necessary"*

With that standing question resolved, we turn to the merits of the motion and consider whether the Defendants' subpoena should be enforced or quashed on the Government's motion.

The Sixth Amendment's explicitly grants criminal defendants the right "to have compulsory process for obtaining witnesses in [their] favor." U.S. Const. amend. VI.  That right is substantial, but it is not unlimited. The Compulsory Process Clause's favorability requirement serves as a meaningful check on the Sixth Amendment right. *United States v. Mitrovic*, 890 F.3d 1217,1221 (11th Cir. 2018) (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998)); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (quoting U.S. Const. 6th Amendment) ("Indeed, the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him 'compulsory process for obtaining *witnesses in his favor*.'") (emphasis added).  In short, the defendant cannot compel just any witness; only witnesses whose testimony would actually benefit the defense may be called to trial under Rule 17.

As a result this subpoena power is not a discovery tool. *See Bowman Dairy Co.*, 341 U.S. at 220 (citing *United States v. Maryland & Virginia Milk Producers Ass'n, D.C.,* 9 F.R.D. 509 (D.D.C. 1949) ("Rule 17(c) was not intended to provide an additional means of discovery.  Its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials.")); *see also United States v. Nixon,* 418 U.S. 683, 698 (1974) (citations

omitted) (acknowledging as "certain fundamental characteristics of the subpoena duces tecum in criminal cases . . . it was not intended to provide a means of discovery").

The party issuing the subpoena must thus bear the burden to show that the proposed witness's testimony would provide a "material and plausible benefit to their case." *Valenzuela-Bernal*, 458 U.S. at 867. And it is the Court's responsibility – not the opposing party's – "to ensure that a subpoena secured under Rule 17(c) is for a proper purpose." *Tomison,* 969 F. Supp. at 594 (citing *Bowman Dairy Co.,* 341 U.S. at 221).

While the Supreme Court has twice recognized that even Chief Executives of the federal government do not benefit from absolute immunity from the subpoena process, *Nixon*, 418 U.S. at 683; *Clinton v. Jones*, 520 U.S. 681 (1997), that is not the same as ignoring practical reality. Courts have consistently expressed concern about subpoenas that disrupt government activity. In *In re United States*, 985 F.2d 510, 512 (11th Cir. 1993), our Circuit warned trial judges that enforcing subpoenas for high-level executive branch officials without a compelling need should be "discouraged." And that case involved the Commissioner of the Federal Drug Administration, whose compelled testimony could raise "separation of powers concerns" and "harm the public perception of the FDA." By that measure a subpoena enforced against a sitting Chief of Staff would raise those concerns exponentially.

Much of the relevant case focuses on officials in secretary positions whose appointment rests on the advice and consent of the Senate pursuant to U.S. Const.

Art. II, Section 2. *See, e.g., Simplex Time Recorder Co. v. Sec'y of Lab.*, 766 F.2d 575 (D.C. Cir. 1985) (refusing to grant a party's move to secure testimony from top Department of Labor officials without a showing of specific information the officials might possess that the parties could not attain by other means); *In re Off. of Inspector Gen., R.R. Ret. Bd.*, 933 F.2d 276, 278 (5th Cir. 1991) (advising the district court on remand to apply heightened scrutiny before requiring testimony of top executive department officials). But that functional rationale applies with equal force here: a senior government official "would have to take valuable time away from other tasks in deciding whether to incur the sanction of the court." *In re United States*, 985 F.2d at 512.

Ms. Wiles's responsibilities place her squarely within the concerns that animate this line of authority. Thus, this Court will disregard strictly formalistic principles simply because Ms. Wiles serves *only* as a political appointee rather than a cabinet-level official, as the Defendants suggest. Given her position in the Executive Branch, most important of which is her day-to-day responsibility in the operation of the White House and the management of a President, not to mention *this* President, we must at a minimum apply the same heightened standard. Ms. Wiles wields the responsibilities of a senior government official, and she should be treated as one for purposes of this analysis.

With that standard in mind, we turn to the four arguments Defendants press as to how Ms. Wiles's testimony will be material, favorable, and necessary. The problem, however, is that Defendants rely on a series of minimally speculative

connections. First, the government produced over 400 pages of Ms. Wiles's emails and calendar entries, which the Defendants say renders her testimony necessarily relevant. [D.E. 337 at 2]. Second, those discovery materials reveal that Ms. Wiles played a central role in Ballard Partners' efforts to connect Gorrin and Globovision with senior Trump Administration officials, including the Vice President. This thus gives her special material knowledge that no other witness or document can supply. "Ms. Wiles [is] uniquely positioned to testify about the nature, scope, and legitimacy of Ballard Partners' lobbying efforts on behalf of Globovision (and Raul Gorrin)." [D.E. 330 at 3]. Third, if Ms. Wiles were to testify, the trier of fact would realize that it's *possible* to engage in a legitimate lobbying campaign on behalf of Mr. Gorrin or his enterprises and that he did not always act as Maduro's agent. *Id.* Fourth, her testimony would then to show that the $3.75 million paid to Communications Solutions in 2017 was for legitimate media lobbying and not for the benefit of the Maduro government. [D.E. 337 at 4].

None of these arguments hold up. While the Defendants' arguments identify several points that Ms. Wiles testimony may touch upon, they provide no support in this record for how her testimony might actually help their case other than to show that another entity's prior business dealings with Raul Gorrin did not involve illegal activity. But that is not how materiality works. To begin with the volume of discovery produced does not by itself make a witness material. And the superseding indictment does not allege foul play between Communication Solutions and Globovision. The Government's charge is narrower: that Defendants and their co-conspirators quietly

represented the Venezuelan government and received funds from Venezuelan government subsidiaries in return. To be clear, no one disputes that Ballard Partners registered under FARA and dealt with Gorrin openly. Defendants do not need Ms. Wiles to make that uncontroverted point. [D.E. 350 at 12-42]. But the fact that Mr. Gorrin employed Ballard Partners, a legitimate lobbying firm, does not make his dealings with the Defendants legitimate. More importantly the fact he dealt with Ms. Wiles on matters unrelated to the Defendants does not make her testimony material to the defense of the charges against these Defendants.

Rather than basing their testimony on a material connection to the facts leading to the charges against which *they* defend, Defendants generally advance the idea that the jury will become confused about the core issues in their case. This would possibly lead to their conviction based on guilt-by-association: because they had dealings with shady characters, such as Raul Gorrin, they must have broken the law without any actual proof that a crime was committed. [D.E. 337 at 3-5, 10, 16]. That is a legitimate trial concern but not one that is a basis for a Rule 17 subpoena of Ms. Wiles.

Indeed the Defendants are not without recourse. The rules of evidence already provide tools to guard against jury confusion. *See, e.g.,* Fed. R. Evid. 410 (requiring that evidence must be material and determinative); Fed. R. Evid. 611 (limiting cross examination to relevant matters). Plus, the most valuable tool in this regard is Defendants' right to have a proper jury instruction on how the governing laws that apply in the case should be applied to only the facts in evidence. The Court will

instruct the jury that it should not reach its findings by sympathy, animosity, bias, or prejudice, for or against anyone – especially including people who serve as lobbyists or who have clients from all walks of life. These due process and statutory rights provide a far more direct safeguard against a guilt-by-association conviction. *See* Fed. R. Crim. Pro. 30(a) ("Any party may request in writing that the court instruct the jury on the law as specified in the request. The request must be made at the close of the evidence or at any earlier time that the court reasonably sets. When the request is made, the requesting party must furnish a copy to every other party.").

What Defendants cannot do, however, is parade Ms. Wiles to the jury under the guise of Rule 17 and allow her to serve as a quasi-expert witness who can explain that lobbyists at places like Ballard Partners are not really all bad and do not engage in wrongful conduct just because some of their clients are less than desirable. That is not a proper purpose for a trial subpoena of a third party witness, especially one who is not alleged to have interacted with Defendants themselves during the relevant period and who now works in the office adjacent to the President. Given these circumstances, the Court cannot find that Defendants have met their burden of showing that her proposed testimony is essential to their defense in this case.

The Defendants' response ultimately fails to meet the relevancy and necessity thresholds they must demonstrate for the Court to enforce this subpoena. And they have not done so under the standard that would apply to a private witness as well as under the heightened standard that applies here. As one court put it, conclusory allegations of relevance and admissibility are not sufficient because "[s]pecificity is

the hurdle on which many subpoena requests stumble. . . . It also serves to prevent the subpoena from being converted into a license for what the Supreme Court . . . decried as a 'fishing expedition.'" *United States v. Jackson*, 155 F.R.D. 664, 67 (D. Kan. 1994) (citing *United States v. Crosland*, 821 F. Supp. 1123, 1129 (E.D. Va. 1993)).

Defendants' effort here fails for similar reasons. They cannot show that Ms. Wiles testimony would be relevant, material or vital to their defense of these factual and legal allegations. As Judge Hoeveler found in a different high-profile case, that burden is not met simply because a defendant hopes that subpoenaed evidence will turn up something useful. "If the moving party cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up, this is a sure sign that the subpoena is being misused." *United States v. Noriega*, 764 F. Supp. 1480, 1493 (S.D. Fla. 1991). We are enforcing the same principle here by finding that the proffer supporting this subpoena failed to articulate a plausible likelihood of favorability. And quashing this subpoena would not interfere with Defendants' Sixth Amendment rights. It instead enforces them properly.

### C. *Fundamental Fairness is not Infringed*

Finally, the defense throws in one additional argument supporting the subpoena that is based on symmetry. The government intends to call witnesses from Ballard Partners, specifically name partner Brian Ballard. Fair is fair, Defendants say, so the defense should also get to call its own Ballard Partners witness. [D.E. 337

at 3]. The Court need not spill too much ink on this claim because it does not merit it. The symmetry theory ultimately proves too much. Rule 17 subpoenas are not designed to simply "balance the playing field" in such a haphazard manner. Defendants are free to subpoena Ballard Partners witnesses who have personal knowledge of their dealings during the relevant time period. What they cannot do is conscript this particular ex-Ballard partner, the White House Chief of Staff, to serve in that role simply because she once worked there. The relevant question is whether her testimony would be material and favorable to the defense. Based on the record Defendants submitted, it would not be. Ms. Wiles has little relevant or admissible factual testimony to give.

Similarly, Defendants cannot use Ms. Wiles as their quasi-expert because she was a former lobbyist herself or because she had unrelated dealings with some of the same players in this case. A Rule 17 subpoena is not designed to facilitate such an effort. And that is particularly true with respect to a subpoena for an out-of-district witness who happens to be the Chief of Staff to the President.

### III.   CONCLUSION

For the foregoing reasons, the motion to quash the subpoena served upon Susan Wiles is **GRANTED**. The subpoena is Quashed.

**DONE and ORDERED** in Chambers at Miami, Florida this 19th day of February, 2026.

_____
EDWIN G. TORRES
United States Magistrate Judge