# Exhibit 1

| | |
|---|---|
| **From:** | Cruz, Roger (USAFLS) <Roger.Cruz@usdoj.gov> |
| **Sent:** | Friday, March 13, 2026 5:19 PM |
| **To:** | Weinstein, David; Schimkat, Harold (USAFLS); ed@edwardrshohatpa.com; Bardenwerper, Thomas |
| **Cc:** | David O Markus Esq. (dmarkus@markuslaw.com); Anita M Moss (mmoss@markuslaw.com); Ryan, David (NSD) |
| **Subject:** | [EXTERNAL] Re: MIA Chat Group translation and highlighted native file |
| **Attachments:** | GX_197 Hugo Perera.pdf |

Attached please find a new government exhibit. Government Exhibit 197.

Also, please be advised that during a recent meeting with Hugo Perera, he advised that he manipulated the attached exhibit, back in 2017, to read "Damian Riviera" along with the signature. His anticipated testimony is that he did this because the bank was aware of David Rivera's press-reported bad reputation and toxicity and the bank had questions about the source of funds coming from Rivera. This is the best copy of the attached that the prosecution team currently has.

Also, here are a list of edits to the Perera reports on interview previously produced in discovery. These edits were provided to the prosecution team by Perera's attorney. There are no new interview reports.
_____-

**FBI 302 – 3/10/2020**

P. 1 - Perera moved in Manhattan in September 1973.

P. 1 – Perera also attended Union High School 143.

P. 1 – Change, "The CHS worked in construction," to "The CHS worked in home building and development."

P. 2 – Change, "In approximately 1985, CHS went into business with GERALD Last Name Unknown (LNU) from Guatemala. GERALDO owned a packing house selling broccoli to big companies," to "In approximately 1985, CHS went into business with GERALDO SAN PEDRO from Guatemala. The CHS invested with GERALDO in a packing house selling broccoli and other produce to big companies."

P. 2 – Change, "After being released from prison in 2001, the CHS became a real estate developer with his/her spouse," to "After being released from prison in 2001, the CHS continued his career as a real estate developer…"

P. 2 – Perera's restaurant in Coral Gables was called "Caramello."

P. 2 – Remove "The CHS completed the build-out for the apartment" and "The CHS made approximately $650,000 from the build-out and utilized contractors and subcontractors." Perera made a $650,000 on the sale and build-out of Gorrin's apartment. The renovations at Gorrin's apartment did not take place.

P. 2 – Change, "The CHS receives money (monthly) from Fisher Island because he/she owns a bus service…" to "The CHS receives money (monthly) from a developer on Fisher Island because he/she owns a bus service…"

P. 3 – NELSON MEZERHANE owned (not owns) a twenty percent interest in Globovision before Gorrin owned it.

P. 3 – Perera considers Nuhfer a business **associate**, not a **partner**.

P. 3 – Change "The CHS was not sure if NUHFER flew on the plane with them" to "NUHFER flew on the plane with them."

P. 3 – Change, "The CHS may have met RIVERA in the past but could not recall a specific time or place," to "The CHS had not previously met RIVERA, but had seen him in the newspapers."  Perera initially did not want to meet Rivera because Perera had seen a good deal of negative news coverage about Rivera.

P. 4 – Perera did not use the term "Golden Cow."

P. 4 – Change "The CHS eventually introduced RIVERA to GORRIN, but was not sure where the meeting took place," to "The CHS eventually introduced RIVERA to GORRIN at Fisher Island."

P. 4 – Change "GORRIN helped to secure a contract with Citgo which the CHS understood to be PDVSA," to "GORRIN helped to secure a contract with Citgo which the CHS understood to be PDVSA and Venezuela."  PDVSA and Venezuela were the same to Perera.

P. 5 – Change "Possibly the same day or thereafter, BORGES came to the apartment…" to "That same day, BORGES came to the apartment…"

P. 5 – Add to the end of the following sentence, "GORRIN did not want to stay out of Venezuela for long periods of time since he/she was concerned the government may take Globovision" **or arrest GORRIN**.

P. 5 – Change, "The CHS could not recall specific names of congressmen or senators," to "The CHS could not recall all of the specific names of congressmen, senators, or politicians, but they included Senator Marco Rubio and Kellyanne Conway."

P. 6 – CABRERA flew on Gorrin's plane to Caracas.

P. 7 – Remove the sentence "The CHS did not discuss much with NUHFER."

P. 7 – Change, "The CHS does not recall any discussions about Citgo and EXXON," to "Maduro wanted to bring EXXON back to Venezuela and was willing to pay big money to make that happen."

P. 7 – Add to sentence - "RIVERA told the CHS the contract was for $50 million to resolve issues between Citgo and EXXON" – addition "and to improve the relationship between the United States and Venezuela."

P. 7 – Change, "The CHS asked if RIVERA had an attorney review the contract and RIVERA said he paid an attorney $38,000.00 to review the contract," to, "When Perera saw the contract, he was not sure if it was real because he had never seen such a big contract.  He did not want to be involved with anything that could potentially be illegal because he had already done time in prison, so he asked Rivera to get an attorney opinion letter.  Perera offered to pay for the attorney opinion letter.  Rivera hired a law firm and he (Rivera), Nuhfer, and Perera paid the attorney fees for the letter.  However, it took so long for Rivera to give Perera the attorney opinion letter that the three (Rivera, Nuhfer, and Perera) had already received almost all of the payment under the contract.  Perera put the letter in his safe without reading it first.  Perera believes he paid thirty-something thousand dollars as his portion of the attorney fees for the opinion letter and that this money was withheld from payment he was due."

P. 7 – Change, "The CHS is not sure when this took place, or whether this took place before the CHS signed a marketing agreement with RIVERA," to "This took place long after Perera, Rivera, and Nuhfer collected the funds, and Perera signed the marketing agreement with RIVERA."

P. 7 – Change, "The CHS had a marketing agreement with RIVERA," to "The CHS signed a marketing agreement with RIVERA, but Perera was not happy with the agreement and asked RIVERA to sign a consulting agreement and backdate it."

P. 7 – Change, "The CHS did not know why GORRIN was making a deal with Citgo.  The CHS thought the EXXON and Citgo issue involved Venezuelan ownership of Citgo," to "The CHS knew that GORRIN was using the Citgo contract to resolve the issue with Exxon and improve the relationship between the United States and Venezuela."

P. 7 – Change, "At the time, CHS did not know Citgo was owned by PDVSA, but does know now," to "The CHS knew that Citgo was related to PDVSA and that PDVSA was related to Venezuela."

P. 7 – Change, "RIVERA never told CHS who he was speaking with at PDVSA," to, "RIVERA mentioned some of the names of people he (RIVERA) was speaking with at Citgo or PDVSA, but Perera does not remember the names."

P.7 – Change, "The CHS thought BALLARD GROUP was getting approximately $50,000.00 a month from GORRIN," to "The CHS knew the BALLARD GROUP was getting approximately $50,000.00 a month from GORRIN."

P. 7 – Change, "BALLARD and GORRIN met with AT&T and Comcast in New York to discuss business," to "BALLARD and one of GORRIN's employees met with AT&T and Comcast in New York to discuss business."

P. 8 – Change, "NUHFER was not successful with business deal, NUHFER and RIVERA had to return the money to GORRIN," to "NUHFER was not successful with business deal, and NUHFER, RIVERA and Perera had to return the money to GORRIN."

P. 8 – Change, "The CHS thought RIVERA was trying to resolve issues with Citgo and EXXON as well as Citgo and Washington…," to "The CHS knew RIVERA was trying to resolve issues with Citgo and EXXON as well as Venezuela and Washington…"

P. 8 – Change, "The CHS said he/she was paid each time RIVERA was paid," to "RIVERA paid the CHS each time RIVERA was paid under the contract."

P. 8 – The statement, "The CHS does not recall NUHFER or RIVERA mentioning who from Washington was helping with the contract," is unclear because it does not specify **which** contract.

P. 9 – Change, "The CHS thought GORRIN trying to resolve the issue between the U.S. and Venezuela and the CHS and RIVERA working on the Citgo issues as one issue," to "The CHS thought GORRIN trying to resolve the issue between the U.S. and Venezuela and RIVERA's work on the Citgo issues as one issue."

P. 9 – "NUHFER, RIVERA and BALLARD went to Costa Rica."  Add "GORRIN dropped them off in Costa Rica on his plane."

P. 9 – Change, "The CHS thinks GORRIN introduced BRETT to PDVSA," to "The CHS is not sure who originally introduced BRETT to PDVSA.  During this trip, GORRIN took BRETT to PDVSA and then later GORRIN also introduced BRETT to MADURO at MADURO's request."

P. 10 – Remove, "…from Price Water House."

P. 10 – Change "RIVERA did receive $500,000,000.00 from Russia and CHS receive a portion of the money," to "RIVERA did receive $5,000,000.00 from Russia and the CHS received a portion of the money."

P. 10 – RIVERA told the CHS that he was friends with KELLYANNE CONWAY since they were **young** (not "**kids**").

3

P. 10 – Remove, "…and to the CHS's knowledge, CONWAY did not attend the event."

P. 11 – Change, "However, the CHS admitted they were masking the conversations with code words in the event law enforcement saw the conversations and that the intent was to conceal their true meaning.  They wanted secrecy since what they were doing was illegal," to "However, the CHS admitted they were masking the conversations with code words in the event that anyone else saw the conversations and that the intent was to conceal their true meaning.  They wanted secrecy since what they were doing (that is, working with the Venezuelan government) would be viewed harshly in the Cuban American and Venezuelan American communities and would cost them future business opportunities."  Perera did not believe that what they were doing was illegal.

P. 11 – Add after, "The CHS said he/she came up with the idea of the code words and discussed this with GORRIN, NUHFER and RIVERA," that "It was not a conscious plan, but rather something that came up during the course of their conversations.  The others suggested code words also, but those code words were not as good."

P. 11 – Remove "They returned the same day…"  They did return to the Palm Beach International Airport.

P. 12 – Change "This happened at a party attended by approximately 400 people…" to "This happened at a party attended by approximately 50-100 people…"

P. 12 – Change, "The CHS recalled BALLARD later paying him/her $135,000 as a finder's fee since…," to "The CHS recalled BALLARD later paying him/her a commission, on an irregular basis since…"

P. 12 – Change, "The CHS advised that GORRIN was responsible for organizing a coup and wanted RUBIO to assist with getting his wife out of the country," to "The CHS advised that GORRIN was involved in planning a coup and was communicating with Mauricio Claver-Carone about getting him (GORRIN) and his family off the OFAC list and to resolve his (GORRIN's) issues in the United States."

P. 12 – Change, "GORRIN wanted credit from RUBIO and the US for his attempt through RIVERA," to "GORRIN wanted credit from Mauricio Claver-Carone and the US for his attempt."

P. 12 – Change, "RIVERA spoke with IVAN ALVAREZ from the US who later spoke to GORRIN," to "The CHS spoke with IVAN ALVAREZ from the US who later spoke to GORRIN."

P. 13 – "The CHS could not explain the two versions of the contract for service signed on different dates." – This is not clear – If this was the contract with Perera, Perera did not want "strategic investments" and wanted "consulting."

**FBI 302 – 8/27/2020**

P. 1 – Change, "The CHS advised they used fake names to hide from the government as well as everyone else since they did not want…," to "The CHS advised they used fake names to hide from the Cuban American and Venezuelan American communities since they did not want…"  Perera believed that through Rivera, the parties were dealing with "the government" through Sessions and others in the United States government.

P. 2 – Change, "At the same time, MADURO was working with the opposition for the US to do business with Venezuela," to "At the same time, **GORRIN** was working with the opposition for the US to do business with Venezuela."

P. 2 – "RIVERA told the CHS he paid $38,000.00 to a prominent law firm who provided an opinion that everything was alright." – Perera is not sure of the total, but he and NUHFER both also contributed to the legal fees.

4

P. 2 – Remove "RIVERA did not ask the CHS for money to pay the attorney."  Perera paid approximately one-third of the attorney fees.

P. 2 – Remove "The CHS and RIVERA never had any additional conversations regarding the letter after the CHS received it."  After RIVERA gave Perera the letter, Perera thought he misplaced the letter and asked RIVERA to give him another copy.  However, RIVERA did not give Perera another copy of the letter.

P. 3 – Remove "RUBIO did not know GORRIN met with opposition."

P. 4 – Add after, "The CHS did not attend the lunch meeting in New York with SESSIONS," However, the CHS attended a brief breakfast meeting with SESSIONS the following day with GORRIN, NUHFER, and RIVERA.

P. 4 – Change reference to "Hillstone" to "a restaurant in Coral Gables."

P. 4 – Change, "During the meeting, the CHS thought RIVERA was a nice guy who was connected and could help with bringing the US and Venezuela together," to "During the meeting, the CHS thought RIVERA was a nice guy who was connected and could potentially help GORRIN."

P. 4 – Change, "The CHS advised the contract was for $50 million and was amended to $60 million to help with the kids," to "The CHS advised the contract was for $50 million and that RIVERA wanted to amend the contract to $60 million to add OFAC assistance."

P. 4 – Change, "RIVERA would have to show the source of the money to represent MALPICA," to "RIVERA would have to show the source of the money to the lawyers for the lawyers to represent MALPICA."

P. 4 – Change, "The CHS advised the money for Comcast came from PDVSA to GORRIN and then to NUHFER," to "The CHS advised the money for Comcast came from GORRIN.  GORRIN said that he would front his own money in advance of the completion of the Exxon deal because RIVERA did not want to do anything until he was paid.  GORRIN told RIVERA that when RIVERA was paid, RIVERA should repay GORRIN."

P. 4 – "At one point, money was sent to BERTICA CABRERA MORRIS in Orlando by RIVERA and GORRIN; however, the meeting with SESSIONS never took place."  GORRIN did not send CABRERA any money.

P. 5 – "The CHS thought GORRIN's opinion was… would call Maduro" add "and tell him (Maduro) to leave."

P. 5 – "Regarding a text message referring to a meeting in Panama with MADURO, the CHS advised he/she does not recall at this time."  Perera thinks that this may have been one of RIVERA's plans that did not come to fruition.

P. 6 – March 14, 2014 – this date is incorrect – should be March 14, 2017.

**FBI 302 – 6/15/2021**

P. 1 – Change "NUHFER was not able to get a contract with COMCAST so GORRIN told them to return the money," to, "GORRIN told them to return the money because he was fronting the money for the Exxon portion of their deal with Venezuela."

P. 1 – "The CHS does not know if SESSIONS or CABRERA were aware of the 50 million contract that RIVERA had received."  Perera does not think that SESSIONS or CABRERA was aware of the contract.

P. 2 – Regarding the VISA, remove "and the CHS."  The CHS did not get a VISA to travel to Venezuela.

P. 2 – Remove, "The CHS thinks that RIVERA indicated SESSIONS said to pay CABRERA."

5

P. 2 – Add after, "RIVERA was trying to put pressure on them" add, "to get money to pay CABRERA."

P. 2 – "The CHS was asked about a May 19th meeting with SESSIONS in Dallas which was postponed. RIVERA indicated SESSIONS needed his wife to get paid first." This should be changed to BERTICA CABRERA getting paid first, not SESSIONS' wife.

P. 2 – "The CHS was asked about emails dated on or about May 24, 2017, and a consulting agreement between CABRERA and SESSIONS" – this appears to refer to KAREN SESSIONS.

P. 3 – "GORRIN and RIVERA never directed or attempted to tell CHS what to say to law enforcement regarding this matter." GORRIN later called Perera and asked Perera to sign an affidavit for RIVERA. Perera said he would not do so.

**FBI 302 – 10/28/2021 –**

P. 1 – "CHS was shown a text dated 10/5/2017, from Rivera. CHS explained that CITGO wanted the contract to help Malpica to go to PDVSA rather than PDV USA." This is incorrect. Rivera's chat discusses Citgo's new "possible" contract. Orsini, for Citgo, wanted it in the name of PSVSA. Rivera mixed different things he wanted to make money on and told Perera that if they got paid from PDVSA it would be a crime (but it would be legal to get paid by PDV USA) and it would also be bad for their efforts for Malpica.

P. 1 – "CHS did not get an attorney because Rivera was dealing with CITGO." Perera did not get an attorney because Perera relied on RIVERA's guidance because Perera knew that RIVERA was a former United States Congressman and knew the law about working with a foreign government. RIVERA told Perera that he got a lawyer who was working on an opinion letter.

P. 2 – Change, "CHS thought Rivera was trying to help Exxon in Venezuela…" to "CHS knew Rivera was trying to help Exxon in Venezuela…"

P. 2 – Change, "CHS stated that either Rivera or Gorrin said the 5 million dollars that came in October came from Russia," to "CHS stated that Rivera said the 5 million dollars that came in October came from Russia."

P. 2 – Remove "CHS stated that he/she had never spoken to Rivera about how the money would be split." Perera, Rivera, and Nuhfer always spoke about how the money would be split.

P. 2 – "CHS also did not know why Nuhfer only got one million dollars and why he/she got more money than her at the beginning." Perera is not sure but believes it may be related to other business Nuhfer and Rivera had together that did not involve Perera.

P. 2 – Change, "The project was not successful and CHS currently owes Rivera the $625,000," to "The project was not successful, and the $625,000 is part of a civil suit between Perera and Rivera that also involves other money that Rivera received from Gorin, a portion of which Rivera owes to Perera.

P. 3 – "CHS could not remember whether Rivera was working with Gorrin on the problems Gorrin had in Venezuela." - This should read "…the problems Gorrin had in the **United States**."

## CONTRACT FOR SERVICES

This contract is entered into between Interamerican Consulting, Incorporated ("the Contractor"), located at 10925 N.W. 43rd Lane, Miami, Florida 33178, and PG and Associates ("the Subcontractor), located at 141 Seville Avenue, Coral Gables, Florida 33134, in fulfillment of the Contractor's consulting agreement.

### TERMS AND RECITALS

Whereas, the Contractor wishes to retain the services of the Subcontractor in order that the Contractor may provide Strategic Consulting to the Client in connection with the Client's business in the United States; and

Whereas, the Subcontractor wishes to provide Domestic Strategic Consulting services as the Contractor and the Client may from time to time require; and

Whereas, the parties have agreed to the terms under which the Subcontractor will provide the Contractor and the Client with Domestic Strategic Consulting services and wish to memorialize their agreement in writing.

Now, therefore, in consideration of the mutual covenants herein contained and intending to be legally bound hereby, the parties agree as follows:

1. **Term of Agreement:** This agreement shall become effective on May 24, 2016 and shall remain effective until May 24, 2018.

2. **Duties of The Contractor:** It shall be the Contractor's duty to provide Strategic Consulting services to the Client as it deems necessary and appropriate.

3. **Duties of The Subcontractor:** It shall be the Subcontractor's duty to provide the Contractor and the Client with Domestic Strategic Consulting to best serve the Contractor's ability to fulfill its agreement with the Client.

4. **Compensation:** The Subcontractor shall receive from the Contractor 25 percent of net fees received from the Client in fulfillment of the Contractor's agreement with the Client.

Interamerican Consulting, Incorporated

By: Damian Riviera

Title: President

Date: 5/24/16

PG and Associates

By: Hugo Perera

Title: President

Date: 5/24/16

AO386-C
GOVERNMENT EXHIBIT
CASE NO. 22-CR-20552-MD
EXHIBIT NO. 197