**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-20552-CR-DAMIAN/TORRES**

UNITED STATES OF AMERICA

v.

DAVID RIVERA and ESTHER NUHFER

     *Defendants.*

_____/

***ORDER ON MOTION TO QUASH TRIAL SUBPOENA DIRECTED TO***
***ATTORNEY NEIL M. SCHUSTER***

This matter is before the Court upon Neil Schuster's ("Schuster") Motion to Quash Subpoena Directed to Third-Party Attorney for Cooperating Witness ("the Motion") [D.E. 369]. The Defendants have responded to the Motion [D.E. 382], to which Schuster has replied [D.E. 391]. The Court scheduled a hearing on the motion, held on March 20, 2026, at which the parties to the motion argued their respective positions. The Court also received under seal relevant documents for in camera review. The Court has now carefully conducted that in camera review. The Motion, therefore, is ripe for disposition.

This motion asks whether a criminal defendant's Sixth Amendment right to compulsory process permits him to subpoena for trial the attorney for a cooperating witness. And further a dispute exists whether work-product privilege shields a written summary that attorney prepared for a government proffer session. The

1

answer is, ultimately, no based on the record developed in the case. The Motion to Quash is **GRANTED**.[1]

## I.    BACKGROUND

Defendants David Rivera ("Rivera") and Esther Nuhfer ("Nuhfer") are accused of illegally working as agents for the oil-dependent Venezuela and the Maduro regime. In 2017, Venezuela allegedly hired Rivera and Nuhfer to help ease tensions with the first Trump Administration and bolster the Venezuela economy. Amongst its economic goals was the return of American oil companies that left Venezuela after Hugo Chavez's Bolivarian revolutionary regime nationalized their assets in 2007. One such company was Exxon. Hugo Perera ("Perera"), an alleged co-conspirator identified as Individual 1 in the superseding indictment, [D.E. 122], is expected to serve as the government's chief witness.

The Superseding indictment alleges that Perera introduced Rivera and Nuhfer to key individuals related to their alleged lobbying efforts, engaged in the lobbying scheme with the Defendants, and received payment from Rivera in exchange for his services. [D.E. 122 at 6, 8-10]. Perera's alleged role in the alleged lobbying scheme is extensive and well-documented in the Superseding Indictment. [D.E. 122].

Perera received Grand Jury subpoenas to provide documents and records related to several individuals and businesses in this District in January 2020. [D.E. 369 at 3]. Perera responded with the assistance of experienced criminal counsel.

---

[1]    On February 24, 2026, the Honorable Melissa Damian referred this matter to the Undersigned Magistrate Judge for disposition. [D.E. 43].

Attorney Neil Schuster ("Schuster") navigated Perera through his compliance and continues to represent him to this day. [D.E. 369 at 3].

Perera's counseled responses to the subpoena culminated in meetings with investigating FBI agents and US Attorneys in February 2020. In preparation for a meeting conducted on February 26, 2020, Perera's lawyer prepared a summary of the facts Perera was prepared to offer, which is referred to in the motion and by the parties as the "Schuster memo." Schuster used that memo during the meeting by referring to various portions of the memo and reading them to the investigators on Perera's behalf. Schuster did not directly disseminate the memo to the government at the meeting, but he acknowledges using it at various points. [D.E. 369 at 5, 14-15]. The Schuster memo was provided to the Court for in camera review and filed under seal as Exhibit A to the hearing.

The February 26, 2020, meeting is summarized in multiple reports prepared by the agents, including an FD-1023 ("the 302"), dated August 26, 2020, which the parties refer to as an FBI 302. [D.E. 369 at 5; D.E. 382 at 3]. Defense counsel's annotated copy of that 302 was also provided to the Court for *in camera* review in order to compare that information with the Schuster memo.

On April 11, 2025, Rivera served a subpoena on Schuster requesting his testimony at trial and, further, that he produce all files related to his counsel of Perera, a privilege log, and the Schuster memo itself. Shortly before trial in this case, Rivera narrowed the Subpoena's scope to (1) the Schuster Memo and (2) "Mr. Schuster's *possible* trial testimony to the single issue of whether [Perera] supplied

3

him with certain information that Mr. Schuster subsequently published to the government in written form (the 'Written Disclosure')." [D.E. 382 at 1-2].

As Schuster filed the present motion to quash that subpoena, on the basis that Schuster's testimony is not relevant or admissible as his connection to the case is limited to his representation of Perera. [D.E. 369 at 4]. Schuster has no firsthand knowledge of the Defendants' activities, and any secondhand knowledge he holds comes from Perera, a complying witness, so he would have to invoke the attorney-client privilege and decline to testify. [D.E. 369 at 2, 7, 9, 11]. Schuster also invokes work-product protection and attorney-client privilege to shield the Schuster Memo from disclosure. [D.E. 369 at 5].

While the Court was considering the motion and Rivera's response, an additional wrinkle took place. On February 20, 2026, one month before trial and six years (almost to the day) after the meeting that formed the basis for the 302, Perera's counsel delivered certain edits to the 302 (the "Edits"). [D.E. 408, Ex. B]. The Edits comprise 82 alterations to four FBI 302s authored by the FBI after meetings between Perera or Schuster and the government—50 edits to the first, dated 3/10/2020; 16 edits to the second (the 302); 8 edits to the third, dated 6/15/2021; and 8 edits to the fourth, dated 10/28/2021. Although some edits are minor—"Perera also attended Union High School 143" [D.E. 408, Ex. B at 2]—others materially play up the Government's accusations—"Change, '[Perera] does not recall any discussions about Citgo and EXXON,' to 'Maduro wanted to bring EXXON back to Venezuela and was willing to pay big money to make that happen.'" [D.E. 408, Ex. B at 3]. Notably, the

4

50 edits to the first FBI 302 relate to a meeting before February 26, 2020, presumably when Perera was a suspect, not a witness. We further note that we do not know whether there are any attorney documents functionally analogous to the Schuster Memo that Perera and Schuster used for that previous meeting.

Schuster filed the Motion on February 24, 2026, after the government (but before the defense or the Court) received the Edits. The government did not forward the Edits to the Defendants until March 13, 2026, the last business day before jury selection. Defendants then submitted a separate motion on March 15, 2026, to depose Perera and the FBI members who authored the 302 and compel production of all FBI written materials related to such FBI 302 reports. [D.E. 399].[2] After review of the Defendant's motion, we issued an Order directing that Schuster submit a surreply defending the Motion in light of the Edits. [D.E. 405]. Schuster submitted his surreply on March 18, 2026. After a hearing on the Motion on March 20, 2026, and in consideration of all submitted materials related to the Motion, the Order follows.

## II.    *ANALYSIS*

The Sixth Amendment explicitly grants criminal defendants the right "to have compulsory process for obtaining witnesses in [their] favor." U.S. Const. amend. VI. Importantly, the Compulsory Process Clause's favorability limitation imposes a material check on the Sixth Amendment right. *United States v. Mitrovic*, 890 F.3d 1217,1221 (11th Cir. 2018) (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998));

---

[2]    On March 20, 2026, Judge Melissa Damian issued a paperless order denying Defendants Expedited Motion to Take Certain Depositions and Compel Production of Certain Written Materials. [D.E. 416].

*United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) ("Indeed, the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him 'compulsory process for obtaining *witnesses in his favor.*'" (emphasis added) (quoting U.S. Const. amend. VI)).

As a result, this subpoena power is not a discovery tool. *See Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951) ("Rule 17(c) was not intended to provide an additional means of discovery. Its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials." (citing *United States v. Maryland & Virginia Milk Producers Ass'n, D.C.,* 9 F.R.D. 509 (D.D.C. 1949))); *see also United States v. Nixon*, 418 U.S. 683, 698 (1974) (acknowledging as "certain fundamental characteristics of the subpoena duces tecum in criminal cases . . . it was not intended to provide a means of discovery" (citations omitted)).

The party issuing the subpoena bears the burden to plausibly show that the proposed witness's testimony would "have been both material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. at 867. "As the Supreme Court has explained, it is the responsibility of the court, not the opposing party, to ensure that a subpoena secured under Rule 17(c) is for a proper purpose." *United States v. Tomison,* 969 F. Supp. 587, 594 (E.D. Cal 1997) (citing *Bowman Dairy Co.,* 341 U.S. at 221). Hence the Court must ensure that "the defendant must demonstrate materiality and favorability either by some plausible avowal of how a witness may

6

testify, or else by a plausible description of 'the events to which a witness might testify, and the relevance of those events to the crime charged.'" *United States v. Damra,* 621 F.3d 474, 490 (6th Cir. 2010) (quoting *Valenzuela-Bernal,* 454 U.S. at 868).

### A. *The Subpoena for Schuster's Testimony is Quashed*

As a threshold matter, Schuster's comparison of the Court's Order to quash Ms. Susan Wiles's subpoena [D.E. 369 at 4-9] is unconvincing. We did not grant that motion solely because Wiles had no firsthand knowledge of the defendants. A multitude of factors guided our decision, including the fact that Rivera primarily sought Ms. Wiles's testimony to convince the jury that it is possible to work with an alleged criminal (e.g., Gorrin) in a non-criminal manner, something a reasonable juror does not need illuminated. Rivera's mission to impeach Perera is less abstract and more relevant. Perera is a witness who disclosed information to the government; reports in discovery from Perera's meetings contradict Rivera's account of the story, which additionally contradict Perera's later edits; Rivera believes Perera or his counsel advanced factual inaccuracies as evidence and plans to expose Perera to the jury.

Evidence used to impeach is undoubtedly material. *United States v. Noriega,* 117 F.3d 1206, 1218 (11th Cir. 1997) ("[F]avorable, exculpatory or impeachment evidence is material"). Rivera thus plans to demand Schuster's testimony if Perera denies the validity of the disclosed information. [D.E. 382 at 9]. Schuster's possible testimony, were he to give it, would clearly satisfy Fed. R. of Evid. 401's relevancy

test since the "Written Disclosure" to which Rivera refers would be proven to be either (1) false or (2) true, in which case a jury would understand that either the government relied on false information or Schuster provided false testimony. This method is generally consistent with Fed. R. of Evid. 613(b), which allows extrinsic evidence of a witness's prior inconsistent statement only "after the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it." If Rivera denies the contents of the Written Disclosure, Schuster would be forced to either bolster Rivera or the materials he claims to have written.

While Rivera's argument has some appeal, his Response clarifies that he requests a "conditional" subpoena. [D.E. 382 at 9] ("*Should* Mr. Perera (i) deny that he ever provided such information to Mr. Schuster or (ii) state that the information conveyed in the Written Disclosure is incorrect, Mr. Rivera intends to call Mr. Schuster as a witness to impeach Mr. Perera." (emphasis added)). While such "conditional" subpoenas are rarely adjudicated, at least one district court has denied them as untimely and speculative. In *Stocking v. Newmark Knight Frank Valuation & Advisory, LLC*, No. 22-CV-7347 (ER), 2025 WL 33428, *7 (S.D.N.Y. Jan. 6, 2025), the Plaintiff requested leave to issue a "conditional" subpoena to depose a third-party *only if* the defendant failed to provide certain evidence through discovery. The Southern District for New York denied the request as "premature" because it depended on circumstances that hadn't occurred. *Id.* We agree with the Southern District of New York's analysis. Subpoenas dependent on future events, which may

not occur, are by nature speculative, not relevant, material, and favorable. Rivera cannot satisfy the Sixth Amendment's burden. The Motion with respect to the testimony is technically improper and can thus be quashed on this motion on that basis.

Apart from that, however, the subpoena on counsel personally runs afoul of the general principle that lawyers should not be forced to testify against their clients because clients must always feel free to openly communicate with their lawyers without fear that the lawyers will be witnesses against them. *See Upjohn v. United States,* 449 U.S. 338, 389 (1981). Of course directly privileged communications are protected in that instance. *Id.* But the work product doctrine was also adopted with this principle front and center:

> In performing his various duties, . . . it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.  . . . Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

*Hickman v. Taylor,* 329 U.S. 495, 510–11 (1947).

Here, the subpoena reserves the right to call Perera's counsel to provide impeachment evidence against him. That process is obviously disfavored because it presents a clear and obvious threat to the zone of privacy and confidence that the Supreme Court's work product doctrine protects. It is thus axiomatic that courts should guard against such an effort except in very limited and rare circumstances.

9

*See, e.g., In re Trasylol Products Liab. Litig.*, No. 08-1928-MDL, 2009 WL 2575659, at \*3 (S.D. Fla. Aug. 12, 2009) (Middlebrooks, J.).

The predicate for that exceptional situation here is the need to impeach Perera based on the Written Disclosure used to apprise the government of Perera's anticipated testimony. If that disclosure is itself protected as work product, then it follows that any testimony from Perera's counsel would be equally protected and could not be utilized at trial. For the reasons explained below, we find that the document at the source of that disclosure remains protected. Therefore, the subpoena on counsel can also be quashed on that basis as well.

### B. *The Schuster Memo is Protected Work-Product*

We turn next to Schuster's argument that the Schuster Memo is protected work product.[3] Work product protection is "distinct from and broader than the attorney-client privilege." *United States v. Nobles*, 422 U.S. 225, 238 n.11 (1974) (citing *Hickman,* 329 U.S. at 495); *In re Renco Grp. Inc.*, 164 F.4th 1336, 1344 (11th Cir. 2026) ("The attorney-client privilege 'belongs solely to the client,' and only the client can waive the privilege, 'either expressly or by implication.' . . . The attorney work product doctrine affords broader protection, 'extend[ing] to material obtained or prepared by counsel in the course of their legal duties provided that the work was

---

[3] Note that the record shows that the Schuster Memo was never technically turned over to the government during the Perera debrief sessions. The subpoena assumed that to be the case in referencing the "written disclosure" that it sought to obtain. There was in fact no written disclosure, but instead counsel read from various parts of the memo during the interview session to show what knowledge his client had. So with that assumption we will focus on simply whether the Memo itself remains protected.

done with an eye toward litigation.'") (internal quotations and citations omitted). Once information is established as "qualified" work product, the party seeking to "invade that privacy" between the attorney and client must "establish adequate reasons to justify production through a subpoena[.]" *Hickman*, 329 U.S. at 512.

"Work product is divided into two general categories: 'qualified' work product, which protects an attorney's factual investigations, and 'absolute' or 'opinion' work product, which protects an attorney's mental impressions." *United States v. Zahn*, No. 3:22-CR-23-BJD-MCR, 2022 WL 17811346, *7 (M.D. Fla. Dec. 19, 2022) (quoting *Doubleday v. Ruh*, 149 F.R.D. 601, 607 (E.D. Cal. 1993)). "[F]act work product consists of 'documents and tangible things . . . prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative.'" *United States v. Pepper's Steel & Alloys, Inc.*, 132 F.R.D. 695 (S.D. Fla. 1990) (quoting Fed. R. Civ. P. 26(b)(3)). Fact work product is discoverable "upon a party showing substantial need for the materials to prepare its case" unattainable without "undue hardship." *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1335 (11th Cir. 2018).

"Opinion work product encompasses all material that reflects an attorney's mental impressions, conclusions, opinions, or legal theories." *Williamson v. Moore*, 221 F.3d 1177, 1182 (11th Cir. 2000) (citing *Hickman*). Unlike factual work product, opinion work product triggers a higher burden. *Upjohn,* 449 U.S. at 401 (opinion "work product cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship."). Limiting outside access to opinion work product is a necessary protection against fundamentally altering the

11

*status quo* relationship between attorneys and their clients. *See Williamson*, 221 F.3d at 1182 ("[I]f opinion work product were accessible by opposing counsel 'much of what is now put down in writing would remain unwritten.' . . . '[I]nefficiency, unfairness and sharp practices . . . in the preparation of cases for trial' would result." (quoting *Hickman* 329, U.S. at 393, 394)).

The Supreme Court passed over the opportunity to create a bright-line rule for opinion work product protection, instead noting only that its compulsion requires "a far stronger showing of necessity and unavailability" than the substantial need test. *Upjohn*, 449 U.S. at 402. While our District has generally found opinion work product "absolutely immune from discovery[,]" *Pepper's Steel & Alloys, Inc.*, 132 F.R.D. at 698 (citing *Bd. of Trs. of Leland Stanford Jr. Univ. v. Coulter Corp.*, 118 F.R.D. 532 (S.D. Fla. 1987)), the Eleventh Circuit has more recently found that "extraordinary circumstances may exist that justify a departure" from the protections opinion work product ordinarily receives. *Williamson*, 221 F.3d at 1182-3 (citing *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir. 1994)); *see also In re Grand Jury Subpoena*, 463 F. Supp. 2d 573 (W.D. Va. 2006) (finding opinion work product immune from compulsion absent "extraordinary circumstances" and the moving party demonstrates a "compelling" need).

Schuster argues that the Schuster Memo receives absolute protection because it contains Schuster's "mental impressions, thoughts, and opinions regarding the matters he discussed with his client." [D.E. 369 at 15]. Further, to the extent the work product was disclosed to the government, Schuster argues that Rivera already has

access to it through the 302. [D.E. 369 at 5]. Schuster additionally argues, to the extent the Schuster Memo is merely fact work product, "Rivera has not – and cannot – make the required substantial showing that he is unable to obtain needed information because he already has the disclosures made by the Government in the 302 referenced in the Rivera Subpoena." [D.E. 369 at 15] (internal quotations omitted) (citations omitted).

Rivera responds that the Schuster Memo was not developed in anticipation of litigation, [D.E. 382 at 5, 6], and therefore not protected by the work-product doctrine because Perera was "intricately involved in the events that underlie this case" and complied with the government as a bid to avoid prosecution himself. [D.E. 382 at 2, 4]. Even if we find work product protection, Rivera insists that Schuster waived any protections afforded to the Schuster Memo when he "disclosed [its] contents" during the meetings. [D.E. 382 at 4].

### 1.  *The Schuster Memo was Created in Anticipation of Litigation*

Anticipation of litigation may occur when there is "prospective or ongoing litigation." Epstein, *The Attorney–Client Privilege and the Work Product Doctrine*, 4th ed. Supplement, 146 (2004). How this well-established principle applies in the criminal context is not without its challenges. We know, of course, that the Supreme Court has already found that the work product doctrine applies in both civil as well as criminal proceedings, and that can extend to third parties. *Nobles*, 422 U.S. at 236-38. The Federal Rules expressly incorporate work product protections for litigants in

criminal cases governed by Federal Rules of Criminal Procedure 16(a)(2) and (b)(2)(A).

The difficulty this case raises, however, is that the claim of privilege is on behalf of a witness and the witness's lawyer, in the course of representation of that witness before government attorneys and investigators. Perera is not a party in this case, nor is his counsel. So technically Rule 16 does not govern. Instead, courts have turned to federal common law to safeguard the public's interest in protecting a lawyer's work product related to criminal or governmental investigations. Our District has enforced that safeguard because, though government investigations do not constitute litigation per se for the work product analysis, the existence of a government investigation may generally cause an individual or organization to reasonably anticipate that litigation will follow. *In re Trasylol,* 2009 WL 2575659, at *5 (citing *Abdallah v. Coca-Cola Co.,* 2000 WL 33249254, at *5 (N.D. Ga. Jan. 25, 2000).

Thus anticipation of litigation in the criminal or investigatory context is generally interpreted broadly. Eleventh Circuit precedent in fact recognizes as much because "litigation need not necessarily be imminent . . . as long as the primary motivating purpose behind the creation of the document was to aid in *possible future litigation.*" *United States v. Davis,* 636 F.2d 1028, 1040 (5th Cir. Unit A Feb. 1981)[4] (emphasis added). The Eleventh Circuit has not again directly addressed all the

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

standards necessary to find anticipation of litigation. But it has recently endorsed our District's view that the "attorney work product doctrine affords broader protection, 'extend[ing] to material obtained or prepared by counsel in the course of their legal duties provided that the work was done with an eye toward litigation.'" *In re Renco Group Inc.*, 164 F.4th at 1344 (quoted citations omitted) (affirming finding that claim of work product protection related to foreign criminal investigation had not been sufficiently substantiated).

Indeed this recognized broad reading of the standard, in keeping with the purpose of the work product doctrine in the first place, has been widely accepted and followed in the investigatory context. *See, e.g., In re Grand Jury Subpoena*, 220 F.R.D. 130, 147 (D. Mass. 2004) ("[m]any courts have held . . . that once a governmental investigation has begun, litigation is sufficiently likely to satisfy the 'anticipation' requirement.") (citing *Martin v. Bally's Park Place Hotel & Casino,* 983 F.2d 1252, 1261 (3d Cir. 1993) (materials prepared after an OSHA investigation had commenced were made in anticipation of litigation, where "[t]he correspondence and testimony reveal[ed] that the report was commissioned in response to OSHA's inquiry and out of concern that either OSHA or the employees would bring suit"); then citing *Guzzino v. Felterman,* 174 F.R.D. 59, 63 (W.D. La. 1997) ("Federal courts have concluded that once an investigation by a federal agency has commenced, that a corporation may reasonably be said to anticipate litigation.")); *A. Michael's Piano, Inc. v. F.T.C.*, 18 F.3d 138, 146 (2d Cir. 1994) ("The courts have taken a flexible approach in determining whether the work product doctrine is applicable, asking not whether

15

litigation was a certainty, but whether the document was created 'with an eye toward litigation.'" (quoting *Hickman,* 329 U.S. at 511)).

In the criminal context, work product protection in anticipation of litigation is triggered when an individual or organization is either a direct target of an investigation or one suspected of involvement. After all, especially when the federal government comes calling, the "possibility" of litigation is heightened and the jeopardy facing a witness or target is palpable. A target or witness in that instance would thus be foolhardy in not retaining counsel for advice and guidance, especially if such advice could prevent that client from being charged by the government in the first place. It is thus senseless to find that, given the seriousness of the risk and the need for able counsel, "work product" falls by the wayside when the government does not charge the individual and, like here, instead chooses to utilize that person as a witness for its investigation.

Either way, the existence of potential criminal charges at the time of retention of counsel is what is paramount in the analysis. "The question 'should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation . . . , and litigation should be understood generally to include proceedings before administrative tribunals if they are of an adversarial nature." *In re Trasylol,* 2009 WL 2575659, at *4 (citing C. Wright & A. Miller, *Fed. Pract. & Proc. Civ. 2d* § 2024 (2009); *United States v. Adlman,* 134 F.3d 1194, 1203 (2d Cir. 2003)).

16

Federal courts have thus routinely enforced work product protections for subjects or witnesses in a variety of criminal and regulatory investigations, both at the investigatory stage and once charges or claims have been filed. *See, e.g., In re Special 1978 Grand Jury II,* 640 F.2d 49, 61-62 (7th Cir. 1980); *In re Grand Jury Subpoena Dated July 6, 2005,* 510 F.3d 180, 183 (2d Cir. 2007); *In re Grand Jury Proceedings,* 492 F.3d 976, 981 (8th Cir. 2007); *In re Grand Jury Proceedings,* 6045 F.2d 798, 803 (3d Cir. 1979).

And these protections apply to those eventually charged with a crime or violation, as well as non-parties or witnesses who were implicated or questioned during that same investigation. If they were represented by counsel at the time of the investigation, they retain the right to enforce their privileges even if they are not technically parties to a later case. *See, e.g., In re Grand Jury Subpoena,* 419 F.3d 329, 338-40 (5th Cir. 2005) (former counsel representing suspect questioned by investigators could assert work product protection for written statements of client). That is because the privileges do not dissipate for those who do not ultimately become parties to the contemplated litigation that generated the need for counsel. *See, e.g., Klosin v. E.I. du Pont de Nemours & Co.,* 561 F. Supp. 3d 343, 352 (W.D.N.Y. 2021); *Estate of Dabela v. Town of Redding,* No. 3:16cv534(RNC), 2018 WL 1445577, at *2 (D. Conn. Mar. 23, 2018) ("The work product doctrine under *Hickman* extends to nonparties and depositions."); *Vasquez v. City of New York,* No. 10-CV-6277 (JMF), 2014 WL 6356941, at *1 (S.D.N.Y. Nov. 14, 2014) ("Specifically, '[c]ourts have extended work-product protection to non-parties when [doing so] vindicated the

17

purposes underlying the [*Hickman*] doctrine,' including 'protecting an attorney's ability to formulate legal theories and prepare cases, preventing opponents from "free-loading" off their adversaries' work, and preventing interference with ongoing litigation.' ") (alterations in original) (quoting *Schomburg v. New York City Police Dep't*, 298 F.R.D. 138, 142-43 (S.D.N.Y. 2014)); *cf. Basinger v. Glacier Carriers, Inc.*, 107 F.R.D. 771, 771-72 (M.D. Pa. 1985) (granting protective order to non-party insurance company and assistant claims manager to prohibit defendants from examining documents contained in insurance carrier's investigatory file and preventing them from deposing claims manager, explaining that both the insurance company and the claims manager "may become parties because of the circumstances of the accident").

While Schuster cites several closely analogous cases in his favor (all which Rivera attempts to distinguish), he primarily relies on *United States v. Shah*, Case No. 19 Cr. 833, 2022 WL 1284550 (S.D.N.Y. Apr. 29, 2022), and *United States v. Zahn*, No. 3:22-CR-23-BJD-MCR, 2022 WL 17811346 (M.D. Fla. Dec. 19, 2022).

In *Shah*, defendant Shah served subpoenas on counsel to certain government witnesses who each litigated a separate matter as co-defendants alongside Shah. 2022 WL 1284550 at *1. Shah subpoenaed "[a]ll documents and communications between [counsel] and any members of the United States Attorney's Office concerning this [criminal] matter" ("the Shah Subpoena") *Id.* at *2 (internal quotations omitted) (citations omitted). The court quashed the subpoena on several grounds. First, it considered the subpoena an inadmissible, "fishing expedition." *Id.* (citing *U.S. v.*

18

*Nixon*, 418 U.S. 683, 700 (1974); *In re Irving*, 600 F.2d 1027, 1034 (2d Cir. 1979); *Mendinueta-Ibarro*, 956 F. Supp. 2d 511, 513 (S.D.N.Y. 2013)). Second, it considered the disclosed information in the documents repetitive since the information shared would "be government witnesses and the government" and was "already subject to being turned over to the defense pursuant to Fed. R. Crim. P. 26.2 and 18 U.S.C. § 3500." *Id.* Finally, it found "'[N]o statement or report in the possession of the United States which was made by a government witness or prospective Government witness . . . shall be the subject of subpoena' until the witness testifies." *Id.* (quoting § 3500). "Other relevant, discoverable information in the government's possession has already been provided . . . pursuant to Rule 16 of the Federal Rules of Criminal Procedure." *Id.* The district court then quashed the second set of subpoenaed items—"[a]ll attorney notes or other documents prepared by [counsel] and any law enforcement agent concerning this Matter"—on the same grounds. *Id.*

The Shah Subpoena also requested "[a]ll attorney notes or other documents prepared by [counsel] from each Proffer Session attended by [client] in connection with this Matter." *Id.* at *3. The court shielded the requested material as privileged work product taken in anticipation of litigation. *Id.* "To the extent that counsel's notes from proffer sessions with the government reflect the attorney's 'mental impressions, conclusions, opinions, or legal theories,' they are privileged and not discoverable or subject to production via subpoena." *Id.* (quoting Fed. R. Civ. P. 26(b)(3)(B); *Hickman*, 329 U.S. at 510). "To the extent that [the provided notes] were not verbatim notes, 'it is to be expected in the ordinary course' that the mental impressions of counsel '[are]

19

precisely what notes taken under these circumstances would contain.'" *Id.* (quoting *United States v. Arias*, 373 F. Supp. 2d 311, 312 (S.D.N.Y. 2005)). Finally, the court noted that the defendant's statements in the proffer captured by the attorney in his notes would be produced to the defendant upon the witness's testimony pursuant to 18 U.S.C. 3500. *Id.*; *see* 18 U.S.C. § 3500(b) ("After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.").

In *Zahn*, defendants Aaron Zahn ("Zahn") and Ryan Wannemacher ("Wannemacher") were indicted for allegedly building a scheme to defraud Jacksonville Electrical Authority ("JEA") and the City of Jacksonville ("Jacksonville"). *Zahn*, 2022 WL 17811346 at *1. Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins") assisted the government's Special Investigation Committee on JEA by voluntarily disclosing certain information related to JEA's then pending civil litigation again Zahn. Zahn and Wannemacher served Nelson Mullins with a subpoena to produce certain documents related to Nelson Mullins's compliance with the prosecution. *Id.* Nelson Mullins submitted 17 pages of documents and a privilege log identifying documents withheld under work product privilege. Zahn and

20

Wannemacher then sought compelled disclosure of the withheld documents and Nelson Mullins moved to quash, which the court granted. *Id.*

*Zahn* recognized that only documents prepared in connection with ongoing or anticipated litigation receive the strong work product protections provided under Rule 26(b)(3). *Id.* at *8. Finding the subpoenaed materials privileged as opinion work product since it was prepared "in connection with the development of JEA's litigation and trial strategies" in its civil case against Zahn. *Id.* at*10. It also decided that Nelson Mullins did not waive privilege when it voluntarily disclosed protected information to the prosecutor because the JEA and the Government were "not adverse parties, JEA [was] not a target of an investigation, and the disclosure to the prosecutor did not substantially increase the opportunity for potential adversaries to obtain the information[.]" *Id.*

Taken together, Schuster persuasively argues *Shah* and *Zahn* are compelling illustrations of how the Schuster Memo is protected work product generated in anticipation of possible litigation against him or involving him. [D.E. 369 at 19]. Moreover, Schuster posits that compelled production would be repetitive because the 302 report provides Rivera with the same already-disclosed information. [D.E. 369 at 17; D.E. 391 at 6].

Rivera argues that this case is unlike *Shah* because the information he requests *was* disclosed to a third-party during proffer sessions while the notes in *Shah* were developed during them. [D.E. 382 at 4]. True enough, but this is not a

material distinction—both defendants in *Shah* and in the case at hand seek to obtain that information they believe is not already shared.

Rivera suggests in his Response to the Motion that both the Schuster Memo and the 302 are inaccurate [D.E. 382, at 3]. He *suspects* the story summarized in the 302 paints a picture "riddled with holes, inconsistencies, inaccuracies, and misrepresentations" that Mr. Rivera "cannot be forced to accept." [D.E. 382 at 10]. Rivera argues his suspicion of inaccuracies in the FBI's work is bolstered by Schuster's "disagreement with that FBI agent [who drafted the 302] over who prepared the Schuster Memo." [D.E. 382 at 10].[5] The 302 claims that Perera authored it while Schuster claims he developed it. [D.E. 369 at 2, 5, 14, 18].

Rivera alternatively argued during a March 20, 2026, hearing that if the Schuster Memo matches the information in the 302, which he then categorized as the truth (contradicting his Response), it would serve well to impeach the witness's edits. This argument is bolstered by District Judge Damian's March 20, 2026, preliminary ruling that Perera's edits do not constitute adoption of any portion of the 302 for purposes for Fed. R. Evid. 801(d)(2)(B). As Rivera cannot point to the 302 as Perera's prior statement, he seeks to rely on the Schuster Memo and contrast its discrepancies with the Edits. While we recognize why Rivera's strategy may change in light of the Edits—several of the revisions provide more evidence of criminal activity—we cannot

---

[5] We note that cross-examination at trial will provide Rivera with ample opportunity to impeach the witness.

understand how Rivera transitioned from being unable to accept the 302 to embracing it.

> Nonetheless, Rivera additionally attempts to distinguish *Zahn*:

> The two critical differences between *Zahn* and the present case are that (i) the *Zahn* memorandum was prepared *in anticipation of litigation*, and (ii) the third-party entity in *Zahn* was engaged in simultaneous civil litigation *in conjunction with the government* against one of the criminal defendants. . . . Neither of these critical elements are present here; there is no indication (i) that the Schuster Memo was prepared *in anticipation of litigation* or (ii) that Mr. Perera and the government are working *together* in such litigation against Mr. Rivera. Instead, the Schuster Memo was prepared solely to summarize Mr. Perera's *voluntary* disclosures to law enforcement and prosecutors for the simple reason that Mr. Perera was trying to escape prosecution.

[D.E. 382 at 5-6] (citations omitted). Rivera argues Perera was "trying to escape litigation" but not anticipating litigation.

As to the first point, we have already rejected it. Perera need only show that, at the time the Schuster memo was generated, it was treated as work product in anticipation of possible litigation with the government. And even if, by February 2020, it was unlikely that Perera would not be a target and instead would be a material witness for the government, the work product protection would not dissipate. At the time of its creation, the document was prepared by counsel representing a potential target or witness in a criminal investigation. The purpose of the work product protection applies equally to him even though the possibility of litigation against the government was lessened by his anticipated cooperation. After all, the government could have rejected his testimony or deemed it insufficient to not charge him as a conspirator. Neither Perera nor his counsel knew for a certainty that

full cooperation with the government would leave Perera free and clear. The prospect of litigation with the government was still a viable concern.

At the very least, as against Rivera, the work product protection for a non-party like Perera remains intact. Perhaps the government could argue that, as against it, Perera's disclosures vitiated a claim of privilege viz-a-viz the government (as further discussed below). But Rivera cannot benefit from that argument because there has been no waiver as to him of the Schuster memo. And that memo enjoys work product protection after having been created as a witness summary in anticipation of possible litigation. In our circuit, that is enough.

### 2. *Perera's cooperation has not waived work product and substantial need has not been established*

Turning to the waiver argument, it is true that when a disclosing party voluntarily discloses to "escape or limit criminal prosecution" courts generally find a waiver. *See*, e.g., *Brown v. NCL (Bahamas), Ltd.*, 155 F. Supp. 3d 1335, 1341 (S.D. Fla. 2015) ("[V]oluntary disclosure to a government agency 'to effect a goal by the disclosing party other than assistance in prospective or ongoing litigation … generally constitutes waiver.'" (quoting *Epstein*, 4th ed. Supplement, at p. 146)). Perera was no longer an active subject of the investigation at the time because he was cooperating with the government's efforts to indict and convict Rivera and Nuhfer. Perera's cooperation was clearly not *just* to help the government out of his good will, but because he had skin in the game—he sought to avoid finding himself in the Defendant's shoes. Furthermore, although Perera may have sought to avoid litigation from the government, the government and Perera (or Schuster) were not adverse

24

parties at the time of disclosure. Like in *Zahn*, Schuster never provided the government with the Schuster memo, thus limiting the likelihood it became disclosed. Without considering the materials in the Schuster Memo, we therefore find that the Schuster Memo (1) was created in anticipation of litigation and (2) the voluntary disclosure does not defeat a valid work product claim.

After *in camera* review of the Schuster Memo, we also find that the Schuster Memo is fact work product and thus subject to qualified privilege. Rather than trial strategies or mental impressions, the Schuster Memo serves as a summary of Perera's alleged role in the leading up to the allegations in the Superseding Indictment and is written in Perrera's (not Schuster's) point of view. It contains no strategies, tactics, or other materials attributable to Schuster. As such, the Schuster Memo is subject to disclosure upon a substantial need showing. Fed. R. Civ. P. 26(b)(1) (the moving party must show a "substantial need for the materials to prepare its case and *cannot*, without undue hardship, obtain their substantial equivalent by other means" (emphasis added)); *see e.g., Sprague v. Director, Office of Workers' Compensation Programs, U.S. Dep. Of Labor*, 688 F.2d 862, 870 (1st Cir. 1982) (after in camera review of sought evidence, the panel opinion held claimant's misguided faith-based justification that protected factual work-product would strengthen its case insufficient to show a substantial need). "Parties commonly argue that they have substantial need for discovery of work product material because it contains information that can only be found in the material itself." *King v. Odeco*, 106 F.3d 396, 1997 WL 33367, at *2 (5th Cir. 1997) (citing *Koenig v. International Sys. And*

25

*Controls Corp. Litig. (In re Int'l Sys. And Controls Corp. Secs. Litig.)*, 693 F.2d 1235, 1241 (5th Cir. 1982)).

At the same time, a "viable alternative to invading work product, will, in most situations . . . negate any substantial need." *Fisher v. National R.R. Passenger Corp.*, 152 F.R.D. 145, 152 (S.D. Ind. 1993); *see King v. Odeco*, 1997 WL 33367, at *3 (finding the party seeking compelled discovery unable to meet the substantial need burden without showing that he could not obtain the information through other means). And a generalized showing of need is not enough; the moving party must make a particularized showing for substantive material. *See United States v. Chatham City Corp.* 72 F.R.D. 640, 644 (S.D. Ga. 1976) ("Defendants have shown a general, not a particularized, need for the materials they seek. The claim of necessity for the intrusion into the investigative file appears to be little more substantial than a desire to learn what kind of a case the Government has."); *see Delco Wire & Cable, Inc. v. Weinberger*, 109 F.R.D. 680, 689 (E.D. Pa. 1986) (finding that a party's assertion that attorneys' work-product was necessary to prove its case did not establish the requisite substantial need because it did not request any specific documents).

No such showing has been made here. The Court's review of the Schuster Memo in camera has revealed that the original 302s fully encapsulated what Perera was proffering. Rivera does not require the Schuster Memo to impeach the government's witnesses or Perera because, if his testimony falters, the discovery materials that Rivera has already provide ample impeachment evidence.

C. ***The Edits to the 302 do not Compel Disclosure and the Defendant has not Shown a Substantial Need***

26

Movants argue in their surreply that nothing about the Edits changes our analysis. [D.E. 408 at 4]. After the Court reviewed and compared the Schuster Memo with the 302 and the Edits *in camera*, we agree. Our review shows that the Schuster Memo is substantially similar to that in the 302. Where the Edits alter the Schuster Memo and the 302, the alterations are minor. Moreover, the 302 and the Edits are individually and together more substantive than the Schuster Memo, and compelled disclosure would be duplicative. Any material that Rivera needs to impeach is therefore already available. Forced compulsion of the Schuster Memo would be duplicative, not outcome-determinative. As Rivera already possesses a viable alternative in the form of the 302, Rivera cannot show a substantial need to compel the Schuster Memo. And the Court's *in camera* review of the memos itself fully resolves any lingering doubt otherwise. We therefore do not find the Schuster Memo subject to disclosure on this basis.

### III.   CONCLUSION

The motion to quash is Granted for the reasons explained above. This result does not diminish Rivera's right to challenge Perera's credibility at trial. Rigorous cross-examination remains available, and the key impeachment materials necessary for that purpose are already in Rivera's hands. It reflects only that the Sixth Amendment does not require this Court to breach the attorney-client relationship or a lawyer's work product, or to compel duplicative material Rivera does not need. The subpoena is quashed.

For the foregoing reasons, the Court **ORDERS** that the Motion be **GRANTED**.

Rivera's subpoena against Schuster is hereby **QUASHED**.

**DONE and ORDERED** in Chambers at Miami, Florida this 30th day of March, 2026.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge