**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-CR-20552-Damian/Torres**

**UNITED STATES OF AMERICA**

**vs.**

**DAVID RIVERA and**
**ESTHER NUHFER,**

      **Defendants.**

                                   /

**GOVERNMENT'S OPPOSITION TO DEFENDANT**
**RIVERA'S MOTION FOR ACQUITTAL AND FOR A NEW TRIAL (Dkt. No. 543)**

**Introduction**

This Court should deny David Rivera's ("Rivera") motion for a new trial and judgment of acquittal because it is substantively and procedurally without merit.   After a six-week trial, the jury convicted Rivera of all of the counts in the Superseding Indictment (Counts 1 - 8) charging him with offenses relating to the Foreign Agents Registration Act ("FARA") and money laundering statutes in less than 48 hours.   That the jury did so is actually no surprise as the evidence presented to the jury overwhelmingly established that Rivera and his co-defendant Esther Nuhfer were guilty of acting as unregistered agents of the Venezuelan government when they engaged in a clandestine lobbying effort in 2017 and 2018 to normalize relations between the United States and Venezuela at the direction of Nicolas Maduro and other members of his regime.

Implicitly recognizing this fact, Rivera all but ignores any substantive analysis of the evidence presented at trial, opting instead to devote the majority of his motion to arguing that the Court committed legal error in ruling against him on various jury-instruction and evidentiary issues that were raised before and mid-trial.   In effect, Rivera is asking this Court to reconsider its prior rulings despite there being no change in the law or other pertinent grounds to revisit the legal issues already resolved against him.   Indeed, it is well-settled under controlling case law that Rule 29 motions for judgment of acquittal are limited to arguments concerning insufficiency of the evidence.   Similarly, Rule 33 motions for a new trial are disfavored under the law and are not the proper forum to revisit prior court rulings absent instances in which the evidence preponderates so heavily against the jury's verdict that it would be a miscarriage of justice to let the verdict stand.

As to the merits of the legal issues Rivera raises in his motion, he is simply incorrect in asserting that the Court erred in previously ruling against him on these matters.   Indeed, the parties litigated before this Court each of the issues Rivera raises in his current motion – most often in written briefing – and in each instance the Court ruled against him.   Rivera fails to raise any significant or non-frivolous new arguments and instead regurgitates the same arguments he previously made to this Court.   As such, Rivera fails to establish that this Court erred in rendering its previous rulings and his motion therefore fails as a matter of law.

1

Finally, to the extent the introductory section of Rivera's brief (Mot. pp. 2-5) can be read as raising an insufficiency argument, this Court should summarily reject it.   Rivera avoids engaging in any real analysis of the evidence, and instead asserts summarily that the evidence did not satisfy the elements, but rather "overwhelmingly" supported the defense's position that Rivera and Nuhfer never acted as agents of the Venezuelan government.   These types of blanket statements and conclusory allegations without citation to any evidentiary support are simply not sufficient to raise a legitimate question concerning the weight of the evidence on a Rule 29 motion (and are meritless regardless) and therefore the Court should deny Rivera's effort to obtain a judgment of acquittal (and his Rule 33 motion for that matter) on that basis.

**Legal Standards on Motions Under Rule 29 and Rule 33**

A Rule 29 motion "is a direct challenge to the sufficiency of the evidence presented against the defendant."   United States v. Aibeieris, 28 F.3d 97, 98 (11th Cir. 1994).   The "sole ground for a post-trial motion under Rule 29(c) is that the evidence was insufficient to sustain a conviction." United States v. Miranda, 425 F.3d 953, 962 (11th Cir. 2005); United States v. Archie, 2017 WL 11471581 at *2 (N.D. Ga. 2017) (finding that challenge to jury instructions was not proper under Rule 29(c) because motions for judgment of acquittal are limited to insufficiency of the evidence issues); United States v. Goklu, 2023 WL 184254 at *4 (E.D.N.Y. 2023) (holding that a Rule 29 motion "is not an open-ended opportunity to relitigate unfavorable rulings, contest jury instructions, or advance new legal theories").   In ruling on a motion for judgment of acquittal, the Court must view "all the evidence in the light most favorable to the Government," United States v. Martinez, 763 F.2d 1297, 1312 (11th Cir. 1985), and all "credibility choices must be made in support of the jury's verdict."   United States v. Williams, 390 F.3d 1319, 1323 (11th Cir. 2004).

In addition, a "jury is free to choose among reasonable constructions of the evidence" in rendering its verdict.   Id.; see also United States v. Foster, 2014 WL 12687616 at *2 (S.D. Fla. 2014).   Thus, the evidence need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt."   United States v. Garcia, 447 F.3d 1327, 1334 (11th Cir. 2006).   Rather, the ultimate question is whether there was sufficient

2

evidence such that "a reasonable jury could have found the defendant guilty beyond a reasonable doubt." Id.; see also United States v. Wilkins, 2020 WL 7294525 at *5 (S.D. Fla. 2020).

Conversely, on a Rule 33 motion for a new trial based on the weight of the evidence, the court may consider the credibility of the witnesses and weigh the other evidence, and need not draw every reasonable inference therefrom in the government's favor. Martinez, 763 F.2d at 1312. While the decision to grant such motions is committed to the Court's discretion, that discretion is limited in the sense that a court may only grant the motion where "[t]he evidence [at trial] preponderate[d] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." United States v. Cox, 995 F.2d 1041, 1043–44, 1046 (11th Cir. 1993); see Martinez, 763 F.2d at 1312 ("The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable."). At bottom, motions for a new trial are disfavored by the courts and are to be granted only "sparingly and with caution, doing so only in those really exceptional cases." Martinez, 763 F.2d at 1313–14.

Argument

A.     Rivera's Motion Fails the Standard for Reconsideration

Although styled as a motion under Federal Rules of Criminal Procedure 29 and 33, Rivera's filing is in substance a motion for reconsideration of several of this Courts' pre- and mid-trial rulings on FARA's statute of limitations, so-called guilt-assuming hypotheticals, Hugo Perera's cross examination, Rivera's use of the term "tira fleches," and, finally, his counsel's blatant violation of this Court's advice-of-counsel ruling during closing argument. The Court adjudicated these issues before, and Rivera offers no persuasive justification to litigate them again in yet another motion. See United States v. Gupta, 363 F.3d 1169, 1174 (11th Cir. 2004) (cautioning that "permit[ting] the unlimited renewal or reconsideration of fully decided motions would needlessly tie up judicial resources and seriously delay the final disposition of cases"); United States v. Marcelina Orozco, 2020 WL 3963719, *1 (S.D. Fla. July 13, 2020) (reconsideration is an "extraordinary remedy" that should be "employed sparingly").

Courts have recognized three grounds for reconsideration: "(1) an intervening change in

3

controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice."   United States v. Razz, 387 F. Supp. 3d 1397, 1402 (S.D. Fla. 2019). Here, Rivera's motion identifies no new evidence or change of law, and as explained below, it also fails to identify any error in this Court's rulings—let alone "clear error" or manifest injustice. Thus, Rivera's motion fails at the threshold under the standard for reconsideration.   See, e.g., United States v. Reams, 2026 WL 673482 at *2 (D.N.J. 2026) (finding that a Rule 33 motion should not be used to relitigate pretrial rulings or discovery disputes absent a concern being raised in the court's mind that an innocent person may have been convicted).[1]

        B.        Rivera's Rule 29 Motion for Judgment of Acquittal Is
                    Subject to Summary Dismissal

Rivera's motion for judgment of acquittal should be dismissed because it improperly seeks to challenge this Court's rulings addressing various legal matters unrelated to the sufficiency of the evidence.   As noted, the sole issue a defendant may raise in a Rule 29 motion for acquittal is that the evidence presented at trial was insufficient as a matter of law to support the jury's verdict. Because Rivera's motion fails to argue in any meaningful way that the evidence was insufficient to support the jury's verdict, his motion under Rule 29 should be denied out of hand.

To the extent the "introduction" section of Rivera's motion can be construed as raising an insufficiency argument, it is wholly inadequate.   In fact, it barely discusses the evidence at trial, relying instead on conclusory assertions that the government "failed to prove each element of the charged offense" and that "the overwhelming weight of the evidence supports the defense position that Rivera [and Nuhfer] never acted as Maduro agents to help improve Maduro's relations with the United States" (Mot. at p. 4) without providing any supporting references to specific portions of the trial evidence.   This Court should reject that type of summary argument as failing to raise

---

[1]  See also United States v. Parnas, 2022 WL 669869 at *6 (S.D.N.Y. 2022) ("In the absence of a manifest injustice, a Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions."); United States v. Malka, 623 F. Supp. 3d 306, 328 (S.D.N.Y. 2022) ("Courts routinely deny attempts to relitigate already resolved matters under the guise of a Rule 33 motion.").

any doubt as to the evidentiary foundation supporting the jury's across-the-board guilty verdict.

Regardless, there was ample evidentiary support for the jury to find that Rivera willfully acted as an unregistered agent of the Venezuelan government, abetted Nuhfer in her commission of that same violation, joined Nuhfer in a conspiracy to violate FARA, and committed the charged money-laundering offenses.   For one, most of the evidence discussed in the government's opposition to Nuhfer's Rule 29 motion (ECF 550), to demonstrate the sufficiency of the evidence to support her convictions, is equally inculpatory with respect to Rivera.   This included:

- Rivera's shared understanding with Nuhfer that FARA applied to their conduct, as evinced by their use of FARA filings for foreign-government lobbying representations to draft the $50 million PDV USA agreement (Compare GX326, 328 with GX133 p.6);

- Rivera's knowledge that Venezuela's senior-most officials had approved the $50 million agreement as compensation for their political activities (e.g., GX15 p.9, Delcy Rodriguez messages in the MIA Chat);

- Rivera's joining with Nuhfer in the drafting of correspondence to be sent by senior Venezuelan officials to their American counterparts regarding U.S.-Venezuela relations (e.g., GX200B, GX15 p.32);

- Rivera explicitly referring to the Venezuelan government as his "client" in connection with his political activities and the $50 million contract, e.g.:

  o GX15 p.39: "We are fulfilling our commitment to the Chancellor/client in transmitting the position of V[enezuela] to the highest level of Ex[xon]."

  o GX389: "Raul, I understand all of the concerns and frustrations expressed by the client. *** If V[enezuela] persists in its unwilling to make the formal meeting request, then I suggest we return the last payment and either terminate the contract *or return our focus to the original intent of the contract which was to work toward normalizing relations.*" (Emphasis supplied)[2]

Moreover, the evidence was particularly inculpatory for Rivera in important respects.   It was Rivera's wholly owned company, Interamerican, that was the counterparty to the $50 million agreement, and thus Rivera played a primary role in the conspirators' receipt of each $5 million installment payment from Venezuela, and the subsequent division of those payments among the

---

[2] Rivera complains that the government misleadingly deleted the words "from the contract" from the bolded text above in citing this communication (Mot. 3 & n.5).   In truth, Rivera sent multiple versions of this email, to Bertica Cabrera and Nuhfer, which included both formulations (i.e., "original intent which was to work toward normalizing relations" and "original intent of the contract which was to work toward normalizing relations").   Compare GX390 with GX388, 389.

four members of the partnership (i.e., Rivera, Nuhfer, Gorrin, and Perera).   And it was Rivera's longstanding ties to prominent political figures including Rep. Sessions, then-Senator Rubio, and Kellyanne Conway, and his status as a former U.S. Congressman, that was the principal basis for the conspirators' being able to obtain the contract in the first place.   *See* GX15 at 5 (MIA Chat pictures of Rivera with political figures); GX25 (Rivera-Rubio texts); Tr. (Apr. 7, Perera) at 125 (describing Rivera's contribution to the partnership as "all of his political relations and his contacts").   Moreover, the jury was presented with demonstrably false statements Rivera made in various fora—including his deposition testimony and his televised interview on *This Week in South Florida* with Michael Putney (GX652A1)—that vividly demonstrated his willfulness and consciousness of guilt to the jury.   These included his sworn denials of having received any compensation for his efforts relating to the April 2017 meetings in New York (GX657C-TR p.628), and of having even considered FARA in connection with the PDV USA agreement's formation (GX657X7-TR, pp. 617-18).   And who could forget Rivera's December 2017 email to Gorrin with proposed false responses to the Herald's inquiries regarding his confederates' activities over the past year, in which Rivera stated at the outset: "They want to write that there is a Venezuelan businessman with ties to or access to Maduro who is trying to influence US policy toward Venezuela.   ***This would require registration as a foreign agent***."   GX445AT.

As for the factual and legal defenses (including the FARA-exemption defenses) that Rivera presented in his case-in-chief and through his counsel's examinations and argument—essentially to the effect that in his political activities he was actually working for the Venezuelan opposition rather than Maduro, and that the PDV USA agreement was perfectly legitimate—the evidence (and Rivera's shifting stories before the jury) utterly refuted those defenses.   For example:

- In opening, Rivera's counsel claimed that the $50 million agreement's "one purpose . . . was an opportunity to get ExxonMobil Corporation, the largest U.S. oil company . . . to come back into Venezuela and start drilling."   Tr. (Mar. 23) p.70.   And in closing, counsel stated that "the real purpose of that three-month, $50 million contract   . . . was to get Exxon back into drilling in Venezuela."   Tr. (Apr. 28) p. 183.   Yet in his televised interview with Michael Putney, Rivera contrived a completely different story, i.e., that "CITGO Petroleum in 2017 approached me because members of the Venezuelan opposition had talked to me about dissidents inside Citgo that were not happy with the way the company was being run

by Venezuela . . . and they came to me asking for suggestions . . . on how they could distance themselves, separate themselves [from Venezuela]. . . [The $50 million contract] had nothing to do with the government of Venezuela.")  GX652A1; *but see* Tr. (Apr. 28, Shohat) p. 184 ("We're not claiming now that PDVSA and the Government of Venezuela were not behind that contract.   They were behind that contract.");

- The testimony from Citgo witnesses (Gina Coon, John Butts, and Arnaldo Arcay) that PDV USA had no actual business operations and was instead a vehicle used to implement projects in the U.S. at the direction of its Venezuelan parent PDVSA, and that the PDV USA agreement—with its patently absurd payment schedule ($50 million for a 3-month term)—was instituted by top-ranking Venezuelan government officials;

- Rivera's use of sham contracts and attempt to pressure Gorrin's yacht broker, Joel Brakha, into signing a false "consulting" agreement (ECF 550 p.14, summarizing this evidence);

- Hugo Perera's testimony, consistent with documentary evidence, that the efforts of the four partners were directed to normalizing U.S.-Venezuela relations, and that Rivera's client was the Venezuelan government, e.g., Tr. (Apr. 7) pp.94-95.

- Opposition leader Julio Borges' testimony that Rivera did not provide funds to help the Venezuelan opposition or do much of any substance to aid his efforts to oppose Maduro, e.g., Tr. (Mar. 27), pp. 15 ("Q. . . Is it your testimony that you never received financial assistance from the defendant, David Rivera? A. That's right"), and forensic accountant Mike Petron's consistent testimony that his review of bank records revealed no such assistance by Rivera to the opposition, Tr. (Apr. 17) pp.164-165 (repeatedly stating "No" or "I did not" when asked if he saw any outgoing transactions from Rivera or Nuhfer to various persons and entities affiliated with the Venezuelan opposition).

- Rivera's text message to Brian Ballard, after the press reported the PDV USA litigation and the $50 million contract, in which Rivera speciously claimed that "ALL of the funds, every penny, in consultation with the Venezuelan opposition [were used] in an effort to undermine PDVSA and Maduro's control."   GX82B.

- Rivera's meeting with then-Senator Rubio in July 2017 to discuss U.S.-Venezuela relations and suggesting that Rubio use his speech on the Senate floor to urge "reconciliation," "no[t] vengeance" with respect to the Maduro regime (GX25).

- Rivera's "summary" of an August 2017 meeting with Gorrin and others in the MIA Chat Group, in which he explicitly sought "5 melons of retainer," and further tens of millions of dollars, in connection with "resolv[ing] the crisis" and related U.S. sanctions against senior Venezuelan officials—following which Rivera took steps to obtain sanctions relief for Maduro-affiliate Eric Malpica Flores, and worked with Nuhfer to prepare an "amendment" to the contract extending its total payment to $60 million (GX15 pp. 95, 98); GX431.

- Any number of instances in Rivera's contemporaneous emails and chats reflecting his understanding that the Maduro regime, including Delcy Rodriguez and Maduro himself, were ultimately behind his and his confederates' efforts in 2017–2018 (e.g., GX15 p.28 (Rivera: "We need to get this to the Chancellor [Delcy] to ensure she is okay with this seating arrangement"; id. p. 36 (Gorrin: "Direct instructions from the president [Maduro]").

7

- Rivera's March 2018 email to Gorrin sharing a draft letter—from Nicolas Maduro to President Trump—in anticipation of Rep. Sessions' travel to Caracas the following month. There, Rivera wrote (on Maduro's behalf), "I want to assure you of my good-faith desires to take steps that will facilitate the ***reestablishment of normal relations*** between the United States and Venezuela," and "it is my further hope that ***such normalization would begin immediately after a negotiated solution is achieved*** with calibrated measures from your [U.S.] government that validate the efforts of my government culminating in a democratic election, the results of which would be recognized by your government ***irrespective of outcome***." (Emphasis supplied). GX469AT.[3]

In short, Rivera's claim—that no reasonable jury presented with this evidence could find him guilty—is patently absurd, and his Rule 29 motion should be denied.

      C.      The Court Properly Declined to Give the Defendants' Proposed Jury Instruction Regarding the FARA Statute of Limitations

Rivera's primary claim in his motion for a new trial pursuant to Rule 33 is that this Court erred in declining the defendants' request for a jury instruction concerning the statute of limitations for the substantive FARA charge (Count 2). In so doing, however, Rivera basically reasserts the same arguments this Court previously rejected following extensive briefing on the issue by the parties and oral argument held on March 24, 2026. Because Rivera has not shown clear error or manifest injustice resulting from the Court's prior rulings on the statute of limitations, Rivera's Rule 33 motion for a new trial should be denied.

Further, Rivera's claim remains as substantively without merit now as it was three months ago. Essentially, as Rivera's motion describes, the parties' dispute regarding the running of FARA's five-year statute of limitations comes down to the timing of when the statute begins to run. Rivera first raised this issue in a twenty-page motion for judgment of acquittal (ECF 465) filed on April 21st, arguing that this Court should follow the reasoning of the majority opinion in a forty-year-old District of Columbia case entitled United States v. McGoff, 831 F.2d 1071 (D.C. Cir. 1987). The majority in McGoff, a two-to-one opinion with Judge Bork in dissent, declared

---

[3] Rivera's claim that "the government could point to only a single exhibit which even arguably supported its 'normalize relations' theory" is thus without merit. Mot. 3 & n.5. Multiple exhibits, as shown above, included Rivera's (and his confederates') use of those words. And as confirmed in the bolded text in Rivera's email above, normalization was demonstrably **not** "an intention to *remove* Maduro and *then* normalize relations," as Rivera now claims in his motion. Id.

FARA's statutory language to be ambiguous on the limitations issue and then embarked on a lengthy intellectual journey through the statute's legislative history, the rule of lenity, and other canons of interpretation to ultimately hold that FARA's limitations period begins to run when the defendant ceases to act as a foreign agent.   Rivera also filed a notice that day for several proposed jury instructions, including an awkwardly (and ultimately incorrectly) drafted instruction on FARA's statute of limitations predicated on the jury making a finding as to when "the defendant's obligation to register ended" as a starting point for the running of the limitations period (ECF 467).

On April 21st, the government filed a ten-page notice with the Court in response to the defendant's proposed jury instruction (ECF 468).   In its response, the government stated its view based on the plain text of the controlling sections of FARA – 22 U.S.C. §§ 612(a) and 618(e) – that FARA's statute of limitations does not start to run until a defendant actually files a registration statement with the Attorney General of the United States.   In so doing, the government essentially relied on the emphasis courts have placed over the last forty years on giving meaning to a statute's express language, consistent with Judge Bork's dissent in McGoff.   In addition, the government noted that in the only other published opinion addressing the running of FARA's limitation's period, Judge Boasberg of the District Court for the District of Columbia recently noted that Judge Bork's dissent was the "more sensible" and "more natural reading of [FARA's] text" but that he was constrained to follow circuit precedent and apply the majority's rule in McGoff.   See Attorney General of the United States v. Wynn, 636 F. Supp. 3d 96, 102-03 (D.D.C. 2022), aff'd on other grounds, 104 F.4th 348 (D.C. Cir. 2024).

On April 23rd, the government filed its thirteen-page response to Rivera's motion for acquittal in which it once again described in detail why the majority opinion in McGoff ruled in error and that the statutory text was clear and unambiguous in that the limitations period does not begin to run until a defendant files a registration statement (ECF 472).   In addition, the government set forth in some detail the post-November 2017 facts regarding Rivera's substantive violation of FARA—including defendants' drafting of official correspondence to be sent by Venezuelan officials to their U.S. counterparts in relation to the April 2018 Caracas trip—and

9

pointed out that overt acts for the FARA *conspiracy* (charged in Count 1) quite obviously extended throughout 2018 with, *inter alia*, Rivera's continuing demands for payment under the $50 million agreement—an issue Rivera does not seriously address in his motion.  Id. 8-12; GXs 485AT, 489A, 504A; see United States v. Butler, 792 F.2d 1528, 1533 (11th Cir. 1986) ("On conspiracy charges which require listing of overt acts, the statute of limitations is satisfied if the last overt act alleged and proved occurs within the limitations period.").

On April 24, 2026, the Court held a hearing to address various pending legal issues including Rivera's motion for judgment of acquittal and the defendants' proposed jury instruction on the statute of limitations issue (ECF 476).  First, the Court addressed Rivera's motion for judgment of acquittal based on his statute of limitations argument.  The Court initially rejected Rivera's claim that the $50 million consulting contract's three-month term was dispositive of the statute of limitations issue finding that it was "not the relevant time frame for the end of the conduct that falls within the counts related to FARA."  (Tr. (Apr. 24) pp. 41-42).  The Court then held that the government had alleged "conduct by both defendants that falls within the statute that does extend well beyond – into 2018.  So it is well within the statute of limitations."  Id. Accordingly, the Court denied Rivera's motion for judgment of acquittal.

Next, the Court addressed defendants' request for a jury instruction, based on the McGoff majority, requiring the jury to make a factual finding as to when the defendants' agency relationship with Venezuela ended as the starting point for the running of the five-year limitations period.  The Court rejected the reasoning of McGoff's majority opinion, repeatedly finding that FARA's relevant statutory text—§§ 612(a) and 618(e)—was not ambiguous on the matter and that the five-year limitations period does not start to run until the defendants file a registration statement for the period during which they acted as agents of a foreign principal:

- "[W]ith respect to the defense's request to include a statute of limitations defense, I find that a statute of limitations defense is not warranted or appropriate based on the evidence that's been presented in this case, the text of the statute, and that being 22 U.S.C. § 612(a) and 22 U.S.C. § 618(e), are very straightforward and clear and unambiguous with respect to the running of the statute of limitations or when the statute of limitations begins to run

10

appreciating that that could lead to an absurd result and appreciating the majority views in the D.C. cases offered by the defense . . . ." Tr. (Apr. 24) p. 92;

• "[T]his is not a close case.   It's not an issue that needs to be presented to the jury because of the very clear language of the statute and because of the say – I'm saying there is no prejudice to the defendants because, even if it was read to the jury, there's not an absence of evidence that the conduct was occurring well within the limitations period."   Id. at 93.

The Court further held that applying the plain language of the statute did not produce an absurd result under the facts of this case as the initial Indictment had been returned in November 2022 "very close in time" to the "defense's position that it should have run from the expiration of the Interamerican contract with PDV USA [in June 2017]." Id. at 92.

Accordingly, Rivera's motion fails to show that this Court erred in denying the defendants' request for their proposed jury instruction on FARA's statute of limitations and his Rule 33 motion should therefore be denied as it is substantively and procedurally without merit.[4]

D.      The Court Properly Allowed the Government to Ask Witnesses Questions
         Regarding Their Lack of Knowledge of the $50 million PDV USA Contract

The jury convicted Rivera of willfully acting in the United States as an agent of the Venezuelan government while failing to register as required by FARA.  It is well-settled that "[e]vidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive, and set-up of the crime, is properly admitted if it forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." United States v. Church, 955 F.2d 688, 700 (11th Cir. 1992).   Here, that principle applied to the government's presentation of testimony from U.S. officials and others, to the effect that they would not have interacted with Rivera in respect to his FARA-registrable conduct on Venezuela matters had they known of the $50 million agreement between his company and PDV USA, and that the activities of Rivera and his confederates had been instituted by high-ranking Maduro officials. That testimony was relevant and necessary, at a minimum, to place Rivera's crimes in context for

_____

[4] Rivera also asserts that somehow the Court's denial of his request for a statute of limitations instruction also requires a new trial on the money laundering counts. However, since the Court did not err in declining to give the defendants' requested jury instruction, this argument is of no moment and should be denied as well.

the jury and to show Rivera's motive in violating FARA—including *why* he failed to register.

As alleged in the indictment (ECF 122 at p.11) and proven at trial, an essential part of Rivera's FARA violation was his need to conceal the nexus between the Maduro regime and his political activities in 2017-18, including top Maduro officials' approval of the $50 million PDV USA agreement.   The evidence showed that Rivera—who drafted the agreement with Nuhfer by copying from contracts made available to the public in U.S. lobbyists' FARA filings for foreign-government clients—knew that registration would entail disclosure of the agreement (and the millions paid thereunder), and the connection between Rivera's conduct and the Maduro regime.

The jury further learned that Rivera, in fact, did not register as the law required, and the government properly adduced evidence establishing his reasons for failing to do so.   Church, 955 F.2d at 700.   Hugo Perera, for example, testified that if the public "were to find out that we were representing Venezuela, it would be an enormous problem" in view of his, Rivera's, and Nuhfer's shared affiliation as conservative Cuban Americans in South Florida, where it would be detrimental for the community to learn of any political dealings with Venezuela's communist government.   Tr. (Apr. 7, Perera) p. 137; see also id. ("Because [Rivera] was a politician, and if people find out [about his lobbying for Maduro], he would never win an election.").   And in Rivera's own words, if the public were to learn the nexus between his conduct and Venezuela's government, "it would be a scandal of monumental proportions."   GX15 p.99.

In that vein, the government asked a number of its witnesses about what their reaction would have been had they known of the $50 million PDV USA agreement and that Rivera was working on behalf of Venezuela's government.   Then-Senator Rubio, who met with Rivera on multiple occasions to discuss U.S.-Venezuela relations—for which Rivera sought payment under the agreement (GX 24 p.6, Rivera: "Tell Hugo to tell his new BFF [Maduro] to pay us for the mtg w Marco")—testified on direct examination that Rivera never told him "that his company, Interamerican Consulting, had a contract for $50 million with an affiliate of PDVSA."   Tr. (Mar. 24) p.45.   And, when asked if that fact would have been of interest to him in his dealings with Rivera, Sen. Rubio confirmed as much, explaining: "because I would have known that if in fact

this was the case, he was representing an entity controlled by the Venezuelan government and it most certainly would have influenced my decision whether to continue down this path or not." Tr. (Mar. 24) p.46.[5]  Similarly, when State Department official Naranjo was asked if it would have been important for him to have known, in his April 2017 interaction with Rivera and Gorrin in Caracas, that they had "received $20 million in 2017 pursuant to a contract with a subsidiary of Petroleos de Venezuela," he responded, "Absolutely."   Tr. (Apr. 2) p. 43-44.   And when Venezuelan opposition leader Julio Borges was asked if he would have met in New York with Rivera and Sessions in April 2017 had he known that "Delcy Rodriguez authorized the payment to [Rivera]'s company," he responded, "Not even in a thousand years."   Tr. (Mar. 27) p. 37.

This testimony was necessary to establish the "chain of events explaining the context, motive, and set-up of the crime," and to "complete the story of the crime for the jury."   Church, 955 F.2d at 700.   In particular, this testimony was necessary to explain why Rivera—who knew that FARA registration would entail disclosure of the Maduro regime's nexus with his activities and the $50 million PDV USA agreement—willfully failed to register, including that public knowledge of these matters would have been catastrophic to his political standing in South Florida, and would also have precluded him from obtaining meetings with political figures, thereby preventing him from obtaining the millions paid to him and his confederates for their activities.

In claiming that the government's offering such testimony was improper, Rivera relies on inapposite case law concerning the government's use of so-called "guilt-assuming hypotheticals" posed to witnesses *called by the defense* to establish the defendant's good character.   Mot. 13-15. For example, in Rivera's lead case, United States v. Guzman, 167 F.3d 1350 (11th Cir. 1999), the Eleventh Circuit held that the district court erred in permitting the government to ask the defendant's character witness whether his opinion of the defendant would have changed if he had

---

[5]  Similarly, on re-direct, the government asked Rubio (who during cross-examination by Mr. Shohat had related his knowledge of Rivera's political persona as a "staunch anti-communist" over the years), was asked, "if [Rivera] had been working for the Maduro regime [in 2017] would that have been completely different?", to which Rubio responded, "It would have been shocking to me."   Tr. (Mar. 24) p.135.

known that the defendant was involved in transporting multi-kilogram quantities of cocaine.   167 F.3d at 1351.   In discussing this issue, the Eleventh Circuit made clear (although it upheld the guilty verdict on harmless error grounds) that the rule it was applying was limited to the specific context of the government's cross-examination of the defendant's own character witness because the "harm in allowing the use of this type of improper hypothetical lies in the effect ***of having the defendant's own character witness assume that the defendant is guilty.***"   Id. at 1353.

Here, the rule in Guzman does not apply for multiple reasons.   First, the government asked the questions described above to its own fact witnesses—not to any defense character witness called by Rivera.   See United States. v. Laurienti, 611 F.3d 530, 549 (9th Cir. 2010) (rejecting the proposition "that the government cannot ask its own fact witnesses otherwise relevant questions that may have a guilt-assuming element").   Moreover, the government did not ask any witness to "assume" Rivera's guilt for the instant offense, e.g., by asking what they would have done had they known Rivera was willfully acting as an unregistered foreign agent.   Rather, the government asked its witnesses how they would have reacted had they known of the $50 million PDV USA agreement, and that the agreement (and Rivera's activities thereunder) had been instituted by Maduro's government.

Indeed, as explained in the government's motion in limine (ECF 341 at p.14-16), there is ample case law approving such hypothetical questions in the government's examination of its own witnesses.   See, e.g., United States v. Hill, 643 F.3d 807, 841–43 (11th Cir. 2011) (rejecting mortgage-fraud-scheme defendant's challenge to the use of hypothetical questions posed to victim lenders concerning whether the disclosure of misrepresentations in loan applications would have affected their loan approvals); Laurienti, 611 F.3d at 549–550 (rejecting defendants' challenge to "guilt-assuming hypothetical" questions posed to government's witnesses in securities-fraud prosecution); United States v. Cuti, 720 F.3d 453, 458–59 (2d Cir. 2013) (rejecting CEO's challenge to hypothetical "what-if-you-had-known" questions to auditors on the effect of withheld

14

information on transactions' accounting treatment).   Rivera's argument is thus without merit.[6]

E.      The Court Did Not Erroneously Limit the Defense from Cross-Examining
        Hugo Perera Based on the FBI 302s or the Schuster Proffer

Rivera claims that this Court erred by precluding the defense from introducing "strong evidence" of witness Hugo Perera's bias in favor of the government.   In support of this claim, Rivera asserts that he should have been allowed to introduce the FBI reports summarizing the government's interviews (four in total) of Perera that had been prepared during the course of the government's pre-indictment investigation.   Rivera seems to assert that the reports are somehow evidence of Perera's bias in favor of the government and therefore admissible as extrinsic evidence under Rule 613(b).   Rivera's argument is without merit (and borderline frivolous).

Rivera prefaces his argument with the assertion that the failure to allow the defense to introduce the contents of the interview reports "is flatly incorrect and is entirely inconsistent with standard cross-examination based on statements reportedly made by testifying witnesses during prior interviews under Rule 613(b)."   But that is simply not the case.   As any experienced practitioner in this district knows, interview reports prepared by law enforcement are not the witness's Jencks material as they are, in general, considered the agent's statements rather than the witness's.   Reports, however, may be used by defense counsel to refresh a witness's recollection provided the proper evidentiary procedures are followed but the reports themselves are not subject to admission to do so.   In addition, defense counsel may use interview reports in relation to impeaching a witness's testimony by, for example, asking a witness whether the witness previously made a specific statement to law enforcement (such as the FBI in this case) that defense counsel believes is inconsistent with the witness's trial testimony.   If the witness then denies making the prior inconsistent statement, defense counsel can call the agent who prepared the report to testify

---

[6]   Finally, Rivera's claim that he moved for the Court to give the jury a limiting instruction regarding such hypothetical questions "on March 24, 2026 . . . at the close of Secretary Rubio's testimony" appears inaccurate.   Mot. at 15-16 & n. 12.   The government was unable to locate the proposed instruction quoted in Rivera's motion in the transcript from March 24 (or otherwise a record that such a motion was made).   Regardless, no limiting instruction was necessary because the questions posed to the government's witnesses were proper as described above.

15

that the witness in fact made the prior inconsistent statement.   A defendant, however, is generally not allowed to impeach the witness by introducing into evidence the interview report itself that contains the allegedly inconsistent prior statement.

This should come as no surprise to Rivera as the Court discussed it in detail with the parties in a pre-trial hearing at which Rivera's defense counsel agreed with Court as to the use of the interview reports at trial.   As this Court may recall, this issue came before the Court through the defendants' motion for discovery concerning an email the government received from Perera's attorney suggesting "edits" to the FBI 302s of Perera's interviews to correct what Perera's attorney (Joseph Schuster) stated were inaccuracies in the reports (ECF 399).   After the government filed its response explaining the circumstances involved in the matter (including that the FBI 302 reports had not been edited or changed in response to Perera's attorney's email and that the agent's notes of the interview had been turned over in discovery along with the interview reports themselves) (ECF 412), the Court held a hearing on March 20, 2026.   During the hearing, the Court reviewed the matter in detail and denied the defendants' motion to depose the agents involved in the interviews, noting that if anything the attorney's email was additional ammunition for the defense to attempt to impeach Perera's testimony (Tr. (Mar. 20) at pp. 30, 33-34).

In doing so, the Court discussed at length with Rivera's counsel the procedures it expected counsel to follow in using the reports to impeach Perera or refresh his recollection, emphasizing that one thing the defense could not do is announce to the jury that there was an FBI report containing the specific statement that defense counsel was asking Perera about (Tr. (Mar. 20) at pp. 30-34).   Indeed, after some back and forth between the Court and the parties, Rivera's counsel acknowledged that he "had no intention to mention and never had an intention to mention to Mr. Perera that there is a 302 that says it.   That, I am not going to do." Id. at 34.   Defense counsel then went on to add "I have every intention to ask:   On such and such a date and to the FBI.   Did you make a statement to the FBI as follows."   In response, the Court advised defense counsel "that's not something I'm not going to permit" and then ran through a brief example of the type of questioning defense counsel would be allowed to engage in.   Id. at 35.   The Court concluded by

16

stating "maybe I'm not disagreeing with you.   Maybe we're all on the same page on that.   I think we're actually in agreement, Mr. Shohat" to which defense counsel replied "okay."   Id.

Accordingly, there ultimately was no disagreement between the parties as to the methodology to be employed to cross-examine Perera with the interview reports and related materials.   Indeed, the undersigned can recall one instance in which defense counsel used one of the interview reports to refresh Perera's memory regarding the date of one of his interviews and defense counsel served trial subpoenas (with the assistance of the U.S. Attorney's Office) on two of the FBI agents who prepared the reports of Perera's interviews.   Although defense counsel ultimately chose not to call either of those agents as witnesses at trial to try to impeach Perera's testimony, that is of no moment as this Court in no way improperly denied Rivera the opportunity to properly use the interview reports to cross-examine Perera at trial.[7]

F.     The Court Did Not Erroneously Admit the "tira flechas" Messages in Violation of Federal Rule of Evidence 403

Rivera's claim that this Court erred in admitting the "tira flechas" text messages is as equally without merit as his other claims.   Rivera once again makes the same arguments previously rejected by this Court and fails to show clear error or manifest injustice in the admission of the text messages under Rule 403.   Accordingly, the Court should deny his motion.

Relevant evidence is generally admissible unless the Rules of Evidence or other federal law provide otherwise.   See Fed. R. Evid. 402.   Evidence is relevant if (a) "it has any tendency to make a fact more or less probable than it would be without the evidence," and (b) "the fact is of consequence in determining the action."   Fed. R. Evid. 401.   In a criminal trial, "issues of consequence generally consist of the elements of the offenses charged and the relevant defenses (if any) raised to defeat criminal liability."   United States v. Williams, 51 F.3d 1004, 1010 (11th Cir. 1995).   The Court may exclude relevant evidence if its probative value is substantially

---

[7] Although Rivera entitled his motion to include that the Court erroneously limited the defense from using the Schuster Proffer to cross-examine Perera, Rivera has abandoned that argument as he does not address the Schuster proffer/email at all in the body of his argument.

outweighed by the danger of unfair prejudice (or the other dangers identified in Rule 403).   Fed. R. Evid. 403.   However, "exclusion for prejudice under Rule 403 is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility."   United States v. Fey, 89 F.4th 903, 913 (11th Cir. 2023); see also United States v. Wilson, 788 F.3d 1298, 1314 (11th Cir. 2015) ("[T]he test under Rule 403 is whether the other acts evidence was dragged in by the heels *solely for prejudicial impact*.") (emphasis supplied). Ultimately, "the trial court is vested with broad discretion in ruling upon the relevancy and admissibility of evidence."   Williams, 51 F.3d at 1010.

Here, Rivera's defense at trial (including his affirmative defense that he was exempt from registering under FARA pursuant to the not-predominantly-serving-a-foreign-interest exemption) included, in relevant part, that Rivera's lobbying-related activities were undertaken in conformance with U.S. foreign policy to assist the Venezuelan opposition and help the Venezuelan people – who were suffering the economic and humanitarian consequences of a living under the rule of a corrupt regime – rather than for the $50 million Rivera was to receive for assisting the Maduro regime in normalizing Venezuela's relationship with the United States.

Rivera's defense counsel, for example, said as much in his opening statement stating that the La Luz chat messages "are only about supporting the Venezuelan opposition." (Tr. (Mar. 28) at p. 93).   And both the government and defense admitted at trial excerpts from Rivera's deposition in the SDNY civil case in which Rivera repeated these claims.   See DRX 811 (stating, in reference to the April 2018 meetings in Caracas with Maduro and Congressman Sessions, that Rivera was "working for the people of Venezuela, but I wasn't paid if that's how you define work"); GX 653A1-TR (stating, in reference to the April 2017 meeting in New York City between Venezuela's Foreign Minister Delcy Rodriguez and Congressman Sessions, that Rivera helped arrange the meeting for the "same reason I did the April [2018 Caracas] meeting, for the Venezuelan people and the opposition").   That is no surprise as Rivera to this day continues to assert that, despite the vast amount of evidence to the contrary, the evidence in this case was "entirely about supporting the opposition efforts to remove Maduro."   Mot. at p. 3.

18

As a result of Rivera making his purported support for the opposition and Venezuelan people a defense at trial, the government offered the tira fleches text messages (GX23 p. 20) to counter his claims that his actions were acts of good will rather than an effort to be compensated an outrageously large amount of money by the Maduro regime.   Accordingly, it was the government's position that Rivera's text messages with Perera in which Rivera made disparaging remarks towards Venezuelans belied his essentially good-faith defense (including his claimed exemption from registering under FARA) at trial.

The Court agreed with the government and allowed the admission of the relevant portion of the text chat because it "goes directly to the contrary – to the message, which is Mr. Rivera's message, which is they wanted to help the Venezuelans and the Venezuelan people.   And the government's point is yet, here he is saying these negative things about Venezuelans." (Tr. (Apr. 8) at pp. 160-61).   See also Tr. (Apr. 6) at pp. 4-28 (discussing GX 23 (tira flechas text messages) and GX 26 (little brown Indian texts)).   And Rivera has proffered nothing in his motion establishing that the Court's ruling was error let alone clear error.

To the extent that Rivera now claims that the government unfairly touted the tira flechas texts during trial, he greatly exaggerates the issue.   Based on the Court's rulings, the questioning of Perera during his direct was rather limited (Tr. (Apr. 8) at pp. 149-151) and the government directly referenced the texts again only (to the undersigned's knowledge) towards the end of its opening close in reference to Rivera's affirmative defense that there was no requirement to register under FARA pursuant to the exemption for activities not serving predominantly a foreign interest. Id. at pp. 165-66).[8]   Indeed, in the defendant's closing argument, defense counsel spent more time discussing the tira flechas text messages – telling the jury that it was just unfortunate political dialogue – than the government spent in its closing remarks.   Id. at pp. 179-85.   Accordingly, this

---

[8] Contrary to Rivera's assertions, the government did not refer to the tira flechas text messages during Congressman Sessions cross-examination. Rather, the government asked Congressman Sessions whether he had ever heard Rivera criticize or make derogatory remarks about the people of Venezuela, but quickly moved on from the topic without referring to the tira flechas text messages or government exhibit GX23.   Tr. (Apr. 27) at pp. 129-30.

Court committed no error in admitting the tira flechas text messages and Rivera's motion should be denied.

G.     The Court Did Not Improperly Disparage Rivera's Closing Argument

In advance of trial, the parties litigated the government's motion to compel disclosure of, and discovery regarding, any advice of counsel defense as to both defendants Rivera and Nuhfer. On February 21st, the Court granted the government's motion in relevant part, ruling that if either defendant intended to assert a defense of good-faith reliance on advice of counsel, that defendant would be required, by March 2nd, to identify any attorneys they consulted with regarding the defense, and to waive privilege and produce any such attorney communications. The order further stated: "Any Defendant who does not timely comply with these disclosure requirements will be barred from raising the advice of counsel defense or mentioning evidence concerning this defense before the jury." ECF 360 p.2. Neither defendant noticed an advice-of-counsel defense or made the requisite disclosure by March 2nd and, accordingly, Rivera was barred from "mentioning evidence concerning this defense before the jury."

During his closing argument, Mr. Shohat highlighted the October 5, 2017 message Rivera sent to the MIA Chat Group, in which he claimed to have consulted with an attorney regarding the assignment of the $50 million agreement from PDV USA to its Venezuelan parent, PdVSA. Tr. (Apr. 29) pp. 16–22, 28–33. That text message, which was alleged in the superseding indictment as an overt act (ECF 122 p.24), and contained in the government's and defense's exhibits for the MIA Chat (GX15 p.99, DRX776 p.141), is excerpted in relevant part below:

> Raul, I just talked to Eduardo Orsini [from PDVSA]. He asked me for two things. 1. That I sign the transfer of the contract from PDV USA to PDVSA Caracas. 2. That I send a report justifying the first three payments. About 1. Just as it was impossible to transfer it when asked for four months ago, it is even more impossible to transfer it now, as it would harm our efforts for Eric [Malpica Flores]. It would be impossible to resolve Eric's situation based on a contract with an entity that OFAC considers a source of income for people already sanctioned and that at this moment is sanctioned by OFAC (particularly, if Miss Clairol [*i.e., Marco Rubio*] is involved). ***And secondly, a contract with PDVSA Caracas requires registering with FARA (Foreign Agent Registration Act), which my attorney has told me is currently illegal due to Trump's sanctions on PDVSA, and not to touch it with a 50-foot pole, but it would be a scandal***

*of monumental proportions*. \*\*\*

During closing argument, as Mr. Shohat began quoting from this text message extensively—and arguing the inferences therefrom in respect to Rivera's good faith defense—he at first drew no objection.   Tr. (Apr. 29) pp. 16–17.   It was only when Mr. Shohat, immediately after reading the bolded text above, stated— "Right there.   You see in starkest possible terms that David Rivera, **with the advice of his attorney"**— that the government objected.   Id. ("AUSA Cruz: Objection, Your Honor.   There's no evidence of that, no advice of an attorney. The Court: Sustained.").   Immediately thereafter, Shohat continued: "Based on what he said in his text message, [Rivera] could not assign that contract and never did assign that contract to PDVSA and believed that as long as the contract was with PDV USA, an American company, it was perfectly legal, right there, in writing in the government's own document. . . . Ladies and gentlemen, this is hardcore proof of David Rivera's good faith in this case"—without any objection.

Thereafter, Mr. Shohat returned to the October 5th text message in his discussion of the element of willfulness under FARA: "Third, that the defendant acted knowingly and willfully.   As you'll see in these instructions, . . . with a bad purpose to disobey or disregard the law. You just saw Defendant's Exhibit 776, page 141, *where he said his bad purpose was based on attorney advice that he couldn't assign the contract*."   Tr. (Apr. 29) at 21.   AUSA Cruz again objected, "no attorney advice in this case," which the court sustained, following which Mr. Shohat stated (without objection): "It's in the chat.   You saw what Mr. Rivera said.   He had to act willfully with a bad purpose to disobey or disregard the law."   Id. Thus, once again, counsel was free to highlight the communication and argue the inferences therefrom as to Rivera's good faith—but, consistent with the Court's ruling, he was precluded only from arguing that Rivera's "purpose was based on attorney advice."

Later in closing, Mr. Shohat returned to this subject yet again as he argued to the jury that the $50 million contract was "perfectly legal," and that Rivera, like witness Hugo Perera, believed it to be so.   Tr. (Apr. 29) at pp. 28-29.   At this time, as he did during his earlier remarks in closing, Mr. Shohat again displayed to the jury a slide containing advice-of-counsel-defense arguments

21

relating to the October 5 text message, in direct contravention of the Court's order (id.):

| | |
|---|---|
| Mr. Shohat: | [T]he evidence in this case is that David Rivera believed in good faith that no FARA registration was needed and there was no agreement not to file a FARA.   Ever.   Let's talk about that. |
| AUSA Cruz: | Judge, the slide again. |
| Mr. Shohat: | I took the slide. |
| AUSA Cruz: | Misstates any allowable defense of advice of counsel. |
| Mr. Shohat: | I took the slide off. |
| AUSA Cruz: | Objection, Judge. |
| Mr. Shohat: | Let's talk about – |
| The Court: | The objection is sustained.   And the jury, please disregard comments regarding conversations and advice from counsel. |
| AUSA Cruz: | Thank you, Your Honor. |
| Mr. Shohat: | Your Honor, they put – they put the exhibit in evidence, not me. |
| The Court: | Move on. |

On the next page of the transcript, Mr. Shohat again argued this issue, without objection:

Hugo Perera told you there was never a mention of a FARA, not until he saw DRX776, page 141 [*i.e.*, *the October 5 text message*], which I just showed you. In October where David Rivera says he cannot assign the contract because it would require filing a FARA, they didn't even hear of FARA.   You'd have to find that there was proof beyond a reasonable doubt of an agreement not to file a FARA.

And in the final remarks of his closing, Mr. Shohat *again* argued, to no objection, Rivera's good-faith based on the October 5th message, stating: "It's all over the chats.   The last place it is is DRX776, page 141.   This is absolute evidence of Rivera's actual good-faith belief that he had no obligation to register under FARA.   Even if he's wrong . . . that's what he believed."   Id. p.33.

After Mr. Shohat's closing, outside the presence of the jury, the Court pointed out that the defense case "is not an advice-of-counsel defense. And we've litigated this. And we made it very clear you were not asserting an advice-of-counsel defense."   Id. p.48.   In response, Mr. Shohat claimed, erroneously, that the Court "in front of this jury, you have told the jury to disregard a piece of evidence in this case."   Id.   But the Court's limited remark before the jury—"please

disregard comments regarding conversations and advice from counsel"—were merely directed to Mr. Shohat's "comments" at that time on Rivera relying on "advice from counsel"—and could not possibly be construed as an instruction to disregard the October 5th message that was discussed extensively throughout both defendants' closings, and then went to the jury in the defense and government exhibits of the MIA Chat (as well as the indictment itself).

As shown above, Rivera's claim—that the Court "instructed the jury to disregard the argument" that the government could not prove Rivera's lack of good-faith beyond a reasonable doubt in view of the October 5th message, and "this was extremely prejudicial" to his defense (Mot. at 19-20)—is wholly without merit.   To the contrary, the transcript reflects that Mr. Shohat had free rein to present the text message and to argue appropriate inferences therefrom, and was limited only in his attempts to argue that Rivera relied on advice of counsel, contrary to the Court's pre-trial ruling (which is not challenged in the instant motion).   The motion should be denied.[9]

### Conclusion

For the reasons stated above, this Court should deny Rivera's Motion for New Trial and Judgment of Acquittal.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By:      /s/ Harold E. Schimkat
Harold E. Schimkat, AUSA
Roger Cruz, AUSA
Court ID No. A5500567
Fla. Bar No. 157971
99 N.E. 4th Street, 4th Floor
Miami, Florida 33128
Office: (305) 961-9298

---

[9]   Rivera's claim that "at no time did the Court make it clear to the jury that it, and not the Court, was to determine the facts related to the Good Faith defense" is equally unfounded.   The Court instructed the jurors that they were "judges of the facts" (ECF 491 at p.36); gave a fulsome instruction on Rivera's theory of defense, including his "good faith" (id. at p.28); and gave a separate "good-faith defense" instruction applicable to both defendants, including that "one who expresses an honestly held opinion . . . is not chargeable with willful intent even though the opinion is erroneous, or the belief is mistaken."   Id. at p.31.

23

Cell: (786) 378-4344
Harold.schimkat@usdoj.gov

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on July 6, 2026, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.

 /s/   Harold E. Schimkat                    
Harold E. Schimkat

24