UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

No. 22-cr-20552-DAMIAN/Torres

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DAVID RIVERA,

      Defendant.

_____/

**DAVID RIVERA'S REPLY TO GOVERNMENT'S RESPONSE TO RIVERA'S
MOTION FOR NEW TRIAL
<u>AND FOR JUDGMENT OF ACQUITTAL</u>**

Defendant, David Rivera ("Rivera") respectfully replies to the Government's Response in Opposition to his Motion for New Trial (DE 563).

**INTRODUCTION**

The Government's Response is outrageous, and for more than one reason. First, with regard to Rivera's Statute of Limitations jury instruction argument ("SOL"), the prosecutors have the temerity to literally ignore the evidence (and with-it Rivera's entire argument) that they misrepresented the DOJ's position when they argued and convinced the Court that the SOL does not begin to run until a non-filer files a FARA registration. Instead of addressing Rivera's argument and supporting case authority, the government argues only that there is sufficient evidence in the trial record to support the conviction over any SOL argument Rivera might make.

Crucially, this argument ignores the cited Eleventh Circuit case law that a jury instruction is required as to any defense as to which there is evidentiary support even if the Court believes the weight of the evidence is otherwise. (MFNT at pp. 10-11) (citing binding Eleventh Circuit caselaw), a point the government actually conceded in DE 468, p.1.

More broadly, the arguments advanced by the Government in response to Rivera's opening contention that not a single piece of evidence offered at trial shows actual support for Nicholas Maduro's government by Rivera or Nuhfer, are nothing more than a broadside assault on the truth about the actual trial evidence.  They are also a continuation of the prosecutorial slight of hand at the very end of the trial, to the effect that somehow Rivera pulled the wool over the eyes of Marco Rubio and others, tricking them into believing that he opposed Maduro when he actually was trying to help him. *There was no evidence in the case that Rivera supported, said or did anything to help Maduro-none.* As William Shakespeare famously wrote in Act 5, Scene 5 of Macbeth, the government's 'throw it up and see what sticks' response "is all full of sound and fury, signifying nothing."

**RULES 29 AND 33**

Rivera opened his Motion for New Trial ("MFNT") by laying down a direct challenge to the government on the actual weight of the evidence. In the process of doing so, Rivera referenced the key government and defense exhibits - the months-long series of chat threads containing the

#112132361v1

contemporaneous conversations of the so called "four partners," Rivera, Nuhfer, Gorrin and Perera. Rivera contended, just as he did at trial on the cross examination of Perera and in his arguments to the jury, that not a single line in any of the chat threads was in support of Maduro. Rivera even pointed specifically to the chat thread in which Gorrin told Rivera that Maduro told him to "go f—k myself" when he proposed that Maduro support free and fair elections in exchange for a soft landing upon his exit. Neither Perera nor the government ever pointed to a single statement in support of Maduro. Incredible! Revealing!

The government response offers nothing but deflection with arguments like; they kept seeking payment and they arranged meetings with Rubio and Sessions (Response p. 7 ), they tried to find a lawyer for Malpica (Id.) and Perera's repeated statements that the Consulting Agreement was about normalizing relations (Id.). None of which, including Perera's obviously transparent and conclusory statements about normalizing relations, actually establish a specifically identified effort to help the Maduro government. The actual evidence at trial, including the testimony of Rubio, Borges, Ballard, Morris and Sessions, was that *every single thing* Rivera said and did, including the Exxon effort, was in support of the Venezuelan Oppositions' efforts to remove Maduro. Even Perera admitted on cross that references to "normalizing relations" meant removing Maduro and *thereafter* normalizing relations, (Tr. excerpt April 13, 2026 at pp 39-42) (DRX 776 pp. 10-11) something the charged FARA agency could not possibly have contemplated.

Bottom line, just as set out in the MFNT, after cutting through the government's lists of evidentiary points- nothing more than 'smoke and mirrors'- the overwhelming weight of the trial evidence supports Rivera motions under both Rules 29 and 33, F.R.Cr.P. and said motions should be granted.

### PART I STATUTE OF LIMITATIONS

It is axiomatic that parties are barred from mispresenting the facts or law in an effort to win an argument. At trial, in the face of long and extensive litigation on the issue, the Government made no mention of the amendment to FARA, sought and secured by the DOJ, for the express purpose of clarifying that the SOL begins to run from the last day that a non-filer acts as an unregistered agent in arguable violation of FARA, not from the day a non-filer files a FARA. (See

3

#112132361v1

DE 543-1, MFNT, Exhibit "A"). The government completely ignored this argument and its obvious ramifications for Rivera's jury instructions request at trial. Instead, they argued, in a nutshell, that Judge Bork's dissent in *United States v. McGoff*, 831 F.2d 1071, 1072 (1987), that the better argument is that the SOL only begins to run when a non-filer actually wakes up and files a FARA. This means that there effectively is no FARA SOL.[1] The obvious red flag of arguing a never adopted dissent is also wholly ignored. But it must not be lost on the Court.

Moreover, as it turns out, the Bork argument is beside the point. Particularly so, in light of the arguments made by the government in DE 468, as well as additional evidence that the government failed to disclose on the SOL issue.

At page 5 of DE 468, the government specifically states, "[h]owever, rather than apply the unambiguous language of the statute, the [*McGoff*][sic] majority declared § 612(a) to be ambiguous *and embarked on a lengthy journey through the statute's legislative history*, the rule of lenity, and other canons of statutory interpretation. See generally [*McGoff*] id. at *1084–96*." (*emphasis added*). At this point in DE 468, the government pushes Judge Bork's *dissenting opinion* that the language in the statute is unambiguous, erroneously convincing this Court to adopt the dissent, which now requires reversal. It is clear that the *majority* found that the language in the statute *is* ambiguous and thus explored in great detail the legislative history of the statutes. While the government continues this argument in their response, contrary to the position taken by the DOJ at the time, it remains a *minority* opinion, one that the majority in *McGoff* discredited and no court has adopted. This Court cannot allow the government to mislead it again.

It follows that if the government makes the specific argument in their papers that the *McGoff* court, "embarked on a lengthy journey through the statute's legislative history," and then cites specifically to the portion of the opinion where the majority did just that, it cannot argue that

---

[1] In their filing, DE 468, regarding the SOL issue, the Government conceded that a jury instruction is required "if the Defendants can provide "an evidentiary foundation . . . if believed by the jury, [that] would be legally sufficient to render the accused innocent" under the statute of limitations. *United States v. Edwards*, 968 F.2d 1148, 1153 (11th Cir. 1992)". See also MFNT pp. 10-11 (citing binding Eleventh Circuit caselaw). At no point has the government argued that an evidentiary foundation for such an instruction does not exist.

#112132361v1

they did not also read that portion of the *McGoff* opinion. Having done so, they must have understood that it was their own agency, the **DOJ,** which was taking a specific position, one also asserted by Rivera. about the initiation of the SOL time period, at the time the legislation was being drafted: *that the SOL begins to run from the last day that a non-filer acts as an unregistered agent in arguable violation of FARA.*

In *McGoff*, at pages 1085-1086, the majority states in pertinent part:

> As the section presently reads there is room for doubt as to whether the statute of limitations against prosecution of an agent for failure to comply with the registration provisions of the act commences to run from the date on which he was first required to register or from the last day on which such unregistered agent has acted. *Doubt has also arisen as to the liability of an agent to file a registration statement for the period during which he was acting as an agent of a foreign principal if he has since ceased such activity.*
> ….
> We thus see in the genesis of the bills amending sections 612(a) and 618(e) respectively *a common concern on the part of the Executive Branch to prevent the statute of limitations from expiring while the foreign agent continued his or her efforts on behalf of a foreign principal.* We see in the proposed amendment to section 612 the concern over whether an agent's ceasing activities could be deemed to cut off liability for failing to comply with FARA's registration requirements. (***We likewise see in Mr. Ford's letter an "either or" approach that excludes the Government's interpretation: the statute begins to run either "from the date on which he was first required to register or from the last day on which such unregistered agent has acted."***) In tracing the separate path each bill took in Congress, *we find clear indications in the history of section 612(a) that Congress enacted the amendment with the intention of addressing both concerns*." (emphasis added).

It could not be any clearer from reading this excerpt from *McGoff*, to which the government directed the court in DE 468, that they must have been aware of a decades long position advanced by their own DOJ. That position is in direct contravention of the position that they took in this case and at odds with the dissenting view of Judge Bork, of which they convinced this Court.

Additional evidence that the government failed to disclose on the SOL issue is contained in the following exhibits:

#112132361v1

Exhibit "B" - the written and oral testimony of then Chief of DOJ's Foreign Agents Registration Section given to Congress in 1950, where he stated, "In order to make certain of the fact that the statute will not begin to run *until the last day* on which a person acts in the United States for a foreign principal." (*emphasis added*) Thus urging passage of the amendment on the *exact same* argument the defense made to the Court.

Exhibit "C" - an excerpt from the House Congressional Record dated April 3rd, 1950 showing the passage of HR 4326 to Amend Sections 2 and 7 of the Foreign Agents' Registration Act "to make failure to register a continuing offense…and to continue the obligation to comply with the act despite the dissolution of the agent."

Exhibit "D" - an excerpt from the Senate Congressional Record, dated in 1950, showing the passage of the amendment by the Senate and clarifying, in the most plain language possible, that under the amendment the SOL runs *"only from the last day on which the unregistered agent acts as such"* which again is precisely our argument to this Court. (*Italics supplied*)

Exhibit "E" - a letter, dated April 12, 1949, from Peyton Ford to The Speaker, House of Representatives, describing the proposed amendment to section 612(a), which would clarify, "whether the statute of limitations against prosecution of an agent for failure to comply with the registration provisions of the act commences to run from the date on which he was first required to register or from the last day on which such unregistered agent has acted."

Collectively, these exhibits, as well as the portion of the *McGoff* opinion to which the government directed the court in DE 468 as well as DE 543-1, MFNT, Exhibit "A", leave no room for doubt that Rivera is correct.

Though Rivera's argument is not dependent on it, the record is a template for *Judicial Estoppel*, estoppel by inconsistent position. E.g., *New Hampshire v. Maine,* 532 U.S. 742, 749-50 (2001).[2]   The doctrine targets those who "deliberately" mislead courts, not those whose inconsistent positions stem from "inadvertence or mistake."  *Id*. at 750, 753. The government

---

[2] "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."...*Davis* v. *Wakelee,* 156 U.S. 680, 689 (1895). *Pegram* v. *Herdrich,* 530 U. S. 211, 227, n. 8 (2000); see 18 Moore's Federal Practice § 134.30, p. 134-62 (3d ed. 2000) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding"); 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4477, p.782 (1981) (hereinafter Wright) ("absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory"). 532 U.S. at 749

6

should not be allowed to get away with what they argued to the Court, especially given their own DE 468 citation to the legislative history discussion in *McGoff* and without even addressing the arguments advanced by Rivera in his MFNT.[3]

Prosecutors are officers of the Court and, as such, have the fundamental duty to give the Court any authority that is counter to their position. See Rule 4-3.3(a)(2) and (3), Florida Rules of Professional Conduct.  Even if they did not know about this evidence before the defense put it on their plate, which would arguably be negligence in the first degree, to intentionally steer the Court away from the DOJ's official position as set out in extensive legislative history and as reaffirmed *McGoff* in DE 468, a legal position from which neither the DOJ nor any court has ever receded, and then to ignore it in their Response after Rivera argued it squarely in his MFNT, strongly suggests that the government violated their duties of candor and honesty to the court in an effort to maintain the verdict.

Rivera's trial argument in support of a SOL jury instruction was based on substantial evidence in the record *which has never been questioned by the government*, evidence in fact largely offered *by the government* in the testimony and email correspondence of Gina Coon and Arnardo Arcay, and expanded on during the cross-examination of those witnesses, to the effect that Rivera's foreign agency under the Consulting Agreement was terminated in May 2017 more than five years before the indictment in November 2022. Rivera's defense was that nothing that occurred after May 2017 was FARA activity and a properly instructed jury could well have agreed. But the Court was misled by prosecutors who never revealed and, in DE 468, intentionally deflected the Court away from the DOJ position on the SOL and the congressional amendment which codified that position. If left standing, this is reversable error. Respectfully, it is the responsibility of this Court to correct the injustice now, to stop the financial bleeding, the enormous waste of time and the

---

[3] In *New Hampshire,* the Supreme Court expressly rejected the state of New Hampshire's argument that "ordinarily judicial estoppel is not applied to states". 522 U.S. at 755-756 They did so in part because this is not a case where "…the government is unable to enforce the law because the conduct of its agents has given rise to an estoppel." The same is true in this case inasmuch as only a proper jury instruction, not the ability of the government to enforce the law, is at stake.

7

improper incarceration of Rivera by setting aside the improperly obtained verdict and ordering a new trial.

### REMAINING ISSUES IN MFNT

### PARTS II AND III

With regard to its use of guilt assuming hypothetical questions, the government's reliance on *United States. v. Laurienti*, 611 F.3d 530, 549 (9th Cir. 2010) is misplaced. The operative language in that case is,

> "With respect to the government's fact witnesses, however, there appears to be no support for the proposition that the government cannot ask its own fact witnesses otherwise relevant questions that may have a guilt-assuming element. The government's questions in this case were plainly relevant and probative: In order to establish materiality of Defendants' actions, the government asked questions such as, *"If you had known prior to purchasing [a house stock] that Hampton Porter prevented or discouraged their brokers from allowing their clients to sell their shares of [the house stock], would you have purchased the [shares of the house stock]?"* Because those questions have much more than "negligible probative value as it bears on the central issue of guilt," *id.*, our primary concern with respect to character witnesses simply does not apply. We therefore hold that the district court did not abuse its discretion by permitting the government's questioning of its own fact witnesses. [internal citations omitted] (*Italics added*)

The key language is "otherwise relevant questions that may have a guilt assuming element". In this case, simply asking fact witnesses such as Marco Rubio, Julio Borges, Brian Ballard and others "would they have dealt with Rivera had they known that he had a $50M contract with the Maduro government" is not "an otherwise relevant question that may have a guilt assuming element." The purpose of the Consulting Agreement was a highly contested factual issue at trial. In *Laureinti*, there was *no* contested factual issue over the facts that formed a central part of the hypothetical question. This distinction makes all the difference in the world because it makes the guilt assuming hypothetical questions in this case, containing no fact other than the contract itself, probative of no contested fact in the case and not just a question "which *may* have a guilt assuming element". The guilt assuming element was the *only* element of the hypothetical questions in this case.

#112132361v1

The government's argument that hypotheticals were relevant to corroborate Hugo Perera's testimony that Rivera did not want to file a FARA because he was running for office and voters would have reacted negatively to him having a contract with the Maduro government, (Resp. at p. 12) does not correct for the factual vacuity of the hypothetical, where the purpose of the contract was a major issue at trial. In the end, the relevance of the guilt assuming hypotheticals, without the facts behind the contract, to corroborate Perera's 'need to keep the contract secret' testimony, with no reference to the disputed purposes, rendered the guilt assuming parts of the questions far more prejudicial than probative. Any corroboration of Perera's testimony was accomplished with testimony that Rivera did not mention a contract to the witness, not in the highly prejudicial "what would your reaction have been" hypothetical.

Finally, there is a difference between "concealing" something and not discussing something that has no relevance. The Rubio and Borges meetings, which were after the contract was cancelled, had nothing to do with the contract and were about ousting Maduro. There was no relevance to the contract. The Venezuelan government would and did not pay even $1 for meetings with avowed enemies Rubio and Borges. The guilt assuming hypotheticals, particularly as deployed by the government at trial, were pure conjecture and seriously and unfairly prejudicial. [4]

As for Part III of Rivera's MFNT, arguing error by the Court in refusing to give the jury a limiting instruction as to the hypothetical questions, this is another argument which the government choose to simply ignore in its response. (See Gov't Response pp. 11-14)

## PART IV

The Government just does not understand Rivera's argument in Part IV of his MFNT, or worse, the Government is seeking to set up, and then knock down, an inept strawman by making the following statement at page 15 of its Response: "Rivera asserts that he should have been allowed to introduce the FBI reports summarizing the government's interviews (four in total) of

---

[4] E.g., eliciting the "[i]t would have been shocking to me" statement from Secretary of State Rubio in response to a repetition of the question as the last question on his redirect immediately following which Rubio marched out of a side door of the courtroom along with his Secret Service entourage.  [Tr 3/24/2026 (condensed):113: l-18]

9

Perera that had been prepared during the course of the government's pre-indictment investigation. Rivera seems to assert that the reports are somehow evidence of Perera's bias in favor of the government and therefore admissible as extrinsic evidence under Rule 613(b)."

Rivera *never* moved for admission of the reports themselves, rather, relying on the requirements of Rule 613(b), F. R. E, Rivera opened Part IV of his motion by stating,

> "However, it is not possible under the Federal Rules of Evidence to impeach the witness and to later perfect the impeachment by admitting extrinsic evidence if the content of the report, *i.e.*, the statement made, is not referenced. Indeed, "extrinsic evidence of a witness's prior inconsistent statement may not be admitted until *after the witness is given an opportunity to explain or deny the statement*." Fed. R. Evid. 613(b) (emphasis added).. The statement (meaning the content of the report) *must* be revealed and asked about in open court before the jury." MFNT at page 16.

Rivera's argument goes on: "[t]herefore, the government's insistence and the Court's agreement that "introducing the contents of such reports" is not permitted is flatly incorrect and is entirely inconsistent with standard cross-examination based on statements reportedly made by testifying witnesses during prior interviews under Rule 613(b)." Id., pp. 16-17.

Rivera merely sought to ask Perera if he had ever made certain statements to federal investigators at odds with his trial testimony, standard cross examination, and the government, by arguing that such statements recorded in interview reports are the statements of the agents and not of the witness, induced the Court into error. Rivera was entitled to impeach Perera with prior inconsistent statements reported by federal investigators, including 32 instances where he claimed investigators mis-reported or needed to be corrected, and as required by Rule 613(b) in order to lay a predicate for potential later agent testimony as to his statements as well to prove Perera's pro-government bias. In pretrial rulings, the Court essentially shut down this questioning and severely prejudiced Rivera's defense. The government continues not to address Rivera's argument.

## **PART V**

In Part V of his MFNT, Rivera directly challenges the government's use, on multiple occasions, including during its closing arguments, of GX 23, page 16 which (falsely) attempts to paint Rivera as a racist towards Venezuelans. Without even attempting to deny the racist

implications of the exhibit or even its own intention to inflame the Venezuelan connected jury about Rivera's animus towards Venezuelans, the government merely argues that the exhibit had relevance because Rivera's defenses assumed an intention to help ordinary Venezuelans. (Resp. at p. 18) He could not have had such intentions, they contend, because Rivera actually loathed Venezuelans[5] Then, in footnote 9 at page 19 of its Response, the Government concedes that during its cross-examination of Congressman Sessions it referred to "derogatory" remarks Rivera made about Venezuelans. The arrogance of the Government's complete adoption in their Response of their intention to show Rivera to be a racist is highly relevant.

Rivera's MFNT directly, specifically and in considerable detail challenged, as he had done at trial, the relevancy of the "savages" text.[6] And the issue is not whether such evidence has *some* probative value, but whether, under Rule 403 and the cited cases, the "probative value is substantially outweighed by the danger of unfair prejudice." Because of the minimal probative value at best, particularly in light of the whole context of the exhibit which demonstrates it to be a political statement about *liberal Venezuelan- Americans living in the United States* who oppose conservative Republican policies, *not Venezuelans living in Venezuela*, the "danger of unfair prejudice", particularly as the exhibit was actually deployed and emphasized by the prosecutors multiple times with this particular Venezuela connected jury, was overwhelming. The admission of GX 23, page 16 and its repeated misuse over objection, was manifest error.

**PART VI**

Part VI of Rivera's MFNT assigns as serious error the Court's rulings during counsel's closing argument on objections by the government to counsel's references to part of GX 15, a text thread by Rivera on October 5, 2017, in which he explained to Raul Gorrin why he had refused to accept renewed efforts to get him to agree to assign the Consulting Agreement from PDV USA to

---

[5] From the government's Response at page 19: " [a]nd the government's point is yet, here he is saying these negative things about Venezuelans." (Tr. (Apr. 8) at pp. 160-61). See also Tr. (Apr. 6) at pp. 4-28 (discussing GX 23 (*tira flechas* text messages) and GX 26 (little brown Indian texts))"

[6] (MFNT at pages 18-19).

#112132361v1

PDVSA. In the message, introduced into evidence in its entirety by the government[7], Rivera makes reference to lawyer advice *that he should not assign the contract to PDVSA*. Pretrial Rivera agreed that he was not advancing an advice of counsel defense to the FARA charges in the indictment. The GX 39/GX 15 reference had nothing to do with any advice of counsel regarding whether to file a FARA, the charge in the indictment. The reference in the government exhibits was only to the assignment of the contract.  If the government had any concerns regarding Rivera's reference to counsel in the exhibits they introduced, they could have initially proposed a redacted version and any issues could have been aired and adjudicated by the court other than on the spur of the moment in front of the jury near the end of defense counsel's closing argument, the worst possible time.  This, the government did not do.  Nevertheless, the Court jumped on the government objection totally unresponsive that the government had opened the door by introducing the unredacted exhibit, (TR 4/29/2026: 17:15-17; 21: 4-10 (("it's in the chat")); 29: 2-15 (("Your Honor, they—put the exhibit in evidence")). Ignoring the opened door, the Court ordered counsel not to reference language in the government's own exhibit and ultimately instructed the jury in a manner easily interpreted as undercutting Rivera's entire good faith defense on which the jury had already been instructed by actually telling them, in effect, to "disregard" counsel's references to the government's own exhibit as part of Rivera's good faith argument. (Id.:29:9-11). And this occurred literally at the end of Rivera's closing argument. This was seriously wrong and prejudicial!

---

[7] See e.g., Tr. 4/9/2026 at page 45 where, during the direct examination of Hugo Perera, the government introduces GX 39A containing this excerpt from GX 15.

WHEREFORE, David Rivera asks that this Court grant this Motion and grant a judgment of acquittal or, alternatively, order that a new trial be conducted.

Respectfully submitted on July 23, 2026.

**EDWARD R. SHOHAT, PA**
201 S. Biscayne Blvd., Suite 3000
Miami, FL 33131
Tel: (786) 525-3621
By:    */s/ Edward R. Shohat*
       **Edward R. Shohat**
       Florida Bar No. 152634
       ed@edwardrshohat.com

**JONES WALKER LLP**
201 S. Biscayne Blvd., Suite 3000
Miami, FL 33131
Tel: (305) 679-5700
By:    */s/ David S. Weinstein*
       **David S. Weinstein**
       Florida Bar No. 749214
       dweinstein@joneswalker.com
*Counsel for David Rivera*

13

#112132361v1