UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 22-CR-20552-DAMIAN

UNITED STATES OF AMERICA

vs.

ESTHER NUHFER

_____/

### ESTHER NUHFER'S SENTENCING MEMORANDUM

"I have watched [Esther] spend her entire life helping people, caring for our family, giving to her community, and putting others before herself." *Brenda Nuhfer*

This is the person who is before the Court for sentencing.

### I.   INTRODUCTION

Esther's life is much more than the conduct at issue in this case.   To the contrary, "[s]he is defined not by one chapter of her life, but by <u>decades</u> of compassion, responsibility, loyalty, and services to others."   *Aimee Artiles* (emphasis added). "That is the person I hope the Court will see."   *Brenda Nuhfer*.   Our system of justice has long recognized that it is incumbent on the Court to examine every part of her life.   As the Supreme Court has directed – "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate . . . the crime and the punishment to ensue."   *Koon v. United States*, 518 U.S. 81, 113 (1996).   When Esther's history is viewed in full — and when the profound and enduring impact she has had on those around her is given its proper weight — the only just conclusion is that a downward variance to a sentence of probation is warranted.   Simply put, "[s]he doesn't belong behind bars."   *Alina Garcia*.

The number of facts and factors that support a downward variance to a sentence of probation include:

- Esther is a first-time non-violent offender;

- She is a generous, kind, compassionate, and faithful person, who is essential for the health and well-being of her elderly parents – care that no one else can regularly provide;

- The government viewed her (during trial) as someone who did not need to go to prison; it offered her probation;

- Her role was minimal; she made no substantive or essential contribution towards accomplishing any "normalizing of relations";

- As acknowledged by the PSR, there are no victims in the case;

- Rivera's and others' efforts to resolve legal and political disputes for PDVSA, the Venezuelan government, or Nicolas Maduro accomplished nothing; no U.S. policy was changed and no Venezuelan progress was made;

- Other more significant players – Hugo Perera, Raul Gorrín, Bertica Cabrera – were never charged;

- Sentences in other comparable FARA cases support a significant variance below the advisory guidelines;

- Money laundering charges are not meant to dictate, and barbarically increase, a sentence when the underlying offense is less serious; and

- The primary charge of conviction is, at bottom, the failure to file a form.

We will not burden the Court with a lengthy explanation of the law and history relating to *Booker* and the § 3553(a) factors, of which the Court is already aware. Instead, we will focus on the most relevant issues for the August 18th sentencing hearing.

## II.   THE NATURE AND CIRCUMSTANCES OF ESTHER'S OFFENSES DEMONSTRATE THAT A SIGNIFICANT DOWNWARD VARIANCE IS WARRANTED

### A. Congress did not intend to punish FARA violation offenders the same as sex traffickers, violent offenders, or narco-terrorists.

FARA is a disclosure statute:  it does not prohibit underlying conduct but rather requires individuals to fill out a form with the FARA Unit.  Start with the number Congress chose for those who didn't file this FARA form. Five years. That is the maximum for the worst FARA offender the law can imagine: the devious operative who spends a career secretly and deceitfully shaping American policy at a foreign government's direction without registering under FARA. Congress looked at that person and capped the sentence at sixty months.

That is not Esther. Take the government's case at face value. Accept every word of it. Esther remains one of the least culpable defendants ever prosecuted under this statute.[1]  She is far from the worst offender possible.  And her conduct is certainly significantly less shocking than others involved.   How does an offense with a five-year maximum get transformed (if probation is to be believed) into a guideline range 125% higher than the maximum for the worst conceivable FARA offender? Not through any guidelines written for FARA.   There is none.   Probation concedes

---

[1] When we say Esther is one of the lesser-involved individuals who *has been prosecuted* for not registering, we deliberately speak in the past tense. That is because, as the Court is aware, over a year ago the Attorney General ordered "[w]ith respect to FARA and § 951, [prosecutors] shall focus on civil enforcement, regulatory initiatives, and public guidance," not criminal charges.  If she were untethered to David Rivera, it is likely that Esther's conduct would not be prosecuted today and thus she would serve NO time.

that the Guidelines Manual contains no guideline for the FARA counts and that there is nothing sufficiently analogous to them. PSR ¶ 156; *see* U.S.S.G. § 2X5.1. Doesn't that say something?   The Commission has never thought to even assign this offense a guideline section.   Consider the implication of that Commission decision (or oversight).   It would mean that an offender with a Category VI criminal history walks into their sentencing facing the exact same advisory guideline recommendation as a first-time offender like Esther.   That would <u>never</u> be the case for offenders of *serious* crimes, like drug distribution, firearms possession, possession of child pornography, child trafficking, robbery, terrorism, treason, health care fraud, bank fraud, etc.

### B. The money laundering charges should not drive a sentence dramatically above the punishment Congress prescribed for the underlying FARA offense.

Because there is no analogous guideline provision, <u>every</u> <u>single</u> <u>level</u> assessed by probation towards Esther's advisory guideline range emanates from the secondary charge and the money laundering guideline, § 2S1.1.   The huge problem with this, however, is that the Supreme Court and numerous courts around the country have explained that the money laundering guideline – especially for a § 1957 offense, which is simply a spending statute – should not dictate a sentence more severe than the underlying offense.

This case presents the precise sentencing concern identified by courts and Congress in the money-laundering context: the risk that a money-laundering conviction will dramatically increase the punishment for an underlying offense well

beyond the statutory maximum even where the alleged laundering conduct is merely incidental to that offense.   Here, the sentence should be anchored to Esther Nuhfer's FARA conduct, not inflated by a § 1957 conviction arising from an open transaction involving the alleged proceeds of that same conduct.   At the end of the day, we all know that the FARA violation is undeniably the main charge, not the money laundering.   Remember how much of the trial the government devoted to presenting evidence regarding money laundering.   It was negligible: **one** witness and a couple of hours over the course of a lengthy six-week trial where every other witness testified about the FARA conduct for hours and, in some cases, days.   The money laundering was treated as a tack-on, minor offense.

> **i.     The Supreme Court has warned against allowing derivative money laundering charges to overwhelm the punishment Congress prescribed for the underlying offense.**

The Supreme Court has spoken directly about this extreme imbalance and shortcoming of the guidelines.   It cautioned forty years ago against sentencing factors that become "a tail which wags the dog of the substantive offense." *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986). Esther's PSR is exactly what the Court warned against.

The Supreme Court's decision in *United States v. Santos*, 553 U.S. 507 (2008) (plurality), reflects a fundamental concern that money-laundering charges should <u>not</u> be used to transform an underlying offense into a far more serious crime merely because the defendant later engaged in ordinary transactions involving the proceeds of that offense. In *Santos*, the government charged the operators of an illegal lottery

not only with the gambling offense itself but also with money laundering based on payments made to lottery winners and employees. The Court recognized that treating such routine transactions as independent money-laundering offenses created a serious "merger problem." As Justice Scalia explained, if the Government's theory were accepted, "nearly every violation" of the underlying gambling statute would automatically become a money-laundering offense as well.[2]   *Id*. at 515.   The Court found it significant that Congress had already determined the appropriate punishment for the underlying offense, yet the Government's interpretation would permit a derivative money-laundering charge to radically increase that punishment: "Congress evidently decided that lottery operators ordinarily deserve up to 5 years of imprisonment ... but as a result of merger they would face an additional 20 years." *Id*. at 516.   The Court further observed that the Government offered no persuasive explanation for "why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code to radically increase the sentence for that crime." *Id*. at 517.[3]

Those concerns are directly implicated here. Esther Nuhfer's case does not involve the classic hallmarks of serious money laundering (concealment,

---

[2] Justice Scalia also included that in such situations "[p]rosecutors, of course, would acquire the discretion to charge the lesser lottery offense, the greater money-laundering offense, or both—which would predictably be used to induce a plea bargain to the lesser charge."   *Id*. at 516.

[3] Congress later superseded the Court's construction of "proceeds," *see* 18 U.S.C. § 1956(c)(9), but it did nothing to the proportionality concern that drove the opinion. That concern was never about the meaning of a word.  It was about a derivative charge swallowing the punishment Congress set for the real offense, which is exactly what § 3553(a) directs this Court to weigh.

sophisticated laundering techniques, shell companies, offshore accounts, nominee entities, false invoices, sanctions evasion, campaign-finance violations, obstruction, witness tampering, or efforts to disguise the source, ownership, or movement of funds). Nor does it involve promotion laundering, where proceeds are reinvested to expand or perpetuate the underlying criminal activity. Instead, the § 1957 conviction arises from a normal, open, and transparent transaction involving funds allegedly derived from the underlying FARA offense.

That distinction matters. Section 1957 is often described as the least aggravated form of federal money laundering because it criminalizes the knowing expenditure or transfer of criminally derived property over the statutory threshold, without requiring proof that the defendant sought to conceal the funds, disguise their source, evade detection, or promote future criminal activity. By contrast, the more serious money-laundering cases that routinely produce substantial sentences involve concealment laundering under § 1956, promotion laundering, or both. Yet even in *Santos*—considering a case involving the more deliberate offense of promotion laundering under § 1956—the Supreme Court expressed concern that a money-laundering conviction could overwhelm the punishment Congress prescribed for the underlying offense and radically increase a defendant's sentencing exposure.

Those concerns apply with even greater force here. If the Supreme Court was troubled by a promotion-laundering theory that effectively transformed a five-year gambling offense into a twenty-year money-laundering case for a § 1956 conviction, the same caution is especially warranted where the government relies on a § 1957

transaction that involved no concealment, no promotion of future criminal conduct, and no effort to disguise or launder funds in the ordinary sense of that term. Esther is not being sentenced for operating shell companies, taking cash, hiding money offshore or in foreign accounts, obstructing investigators, transferring assets to other people's names, or moving illicit funds through a complex laundering scheme. Consulting fees came into Interamerican's account, and Interamerican distributed the money. That is the entire "laundering conspiracy" scheme. The money became "criminal proceeds" only because, on the government's theory, the underlying engagement should have been registered. Thus, Esther is being sentenced for a FARA violation (arising out of another person's contract for which he was paid) accompanied by a single derivative monetary transaction offense (for a normal, non-extravagant purchase of property that she put in her name).

Courts applying *Santos* have repeatedly recognized the danger that a derivative money-laundering offense can overwhelm the punishment Congress prescribed for the underlying crime. *See United States v. Kratt*, 579 F.3d 558, 561-62 (6th Cir. 2009) (holding that merger concerns arise when the predicate offense "creates a merger problem that leads to a radical increase in the statutory maximum sentence" and produces a "perverse result" that "Congress could not have intended") ("[N]early every violation of a number of predicate offenses ... also violate[s] the money-laundering statute, and money laundering sometimes 'radically increases' the statutory maximum sentence compared to the merged offense."); *Jamieson v. United States*, 692 F.3d 435, 440 (6th Cir. 2012) (explaining that *Santos* sought to prevent a

sentence from "automatically spiking from five to twenty years" and reaffirming that the relevant inquiry is whether the merger leads to a "radical increase in the statutory maximum sentence"); *United States v. Crosgrove*, 637 F.3d 646, 655 (6th Cir. 2011) ("A merger problem arises" where the predicate offense carries "a much lower statutory maximum sentence than the associated money laundering charge"; recognizing that the money-laundering charge "significantly increased Crosgrove's exposure to prison time" and carried a "far heavier statutory maximum" than the predicate offense); *United States v. Grasso*, 724 F.3d 1077, 1091-92 (9th Cir. 2013) (recognizing that Congress would not have intended transactions that can be a "normal part" of the underlying offense to "radically increase the sentence" for that offense, warning against punishment of "essential expenses" as money laundering, and directing courts to consider whether the laundering charge causes "a radical increase in the statutory maximum sentence"). Offenses that actually implicate a breach of national defense carry lower ranges than what is being proffered by the probation officer for Esther (illegally selling arms to foreign countries – level 26; gathering national defense information – level 30; disclosure of classified information to a foreign government – level 29; disclosure of information identifying a covert agent – level 30). This is simply not what Congress and the Supreme Court intended.

"[W]hen Congress caps a defendant's maximum sentence for the underlying offense at something radically less than the maximum sentence for money laundering, we may infer that Congress did not intend the 'important limitation' on the penalty for the underlying offense to be 'eviscerated' by the penalty for a money

laundering conviction." *Grasso*, 724 F.3d at 1092.   Here, although the § 1957 conviction may be considered as part of the advisory guideline calculation, the Court should not allow that derivative count to drive a sentence dramatically greater than what the underlying FARA conduct itself would warrant. To do so would risk imposing precisely the kind of disproportionate punishment that concerned the Supreme Court in *Santos*.

### ii. The Sentencing Commission also did not intend for the money laundering guidelines to produce such an absurd result.

The Sentencing Commission likewise saw the same danger and rewrote § 2S1.1 (through Amendment 634) to tie laundering sentences to the seriousness level of the underlying crime, so that moving the proceeds of an offense could not dwarf the primary offense.   Instead of the old money laundering guidelines' base offense levels of 23 (for § 1956 violations) or 17 (for § 1957 violations) and then adding on multiple levels for the amount of money involved, the Sentencing Commission tried to correct a nonsensical outcome such as what has happened here.   The resulting change now dictates that if a defendant committed the underlying offense (like the jury found for Esther), the base guideline starts at the offense level for that offense and adds a single level for a § 1957 conviction (two for § 1956). § 2S1.1(a)(1), (b)(2).   That is the Commission's own judgment about what this kind of laundering adds to the crime that produced the money: one level.   Not the difference between probation and 11 to 14 years.

Subsection (a)(2) of the 2S1.1 guideline is the fallback, built for the third-party

launderer who has no underlying offense and washes someone else's proceeds.[4]   The PSR applied it to Esther only because FARA has no guideline of its own.   This is an unfortunate gap in the Guidelines Manual.   But instead of seeing this as an unintended lapse by the Commission, probation has transformed it to become the "tail which wags the dog."   *McMillan*, 477 U.S. at 88.   The Commission's design says the opposite: the laundering follows the crime that produced the money. It does not replace it.

### C. The goals of the FARA-related activity were aligned with the goals of the United States.

We've said repeatedly that Esther played a much smaller part in the overall conduct than the other players.   D.E. 577.   The government's case was that Esther Nuhfer acted essentially as a twice-removed subcontractor.   She did not have the relationship or connections to Nicolas Maduro, Delcy Rodriguez, or PDVSA.   Gorrin did.   She did not receive instructions from Venezuelan officials.   Gorrin did.   She did not sign a contract to represent the government of Venezuela.   Rivera did.   She was not paid by PDVSA or Venezuela for work.   Rivera was.   She did not meet with Venezuelan Opposition leaders or Nicolas Maduro.   Gorrin and Rivera did.   And no one from Venezuela, including Gorrin, directed her to do any work.   Rivera did.

And assuming that Esther was all-in on the efforts to normalize relations between Venezuela and the United States, none of the participants' endeavors were

---

[4] Subsection (a)(2) is also what makes the addition of a 6-level national security increase possible. We have already explained why that enhancement is inapplicable in Nuhfer's Objections to the PSR.   D.E. 577.

successful. Congressman Sessions and David Rivera were unable to resolve the mediation between Exxon and PDVSA. The "team" was not able to lift sanctions against Maduro and provide a penalty-free opportunity for him to leave power. And Erick Malpica was not removed from the OFAC list (until 4 years later by others' efforts).

But even setting aside the abject failure to accomplish anything, the preeminent objective of the "partners" was not anti-American. In fact, the ultimate goal of the players was aligned with exactly what the United States government wanted for Venezuela. This was to remove Maduro as the leader/dictator of Venezuela and allow for a democratically elected government to take control, preferably by one of the leaders of the Opposition party. For Esther, the evidence showed, through the chats, what she wanted – she wished for a free Venezuela, the release of political prisoners, and to help Opposition leaders. She <u>never</u> spoke in favor of supporting or keeping Maduro in power. She is the one who repeatedly sent postings for a free Venezuela:



We demand the removal of the coup-plotting judges, a humanitarian aid corridor, freedom for political prisoners, and general elections.





Excerpts from EN30 (Esther's chats), admitted at trial.

Secretary Rubio testified that those views, carried by Esther, were identical to what the United States wanted: "That we would help … lead to a return to democracy, hopefully in peaceful ways, no bloodshed, … just sort of an internal transition." Tr., March 24, 2026. When Rivera approached him and persuaded him to

give a speech to the Venezuelan people, Secretary Rubio testified that Rivera "represented to me that there [was] this effort going on inside of Venezuela that Maduro had been convinced by insiders to step aside and have free and fair elections, and that if they got some signals from the U.S. government that this was something we were open to facilitating and actually making happen that that would be positive, that they would be watching. That they would view that as an open door to sort of continue down this road." *Id.*   Rubio took this message and followed through by doing two speeches because "[i]t was consistent with my position." *Id.*   Moreover, "[t]his would be about restoring democracy, uniting the country moving forward …. And that was the theory that David had represented to me. And ironically, these words are very much aligned with what we're trying to achieve now in Venezuela."[5] *Id.*   At no point did Esther jeopardize this nation's security, or have reason to believe that failing to register for FARA could injure the United States.   How could she, when the FARA objectives and the United States' intentions were the same?   Thus, while the purpose of FARA registration allows the U.S. to evaluate the activities of foreign agents for U.S.-adverse actions, here, there was no anti-American lobbying; the ambitions were the same.   Under both subsections 3553(a)(1) and (2), these facts favor a downward variance in Esther's sentence.

---

[5]   The fact that Rivera was being paid by Venezuela to "lobby" Rubio to convey Venezuela's position and did not disclose the payment to Rubio is of no consequence. The reality remains that Venezuela's desires did not differ from those of the American government.

### III.   ESTHER SHOULD RECEIVE PROBATION IN ORDER TO AVOID UNWARRANTED SENTENCE DISPARITIES UNDER § 3553(a)(6)

#### A. Other FARA cases and sentences support a significant variance below the advisory guidelines.

The national FARA sentencing record demonstrates a consistent pattern: defendants convicted of ordinary registration and disclosure violations or defendants who played lesser roles in a wider scheme typically receive probationary sentences or relatively modest custodial terms, while lengthy sentences are generally reserved for cases involving substantial aggravating conduct independent of the FARA violation itself. This sentencing landscape does not support treating Esther Nuhfer like a high-custody foreign-influencer defendant.

Esther's case does not involve obstruction of justice, witness tampering, perjury, tax evasion, illegal campaign contributions, sanctions violations, bribery, false FARA filings, or broader national-security-related misconduct.  This is especially true given the nature of the underlying offense itself. The alleged FARA violation was victimless, caused no identifiable harm, and allegedly involved an effort to normalize relations with the Maduro government that never came to fruition. The government does not contend that U.S. policy changed, that sanctions were lifted, or that any concrete benefit to the Venezuelan government was obtained as a result of Esther's conduct. Indeed, these types of actions are no longer even being prosecuted by the Department of Justice.

When viewed against the actual universe of FARA defendants, Esther's conduct aligns far more closely with the probationary and low-custody cases than

with the handful of highly publicized foreign-influence prosecutions that generated

substantial prison sentences.

## B. Ordinary FARA cases routinely result in probation or limited custody.

The most comparable FARA cases involve failures to register or related

disclosure violations without significant aggravating conduct. The lowest and most

comparable FARA cases or cases involving FARA-type conduct resulted in probation

or modest custodial sentences, even where the facts were more severe than Esther's:

- *United States v. Chaudhry*, **3 years probation** for failing to file a FARA registration statement arising from Pakistan-related advocacy.

- *United States v. Patten*, **3 years probation** for violating FARA in connection with lobbying and political consulting work for a Ukraine-related political party, including extensive contacts with U.S. policymakers and the media.

- *United States v. Higginbotham*, **3 months probation** for DOJ attorney who created fake consulting agreements and other false documentation to conceal foreign lobbying work on behalf of Ukrainian interests, allowing foreign individuals to lobby U.S. officials and taking control of bank accounts with foreign funds to disguise their true ownership.

- *United States v. El-Siddig*, **2 years probation** for lobbying on behalf of the International Islamic Relief Organization, in a matter where the broader investigation involved allegations of terrorism financing and national-security concerns.

- *United States v. Bendler,* **one year and one day imprisonment** for CIA contractor (and former CIA agent) who worked on behalf of foreign nationals, illegally searched classified government databases, and unlawfully obtained and removed classified information for them.

- *United States v. Ben Israel*, **7 months imprisonment** involving efforts to lobby U.S. officials to lift sanctions imposed on Zimbabwe and President Robert Mugabe.

- *United States v. Siljander*, **one year and one day imprisonment** for former Congressman Siljander who acted as an unregistered foreign agent on behalf

of the International Islamic Relief Agency and obstructed the ensuing investigation, despite government request of 36-48 months on FARA count.

These cases, particularly the probationary cases with no aggravating conduct, demonstrate the type of sentence that is appropriate in this case. That is the group Esther belongs to, although even these individuals, particularly the ones in a position of national trust, engaged in much worse behavior.[6]   Esther should not be sentenced to more time than actual high-level government employees (George Higginbotham, Dale Bendler) who utilized their official positions to betray the United States and aid foreign nationals while making money and violating government confidence who plea-bargained their way to lesser charges.   That would be an injustice.

## C. Even significantly more aggravated FARA cases still result in relatively modest sentences.

Even defendants involved in foreign-government funding schemes, multimillion-dollar influence operations, tax violations, and major corruption investigations generally received sentences measured in months, not the severe penalties associated with the government's likely headline cases.

- *United States v. Lum Davis*, 24 months imprisonment despite government request of 30 months in 1MDB/Jho Low-related case involving multimillion-dollar payments (Lum Davis herself received over $10 million), lobbying directed at the highest levels of government, and conduct connected to one of the largest international corruption scandals ever prosecuted by the DOJ.

---

[6] We recognize that some offenders, like Higginbotham, cooperated with the government to reduce their sentences.  But that fact does not remove these cases from comparison to Esther's. If a government attorney who betrayed his country and his oath to justice received only three *months* of probation, even with the benefit of cooperation, then Esther — whose conduct was far less serious, notwithstanding her lack of any cooperation credit — warrants probation as well.

- *United States v. Fai*, 24 months imprisonment despite government request of 48 months and the case involved millions in concealed Pakistan/ISI funding and tax violations.

### D. It is only the exceptional foreign influence cases with independent criminal conduct and aggravators which result in high sentences.

The highest sentences are in extreme cases. Every case producing a truly substantial sentence involved criminal conduct far beyond a FARA registration violation—tax crimes, campaign-finance crimes, terrorism-adjacent facts, obstruction, witness tampering, corruption, sanctions-related conduct, espionage, perjury, false filings, or multimillion-dollar fraud schemes. They also applied to leaders, planners, and orchestrators of foreign-backed activity. Esther's case has none of those aggravating features. That is why it is not surprising to see outlier sentences of 5, 7½, 12, and 14 years for Tongsun Park, Paul Manafort, Imaad Zuberi, and Prakazrel Michel. These were not "ordinary" FARA cases. Michel proves the point: he was convicted at trial of bank fraud, witness tampering, false entries, and illegal campaign contributions on top of FARA, involving more than $100 million.

This comparison/contrast is important in this case in order for the Court to avoid unwarranted sentence disparities among defendants. 18 U.S.C. § 3553(a)(6). They demonstrate that a sentence of probation is not only appropriate for Esther, it is the routine sentence for individuals like her.

A more detailed chart of the above-referenced cases:

| Case | Key Conduct | Facts | Sentence |
|---|---|---|---|
| Dale Bendler, 25-cr-109 (E.D. Va.) | Public Official Acting as an Agent of a Foreign Principal, 18 U.S.C. § 219; Unauthorized Removal & Retention of Classified | Former senior CIA officer of 30 years who, while serving as a CIA govt contractor with top secret security clearance, signed numerous NDAs for foreign nationals (one accused of ties to terrorist organizations) for multiple | **12 months and 1 day** |

| | Documents, 18 U.S.C. § 1924<br><br>[NO charge of money laundering despite being paid for his activity] | years while concealing his work from CIA colleagues, often misleading and manipulating them.  Bendler engaged in lobbying and public relations activity, accessed govt computer systems for information, and illegally removed classified material. He never registered under FARA. | |
| --- | --- | --- | --- |
| Elliott Broidy, 20-cr-210 (D.D.C.) | Conspiracy to Defraud the U.S. by Serving as an Unregistered Agent of a Foreign Principal<br><br>[NO charge of money laundering despite receipt of multi-million dollar payments] | Lobbied U.S. President and DOJ to resolve legal matters for foreign national who embezzled billions of dollars from a Malaysian investment and development company; traveled to Thailand in exchange for $1 million to meet foreign national; received at least $9 million for participating in back-channel lobbying campaigns relating to the 1MDB investigation and the proposed removal of a Chinese national; pleaded guilty and agreed to a $6.6 million forfeiture judgment. | 0 (no sentence imposed)<br><br>[Received Presidential Pardon] |
| W. Samuel Patten, 18-cr-260 (D.D.C.) | Violation of FARA, 22 U.S.C. §§ 611, 612, 618<br><br>[NO charge of money laundering despite receipt of $1 million] | Formed a company with a Russian national which lobbied for a Ukrainian political party and Ukrainian oligarch; traveled to Ukraine numerous times, received over $1 million for work; set up meetings with Congressional and Dept of State members; drafted op-ed articles; provided talking points to high-ranking officials; withheld documents from and provided misleading testimony before the U.S. Senate Select Committee on Intelligence. | 3 years probation |
| George Higginbotham, 18-cr-343 (D.D.C.) | [a negotiated count of] Conspiracy to Make False Statements to Bank, 18 U.S.C. § 371<br><br>[NO charge of money laundering despite controlling $41 million of funds intended for lobbying activity] | DOJ attorney worked on legal consulting agreements that provided for payments through pass-through entities to hide an individual's efforts to lobby U.S. govt official to drop civil and criminal investigations into a foreign national's company. To make international fund transfers appear legitimate, Higginbotham worked on fake loan docs, investment agreements and consulting contracts. He knew the funds were tied to foreign nationals to lobby U.S. govt officials. He visited the foreign country and eventually took control over the foreign assets of tens of millions of dollars to conceal the true owner. | 3 months probation |
| Nisar Ahmed Chaudhry, 18-cr-226 (D. Md) | Failure to File a Foreign Agent Registration Statement, 22 U.S.C. §§ 611, 612, 618 | For at least 6 years acted as an agent of the Government of Pakistan to influence U.S. policies regarding Pakistan, routinely interacting with influential individuals, travelling regularly to Pakistan to brief Pakistani officials, organizing press briefings in the U.S., and deceiving U.S. officials. | 3 years probation |

| | | | |
|---|---|---|---|
| Prince Ben Israel, 13-cr-572 (N.D. Ill.) | Violation of FARA, 22 U.S.C. §§ 612, 618<br><br>[NO charge of money laundering despite receipt of millions of dollars] | Signed consulting agreement providing pay of nearly $3.5 million; lobbied multiple state and national politicians through meeting, letters, and facilitating communications with foreign nationals to remove sanctions against the government of Zimbabwe and Robert Mugabe (criticized for being a dictator responsible for economic mismanagement and widespread corruption and human rights abuses, including anti-white racism, crimes against humanity, and genocide). | 7 months |
| Abdel El-Siddig, 07-cr-87 (W.D. Mo.) | Conspiracy to Violate FARA, 18 U.S.C. § 371, 22 U.S.C. §§ 612, 618<br><br>[NO charge of money laundering despite making payments to co-defendant] | As an employee of the Islamic American Relief Agency, which had USAID agreements terminated for being suspected of funding terrorism, paid a former Congressman to advocate for IARA's removed from the Senate's list and communicate with USAID, DOJ, the Senate Finance Committee, and the U.S. Army. | 2 years probation |
| Mark Siljander, 07-cr-87 (W.D. Mo.) | Obstruction of Justice, 18 U.S.C. § 1503, 1512; Violation of FARA, 22 U.S.C. §§ 612, 618<br><br>[NO charge of money laundering] | Co-defendant to El-Siddig; paid to interact with multiple U.S. officials and agencies to lobby for Sudanese Islamic organization associated with funding terrorism to remove it as a debarred entity and gain U.S. govt contracts. | 12 months and 1 day (Later received a full Presidential Pardon) |
| Nickie Lum Davis, 20-cr-68 (D. Hawaii) | Aiding & Abetting Violations of FARA, 18 U.S.C. § 2 and 22 U.S.C. §§ 612 and 618<br><br>[NO charge of money laundering despite receipt of millions of dollars] | Personally received over $10 million to convince the U.S. President and Attorney General to drop a federal investigation into a foreign fugitive who embezzled billions and agree to removal of a Chinese exile, "disregarding the national security and foreign policy interests of the U.S." She and others secretly worked for the govt of China and a foreign principal in exchange for $100 million. Lum initially admitted her involvement, only to later recant. She did not register under FARA. | 24 months (Govt asked for 30 months) |
| Syed Fai, 11-cr-561 (E.D. Va.) | Conspiracy to Defraud the U.S., 18 U.S.C. § 371; Endeavoring to Impede Administration of the Tax Laws, 26 U.S.C. § 7212<br><br>[NO charge of money laundering despite receipt of millions of dollars] | Directed an organization secretly run and funded by the government of Pakistan, including the Inter-Services Intelligence Directorate; participated in an over 20 year scheme to take millions of dollars from Pakistani intelligence and lie about it to the U.S. govt.; hid the transactions from the U.S. by making false statements and representations; lied to FBI agents; falsified tax returns. | 24 months |

In addition to noting the sentences and relevant facts in other FARA cases, we also point out that none of these defendants, unlike Esther, were charged with conspiracy to commit money laundering or engaging in transactions in criminally-derived property despite the fact that each of them participated in receiving, transferring, controlling, or paying money derived from a specified unlawful activity and could have been charged for violations of §§ 1956 or 1957. The conduct, therefore, remains "similar" for purposes of § 3553(a)(6) and the lack of money laundering charges for these defendants does not eliminate the need to "avoid unwarranted sentence disparities." Rather, it raises the question why the Government chose to treat Esther differently and potentially expose her to substantially more time for bringing charges that it does not normally bring against others like her. This is also a factor the Court should consider in reaching a sufficient sentence.

## IV. ESTHER NUHFER'S HISTORY AND CHARACTER JUSTIFY A SENTENCE OF PROBATION

"[A]ny novice criminal practitioner can explain in broad strokes how the Sentencing Guidelines operate ... : base offense levels are set for a variety of offenses and then aggravating factors lead to higher sentences while mitigating factors lead to lower sentences." *United States v. Faison*, 2020 WL 815699, at *2 (D. Md. Feb. 18, 2020). Yet most mitigating factors, such as the admirable history and characteristics of an individual, are given no weight in the Guidelines calculation; to the contrary, the Guidelines recognize only the defendant's criminal record (providing for higher offense levels for a greater criminal history, rather than reductions for no

prior record).   And "if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for."   *Id.*

To balance this failing of the Guidelines, courts are instructed to weigh the additional factors of § 3553(a).   *See Rita v. United States*, 551 U.S. 338, 364-65 (2007) ("The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics.   Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civil, charitable, or public service are. . . matters that § 3553(a) authorizes the sentencing judge to consider.").   There, Congress has directed that a defendant's personal characteristics should be considered equally with "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1) (emphasis added).   For Esther, we urge the Court to balance the guideline calculations by giving fair and equitable consideration to her **extraordinary** life.

The Presentence Investigation Report accurately references events in Esther's life.   Like all PSRs, it fails, however, to capture who the true person is.   Instead, the best source of information about Esther's life and character are the dozens of letters of support written on her behalf by individuals, almost all of whom have known her for *decades.   See Exhibit A*, Compendium of Letters in support of Esther Nuhfer.[7]

---

[7] Because Esther's mother is also named Esther, she is frequently called and referred

They offer first-hand experiences and knowledge of Esther beyond the case before the Court.   They are powerful and moving in their description of a person that most of us can only aspire to be – but who Esther truly is.   Without hesitation and having full knowledge of Esther's criminal case, respected and prominent people in the community wrote letters to inform the Court how much they admire, respect, and look up to her despite the jury's verdict.   They are uniform in describing Esther as "compassionate," "selfless," "loyal," "caring," "faithful," "generous," "honest," "positive," "humble," and an individual whose "heart is bigger than her body could ever contain."   Repeatedly, people conclude that "I am a better friend and better person because of the example she has given me….There is a large network of people whose lives have been made better because [Esther] was present in them. Conversely, Esther "is deeply loved, profoundly needed, and has made a lasting positive impact on countless people."

## A.   Esther's personal history.

Esther is the daughter of Cuban immigrants. Esther's mother came to this country when she was 16 years old.   She had no money, no property, no clothes except for what she could fit in a suitcase, and she didn't speak any English. Esther's father came to the United States when he was a child because the Cuban government had emptied out the family's bank accounts and had imprisoned Esther's grandfather for daring to speak out against Fidel Castro. Esther's parents came to this country with nothing.   They worked hard (always 2 to 3 jobs), studied, met at

---

to as Joanne, her middle name.

Miami High School and later got married, saved up money to buy a home in Homestead, and raised four amazing girls.

This is Esther's foundation. These are the people that molded her and showed her what is important in life. The Nuhfers taught their girls about where they came from. "Esther heard many stories growing up from her grandparents and us about our struggles living under a communist regime." *John J. Nuhfer*. But they also taught her to love this country and to appreciate the country that had opened its arms to them.

Esther also learned from her parents the value and importance of hard work and the ability to achieve a good life from steady and determined effort. Her sister says Esther "is one of the hardest-working people I have ever known." *Bianca Nuhfer*. Esther's many years of work for Miami-Dade County reflect her parents' wisdom. An associate of Esther's at the Miami-Dade County Communications Department said "[s]he was an outstanding coworker. One that was dependable, thoughtful, and always willing to lend a hand without expecting anything in return."

*Aimee Artiles*. Another former colleague wrote that:

> [Esther] consistently demonstrated professionalism, integrity, and a remarkable work ethic. She was dependable, conscientious, and always willing to go above and beyond to support our team and serve the public with excellence. I knew I could always rely on Esther to approach her responsibilities with honesty, compassion, and dedication.
> – *Cire Andino, Miami-Dade County Communications Department*

Another spoke similarly about Esther:

> She approached every project with exceptional organization, sound judgment, attention to detail, and genuine respect for everyone she encountered. It was common for me to receive unsolicited compliments

about her professionalism, positive attitude, and ability to bring people together. – *Juan C. Mendieta, Special Events Manager, Miami-Dade County Communications Department*

When Esther was able to finally start her own business, she passed on her parents' message to others.   A woman who is now a senior executive at Jackson Health spoke about her earlier years when Esther hired her at her firm.   "Esther became my mentor [and] one of my greatest professional influences."   She wrote, "Looking back on those years, I can honestly say that Esther changed the course of my professional life…she taught me how to conduct myself with integrity, humility and respect for others.   She led by example.   She expected excellence, but she always extended grace."   *Ivette Pinto*.   One other former co-worker summarized, "Throughout my career in public service, I have had the privilege of meeting and working with people from many different backgrounds.   Those experiences have taught me to recognize honesty, integrity, compassion, and strong character when I see them.   Esther embodies those qualities."   *Carolina Sivoli*.

## B. The hardships experienced by the Nuhfers.

The Nuhfers built a good life in Florida. They still had to count their pennies, but they had what they needed.   Nonetheless, it was not easy, and they faced numerous obstacles.

In 1992, just after Esther graduated high school, Hurricane Andrew tore through Homestead.   Esther's family went to her grandparents in Miami to ride out the storm.   The next day, the family drove home.   The closer they got, the worse things looked; it was like an apocalypse.   No house had a roof and most had no walls.

When Esther's father opened the front door to their home, water came gushing out. It was the first time Esther saw her father cry.   The home was a shambles:   all the windows were broken, most of the roof was torn off, an addition to the house was completely blown away, and, of course, everything in the house was destroyed.   After considering the hardship of rebuilding, Esther's father made the difficult decision to restore their home.   But until then, the family had to split up – three daughters went to stay with their aunt, and Esther's parents and the youngest daughter stayed with the grandparents.   They lived this way for 6 months.   Once they made their way back to Homestead, all of the family (five plus the oldest's fiancé) lived, slept, and ate in the living room of their home for months on Army cots that had been given to them.

Slowly, the family put their lives together again. Esther, who had always wanted to go away to college, decided to stay home and help her family.   She enrolled in Miami-Dade Community College.   On top of school, she worked two jobs - at Miami-Dade Building and Zoning as a permit clerk, and Sizzlers as a waitress.









Through all the hardships, the Nuhfers have only grown closer.   They are a very tight family and find strength through each other.   "We have learned that we are strongest when we stand together."   *Julie Nuhfer-Gonzalez.*   They talk every day, see each other frequently, text each other constantly on group chats, always vacation together, and help each other out.   To them, family is everything.



 

## C. Esther's unending devotion to others.

You can often tell the true character of a person by how they handle difficult situations and how they come out on the other side.   After dealing with so much adversity and loss, many people might break, lose faith, or become resentful individuals.   Esther was the opposite.   "In a world where it is easy to become cynical, Esther has always chosen kindness."   *Mary Juncadella-Ferreiro*. "[S]he never allowed pain to harden her heart.   Instead, she continued to pour love into the lives of others, offering support and encouragement while quietly carrying her own burdens with remarkable strength and dignity."   *Ivette Pinto*.   ████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████    ██████████████    Instead of turning hard, others saw "her demonstrate resilience, determination, and a sincere desire to learn and grow from her experiences." *Santiago Gonzalez, Jr.* Rather than pulling away, Esther has faced "challenges with grace, determination, and unwavering faith." *Alexander Micheal Enriquez.* This speaks volumes about the strength and goodness of Esther's character.

People who have known her for **decades** "have watched her repeatedly set aside her own time and priorities whenever someone was facing a challenge." *Esther Caravia.* Letter after letter talk about Esther's faith and her devotion to others. "Helping others is simply who she is." *Ernie Hernández.* "While many people viewed community service as part of their profession, Esther lived it as part of who she is." *Jeannie Hernandez-Porter.* And rather than intermittent help to family and friends, "Esther is one of those rare individuals whose goodness is not occasional…it is constant, unwavering, and deeply rooted in her faith and her love for people." *Georgelynn "Gina" Alonso.* After going with and seeing Esther work with domestic violence victims, her future husband said, "I knew that very day I had to Marry this Woman." *Alexander Enriquez.* "These qualities are not something she displays only when it is convenient, they are the foundation of who she is." *Anthony Bustamante.* "[Esther] is always there when someone needs her …. [she] has always believed in giving back to her community, not because she seeks recognition, but because serving others is simply who she is." *Julie Nuhfer-Gonzalez.*

Each person who took the time to write to the Court provides descriptions of times Esther put "the needs of others before her own." *Cire Andino, Alexander Micheal Enriquez, Brenda Nuhfer.* There are examples of Esther spending hours volunteering at AGAPE (an organization that provides assistance to homeless and abused women); raising funds for the American Cancer Society; teaching CCD classes at Saint Timothy Catholic Church; serving women at annual Emmaus Retreats (spiritual programs based on the Gospel of Luke); supporting Big Brothers Big Sisters, the Boys & Girls Clubs, and Camillus House; collecting donations for women suffering domestic violence; and organizing weekly Bible studies.

Then, there are other examples of Esther acting as a second mother to her nieces and nephews – attending nearly every one of her nephew's baseball games, sponsoring sporting events, celebrating her nephew for being recognized as a Future Leader of America, giving tough advice to her nephews about school and girls, keeping an eye on her nephews' social media, ███████████████████ ███████████████████ sharing all her nieces' accomplishments, going to all her nieces' school performances, helping to raise money for school events, guiding them in the Catholic faith, and always providing unconditional love.  For her youngest sister who is raising two daughters (Esther's nieces) as a single mother, Esther insisted that they live rent-free in her Coral Gables apartment (the first piece of property Esther bought in her 30s).  Because her sister has a limited income, Esther pays for the girls' school supplies, uniforms, clothing, braces, ballet, cheerleading, gymnastics, drama – anything they need, Esther takes care of so they

don't go without.



Esther with her nieces Victoria and Valentina; cards from her niece and nephews

There are also the times when Esther helped people through the darkest periods of their lives.   Although people wrote about several instances, here are just four:

- "One of the most difficult seasons my family ever faced was when my youngest daughter became very ill and spent nearly five years in and out of the hospital. Those were terrifying years filled with uncertainty, exhaustion, and fear. Esther was there every single time. She would sit with me in the hospital, pray over my daughter, relieve me when I needed rest, and on several occasions even helped care for her. She showed up without being asked, without hesitation, and without ever making me feel like a burden. Her presence brought comfort, strength, and peace during a time when I felt like I had none left. I will never forget what she did for my daughter and for me."   *Georgelynn "Gina" Alonso.*

- After Anthony lost his wife of 14 years in a tragic accident, he realized he was too grief-stricken "to do all the things that needed to be done, purchase a plot, make the burial arrangement, and schedule a wake.   In all the madness Esther Nuhfer stepped up and helped [bear] the weight of my cross.   I didn't ask her to; she just did it….She went as far as to arrange a temporary visa for my wife's dad to be allowed to attend his daughter's funeral….No one in my life stepped up like Esther Nuhfer."   *Anthony Bustamante.*

- When her friend was going through financial and legal challenges and "when

many people we considered friends quietly distanced themselves or were simply unavailable[,] Esther was different.  She consistently showed up for me.  She came and sat with me when I needed someone most, regularly checked on me to see how my family and I were doing, and provided emotional support during one of the most difficult seasons of our lives."  *Aimee Artiles.*

- When Luly lost her job due to budget cuts at Jackson Hospital, Esther did not let her face that difficult time alone.  She called constantly, encouraged Luly not to lose faith, offered to pay her bills, and provided unending emotional support.  "Her kindness gave me hope when I had very little left.  She believed in me at a time when I struggled to believe in myself."  *Guerlin "Luly" Escar*

It is no secret to Esther's friends and family that Esther will do anything for them.  But perhaps the best examples of Esther's service to others are things she has done for strangers. Gina Alonso, who was the Community Outreach Specialist/Constituent Service Representative in the Office of U.S. Senator Marco Rubio, wrote that "[w]henever I encountered a constituent in crisis … Esther never hesitated.  Her immediate response was always, *"We need to help."*  Gina remembered a single mother facing eviction who came to the Senator's office.  "Esther raised the money needed to keep her housed and even connected us with an attorney who took her case pro bono."   Another time, Gina called to tell Esther about a woman who discovered while she was traveling to the U.S. to take care of her own mother that she had breast cancer.  Esther again didn't hesitate; "she rallied her contacts to raise the funds needed for treatment."  *Georgelynn "Gina" Alonso.*

This is the woman before the Court for sentencing.  Esther is like a tide that lifts others up.  "She is an extraordinary woman, friend, and the world is better because she is in it."  *Id.*

### D. Esther's parents need her for their critical care.

If Esther is incarcerated, of course, it will be difficult for her and her friends.

While we believe the nature and circumstances of the offense, and the history and characteristics of the defendant (all detailed above) provide ample reason why a significant downward variance is appropriate in this case, Esther's parents' reliance on her for their care provides the strongest support for a sentence of probation.

Esther is the family member who takes care of her elderly parents. "She has always been the person our family depends on." *Brenda Nuhfer*.



Case 1:22-cr-20552-MD   Document 586   Entered on FLSD Docket 08/06/2026   Page 36 of 40



As time has gone by, Esther's parents rely more and more on others for support – and Esther has been the one to provide that care.  Though they are willing, her sisters, unfortunately, have limited time during working hours because of their jobs. Esther's oldest sister works at a school, the middle sister works in a medical clinic, and the youngest sister is a paralegal for a law firm.  Because she has been self-employed and has more flexibility, "Esther has consistently been the one who rearranges her schedule to care for our parents. She coordinates their medical appointments, helps manage their healthcare needs and is always the first person to respond whenever they need assistance. She has done all of this without complaint or expectation of recognition because caring for our parents is simply part of who she is." *Bianca Nuhfer*. ███████████████████

MARKUS/MOSS PLLC
36

████████████████████████████  "Joanne [Esther] willingly assumed the responsibility of ensuring that our parents never miss these essential medical appointments. She visits them 2-3 times a week to help them at home too. Her dedication has been a huge blessing to our entire family."  *Julie Nuhfer-Gonzalez.   See also Letter from JonAnthony Hernandez (*Esther "take[s] my grandparents to their appointments even though she has to drive far to pick them up. She was more than happy to provide that service since it can sometimes be difficult for my Mom and Aunts to plan for my grandparents' needs.").

A defendant's family responsibilities provide a recognized and reasonable ground for a variance. *See United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) (affirming large variance where district court "recognize[d] that [the defendants] both play important roles as caregivers and caretakers in their families."); *United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (sentence of 1 year and 1 day for a man who possessed with intent to distribute 100 grams of heroin, despite a guideline range of 46-57 months, based on his long work career, community support, lack of a criminal record, and responsibilities as sole supporter of 8-year-old son and elderly parents, which reduced the likelihood he would re-offend); *United States v. Dominguez*, 296 F.3d 192 (3d Cir. 2002) (district court erred in concluding it could not depart four levels in bank fraud case for defendant who resided with elderly parents, who were physically and financially dependent on her); *United States. v. Prisel*, 316 Fed. Appx. 377 (6th Cir. 2008) (sentence of one day in prison plus three years supervised release for possessing child porn upheld despite guideline range of 27-33

months, where defendant worked from home, and had a dependent wife with whom he had a mortgage for which they jointly owed over $70,000); *United States v. Davis*, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (court imposed time-served on a first time offender devoted to the education of the six children of his 15 year marriage – and the judge believed incarceration would deny the children the "care and guidance clearly needed at this point in their lives"); *United States v. Crawford*, 2007 WL 2436746 (E.D. Wis. Aug. 22, 2007) (court granted a variance from the Guidelines due in part to the defendant's family situation with five children and the impact incarceration would have on the children).

## V.    OTHER FACTORS WARRANT A SIGNIFICANT DOWNWARD VARIANCE

Under the circumstances of this case, a custodial sentence is not needed to achieve the goals of sentencing.   Even without any sentence imposed by the Court, Esther's conviction has brought upon her terrible hardships that will be with her for the remainder of her life, including the loss of her business and livelihood, any financial security, the loss of her reputation within the community, and the right to vote – something Esther views as incredibly important and precious. *See* § 3553(a)(2)(A).

Another consideration that justifies a great downward variance is that Esther poses no risk of recidivism.   *See* § 3553(a)(2)(C).   Sentencing Commission research showed that 1) women are less likely to recidivate than men; 2) married people are less likely to recidivate than those who have never been married; 3) college graduates are less likely to recidivate than non-college graduates; 4) those sentenced under the

fraud guidelines are less likely to recidivate than those sentenced under any other guideline; 5) non-violent offenders are less likely to recidivate than violent offenders; 6) first time offenders are less likely to recidivate than repeat offenders; 7) those who were employed are less likely to recidivate than those who weren't; 8) non-drug users are less likely to recidivate than drug users; and 9) older individuals and less likely to re-offend than those in their 20's and 30's.[8]   Every one of these factors points the same way.   The risk that Esther re-offends is as close to zero as this Court will ever see.

## VI.   CONCLUSION

We leave the Court with the wise and thoughtful words of Esther's youngest sister:

> I understand that every person must be accountable for the choices they make. At the same time, I believe it is equally important to consider the entirety of a person's life and the countless ways they have positively impacted others. **Esther's life has been one of faith, service, sacrifice and unwavering devotion to her family and community**. No one is defined solely by the most difficult chapter of their life. When I think of my sister Esther, I think of a woman who has sacrificed for her family, devoted herself to caring for our aging parents, and helped raise my daughters with unconditional love. **I think of someone who has quietly served others without expecting anything in return and has consistently lived a life centered on faith, compassion, and humility**.
>
> I respectfully ask the Court to consider not only the circumstances that have brought her before you, but also the life she has lived, the people whose lives she has touched and the woman she truly is. I remain grateful every day to call her my sister, and I sincerely hope the Court will extend mercy and grace during this difficult time.   *Bianca Nuhfer* (emphasis added).

---

[8] *The Criminal History Computation of the Federal Sentencing Guidelines, Recidivism and the "First Offender,"* www.ussc.gov/research.html. Also consider U.S.S.G. §§ 5H1.1, 5H1.6.



For the reasons set forth in this memorandum, we respectfully request that this Court sentence Esther to probation.

Respectfully submitted,

**MARKUS/MOSS PLLC**
40 N.W. Third Street, PH1
Miami, Florida 33128
Tel: (305) 379-6667
markuslaw.com

By:  /s/ David Oscar Markus
      David Oscar Markus
      dmarkus@markuslaw.com

      /s/ A. Margot Moss
      A. Margot Moss
      mmoss@markuslaw.com
      *for Esther Nuhfer*