**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-Cr-20552-Damian/Torres**

**UNITED STATES OF AMERICA**

**vs.**

**ESTHER NUHFER,**

**Defendant.**

______________________________/

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT ESTHER NUHFER'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT**

The United States of America, by and through the undersigned Assistant United States Attorneys, respectfully submits this response to Esther Nuhfer's ("Nuhfer") objections to the Probation Department's initial Presentence Investigation Report ("PSR") (ECF 577).

## Introduction

In short, Nuhfer does not raise any legal challenges to the Probation Department's calculation of the relevant guideline range. Rather, Nuhfer raises a number of fact based objections to the PSR including that (a) the offense conduct described in paragraphs 9 through 124 of the PSR (all 115 paragraphs) allegedly present "an entirely skewed and exaggerated version" of the relevant events that is untethered in some undescribed way to the evidence in this case; (b) Nuhfer should receive a minimal role adjustment based on her purportedly insignificant (if not nearly non-existent) role, according to defense counsel, in the illegal lobbying and money laundering scheme for which the jury convicted her of all counts; (c) the PSR erred in using the sum of $15 million (roughly the amount of illicit funds Rivera transferred to Nuhfer, Raul Gorrin,

Hugo Perera, and others) as the amount of laundered funds for purposes of § 2S1.1(a)(2) rather than the $3.5 million (an understated amount) that Nuhfer received from the PDV USA payments to Interamerican Consulting; and (d) the PSR erred in applying the six-point enhancement under § 2S1.1(b)(1) for an offense where "the defendant knew or believed that any of the laundered funds were the proceeds of or were intended to promote . . . an offense involving . . . national security." Nuhfer takes this last position despite the fact that a hostile foreign government secretly paid a former one-term U.S. Congressman (Rivera) and a professional political fundraiser and operative (Nuhfer) tens of millions of dollars in return for their efforts to engage in lobbying activities directed at high-level members of the executive and legislative branches of the U.S. government without disclosing that they were in fact acting as agents of Maduro and other members of his corrupt regime.

For the reasons set forth below, Nuhfer's objections are without merit. The facts of this case, as proven at trial, and which are summarized in detail in the government's responses to Nuhfer's and Rivera's motions for judgment of acquittal and new trial (ECF 550 & 563), overwhelmingly demonstrate that Nuhfer is not entitled to a minimal role adjustment and that the six-point enhancement under the money laundering guideline for a matter involving national security is well-founded. Accordingly, Nuhfer's objections, as explained in more detail below, should be rejected by this Court, including her bare-bones assertion that the PSR mis-describes in some way the offense conduct in this matter.

As to Nuhfer's assertion that she should be sentenced under the upcoming November 2026 revisions to the sentencing guidelines, there is no legal authority that requires the Court to do so. However, to avoid any unnecessary delay in Nuhfer's sentencing and to avoid expending resources

on an otherwise minor issue, the government has no objection to Nuhfer's request that the anticipated November revisions to the sentencing guidelines be applied at her August sentencing hearing.

Before turning to the merits of Nuhfer's objections, one further point requires a brief response. Nuhfer's primary complaint in her filing is her belief that the PSR's advisory guideline range of 135 to 168 months imprisonment is unduly harsh in light of FARA's five year statutory cap. Nuhfer, however, defers formally raising this claim as an objection to the PSR, asserting instead that she will address the matter as part of the § 3553(a) factors in her sentencing memorandum, and that the purpose of the present filing is to address "a different problem" (ECF 577 at p. 3). Nuhfer goes on to assert that this alleged problem is the "Government's effort to manufacture an absurd Guideline range through a series of unsupported and cumulative enhancements" through exerting what she suggests was some undue influence over the Probation Department.

These assertions are, of course, meritless and consist of nothing more than defense counsel hyperbole and unfounded innuendo, which is not a first for the proceedings in this case. See Order on Defendants' Joint Motion to Disqualify AUSA (finding that the defendants' claims of a financial conflict of interest involving the spouse of one of the assigned prosecutors was based on the approach that "if there's smoke, there's fire" but that defendants failed to even show that there was any smoke) (ECF 367 at p. 6). In the end, the government did nothing more than provide the Probation Department with the information it requested to prepare the PSR. There is nothing inherently wrong in the government doing so just as there is nothing inherently wrong with defense counsel discussing the potential guidelines and relevant facts with the assigned probation officer.

At the end of the day, the Probation Department is part of the judicial branch and the assigned probation officer does not answer to either the U.S. Attorney's Office or defense counsel. Here, the Probation Department reached its own conclusions as to the applicable guidelines calculations and there is nothing to suggest that anything unsavory or inappropriate occurred after the probation officer's initial discussion with defense counsel (other than defense counsel does not like the Probation Department's ultimate conclusions regarding the applicable guidelines).

## **Argument**

A. Nuhfer's Summary Objection to the PSR's Offense Description Is Unsupported and Should be Denied

Nuhfer begins her objections with a one-paragraph (four sentence) objection to the offense description provided in paragraphs 9 through 124 of the PSR. She claims that the facts set forth by the probation officer provide "an entirely skewed and exaggerated version" of the evidence presented at trial. This claim is patently without merit.

Nuhfer's assertion is nothing more than a conclusory statement that the Probation Department got it wrong. Indeed, Nuhfer fails to cite to any trial evidence contradicting any of the factual descriptions set forth in the 115 paragraphs (paragraphs 9 through 124) describing the offense conduct. Nor does she even bother to cite to a single specific fact within those same 115 paragraphs that she claims is wrong. Instead, she summarily asserts that probation got everything wrong and this Court should simply do Nuhfer's work for her to correct the purported manifest errors in the PSR's offense description by "rely[ing] on the trial evidence."

Indeed, the PSR's description of the offense conduct consists in significant part of a recitation of the factual allegations set forth in the Superseding Indictment that led to the jury's across the board guilty verdicts as to both Nuhfer and Rivera. Those factual allegations, in turn,

consist to a fair degree of the text messages (including the MIA chat group), emails, and financial transactions described in the Overt Acts and other sections of the Superseding Indictment, all of which were corroborated by the hundreds of government exhibits admitted at trial and the testimony of numerous witnesses. For Nuhfer to claim the PSR's offense description presents a skewed version of the evidence is absurd.

B. The Evidence Does Not Support Nuhfer's
<u>Request for A Minimal Role Adjustment</u>

Nuhfer claims that she should receive a mitigating role adjustment to her offense level under USSG § 3B1.2. She asserts that her participation in the unlawful lobbying and money laundering scheme charged in the Superseding Indictment was "extraordinarily limited" (to the point of non-existence if one were to credit her counsel's assertions) such that a four-point minimal role adjustment is appropriate either standing alone or in comparison to the other individuals she labels as "participants" in the criminal scheme. This despite the fact that Nuhfer received nearly ~$4.7 million (GX1), similar to Rivera, for her allegedly *de minimus* efforts (and could have received up to $12.5 million under the full terms of the PDV USA consulting contract) and was convicted by the jury on all counts after a six-week trial. In the end, the trial evidence, as summarized with reference to individual text messages and emails in granular detail in the government's response to Nuhfer's and Rivera's motions for judgment of acquittal and new trial, directly contradicts Nuhfer's hyperbolic declarations and overwhelmingly demonstrates that a mitigating role adjustment is inappropriate under the facts of this case.

Section 3B1.2 provides for a mitigating role adjustment to a defendant's offense level based on the role the defendant "played in committing the offense." USSG Ch.3, Pt.B., intro. comment. This determination is to be made based on all of the defendant's relevant conduct and

"not solely on the basis of elements and acts cited in the count of conviction." Id. See also United States v. De Varon, 175 F.3d 930, 945 (11th Cir. 1999) (holding that in determining a defendant's mitigating role in an offense, "the district court must [first] measure the defendant's role against the relevant conduct for which she was held accountable at sentencing," and second "measure the defendant's role against the other participants, to the extent that they are discernable, in that relevant conduct."

Section 3B1.2 provides that the Court should decrease a defendant's offense level by four levels "[i[f the defendant was a minimal participant in any criminal activity," by two levels "[i]f the defendant was a minor participant in criminal activity," and by three levels if the defendant's conduct falls between a minimal and minor role. USSG § 3B1.2. A "minimal" participant is defendant who "plays a minimal role in the criminal activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. . . . [T]he defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." USSG § 3B1.2, comment. (n.4). A "minor" participant is one "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal" Id. at comment. (n.5).

However, a mitigating role adjustment (whether minimal or minor) is only available if the defendant "plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." Id. at comment. (n.3(A)) (emphasis added). Thus, "[a] defendant who is accountable under § 1B1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in the criminal activity may receive an adjustment" under § 3B1.2. By way of example, application note

3(A) states that a defendant "who is accountable under § 1B1.3 for a loss amount under § 2B1.1 . . . that greatly exceeds the defendant's personal gain from a fraud offense or who had limited knowledge of the scope of the scheme may receive an adjustment under this guideline." Id.

To provide further guidance in deciding whether to apply a mitigating role adjustment, the Sentencing Commission in 2015 made a number of changes to § 3B1.2 including the addition of a non-exhaustive list of factors for courts to consider (Amend. 794, eff. Nov. 1, 2015). These factors include (a) the degree to which the defendant understood the scope and structure of the criminal activity; (b) the degree to which the defendant participated in planning or organizing the criminal activity; (c) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (d) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and (e) the degree to which the defendant stood to benefit from the criminal activity. USSG § 3B1.2, comment. (n. (3)(C).

Here, Nuhfer's activities during the course of the illegal lobbying and money laundering scheme – as proven at trial – easily disqualify her from receiving a mitigating role adjustment. For example, the jury learned during the trial that, among other things, (a) Nuhfer initially introduced the four partners (Rivera, Nuhfer, Perera, and Gorrin) in early 2017, (b) Nuhfer and her partners agreed to share in the proceeds of the $50 million contract in equal parts ($12.5 million each), (c) Nuhfer established the MIA chat group in February 2017 so that the four partners could communicate through encrypted test messages (GX15 p. 1), (d) Nuhfer sent an email with the first invoice for $5 million to Gorrin in early March 2017 (GX307C) and contemporaneously posted

for Gorrin's benefit a photograph of herself with Rex Tillerson (the U.S. Secretary of State) to the MIA chat (GX15 p. 4), (e) Nuhfer participated in a separate chat group ("Otto/La Luz") with Rivera and Perera to discuss matters relating to their efforts outside the presence of Gorrin (GX20), (f) Nuhfer accessed the Department of Justice's FARA website and sent emails to Rivera with excerpts from (and hyperlinks to) several third-party FARA registration statements to help Rivera draft the Scope of Services included in the $50 million PDV USA consulting contract (GX326 & 328), (g) Nuhfer sent to the MIA chat group (in connection with the April 2017 meetings in New York City involving Rep. Sessions and Delcy Rodriguez and Julio Borges) photographs of draft letters of introduction from Delcy to "Secretary of State Rex Tillerson" stating that Raul Gorrin was empowered to act as an emissary on behalf of Venezuela in coordination with Rep. Sessions to engage in discussions with the U.S. government "in furtherance of normalizing the relationship between" Venezuela and the United States (GX15 pp. 31-32), (h) Nuhfer prepared multiple invoices addressed to PDV USA and PDVSA for payment pursuant to the $50 million contract for "strategic consulting services" that she sent to Rivera for dissemination to PDV USA and PDVSA, (i) Nuhfer texted in May 2017 the MIA chat group a bogus one-page contract for $3.75 million between her company Communication Solutions and Gorrin for alleged "strategic consulting services" in order to paper over Gorrin's transfer of funds to Nuhfer's corporate bank account (and from which Nuhfer sent $2.5 million to Rivera) when the PDV USA money initially ran dry in May 2017 (GX15 p. 58), (j) Nuhfer engaged in a chat conversation with Rivera in July 2017 about whether Perera should be allowed to attend the hotel meeting with Rubio (GX28), (k) Nuhfer exchanged text messages with Rivera in July 2017 in which Nuhfer tells Rivera "Call hugo now" "No more mtgs until we get a slice" to which Rivera responded "Tell Hugo to tell his new BFF

the bus driver to pay us for the mtg w Marco. Since there will be no turkey wout him": and Nuhfer replied, "I told him" (GX24 p. 6), (l) Nuhfer engaged in a chat conversation with Rivera on October 10, 2017, about whether they should accept the $5 million payment from Gazprom Bank for helping to obtain sanctions relief for Carlos Erik Malpica Flores (GX29), (m) Nuhfer and Rivera exchanged emails in November 2017 concerning Nuhfer's preparation of bogus progress reports to be submitted to PDV USA in which Rivera told Nuhfer that one of her draft reports was "a Michaelangelo work of art! Hemingway could not have written a better masterpiece. And for only $5 million. $10,000 per word. What a bargain!!!, and Nuhfer responded "Exactly, that is my going rate these days. Should I BS more, or is this fine? . . . You need to send this in tomorrow" (GX428 & 429), and (n) Nuhfer helped draft the letter of invitation to the Acting U.S. Secretary of State from the Foreign Minister of Venezuela inviting Rep. Sessions to travel to Caracas in April 2018 (GX462 & 463), all of which is only a small portion of Nuhfer's considerable efforts to push forward the group's efforts to obtain $50 million from the Maduro regime for their illegal lobbying efforts.

Based on the above-described trial evidence, in addition to the evidence discussed in even more detail in the government's response to Nuhfer's motion for judgement of acquittal and new trial (ECF 550), which the government specifically incorporates by reference, Nuhfer's assertions to the effect that she was not aware of the full scope of the offense conduct (which she attributes to Rivera) and barely did anything to manage or support or in any way further the criminal lobbying and money laundering scheme is patently absurd.

Nuhfer, however, attempts to buttress her request for a mitigating role adjustment by comparing her role in the offense to that of Rivera, Gorrin, Perera, and Cabrera-Morris who she

labels as "participants" in the "broad scheme" described in the PSR and further claims that she was "plainly less culpable than all of them." (ECF 577 at p. 6). This assertion is meritless for several reasons. First, it utilizes an incorrect legal standard. For purposes of a mitigating role adjustment, "participant" is defined as "a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant." USSG § 3B1.2, at comment. (n.1) (incorporating the definition of participant under § 3B1.1).

Here, Nuhfer takes the position in her objections (ECF 577 at p. 14) that Gorrin, Perera, and Cabrera Morris could not be charged with violating FARA due to "willfullness" considerations. The government does not disagree (at least as to Perera and Cabrera-Morris and potentially Gorrin), and doing so precludes them from being considered "participants" under the relevant § 3B1.2 definition. See generally United States v. Costales, 5 F.3d 480, 484-85 (11th Cir. 1993) (holding that a "participant" must be an individual "with criminal liability and intent" who was "an actual member of the plan or conspiracy" and not an "innocent enabler" of the unlawful conduct). Accordingly, applying the plain text of the guidelines, the only other "participant" in the scheme for comparison purposes is Rivera himself and based on the extensive nature of Nuhfer's involvement in the illegal lobbying and money laundering scheme, Nuhfer is not entitled to a mitigating role adjustment. See United States v. Stanley, 739 F.3d 633, 654 (11th Cir. 2014) ("The fact that a defendant's role may be less than that of other participants engaged in the relevant conduct may not be dispositive of role in the offense, since it is possible that none are minor or minimal participants"). In fact, the Eleventh Circuit "has rejected a test that would require sentencing courts to regard the least culpable member of any conspiracy as a minor participant,

regardless of the extent of the member's participation." Id. at 655.

Second, even including Gorrin, Perera, and Cabrera-Morris does not help Nuhfer's cause. Cabrera-Morris, for example, clearly played a less extensive role in the clandestine influence scheme. Her main role was to serve as a liaison to Rep. Sessions and she had no involvement whatsoever with respect to the core group's (Rivera, Nuhfer, Gorrin, and Perera) efforts to lobby Rubio or Conway. Most telling is that she received $250,000, a mere fraction of what Nuhfer, Rivera, Perera, and Gorrin received as part of their co-equal shares of the illicit proceeds. There was also no evidence presented that Cabrera-Morris knew the full scope of the four partners activities on behalf of Maduro (she was not, for example, a member of the MIA chat group for a reason) nor was there any suggestion that she knew that the four partners stood to receive $50 million under the initial consulting contract and up to $60 million under the revised terms set forth in the August 2017 "melones" text message contained in the MIA chat (GX15 p. 95). At bottom, there is no factual basis to support Nuhfer's position that she was less culpable (let alone substantially so) than Cabrera-Morris based on her role in the offense conduct.

Same to for Perera and Gorrin. Although it is true that Perera introduced Rivera to Gorrin as Nuhfer alleges (ECF 577 at p. 6), Perera did so at Nuhfer's request. The genesis of this whole sordid affair was Nuhfer's efforts in early 2017 to refer foreign individuals and entities (including foreign governments) to Ballard Partners for potential representation. That led Nuhfer to solicit Perera for potential clients for Ballard Partners, which in turn led to Perera introducing Rivera to Gorrin, and ultimately resulted in the four them acting as equal partners in their $50 million effort to normalize relations between the U.S. and Venezuela on behalf of the Maduro regime. Indeed, as Cabrera-Morris testified, Nuhfer "was the glue that put it all together."

Beyond that, all Nuhfer asserts is that Perera had business ties to Venezuela, had previously met Maduro (although no details are provided), and travelled to Venezuela to meet with Maduro in April 2018. In so doing, Nuhfer fails to account for the fact that Perera appears to have done little more than participate in the same chat conversations that Nuhfer did and also sat silent at several meetings as Nuhfer claims. Nuhfer, a political fundraiser and operative in her own right, fails to mention that Perera did not have – unlike Nuhfer who emphasized her personal relationship with Rubio at trial – personal ties to any of the relevant U.S. politicians (Rubio, Conway, and Sessions) nor did he participate in such matters as (a) accessing the Department of Justice's FARA website to help Rivera draft the Interamerican Consulting contract, (b) distributing to the MIA chat group draft letters of introduction appointing Gorrin as a personal envoy of Maduro to engage in discussions to normalize relations between the U.S. and Venezuela, (c) preparing a bogus one-page contract between Gorrin and Nuhfer's company Communication Solutions for $3.75 million for alleged "strategic consulting services" in order to paper over Gorrin's transfer of funds to Nuhfer's corporate bank account when the PDV USA money initially ran dry in May 2017, (d) assisting in drafting bogus progress reports to be submitted to PDV USA for, as Rivera stated, a mere $10,000 per word, and (e) drafting letters of invitation to the Acting U.S. Secretary of State from the Foreign Minister of Venezuela inviting Rep. Sessions to travel to Caracas in April 2018.

The same can generally be said for Gorrin. He too had a role to play, primarily as the contact with the Venezuelan government officials who approved and funded the group of four's lobbying related activities. Yet, while his role may have been different from Nuhfer's and Rivera's, there is no factual basis proffered by Nuhfer that makes his role any more significant or extensive than Nuhfer's role—their roles were different, but different is not the same as

substantially less culpable. At bottom, Nuhfer, as the party seeking a mitigating role adjustment, has failed to meet her burden of proof (a preponderance of the evidence), see United States v. Presendieu, 880 F.3d 1228, 1249 (11th Cir. 1249), because the facts established at trial simply do not support her assertion that she was substantially less culpable than the other participants (any way you count them) in the criminal activity at issue.[1]

C. Nuhfer's Objection that the PSR Incorrectly Fails to Use $3,500,000 As the Relevant Amount of Laundered Funds Is Without Merit

Nuhfer objects to two aspects of the PSR's calculation of the amount of funds relevant to the money laundering guideline calculation. The government addresses each of her objections below.

(1) The November 2026 Guideline Amendments

First, Nuhfer asserts that the Court should use at sentencing the upcoming November 2026 guideline amendments that incorporate an adjustment to the dollar amounts used in the fraud loss table at § 2B1.1(b)(1) (which is incorporated into the money laundering calculation at § 2S1.1(a)(2)). Nuhfer notes that the fraud loss table at § 2B1.1 was last updated for inflation in

[1] At various times, Nuhfer engages in rhetorical overstatement in pressing her argument for a minimal role adjustment. For example, she begins her argument by exclaiming that "[o]nly 4 out of 14 government witnesses even knew who she was." (ECF 577 p. 4). That should be no surprise as a number of government witnesses had no reason to have personally known Nuhfer and/or Rivera. These included JJ Gilday (the DOJ NSD program witness re FARA); Mike Petron (government's forensic accountant); Gina Coon, John Butts, and Arnaldo Arcay (CITGO Petroleum employees); Javier Garcia (summary law enforcement witness who published many of Nuhfer's emails and text chats to the jury), and Fernando Cutz (senior advisor within the National Security Council in 2017). Indeed, the primary witnesses with first-hand knowledge of the relevant events all provided testimony about Nuhfer as well as Rivera including Rubio, Perera, Cabrera-Morris, and Brian Ballard. And even Joel Brakha's testimony implicated Nuhfer as a result of his testimony concerning the unidentified woman who was with Rivera when Brakha was asked to sign a phony consulting agreement.

2015. The government has no objection to this request.

The PSR incorporates the current fraud loss table at § 2B1.1 that includes a 20-point increase for offenses where the amount of laundered funds is more than $9,500,000 (and up to and including $20,000,000, which is the breakpoint for the next two-level increase to the base offense level). See USSG § 2B1.1(b)(1)(K) & (L). Using $15,000,000 as the amount of laundered funds, which is roughly the mid-point of the current guideline range, the PSR added 20 points to Nuhfer's base offense level pursuant to § 2S1.1(a)(2). The upcoming guideline amendments, however, adjust the relevant amounts for inflation such that § 2B1.1 will provide a 16-point adjustment if the amount of laundered funds is more than $2,000,000, an 18-point adjustment if the amount of laundered funds is more than $5,000,000, and a 20-point adjustment if the amount of laundered funds is more than $15,000,000. For efficiency and fairness purposes, the government has no objection to the Court applying the November 2026 amendments as they pertain to the fraud loss amount in § 2B1.1. Doing so would appear to result in a two-point reduction in Nuhfer's base offense level as the $15,000,000 amount of laundered funds applied in the PSR would lead to an 18 point (instead of a 20 point) increase to the base offense level.

(2) The Relevant Amount of Laundered Funds under the November 2026 Amendments Is More than $5,000,000

In her second objection to the PSR's money laundering calculation, Nuhfer seeks to further reduce her exposure by arguing that the PSR incorrectly calculates her base offense level by using the sum of $15,000,000 as the amount of laundered funds for guideline purposes. She asserts that the PSR incorrectly charges her with the entire amount ($15 million) that PDV USA paid to Interamerican Consulting in the Spring of 2017—omitting the additional $5 million paid by PDVSA in October 2017—including the "money Rivera kept, money paid to Gorrin, money paid

to Perera, money paid to Cabrera Morris, and money paid to Esther." (ECF 577 at p. 13). She then claims that the correct amount of laundered funds under § 2S1.1(a)(2) should somehow be $3.5 million because this is "the net amount [Nuhfer] received from the $15,000,000 the PSR identifies as the laundered funds." Id. This would result in a 16-point enhancement (more than $2,000,000) rather than the 18-point enhancement (more than $5 million) under the November 2026 guideline amendments. Nuhfer's argument is without merit for several reasons.[2]

(i). First, Nuhfer mischaracterizes the nature of the money laundering conspiracy (Count 3) charged in the Superseding Indictment and adopted in the PSR. Contrary to Nuhfer's claims, the § 1956(h) money laundering conspiracy (the object of which was to violate § 1957) is not based on the total amount of funds ($20,000,000) that Interamerican Consulting received from both PDV USA and PDVSA. Rather, the money laundering conspiracy charge was based on Rivera's and Nuhfer's agreement to divide the funds Interamerican Consulting received from PDV USA and PDVSA in roughly equal parts between the primary participants (Rivera, Nuhfer, Raul Gorrin, and Hugo Perera) with some additional funds used to be used for miscellaneous purposes (such as the payments to Bertica Cabrera-Moris and the law firm Cozen O'Connor).

To effectuate that agreement, Rivera would from time-to-time distribute Nuhfer's, Gorrin's, and Perera's share of the funds (i.e., spend the ill-gotten gains of Rivera's and Nuhfer's FARA violation) through financial transactions involving more than $10,000 in tainted proceeds. It is that agreement between Rivera and Nuhfer for Rivera to distribute the funds to the other participants such as Nuhfer (and other third parties) that constitutes the money laundering

[2] The PSR groups Counts 3 (money laundering conspiracy) and Count 6 (substantive money laundering) as a single group for guideline purposes and then used the sum of $15,000,000 as the amount of laundered funds. PSR at p. 27-28.

conspiracy based on the contemplated § 1957 money spending transactions at the heart of the PSR's guideline calculations. Since it is based on the money distributed by Rivera through Interamerican Consulting, the amount of laundered funds used in the PSR's guideline calculation does not include the roughly $5 million retained by Rivera as his equal portion of the illicitly derived funds.[3]

(ii). Second, to compound this error, Nuhfer argues that Rivera's distribution of funds (reflected in GX1) to Interglobal Yacht for Gorrin's benefit ($5,291,833); Perera's companies ($5,291,833); and Bertica Cabrera-Morris ($250,000), should not be included in the amount of laundered funds attributable to Nuhfer. In support of this position, Nuhfer makes the rather odd argument that, because the government did not charge Perera, Gorrin, or Cabrera-Morris with violating FARA, there was no relevant FARA violation as to those individuals and *ipso facto* "a payment to a person who, on the Government's own account, committed no crime is not a laundering transaction. It is a lawful payment."

This argument is nonsensical and for that reason Nuhfer cites no case or other legal support for her position. The nature of a § 1957 violation is no mystery. Section 1957 is a money spending statute that in its most basic description makes it illegal for an individual to use tainted proceeds (money derived from specified unlawful activity) to engage in financial transactions involving more than $10,000. What makes it a crime is the knowledge of the person spending the money that the funds derive from illegal activity, not the state of mind of the individual receiving the tainted funds. Indeed, a § 1957 laundering transaction will often involve non-complicit third

[3] The government clarified the nature of the money laundering conspiracy charge a number of times in Court. Accordingly, it is not clear to undersigned counsel why Nuhfer persists in mis-stating the nature of the relevant charges.

parties such as a legitimate car dealer who sells an expensive automobile to a guilty party or a jewelry merchant who sells high-end watches to a wrongdoer in a transaction involving more than $10,000. In either instance, the wrongdoer is guilty of conducting a financial transaction in violation of § 1957 regardless of the state of mind of the third-party recipient of the funds.

These rudimentary principles apply with equal force here. Thus, it is no surprise that Nuhfer fails to cite to any legal authority in support of her position that somehow Rivera's and Nuhfer's agreement for Rivera to distribute the tainted proceeds of their illegal activities to Gorrin, Perera, and others does not count because they were not charged with violating FARA.

Accordingly, including just the amount of tainted funds Rivera distributed to Perera, Gorrin, and Cabrera-Morris with the amount Rivera distributed to Nuhfer through her company Communication Solutions ($4,691,333) totals roughly $13,983,166 (see GX1). Including the transfers Rivera made to other third parties (such as the $1,000,000 Rivera transferred to the law firm Cozen O'Connor in December 2017) puts the figure right around $15,000,000. Thus, the 18-point enhancement under the November 2026 amendments for laundering funds of "more than $5,000,000" clearly applies here. Relatedly, the evidence at trial amply demonstrated that the Interamerican Consulting ultimately received $20 million of the $50 million provided for in the PDV USA agreement, and that Nuhfer explicitly agreed with Rivera that she and the other partners in the scheme (Perera and Gorrin) would receive twenty-five percent each.

(iii). Third, Nuhfer attempts to buttress her position by arguing that the PSR "fixes the laundered funds at $15,000,000 based upon the PDV USA payments in March and April 2017" and "correctly excludes the $5,000,000 wired to Interamerican from PDVSA's account at Gazprom Bank on October 27, 2017." (ECF 577 at p. 15). Nuhfer cites to ¶¶ 123 and 158 of the

PSR as the basis for this statement. Yet those paragraphs do no such thing and in fact specifically included the PDVSA transfer from Gazprom Bank in its analysis:

> Between late March 2017 and mid-April 2017, Interamerican Consulting received three of the installment payments, totaling $15,000,000, under the PDV USA consulting contract through bank accounts controlled by CITGO and PDV USA. In addition, on October 27, 2017, Interamerican Consulting received a transfer in the amount of $5,000,000 from a PDVSA account Gazprom Bank in Russia. Rivera divided these funds in approximately equal amounts with Nuhfer, Gorrin, and Perera, with a small amount paid to Cabrera-Morris for her assistance in acting as a liaison with Sessions. Over time, Rivera, Nuhfer, Gorrin, and Perera used their portions of these funds to pay for various personal and business expenses, such as the purchase of real estate, payment of expenses for luxury yachts, and, in Rivera's case, contributions to his campaign account for state office. . . .

PSR at ¶ 123. Frankly, the government is at a loss as to how Nuhfer can claim that the PSR excluded the $5,000,000 PDVSA transfer from its laundering calculations.

Accordingly, this Court should use as the starting point the full $20 million transferred by PDV USA and PDVSA to Interamerican Consulting and then find that the amount of laundered funds was at least $13,983,166 (more than $5,000,000) based on the uncontested evidence (see, e.g., GX1) presented at trial through the government's forensic accountant (Mike Petron of Stout). Under the November 2026 guideline amendments, doing so would result in an 18-point enhancement to the base offense level under § 2S1.1 and accurately reflect the nature of the money laundering conspiracy charged in Count 3 of the Superseding Indictment.

D. The PSR Properly Includes a Six-Point Enhancement for a Money Laundering Offense Involving National Security

Nuhfer argues that the PSR mistakenly applied the national security enhancement pursuant to § 2B1.1(b)(1). That provision provides for a six-point enhancement to a defendant's base offense level where "the defendant knew or believed that any of the laundered funds were the proceeds of or intended to promote . . . an offense involving . . . national security." Nuhfer alleges

that this enhancement fails because (1) FARA is a mere registration offense and is "not an offense involving national security within the meaning of the guideline" and (2) there is "no evidence that [Nuhfer] knew or believed any such thing."

Here, the six-point enhancement clearly applies under the facts of this case. Because FARA violations like the instant offense involve covertly working within the United States on behalf of a foreign principal, they generally present significant national security concerns. See Att'y Gen. v. Wynn, 104 F.4th 348, 353 (D.C. Cir. 2024) (describing FARA enforcement as "touch[ing] on sensitive areas of national security and foreign policy"). Those concerns were especially acute in this case, where the foreign principal was the Venezuelan government itself acting through its highest-ranking officials—including Delcy Rodriguez (who was then Venezuela's foreign minister and is now its acting head of state), as well as Nicolas Maduro. As reflected in their communications, both defendants knew that these top Maduro officials had approved of their activities in exchange for millions in compensation – a total of $20,000,000 in actual payments to Rivera and Nuhfer with the hope of their ultimately receiving up to $60,000,000 – through the Venezuelan state oil company.[4]

Notably, Rivera's and Nuhfer's efforts to lobby politicians in the United States to "normalize relations" (a term the defendants repeatedly used to describe the ultimate objective of their efforts) included their agreement to work to lift economic and other sanctions that the United

[4] Nuhfer cites (once again) the Bondi memo as evidence to support her position that not all FARA violations are categorically matters "involving . . . national security." (ECF 577 p. 17). And that may true. However, here the underlying facts clearly support the national security enhancement and it is worth noting that defense counsel for both Rivera and Nuhfer sought dismissal of the present counts of conviction based on the Bondi memo but those efforts were rejected at the highest levels of the Department of Justice.

States had been imposing in 2017 on top Maduro officials (including Maduro himself and Carlos Erik Malpica Flores—Maduro's nephew), something that was directly contrary to U.S. foreign policy and its national security interests at the time. Indeed, at trial the government introduced as exhibits several of the underlying blocking notices issued by the Department of the Treasury that added Maduro and various other Venezuelan individuals and entities to the U.S. sanctions list. See GX667 (Notice dated July 26, 2017) (adding Carlos Erik Malpica Flores and others); GX668 (Notice dated July 31, 2017) (adding Nicolas Maduro Moros); GX669 (Notice dated August 9, 2017) (adding Adan Chavez Frias and others).

In each of these instances, the 2017 Notices referenced above were expressly issued under the authority of Executive Order 13692 of March 8, 2015, entitled "Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Venezuela," in which President Obama found that the situation in Venezuela "constitute[d] an unusual and extraordinary threat to the national security and foreign policy of the United States" and "declared a national emergency to deal with that threat." See DRX761 (copy of Executive Order 13692 admitted at trial by Rivera). In other words, the entire Venezuelan sanctions program was implemented pursuant to the national security and foreign policy interests of the United States. Accordingly, there is fundamentally no merit to Nuhfer's conclusory assertion that her and Rivera's clandestine lobbying activities – aimed at having those very same sanctions lifted – did not involve a matter of national security.[5]

[5] Fernando Cutz (who was a Senior Advisor to the National Security Advisor of the United States, H.R. McMaster, in 2017) provided extensive testimony concerning the importance of the Venezuelan sanctions program in the context of the U.S.'s national security and foreign policy during the relevant time period. Indeed, he testified that the sanctions that the U.S. placed on Maduro in the summer of 2017 was a huge escalation in the pressure that the U.S. was putting on

Moreover, in their covert efforts for Venezuela's government, both Rivera and Nuhfer sought to exploit longstanding personal ties to senior U.S. political leaders (including Senator Rubio, White House advisor Kellyanne Conway, and Rep. Pete Sessions) in order to influence U.S. policy in the Maduro regime's favor. Those interactions further implicated national security matters by creating situations that could have potentially exposed such officials to clandestine monitoring by an adversarial foreign power and or even potential physical harm. Senator Rubio, for example, testified that in July 2017 – at a time he was on both the Senate Foreign Relations Committee and the Senate Select Committee on Intelligence (which had oversight responsibilities over the U.S.'s intelligence agencies) – he opted to meet with Gorrin at Rivera's request in the belief that Gorrin would deliver a letter from Maduro outlining a potential process for normalizing relations between the U.S. and Venezuela. Rubio, however, testified that he did not want to meet with Gorrin (who Rubio new to be a "corrupt regime insider") at his office in the Capitol Building because Rubio had previously asked for Gorrin to be sanctioned and he was concerned that Gorrin "would implant a listening device in the office." Tr. (Mar. 24) at pp. 41, 62-63. Accordingly, the meeting took place at a hotel in Washington and included both Nuhfer and Rivera among others.[6]

As to Rep. Sessions, Rivera and Nuhfer both directly participated in encouraging and arranging for him to physically travel to Caracas to meet with Maduro and other members of his

---

Venezuela as there were only a few foreign leaders – including Bashar al-Assad in Syria and Kim Jong Un in North Korea – who were subject to U.S. sanctions at the time. Tr. (Apr. 2) at p. 202.

[6] Rivera and Nuhfer also attempted to arrange a meeting between Gorrin and Conway in June 2017 by having Conway, a White House advisor at the time, fly on Gorrin's private jet from Washington to Miami to attend a political event. Conway, however, presciently declined that offer thereby avoiding the potential for the type of surreptitious monitoring described by Senator Rubio.

regime in April 2018. Nuhfer, for instance, helped draft the letter of invitation that was transmitted by the Venezuelan government to the U.S. Department of State inviting Rep. Sessions to travel to Venezuela (GX 462, 463 & 200B). At that time, it was no secret that the U.S. and Venezuela were in an adversarial relationship and a major point of contention was the Venezuelan government having taken as hostages U.S. citizens who had been summoned to Venezuela by the Venezuelan government such as the Citgo 6 or otherwise travelled there on their own initiative such as Joshua Holt who was a specific point of conversation in connection with Rivera's and Nuhfer's communications regarding Rep. Sessions' travelling to Caracas (GX465).

Moreover, Rep. Sessions' unofficial trip to Caracas raised particular concerns to U.S. embassy officials in Caracas at the time. Brian Naranjo, the second-in-charge in Caracas in 2017, described how Venezuela was "an extremely dangerous place to work and live in 2017" and how he went from being able to drive himself around Caracas during his first tour of duty to having to have an armored car and eight to twelve armed bodyguards to travel in Venezuela by 2017. Tr. (Mar. 31) at pp. 262-63. Naranjo testified that while the main concern in Caracas was often general crime with respect to his position with the U.S. government it was also driven by "concerns about politically directed violence, terrorism, that kind of thing." Tr. (Apr. 1) at pp. 96-98. Accordingly, Naranjo testified that the "security concerns" associated with Rep. Sessions visit (which was the only non-official trip – or NODEL – to Venezuela by a Congressman at that time), was "off the charts" in "a place like Venezuela." Tr. (Mar. 31) at p. 262. Those security concerns and the potential for harm to a U.S. Congressman in travelling to Caracas on an unofficial visit (arranged, in part, by Rivera and Nuhfer) should certainly be more than sufficient to find that Rivera's and Nuhfer's unlawful lobbying activities involved a matter of national security for

guideline purposes, and they were aware as much.

While Nuhfer makes much to do about the Manafort case and the terms of his plea agreement, each case stands on its own facts and the undersigned are in no position to address the negotiations that led to the plea deal there. The government notes, however, in a more recent FARA prosecution, the sentencing court, consistent with the Probation Office's recommendation, imposed the six-level national-security enhancement under § 2S1.1(b)(1)(B)(iii). United States v. Michel, 19-cr-148, ECF 402, at 11-12 (D.D.C. Nov. 4, 2025). That the FARA offense conduct in Michel— which concerned international criminal law enforcement matters such as defendant's efforts to terminate criminal and forfeiture proceedings against the foreign principal—was found to trigger the enhancement supports its application here, where the foreign principal was an adversarial foreign government. Moreover, that Rivera and Nuhfer may not have subjectively believed their efforts would harm U.S. national security is irrelevant. United States v. Hanna, 661 F.3d 271, 294 (6th Cir. 2011) ("Though no one asserts that [defendant] believed her exports would 'threaten' national security, that is not required under the sentencing provision: it merely requires that she knew the offense 'involved' national security.").

Here, Rivera and Nuhfer were well-aware that their activities implicated U.S. national security interests. Indeed, the very fact that the top echelon of the Maduro regime was willing to pay tens of millions of dollars to a former U.S. Congressman and a professional political fundraiser and operative to secretly lobby high-level U.S. government officials (including a White House Advisor and Senator who was a member of the Senate's Foreign Relations and Intelligence Committees) on matters of U.S. foreign policy is enough to find that Rivera and Nuhfer were aware of the rather obvious national security implications of their conduct. For that reason and the other

reasons discussed herein, the PSR correctly included the six-point national security enhancement under § 2S1.1(b)(1).

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court reject Nuhfer's objections to the PSR.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: /s/ *Harold E. Schimkat*

Harold E. Schimkat, AUSA
Roger Cruz, AUSA
Court ID No. A5500567
Fla. Bar No. 157971
99 N.E. 4th Street, 4th Floor
Miami, Florida 33128
Desk: (305) 961-9298
Cell: (786) 378-4344

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on August 7, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

/s/ *Harold E. Schimkat*
Harold E. Schimkat
Assistant United States Attorney