**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-Cr-20552-Damian/Torres**

**UNITED STATES OF AMERICA**

**vs.**

**ESTHER NUHFER,**

**Defendant.**

_______________________________/

**GOVERNMENT'S RESPONSE TO ESTHER NUHFER'S SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE**

The United States of America, by and through the undersigned Assistant United States Attorneys, respectfully submits this response to Esther Nuhfer's ("Nuhfer") Sentencing Memorandum (ECF 586) and further states as follows:

## Introduction

This Court should deny Nuhfer's request for a downward variance to a sentence of probation from her preliminary guideline range of 135 to 168 months imprisonment. As this Court is well-aware from the six-week trial in this case and extensive post-trial litigation, Nuhfer was a principal participant along with Rivera in their unlawful scheme to secretly lobby U.S. politicians to "normalize relations" with Venezuela and the Maduro regime in return for which the received $20 million and hoped to receive tens of millions dollars more for their efforts. In so doing, they acted on behalf of a hostile foreign government, the president of which (and his wife) now sit in a jail in New York City awaiting trial on federal narco-terrorism, drug trafficking, and related charges.

Based on their extensive educational and professional backgrounds and political experience – a lifelong federal and state politician (Rivera) and a political fundraiser and operative (Nuhfer) – Nuhfer and Rivera knew full well what they were doing and that they were in violation of the Foreign Agents Registration Act ("FARA"). However, to this day, neither Rivera nor Nuhfer have expressed any remorse for their conduct and they continue to proclaim their innocence, despite the jury's swift verdict and the overwhelming amount of evidence introduced at trial that they were acting as highly-paid agents of the Venezuelan government. Indeed, their continued conduct demonstrates their lack of remorse to the point that Nuhfer continues to trivialize the significance of her conduct including her present assertions that this case is only about "the failure to file a form," (ECF 586 p. 2), and that her failure to disclose the millions of dollars she and Rivera received for acting as agents of the Maduro regime was "of no consequence" (ECF 586 p. 14, n. 5).

For these and the other reasons set forth below, the government believes that the § 3553(a) factors weigh heavily in favor of a significant term of incarceration for both Nuhfer and Rivera and that Nuhfer's request for probation should be summarily denied.

## Argument

### A. Section 3553(a)(1) – The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

As noted, the offense conduct in this case has been covered in great detail during the defendants' six-week trial and the extensive post-trial litigation and other pleadings filed in this case. Accordingly, the government sees no point in subjecting the Court to further detailed pleadings on the underlying facts of the case and would simply rely on the prior proceedings in this matter with which the Court is already familiar.

Suffice it to say for now that the defendants' efforts to influence U.S. policy on behalf of the corrupt Maduro regime were significant, extensive and unfolded over a lengthy period of time. Those efforts included, in part, arranging self-described back-channel meetings between Congressman Sessions and Venezuela's Foreign Minister Delcy Rodriguez and opposition leader Julio Borges in April 2017 in New York City and meetings with Senator Rubio in Washington D.C. in July 2017 and related communications with him and his staff. Their efforts also included arranging for Congressman Sessions (to the point of completing his Venezuelan Visa application and drafting the letter of invite from the Venezuelan Foreign Minister) to travel to Caracas in April 2018 to meet with Maduro himself and members of his regime. All for the stated purpose of somehow normalizing relations between the U.S. and Venezuela and more pertinently the personal enrichment of the defendants and their co-participants to the tune of as much as $60 million—more money than most people will ever see in their lifetime. When considered in the context of the evidence in this case, Nuhfer's claim that this is only about the filing of a piece of paper misses the mark by a mile.

As to Nuhfer, her involvement in the scheme was no innocent mistake or misunderstanding. Rather, she was the one who introduced the four partners (Rivera, Nuhfer, Perera, and Gorrin) to each other and, as the text messages and emails introduced as evidence at trial demonstrated, was involved in almost every aspect of the joint engagement. That she knew what she was doing was entirely consistent with her personal and professional background. She is a college graduate with a Bachelor of Science in Professional Business Management from Nova Southeastern in 1998 (according to her resume attached hereto as Govt. Ex. 1) and, to the government's knowledge, began her career as an employee of the Miami Dade County

government. In 2004, she incorporated Communication Solutions, Inc. ("Communication Solutions"), which she herself describes as a "Miami-based public relations, finance and government consulting firm."

In fact, Nuhfer has over the years registered as a lobbyist with the State of Florida for a number of her clients and she herself states that her government consulting services includes, in part, providing consulting services on political campaigns and securing state budget appropriations on behalf of clients. In addition, Nuhfer has extensive additional experience acting as a fundraiser for candidates for office at the federal, state, and local level, and her national campaign clients have included individuals such as Marco Rubio, Newt Gingrich, Mike Huckabee, and not surprisingly David Rivera. In short, Nuhfer has extensive experience in the world of politics and government such that defendant's efforts to portray herself as a mere unwitting clerk in the underlying criminal conduct rings completely hollow.

Finally, this Court should not credit Nuhfer's claims of ignorance of the details of the underlying scheme in this case or her alleged lack of knowledge regarding the FARA implications of the defendants' conduct. Nuhfer, after all, helped Rivera draft the $50 million consulting contract based on FARA registration statements she personally accessed on the Department of Justice's website. Moreover, she did so within roughly a month of Brian Ballard, one of the top lobbyists in the country, warning her in mid-February 2017 regarding another Venezuelan matter (also involving Raul Gorrin) that Nuhfer should "make sure the people you are dealing with understand the serious nature of the FARA laws . . . [and] I urge you to be extremely careful." GX83B pp. 1-2.

Unfortunately, Nuhfer did not heed Ballard's advice and instead put money ahead of the

potential consequences of her actions.

B. Section 3553(a)(2) – The Need for the Sentence to Reflect the Seriousness of the Offense and Promote Respect for the Law and Just Punishment and Afford Adequate Deterrence

Considerations of just punishment and general deterrence also weigh in favor of a significant, non-probationary sentence under the facts of this case.

As the Eleventh Circuit and other courts have repeatedly emphasized, general deterrence is especially important in white-collar cases "where the motivation [for the crime] is greed. . . . United States v. Hayes, 762 F.3d 1300, 1308 (11th Cir. 2014) (noting that the courts have "set aside sentences of little or no imprisonment because they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others."). Indeed, U.S. District Judge Ruiz observed several years ago, that "[w]hite-collar criminals often calculate the financial gain and risk of loss of their crimes, and an overly lenient sentence sends the message that . . . would-be white-collar criminals stand to lose little more than the portion of ill-gotten gains and practically none of their liberty." United States v. Patel, 19-Cr-80181-RAR (S.D. Fla. Aug. 18, 2023) (ECF 557 at 110:1-5).

Here, that is precisely what Nuhfer and Rivera did. They engaged in conduct clearly falling within the type of "political activity" that requires public disclosure under FARA but chose not to file a registration statement disclosing their efforts due to the adverse financial and reputational harm such disclosure might entail. Moreover, contrary to Nuhfer's assertions downplaying FARA's significance, their failure to disclose their efforts on behalf of a hostile government is no small matter. As Ballard testified, complying with FARA's registration and reporting requirements is part of doing business as a lobbyist and serves to "let the public know that an entity is representing a foreign government. . . . Especially a foreign government, it's

important that . . . not only the government knows but the public knows." Tr. (Mar. 21) at p. 29. Similarly, Rep. Sessions testified during trial at some length regarding the importance of transparency and that as a matter of public policy it is important for lobbyists to register when they are dealing with elected officials, particularly so when they are working on behalf of a foreign government. Tr. (Apr. 27) at pp. 83-84.

Here, a probationary sentence or anything less than a significant term of imprisonment would fall far short of reflecting the seriousness of the defendants' offense conduct, would detract from respect for the law in light of specific facts of this case, and fail to provide just punishment for Nuhfer's and Rivera's actions. At the time of the offense conduct here, Nuhfer and Rivera had clear criminal intent, motivated by avarice and reputational and other personal considerations, and they chose to fail to register under FARA in carrying out their lobbying activities for the Maduro regime's benefit.

Finally, as to general deterrence, Nuhfer argues in a footnote that she would not even be prosecuted today under the Bondi memo but for her association with Rivera. In that regard, it is worth noting that the policies set out there were not in place during the time of the offense conduct here and the defendants' efforts to have the charges dismissed in this case were rejected by the Department of Justice and the U.S. Attorney's Office for the Southern District of Florida. What may ultimately become of the Bondi memo and its policies (which remain in effect) remains to be seen as policies can change or be modified from time-to-time or exceptions made in certain cases. Whatever current preference the Bondi memorandum may reflect for civil enforcement of FARA matters, is not relevant to the egregious facts of the current matter.

C. Section 3553(a)(6) – The Need to Avoid Unwarranted Sentencing Disparities

Nuhfer is incorrect in asserting that the need to avoid unwarranted sentencing disparities weighs in favor of a sentence of probation. In support of her request, Nuhfer includes several charts in her memorandum containing cursory thumbnail sketches of a number of other FARA or FARA-related cases and the relatively light sentences of probation or minimal jail time the defendants in those cases received. Nuhfer labels those cases as "ordinary" FARA cases and essentially asserts that they set a baseline for FARA sentences in cases that do not involve what Nuhfer labels as aggravating factors.

But Nuhfer's analysis is of limited value (at best) and is in fact largely superficial to the point of irrelevancy. Indeed, although Nuhfer acknowledges that one of those defendants received the benefit of cooperation for a reduced sentence, she fails to mention that each and every one of the other defendants in the "ordinary" cases she lists pled guilty to the charges against them. The undersigned is certainly not in a position to opine on the nature of the plea deals in those cases and the benefits that accrued to the defendants as a result. Nor can the undersigned speak to the detailed facts of those cases (including the relevant backgrounds of the individuals involved) and what the basis was for the government to not charge money laundering in those cases or other aggravating crimes. Be that as it may, Nuhfer's efforts to set a baseline standard of probation (and to claim that she is even less culpable than the defendants in those "ordinary" cases) is too superficial and conclusory to say whether the comparisons she makes have any actual bearing on the specific circumstances of her and Rivera's $50 million scheme.[1]

[1] The two cases Nuhfer cites as "aggravated FARA cases" resulting in modest sentences were also the result of plea deals between the government and the defendants. Again, it is difficult to assess

Nuhfer does concede that there certainly are FARA cases in which more significant sentences of five to fourteen years have been imposed including the Tongsun Park, Paul Manafort, Imaad Zuberi, and Prakazrel Michel cases. Again, she provides no detailed explanation as to the "aggravating features" of those cases that takes them out of the category of "ordinary" FARA cases as she sees things or how significant the "aggravating features" were in comparison to Nuhfer's and Rivera's activities (whether separately charged or not) as to the illegal lobbying and money laundering scheme for which they were charged and convicted by the jury.

Indeed, Nuhfer virtually ignores one distinguishing feature of her case from the ordinary cases she describes and that is Nuhfer was charged with money laundering as opposed to those other defendants. In Nuhfer's eyes, however, the fact that the grand jury returned an indictment charging her with money laundering is not an aggravating factor, but instead a heavy-handed and somehow unfair charging decision. That is simply not the case. The cases she cites in support of her position largely involved cases addressing promotional money laundering and the adverse effects it might have in some instances in the eyes of some courts. However, Nuhfer concedes that subsequent to the some of those criticisms, Congress did amend the money laundering statutes to address the matter of promotional money laundering and that the cases she cites are generally inapplicable as she and Rivera were charged with and convicted of § 1957 based money laundering, not promotional money laundering under § 1956. The simple fact of the matter is that Nuhfer and Rivera and their partners received an obscenely large amount of money ($20,000,000) as compensation for their efforts on behalf of a corrupt and hostile foreign regime and were

---

their relevancy based on the summary information Nuhfer provides beyond the fact that neither defendant was charged with money laundering.

promised as much as $60,000,000 if they were successful in their efforts. There simply is nothing untoward with charging them with conspiracy to violate § 1957 and substantive counts of § 1957 money spending based on their transactions of $10,000 or more in illicit proceeds derived from their unlawful lobbying scheme. In short, that is the very purpose that Congress enacted § 1957—to take the profit out of crime by making the spending of illicitly obtained proceeds a crime in and of itself.

D. Miscellaneous Arguments

Nuhfer further asserts that she should receive a probationary sentence based on her "extraordinary life" and family circumstances. She describes at length growing up in Miami and various obstacles she and her family had to overcome – such as dealing with the aftermath of Hurricane Andrew and other setbacks the family faced – during her lifetime, including some of her own medical issues. However, the obstacles and medical issues she describes are of a kind that many individuals and families must face over a lifetime and are not, in the government's view, sufficiently extraordinary or unique such that a downward variance is merited in this case let alone one resulting in a sentence of probation.

To the extent Nuhfer raises her parents' medical needs as a basis for a variance, the premise of her argument relies primarily on her assisting her parents by providing transportation services to help them meet their medical appointments. While that is certainly a good thing to do and most likely of importance to her parents, there is no basis in the government's view that it should justify a significant variance from the guideline range. In particular, Nuhfer acknowledges that she has several sisters and other family members living in the Miami area and it is not unreasonable to suggest that they may find some flexibility in their schedules to compensate for Nuhfer's

unavailability should this Court sentence her to a significant term of incarceration. Further, she makes no showing of her parents' or her family's financial inability to pay for any required transportation services or that publicly provided transportation services such as the Miami Dade County Special Transportation Services (or other similar services) would be unavailable to her family. Accordingly, the government does not believe Nuhfer's request for a variance to a probationary sentence is warranted based on her and her family's personal circumstances.[2]

---

[2] The government notes that the 2025 guideline amendments eliminated, in part, the provisions for departures under the guidelines as previously set forth at USSG § 5H1, including eliminating departures based on family circumstances under § 5H1.6. However, it is worth noting that the guidelines had for many years disfavored such departures providing that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted" and set forth a number of factors for the courts to consider in ruling on a defendant's request for a downward departure based on loss of caretaking.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court deny Nuhfer's request for a probationary sentence and impose a sentence that includes a significant term of incarceration.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: /s/ *Harold E. Schimkat*

Harold E. Schimkat, AUSA
Roger Cruz, AUSA
Court ID No. A5500567
Fla. Bar No. 157971
99 N.E. 4th Street, 4th Floor
Miami, Florida 33128
Desk: (305) 961-9298
Cell: (786) 378-4344

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 14, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

/s/ *Harold E. Schimkat*
Harold E. Schimkat
Assistant United States Attorney