UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA, CASE NO. 22-cr-20552 -Damian/Valle

Plaintiff,

v.

DAVID RIVERA,

Defendants.
_______________________________________//

**DAVID RIVERA'S MOTION FOR 18 U.S.C. § 3553 (a) CONSIDERATION OR, IN THE ALTERNATIVE, FOR A SUBSTANTIAL DOWNWARD VARIANCE**

Defendant, David Rivera, through counsel, respectfully moves this Honorable Court to consider the following facts pursuant to 18 U.S.C. § 3553 (a) or, in the alternative, for a substantial downward variance from the adjusted guideline range determined by the Court, and states:

1. In his Objections to the PSR, both in the "Preface" and in his "Objections to Guideline Calculations" at paragraph 3, Rivera has objected to the use of the money laundering guidelines at all in this FARA registration case and has urged the Court to sentence Rivera as a FARA violator because FARA, after all, is what this case is about. We adopt and incorporate that objection and argument here.

2. Because there are no FARA specific guidelines or sufficiently analogous guideline, this would require the Court to determine Rivera's sentence pursuant to the provisions of section 3553 of Title 18. (PSR paragraph 158). Section 3553 (a) directs the Court to impose a sentence **"sufficient but not greater than necessary"** to comply with the statutory purposes. (bold supplied) In that process, Congress has directed the Court to "consider", among other factors. "the nature and circumstances of the offense and the history and characteristics of the Defendant." (*Id.*,

3553(a)(2)(A)). We have argued the "nature and circumstances" of the crime in Rivera's Objections to the PSR. In this motion, we have set out below, the "history and characteristics" of Rivera which we ask the Court to consider.

3. However, should the Court overrule Rivera's objections to allowing the sentencing in this FARA registration case to be driven by the money laundering guidelines, Rivera moves for a substantial downward variance based on the factors set out below.

4. Before we set out the factual matters in Rivera's life and life's work strongly supporting a substantial downward variance, there are other factors that we ask the court to consider. They are:

A. Today this case would not even be prosecuted. In Former Attorney General Bondi's February 5, 2025, FARA directive, in the section titled "Shifting Resources in the National Security Division" she orders that "the Foreign Influence Task Force shall be disbanded" and that "[r]ecourse to criminal charges under [FARA] … shall be limited to instances of alleged conduct similar to more traditional espionage by foreign government actors." For other FARA matters, the Attorney General directed the Counterintelligence and Export Control Section, including the FARA Unit, to "focus on civil enforcement, regulatory initiatives, and public guidance." Memorandum from the Att'y Gen. to All Dep't Emps., *General Policy Regarding Charging, Plea Negotiations, and Sentencing* (Feb. 5, 2025) at 4.

This case does not involve espionage in any form nor "by foreign government actors" and, under the former AG's directive, it would not even be prosecuted. This is precisely what the government did in the case against Enrique and Imelda Cuellar, (S.D. Tex. Case No. 4:24-cr-0224). In their motion to dismiss the charges related to alleged FARA violations, DE 122 at p.2, the government specifically stated that, "[t]he Department has determined that, for this particular case,



#112223564v4

the § 219-related counts and allegations should be dismissed or stricken pursuant to the Attorney General's February 5, 2025, Memorandum." Given this situation, it is difficult, if not impossible, to see how any sentence imposed on Rivera would not be about as bad an "unwarranted sentencing disparity" within the meaning of 18 U.S.C. § 3553(a)(6) as one can imagine. For goodness' sake, they aren't even prosecuting the crime anymore!

B. The Advisory Guideline Range set out in paragraph 169 and again at paragraph 212 of the PSR, Level 39 (262-327 months), driven by what we contend in Rivera's Objections to the PSR is a serious misapplication of the money laundering guidelines, grossly overrepresents the actual FARA registration offenses which drive this case. In this regard, Rivera adopts and incorporates by reference his Objections to the PSR and case law cited therein and filed simultaneously herewith, at specific objection to the Sentencing Guideline calculations paragraphs 3-5. As stated therein, Rivera contends that a proper application of the guidelines requires the Court to rely on the statute, 18 U.S.C. § 3553, as there is no FARA guideline or sufficiently analogous guideline. (USSG § 2X5.1 ("If the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline. If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control. . . .") (PSR paragraph 158).

C. Rivera has brought in Mark Allenbaugh, Chief Research Officer and Co-Founder of SentencingStats.com, Inc., to provide assistance with his sentencing. Mr. Allenbaugh's Declaration is Exhibit "A" hereto. Mr. Allenbaugh touches on a number of issues covered in this motion as to which he provides the following "Executive Summary":

> • For the past 20 fiscal years, the rate of below range sentences has increased significantly for those sentenced under USSG §2S1.1 in Criminal History Category I.



#112223564v4

- For those sentenced below the advisory sentencing range, their sentences have consistently been averaging between three and five years regardless of Total Offense Level.

- For those sentenced below the advisory with a Total Offense Level of 21, their sentence have consistently been averaging less than two years for nearly the last 20 years.

- At nearly 61 years of age, Mr. Rivera is significantly older than the average age of offenders in this cohort at the time of their sentencings (43.3).

- Mr. Rivera's life expectancy will be significantly reduced by any long term incarceration. He is not expected to survive even eight years of imprisonment.

- The BOP is dangerously overcrowded, which will be made worse by the BOP's recent announcement it is closing or redesignating several camps.

We start with the Statistical Analysis referenced in the first two bullets. Statistically, the kinds of cases which result in sentences of 262-327 months in no way resemble this victimless (PSR paragraph 150) FARA registration offense which actually accomplished nothing (PSR paragraph 123). According to the U.S. Sentencing Commission's 2025 *Sourcebook of Federal Sentencing Statistics*, the average (mean) sentence for those convicted of *murder* in Criminal History Category I was 264 months and the median was just 240 months; for Sexual Abuse the average was 219 months and median 192 months; for Kidnapping the average was 162 months and the median 123 months. [1] In contrast, the average sentence for money laundering in Criminal History Category I was just 42 months and the median 24 months—over an order of

[1] *See* U.S. Sentencing Comm. 2025 Sourcebook of Federal Sentencing Statistics tbl. 27, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2025/Table27.pdf.

magnitude less than what the PSR recommends. To sentence Rivera at the PSR recommended level, or at anything even resembling it, would be a travesty of justice.

D. An examination of recent cases also demonstrates that defendants who engaged in far more egregious conduct than Rivera are not receiving sentences anything like the sentence the government is seeking for Rivera. For example, just yesterday, U.S. District Judge Tiffany Johnson of Atlanta, Ga., sentenced Drive Planning, LLC., executive Julie Edwards to just 24 months for her role in a $380 million dollar Ponzi scheme. Johnson had pled guilty to money laundering but was, according to prosecutors, an integral part of the scheme to deceive investors and, along with others, used their funds to finance luxury lifestyles, pay-off other investors to keep the Ponzi going and make commission payments to the group's agents. For her part, Johnson used stolen money to purchase a $630,000 residential property. (N.D. Ga. Case No. 1:26-cr-00060)

On Tuesday this week a Manhattan federal judge sentenced Joshua Schuster, 42, to four years in prison after he admitted stealing proceeds from investors' membership interests in real estate projects in a $13 million securities fraud. Schuster spent the money on a lavish lifestyle. (S.D.N.Y. Case No. 1:25-cr-00204- Caproni)

Just last week Colorado federal Judge Charlotte Sweeney sentenced Heath Posey to 3.5 years in prison for his role in the operation and promotion of a multimillion-dollar fraudulent investment fund which the judge found caused dozens of individuals to lose their homes, retirement savings as well as the loss of their dignity. (D. Colo. Case No. 1:24-cr-00352)

In June of this year, U.S. District Judge Jed Rakoff sentenced Hollywood director Carl Erik Rinsch, age 48, to 2 ½ years in prison after a jury convicted him of stealing 11 million from Netflix in a fraud and money laundering trial. (S.D.N.Y. Case No 1:25-cr-00085-Rakoff).

Also in June, Giovani Pennetta, the manager of a New York based investment firm, was sentenced after a guilty plea to 4 years in prison for wire fraud and money laundering related to his role in a multimillion-dollar scheme to defraud investors. (S.D.N.Y. Case No 1:25-cr-0057-Rakoff).

In another June case, Leonardo Ayala, age 25, a former TD Bank teller, was sentenced to 2 years for accepting bribes and helping to launder millions of dollars in drug proceeds in a scheme that transferred the illicit money from the U.S. to Colombia. (D.N.J. Case No. 2:26-cr-00004-Salas).

In May, New York attorney John Hanratty, age 51, was sentenced to just a year after his conviction at trial for conning Emigrant Bank out of $20 million by lying about his investment firm's tax lien collateral in what prosecutors described as a straight up scheme to steal from an FDIC insured bank. (S.D.N.Y. Case No 1:24-cr-00153-Schofield).

Together, these and other contemporaneous sentencing cases establish that far more seriously damaging conduct than Rivera's victimless crimes are drawing sentences far *lower* than the government is seeking for Rivera. And Rivera should not receive a sentence anything like these cases.

E. An examination of FARA case sentencing for registration offenses further establishes the outrageous nature of the PSR guideline conclusion and sets the standard for avoiding unwarranted sentencing disparities under Section 3553(a)(6) in this case.[2]

- *United States v. Chaudhry*, **3 years' probation** for failing to file a FARA registration statement arising from Pakistan-related advocacy.

[2] This and the following sections in paragraphs 4 (E)-(H) are largely borrowed from Esther Nuhfer's Sentencing Memorandum, DE 586, Part III, pages 16-21.

• *United States v. Patten*, **3 years' probation** for violating FARA in connection with lobbying and political consulting work for a Ukraine-related political party, including extensive contacts with U.S. policymakers and the media.

• *United States v. Higginbotham*, **3 months' probation** for DOJ attorney who created fake consulting agreements and other false documentation to conceal foreign lobbying work on behalf of Ukrainian interests, allowing foreign individuals to lobby U.S. officials and taking control of bank accounts with foreign funds to disguise their true ownership.[3]

• *United States v. El-Siddig*, **2 years' probation** for lobbying on behalf of the International Islamic Relief Organization, in a matter where the broader investigation involved allegations of terrorism financing and national-security concerns.

• *United States v. Bendler*, **one year and one day imprisonment** for CIA contractor (and former CIA agent) who worked on behalf of foreign nationals, illegally searched classified government databases, and unlawfully obtained and removed classified information for them.

• *United States v. Ben Israel*, **7 months' imprisonment** involving efforts to lobby U.S. officials to lift sanctions imposed on Zimbabwe and President Robert Mugabe.

• *United States v. Siljander*, **one year and one day imprisonment** for former Congressman Siljander who acted as an unregistered foreign agent on behalf of the International Islamic Relief Agency and obstructed the ensuing investigation, despite government request of 36-48 months on FARA count.

F. Even egregious and aggravated FARA cases often with other criminal conduct (not just spending the money, result in modest sentences far below what the PSR concludes:

- *United States v. Lum Davis*, **24 months' imprisonment** despite government request of 30 months in 1MDB/Jho Low-related case involving multimillion-dollar payments (Lum Davis herself received over $10 million), lobbying directed at the highest levels of government, and conduct connected to one of the largest international corruption scandals ever prosecuted by the DOJ.

---

[3] Though Higgenbotham cooperated with the government, he still was a government attorney who betrayed his country and his oath and received only a 3-month probationary sentence.

- *United States v. Fai*, **24 months' imprisonment** despite government request of 48 months in case involving millions of concealed Pakistan/ISI funding and tax violations.

G. Only in extreme cases with independent criminal conduct and aggravators are higher sentences imposed. Every case producing a fairly high (none nearly as high as probation has recommended in this case), includes conduct well beyond FARA registration including tax crimes which are part of the underlying conduct, campaign finance crimes, terrorism-adjacent facts, obstruction, witness tampering, sanctions related conduct, espionage, perjury, false filings or multi-million-dollar fraud schemes. Even then, the sentences were 5, 71/2, 12 and 14 years for Tongsun Park, Paul Manafort, Imaad Zuberi and Prakazrel Michel. Michel was convicted at trial of bank fraud, witness tampering, false entries and illegal campaign contributions, along with FARA, involving more than $100 million and was still only sentenced to 14 years. All of this is precisely why any truly significant multi-year sentence in this case will violate the Section 3553(a)(6) proscription of unwarranted sentencing disparities.

H. In addition to noting the sentences and relevant facts in other FARA cases, we also point out that none of these defendants, unlike Rivera and Nuhfer, were charged with conspiracy to commit money laundering or engaging in transactions in criminally derived property despite the fact that each of them participated in receiving, transferring, controlling, or paying money derived from a specified unlawful activity and could have been charged for violations of §§ 1956 or 1957. The conduct, therefore, remains "similar" for purposes of § 3553(a)(6) and the lack of money laundering charges for these defendants does not eliminate the need to "avoid unwarranted sentence disparities." Rather, it raises the question why the Government chose to treat the defendants in this case differently and potentially expose them to substantially more time for

bringing charges that it does not normally bring against others like her. This is also a factor the Court should consider in reaching a sufficient sentence.

5. Again, borrowing from Nuhfer's Sentencing Memorandum: "any novice criminal practitioner can explain in broad strokes how the Sentencing Guidelines operate ... : base offense levels are set for a variety of offenses and then aggravating factors lead to higher sentences while mitigating factors lead to lower sentences." *United States v. Faison*, 2020 WL 815699, at *2 (D. Md. Feb. 18, 2020). Yet most mitigating factors, such as the admirable history and characteristics of an individual, are given no weight at all in the Guidelines calculation; to the contrary, the Guidelines recognize only the defendant's criminal record (providing for higher offense levels for a greater criminal history, rather than reductions for no prior record). And "if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for." *Id.* To balance this failing of the Guidelines, courts are instructed to weigh the additional factors of Section 3553(a). *See Rita v. United States*, 551 U.S. 338, 364-65 (2007). ("The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civil, charitable, or public service are. . . matters that § 3553(a) authorizes the sentencing judge to consider."). There, Congress has directed that a defendant's personal characteristics should be considered equally with "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1) (emphasis added). By any measure Rivera has led an exceptional life of community and public service which is summarized in detail below and in the Appendix. We urge

the Court to balance the guideline calculations by giving fair and equitable consideration to Rivera's entire life as mandated by Section 3553(a) and the cited authorities.

6. Keeping the foregoing in mind, here are the personal history factors related to Rivera which should be considered.[4]

**A. AGE**.

As indicated, Rivera is 61 years old. According to the Social Security Administration,[5] the current life expectancy of a 61-year-old male (without prostate cancer) is 83.4 years, meaning such a non-cancer diagnosed person would normally be expected to live another 22.5 years. However, "we do know that, as a statistical matter, the life expectancy of an incarcerated person drops significantly for each year of incarceration. *See* Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality*: New York State, 1989-2003, 103 Am. J. of Pub. Health 523, 526 (2013)." *United States v. Jenkins*, 854 F.3d 181, 186 n.2 (2d Cir. 2017). According to the Patterson Study, "every year of imprisonment increased the odds of death by 15.6%, meaning that *every year in prison takes two years off of someone's life expectancy*." Jacob Bronsther, *Is Death Different?*,110 Cornell L. Rev. 597, 654 (2025) (emphasis in original). Accordingly, statistically speaking, even without cancer Rivera would not be expected to survive even eight years in prison.[6] Prostate cancer surely reduces even these numbers even further.

[4] Rivera will file a separate Sentencing Memorandum addressing in more personal ways his personal history largely as seen through the eyes of those who know him best-far better than the Court or prosecutors could ever know him. These will be first-hand accounts of Rivera which we ask the Court to consider in conjunction with this motion.

[5] https://www.ssa.gov/cgi-bin/longevity.cgi.

[6] See Declaration of Mark H. Allenbaugh, Co-Founder and Chief Research Officer for SSINC attached as Exhibit A, Part II, pp. 9-10.

Rivera also is significantly older than the average inmate in the BOP. According to the BOP, only 6.7% of the current roster of inmates are over 60 years of age.[7] That means he will be far more susceptible to abuse in prison than a typical inmate, which warrants a variance. U*nited States v. Parish*, 308 F.3d 1025, 1031 (9th Cir. 2002) ("A defendant's unusual susceptibility to abuse by other inmates while in prison may warrant a downward departure.").

As detailed in Part III of the Allenbaugh Declaration, "The BOP has been chronically overcrowded and short staffed, as independently confirmed by a *60 Minutes expose…60 Minutes* found that 'the Bureau of Prisons is so inadequately staffed that it is struggling to fulfill its mission: rehabilitating inmates and keeping prisons safe." The Allenbaugh Declaration goes on to detail the extent of the problems with federal prisons, including the problems and closures of many camps, a likely designation for Rivera should the Court sentence him to less than ten years. These documented severe problems should be taken into account in the Court's sentencing decision particularly given Rivera's advanced age, health and lower life-expectancy.

Finally, according to a report by the Inspector General for the Department of Justice, not only do older inmates cost more to incarcerate than younger inmates due to their medical needs, but the BOP is not adequately staffed to address these issues and lacks the physical infrastructure to do so.[8]

---

[7] https://www.bop.gov/about/statistics/statistics_inmate_age.jsp.

[8] See generally, Ofc. of Inspector General, DOJ, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons (May 2015), https://oig.justice.gov/sites/default/files/reports/15-05.pdf

**B. MEDICAL.**

As the PSR itself states, Rivera was recently diagnosed with prostate cancer. He also has high cholesterol and two herniated discs. Imprisonment and the lack of adequate or timely medical care, which Rivera is already experiencing at FDC, can exacerbate these conditions.

**C. SENTENCING STATISTICS.**

Mr. Rivera retained the services of SentencingStats.com, Inc., to provide an independent analysis of the U.S. Sentencing Commission's publicly available datafiles.[9] According to SSINC's analysis, "[f]or the past 20 fiscal years, the rate of below range sentences has increased significantly for those sentenced under USSG §2S1.1 in Criminal History Category I regardless of Total Offense Level (TOL). As the trend chart below illustrates (blue line), that rate has increased from 37.4% in FY 2006 to 66.5% in FY 2026. The orange line illustrates the average sentence for those receiving below-range sentences. Those have decreased from 54.9 months to 44.1 months.




[9] Mark Allenbaugh the Statistical Director/and co-founder of SSINC has prepared a declaration which is attached as Exhibit A.

As discussed in the objections to the PSR, the correct calculation of the Guidelines applicable to Mr. Rivera yields a Total Offense Level of 21 in Criminal History Category I to be imposed under USSG § 2S1.1. According to the U.S. Sentencing Commission's Judiciary Sentencing Information (JSIN) platform,[10] "[d]uring the last five fiscal years (FY2021-2025), there were 174 defendants whose primary guideline was § 2S1.1, with a Final Offense Level of 21 and a Criminal History Category of I, after excluding defendants who received a § 5K1.1 substantial assistance departure. . . . [T]he average sentence imposed was 23 month(s) and the median sentence imposed was 24 month(s)." Furthermore, only 16% were sentenced within the 37 to 46 month advisory range.

Utilizing the same selection criteria as JSIN, SSINC expanded the search back to fiscal year 2006. There were 716 individuals matching the selection criteria of which 433 received a sentence below the advisory range. The trend chart below shows the rate of below range sentences (blue line) by fiscal year and the average sentence imposed for those receiving a below range sentence (orange line). Last fiscal year, for those matching the selection criteria, nearly three-quarters received a below-range sentence that averaged less than 20 months' imprisonment.

[10] Available at https://jsin.ussc.gov/. In addition to excluding those who received a downward departure pursuant to USSG §5K1.1, JSIN also excludes those who were convicted of 18 U.S.C. § 924(c), which provides for a consecutive sentence for certain firearms offenses, and 18 U.S.C. § 1028A, which provides for a two-year consecutive sentence for aggravated identity theft offenses.




### D. LOCAL COMMUNTY AND POLITICAL EFFORTS.

Rivera has a long history of political activism as well as helping people, helping his community and the nation, as well as individuals in need throughout the community. Examples are:

1. Teenage Republicans President, Miami Christian School, 1981-83
2. Students for Reagan-Bush, Florida International University Campus Coordinator, 1984
3. Chairman of the Florida International University College Republicans, 1985-86
4. Jack Kemp for President, South Florida campaign coordinator, 1988
5. Connie Mack for Senate, South Florida Political Director, 1988
6. Executive Director of the Republican Party of Miami-Dade County, 1990
7. Republican U.S. State Department appointee under President George H.W. Bush, 1991-92
8. Bob Dole Delegate to the 1996 Republican National Convention
9. Marco Rubio for City Commission, Campaign Advisor, 1997
10. Director of National Political Affairs and Hispanic Outreach for the Republican Party of Florida, 1998-2002
11. Republican National Hispanic Assembly (RNHA), Florida National Committeeman and National Vice-Chairman, 1996-2002
12. George W. Bush Delegate to the 2004 Republican National Convention
13. Florida Republican Party State Committeeman, 2004-2010
14. Chairman of the Republican Party of Miami-Dade County, 2009-2010
15. Florida Co-Chairman of Mike Huckabee for President, 2008
16. Mike Huckabee Delegate to the 2008 Republican National Convention
17. Republican Member of the Florida House of Representatives, 2002-2010

18. Republican Member of the U.S. House of Representative. 2010-2012
19. Florida Co-Chairman of Newt Gingrich for President, 2012
20. Newt Gingrich Congressional Delegate to the 2012 Republican National Convention
21. Donald Trump Delegate to the 2024 Republican National Convention
22. Miami-Dade Republican Party District Committeeman, 2000-present
23. UM Card Center Champion - Center for Autism & related Disabilities
24. Dan Marino Foundation - Empower Individuals with Autism and sponsor of the autism license plate
25. Charlie Deluca Center - Individuals with Development disabilities

Champion for programs to Help Rehabilitate Men and Women

26. Spectrum - Reentry program for formerly incarcerated men and women to help readjust to society
27. AGAPE – Faith Based Rehabilitation Center for women and their babies.

Elderly

28. Senior Centers – A Day Care for the elders.
29. BRAIN Center for MS, Parkinson and Dementia

Cancer

30. American Cancer Society
31. The League Against Cancer

FIU Nursing

32. Creating the FIU Medical School
33. Securing funding for the University of Miami Genome Center
34. Securing funding for Jackson Memorial Hospital and the Sylvester Cancer Center
35. Securing funding for the Port of Miami Tunnel creating thousands of jobs
36. Securing funding for the 836-826 interchange
37. Securing funding for the Doral Airport Viaduct
38. Securing funding for the Miami-Dade College Hialeah Campus
39. Securing funding to protect teachers from public school budget cuts
40. Securing funding for autism providers and creating the autism license plate
41. Securing funding for Miami Children's Hospital
42. Farm Share food bank
43. Camillus House homeless shelter

Rivera’s many community causes were recounted to a substantial degree in the testimony of Secretary Rubio during the trial:

> Q. Are you aware of many of the things that secretary -- that David Rivera did as a state legislature that benefited the south Florida community, many of his initiatives within the legislator?
> A. Yes.
> Q. Are you aware that he was involved in helping to create the FIU Medical School?
> A. Yes.
> Q. Are you aware that he secured funding for Jackson Memorial

> 22 Hospital, the Sylvester Cancer Institute and the League Against
> 23 Cancer?
> THE WITNESS: Yes.
> 3 Q. (By Attorney Shohat) And are you aware that he secured
> 4 funding to help expand the Miami-Dade Community College
> 5 campuses?
> 6 A. I'm not aware of that, but it wouldn't surprise me.
> 7 Q. Are you aware that David Rivera acted to secure funding to
> 8 protect teachers from public school budget cuts?
> 9 A. I don't recall that one specific, but it wouldn't surprise
> 10 me.
> 11 Q. Are you aware that he helped secure funding for autism
> 12 providers like the Dan Marino Foundation?
> 13 A. Yes.
> 14 Q. Are you aware that he secured funding -- programs for the
> 15 developmentally disabled?
> 16 A. I don't recall that one, but it wouldn't surprise me.
> 17 Q. Okay. Do you recall that he helped secure funding for
> 18 Miami Children's Hospital?
> 19 A. I don't recall that one, but it wouldn't surprise me.
> THE COURT: Okay. Now I am going to ask that you get
> 21 to the point, Mr. Shohat.
> 22 Q. (By Attorney Shohat) The point is that while in the state
> 23 legislature working with you and other state legislators, David
> 24 Rivera was active in, not only the activities of the state
> 25 legislator on that state-wide level but helping the Miami community in
> anyway that he could?
> 26 A. Yes.
> (Excerpt of Marco Rubio trial testimony, Trial Day 2, pp.80-83)

In letters filed as part of Rivera's post-trial bail motion (DE 520), community leaders such as former longtime FIU President Mitch Modique lauded Rivera's community improvement efforts. For example, Modique described Rivera as "the father of the F.I.U. Medical School. (DE 520, Ex. "A") Alex Hanna described Rivera's long devotion and service to the Cuban exile community. (DE 520, Ex. "B") In a sentencing letter prepared by Nelson Diaz, he describes how

Rivera "dedicated countless years to community service."[11] In another letter, Mark Rosenberg, FIU's President from 2009-2022 states:

> His support for our community is unrivaled—when he was both a state legislator and a U.S. Congressman, he found ways to get things done that moved us forward. Throughout—particularly the later years, he was a caregiver to his mother, a task that under normal circumstances is trying and difficult.

A number of other letter writers describe the many selfless acts Rivera did for them in times of need.

**E. ANTI-COMMUNIST PRO DEMOCRACY ACTIVITIES.**

For more than 40 years Rivera has been an unwavering opponent of Communism and Socialism in the Western Hemisphere, Cuba, Venezuela and the world. A list of Rivera's anti-communist activities and statements attached as Exhibit B.

## CONCLUSION

Taken together, the foregoing history and characteristics of Rivera establish an extraordinary lifetime of work for the community, his political party, the nation and for friends and family in need. These facts place the conduct of which Rivera stands convicted, FARA registration and related money laundering offenses, in a much different light and, as mandated by the statute and cited cases, warrant consideration of a sentence much lighter than a citizen without these matters in their history might otherwise receive.

18 U.S.C. § 3553(a) mandates that federal sentencing judges consider, not just the "nature and circumstances" of the crime but equally also "the history and characteristics of the defendant." And critically, the factors spelled out in paragraphs 4 and 6, including that there are no longer prosecutions at all for the FARA offenses of which Rivera has been convicted, as well as the

[11] All of these letters, including Nelson Diaz' and Mark Rosenberg's will be included in Rivera's separately filed Sentencing Memorandum.

unwarranted disparity and statistical analyses, frankly, more than justify this sentencing request: no sentence to imprisonment, or a sentence to time served (already four months) based on the Bondi Memorandum. If, for some unknown reason, consideration of the Bondi Memorandum is excluded by or does not impact the Court, then, considering all things set out herein, including other comparative sentences for FARA and other far more serious offenses, a sentence of no more than one year and one day is "sufficient but not greater than necessary" under Section 3553. This is the wholistic approach to sentencing mandated by both Congress and the Courts. *United States v. Booker*, 543 U.S. 220 (2005); *United States Kimbrough*, 552 U.S. 85 (2007) (sentencing judge must make an individualized assessment under section 3553(a)based on specific defendant's history); see also *Koon v. United States*, 518 U.S. 81, 113 (1996).

Respectfully submitted on August 14, 2026,

**EDWARD R. SHOHAT, PA**
201 S. Biscayne Blvd., Suite 3000
Miami, FL 33131
Tel: (786) 525-3621
By: *<u>/s/ Edward R. Shohat</u>*
**Edward R. Shohat**
Florida Bar No. 152634
ed@edwardrshohat.com
**JONES WALKER LLP**
201 S. Biscayne Blvd., Suite 3000
Miami, FL 33131
Tel: (305) 679-5700
By: *<u>/s/ David S. Weinstein</u>*
**David S. Weinstein**
Florida Bar No. 749214
dweinstein@joneswalker.com
*Counsel for David Rivera*