**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CR-20552-DAMIAN/TORRES**

UNITED STATES OF AMERICA,

vs.

ESTHER NUHFER,

Defendant.
___________________________________/

## ESTHER NUHFER'S MOTION FOR BOND PENDING APPEAL

Esther Nuhfer respectfully moves to remain on bond pending appeal under 18 U.S.C. § 3143(b). She is not a risk of flight or danger to the community. And there are a number of substantial issues for the court of appeals to consider.

On August 18, 2026, the Court sentenced Esther to 60 months' imprisonment and, without objection from the Government, permitted her to self-surrender on October 2, 2026. D.E. 605. At sentencing, this Court saw firsthand just how deeply Esther's life is rooted in South Florida. The courtroom was filled with family members, lifelong friends, former colleagues, and others who came not simply to support her, but to explain the overwhelmingly positive role Esther has played in their lives for decades in *this* community. The Court heard about the elderly parents who depend on her, the family she sees and speaks with constantly, and the community in which she has lived, worked, served, and built her entire life. Those ties are not abstract. They were visible in the courtroom and in the dozens of letters that accompanied her Sentencing Memorandum.

The Court also made an observation that goes directly to the question now presented. Throughout an extraordinarily difficult prosecution, a six-week trial, a guilty verdict, and sentencing, Esther consistently conducted herself with composure, professionalism, and respect for the Court. The Court recognized that her conduct in the courtroom was consistent with the character described by the numerous people who know her best. Esther has not merely told the Court that she can be trusted. She has demonstrated it, over and over again, when the stakes could not have been higher.

The Court understandably noted at sentencing that the analysis is different now that Esther has been convicted and sentenced to 60 months' imprisonment, and that the principal issue on a motion for release pending appeal would be whether she presents a risk of flight given the sentence and the international subject matter of the case.[1] But the notion that Esther would now abandon her elderly parents who are in poor health, her husband, her newborn first grandchild who is battling serious health issues, her sisters and extended family, the friends who filled this courtroom, her home, her community, and the appeal through which she continues to maintain her innocence is inconsistent with everything this Court has seen from her throughout this case. She simply would not do it.

Esther has been on bond for nearly *four* years, since December 13, 2022. During her time on bond, she has traveled numerous times, with the permission of the Court and consent by the Government. This includes travel to other states and

---

[1] The Court stated that it had no concerns that Ms. Nuhfer was a danger.

on cruise ships. She, of course, never attempted to flee. She never had an issue while traveling and always returned on the expected date. And Esther has appeared in Court whenever required throughout the case – including after her conviction and after she knew that Probation recommended that she serve a sentence of 135 months in prison.

The fact that the charges involved Venezuela does not change things. As the Court knows well, Esther never even went to Venezuela. The Government's case alleged international political and business activity, but that does not mean Esther has somewhere abroad to flee or any intention of abandoning her entire life here. She does not.

To the contrary, her family history makes that suggestion particularly implausible. Esther has built her entire life in South Florida. In fact, she has never lived anywhere else outside of Miami-Dade County. And she now has every reason to remain here to pursue an appeal that she sincerely believes will vindicate her.

Importantly, even after Esther was sentenced to 60 months in prison, the Court determined that she could remain at liberty and self-surrender to her BOP-designated facility over a month from now. The Court trusted that Esther would not flee and would comply with the Court's Order. The Government did not object to this request.

Esther's appeal also raises substantial questions for appeal. These include, but are not limited to, the scope and application of FARA, the sufficiency of the evidence supporting her FARA and money-laundering convictions, jury selection, the

Government's use of aiding-and-abetting liability, the timeliness of the FARA prosecution, the sentence imposed and objections overruled, and whether she received a fair trial alongside David Rivera.

Although this Court has rejected those arguments, that is not the inquiry for a motion pursuant to § 3143(b). Nor could it be as then every single motion for bond pending appeal would be denied. A district court need not conclude that its own rulings were wrong before permitting a defendant to remain on release pending appeal. The Eleventh Circuit has held that the question is whether the appeal presents a "'close' question or one that very well could be decided the other way." *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985). The issues here comfortably clear that threshold. They go to the heart of Esther's convictions: what FARA requires, whether the evidence proved those requirements beyond a reasonable doubt, whether the resulting funds could constitute criminal proceeds, whether Esther could receive a fair trial amid the extensive evidence directed at Rivera, and whether the sentence imposed was legally and substantively appropriate. And these questions are not academic. If the Eleventh Circuit resolves any of the principal issues below in Esther's favor, the consequence would be reversal, a new trial, or a materially reduced sentence.

In short, Esther satisfies § 3143(b): as this Court recognized at sentencing, there is no dispute that Esther poses no danger to the community, the record establishes that she is not a flight risk, and her appeal presents substantial questions that, if resolved in her favor, would require reversal, a new trial, or a materially

reduced sentence. She has met her burden and should be permitted to remain on release while the Eleventh Circuit considers her appeal.

## I. THE STANDARD FOR RELEASE PENDING APPEAL

Under 18 U.S.C. § 3143(b), a defendant who has been sentenced to a term of imprisonment may remain on release pending appeal where the Court finds: (1) by clear and convincing evidence that she is not likely to flee or pose a danger to the safety of any other person or the community; (2) that the appeal is not for the purpose of delay; and (3) that the appeal raises a substantial question of law or fact likely to result in reversal, a new trial, a sentence that does not include imprisonment, or a reduced term of imprisonment shorter than the expected duration of the appeal. 18 U.S.C. § 3143(b)(1).

The Eleventh Circuit has explained that a "substantial question" is one that has "more substance than would be necessary to a finding that it was not frivolous." *Giancola*, 754 F.2d at 901. It is a "'close' question or one that very well could be decided the other way." *Id.*; *see also United States v. Price*, 611 F. Supp. 502, 504 (S.D. Fla. 1985) (the inquiry asks whether "responsible and conscientious counsel" can identify issues that "are not free from doubt"). Judges in this district have applied that standard in granting release pending appeal for many years. *See*, *e.g.*, *United States v. Hall*, 765 F. Supp. 1494 (S.D. Fla. 1991); *United States v. Hicks*, 611 F. Supp. 497 (S.D. Fla. 1985).

Importantly, the statute does not require the district court to conclude that it probably erred. That would place a district judge in the unusual position of having to

predict that her own rulings will be reversed. Rather, once a substantial question has been identified, the Court assumes that the question will be decided in the defendant's favor and asks whether that resolution would likely result in one of the outcomes specified in § 3143(b)(1)(B). *See Giancola*, 754 F.2d at 900–01. Thus, the question here is not whether this Court presently agrees with Esther's appellate arguments. The question is whether they are sufficiently substantial to warrant appellate review and, assuming they are resolved in Esther's favor, whether the result would be reversal or a new trial.

Esther comfortably satisfies that standard. As explained below, her nearly four-year record on release establishes that she is not a flight risk, and her appeal presents multiple substantial questions that, if resolved in her favor, would require reversal or a new trial.

## II. ESTHER IS NOT A FLIGHT RISK

Because the Court affirmed at sentencing that Esther does not pose a danger to the community, the principal concern under the first prong of § 3143(b) is whether Esther's 60-month sentence and the international component of this case create a risk that she will flee. They do not.

The chances of Esther fleeing while out on bond pending appeal are the same as they were before trial and sentencing. None. In anticipation of this motion, the Court commented that the additional fact that Esther now faces a definite term of imprisonment rather than the possibility of one would be considered. The Court's treatment of Esther following sentencing, however, demonstrates that this one added

fact does not outweigh Ms. Nuhfer's history of staying within the district and facing her obstacles head on. After imposing the 60-month sentence, the Court rightfully permitted Esther to remain on release and self-surrender to her designated facility a month and a half after the sentencing hearing. The Government did not object. Thus, even after Esther knew the precise sentence she faced—the circumstance that arguably creates the greatest incentive to flee—neither the Government nor the Court required her immediate detention. And although the Court set an October 2 surrender date because the Judgment required a date certain, it expressly invited Esther to seek an extension if she had not yet been designated to a BOP facility, rather than surrender to a detention center while awaiting designation. In doing so, the Court contemplated Esther remaining at liberty after sentencing for as long as the designation process required.

And the Court's trust in Esther is well-placed. Esther's conduct over the nearly four years this case has been pending provides perhaps the best evidence that she will not flee. She has been on bond since December 13, 2022. For years, she has appeared whenever required and endured a six-week trial. And even after the jury returned its guilty verdict, when the prospect of a lengthy term of imprisonment became far more concrete, Esther remained compliant and continued to appear before this Court. At every point when the consequences became more serious and the theoretical incentive to flee increased, Esther stayed, appeared, and complied. There is no reason to believe she will do otherwise now.

The record also provides concrete reassurance against any concern about travel. Over the course of this case, the Court granted Esther permission to travel by car, plane, and ship on multiple occasions; every time, she complied with the conditions imposed and returned as required. Further, Esther has no ability to use her passport to leave the country: Probation has possession of both her passport and her husband's passport. D.E. 15 at 2. Esther's history thus demonstrates not only that she has honored the Court's restrictions for nearly four years, but that she has done so even when the Court afforded her greater freedom of movement.

While Esther's past conduct demonstrates that she can be trusted to comply, it is her deep ties to her family and this community that leave no reason to believe she would abandon the life she has built here. Those ties were on full display at sentencing, when the courtroom was filled with the family members and friends who have been part of Esther's life for decades. Esther is the daughter of Cuban immigrants who built their lives in South Florida and raised their four daughters here. Esther herself has spent decades living and working in this community, including years of public service with Miami-Dade County. Her family is exceptionally close: they speak every day, see each other frequently, and remain deeply involved in one another's lives.

Esther has substantial responsibilities that require her presence here. Her elderly parents increasingly depend on her for their care. As her Sentencing Memorandum details, both parents have significant health issues. Esther is the one who coordinates their medical appointments, manages healthcare needs, rearranges

her work schedule to assist them, and visits them two or three times each week to help at home. And now, Esther's first grandchild, less than a month old, is confronting serious health challenges, at a time when her family needs her presence and support more than ever. As her sister explained in her letter to this Court, Esther has long been "the person our family depends on"—the person her family turns to in precisely these difficult moments. Those responsibilities give Esther powerful reasons to remain exactly where she has always been. It is simply impossible that she would flee and thereby irrevocably remove herself from any contact with her family for the rest of her life.

The international subject matter of the prosecution does not change that conclusion. This case involved Venezuela, foreign officials, and work concerning U.S.-Venezuela relations. But the existence of an international component to the charged conduct is not itself evidence that Esther would flee and live abroad, much less that she intends to do so. Indeed, Esther's family history points in precisely the opposite direction. Her parents fled Cuba, built their lives in the United States, and raised Esther to appreciate the country that gave their family a home.

Nor does the 60-month sentence change the conclusion. Esther has every incentive to remain here and litigate substantial appellate issues that could overturn her convictions or require a new trial. Flight would mean abandoning that appeal, her elderly parents, her family, and the life she has spent decades building in South Florida. Nothing in Esther's nearly four-year record on release suggests she would make that choice.

To the extent the Court believes additional safeguards are appropriate now that sentence has been imposed, Esther is willing to accept reasonable additional conditions of release. The record therefore establishes by clear and convincing evidence that Esther is not likely to flee.

## III. ESTHER'S APPEAL PRESENTS SUBSTANTIAL QUESTIONS

Esther's appeal is not taken for purposes of delay. It will present multiple preserved issues arising from a lengthy and unusual prosecution under FARA and the federal money-laundering statutes. Indeed, in denying Esther's post-trial motion, this Court expressly recognized that Esther "raised many legal challenges before and during trial," that the Court addressed those challenges in "written and oral orders," and that Esther "has preserved those challenges for appeal." D.E. 600 at 4.

### A. Whether the Evidence Was Sufficient to Establish a Knowing and Willful FARA Violation

A central question on appeal will be whether the evidence was sufficient to establish that Esther knowingly and willfully acted as an unregistered agent of a foreign principal and knowingly joined an agreement to violate FARA. The mens rea requirement matters. A willful violation requires proof of "the intent to do something the law forbids, that is, with the bad purpose to disobey or to disregard the law." *Bryan v. United States*, 524 U.S. 184, 190 (1998); *see also* D.E. 491 (Jury Instructions). And although intent may of course be proven circumstantially, "[w]here the government relies on circumstantial evidence, reasonable inferences, and not mere speculation, must support the jury's verdict." *United States v. Wenxia Man*, 891 F.3d

1253, 1265 (11th Cir. 2018) (quotation omitted). Esther's appeal will ask whether the inferences necessary to establish that state of mind crossed that line.

The trial record presents a substantial and unusual evidentiary question on both agency and willfulness, arising from the striking absence of direct evidence connecting Esther to the alleged foreign principal or demonstrating a willful violation of FARA. Both must be proven.

Clearly, Esther was not an individual acting at the direction of the Venezuelan government. There were no texts, emails, phone calls, chats, meetings, or other communications in which a Venezuelan official directed Esther to do anything. The one former Venezuelan official who testified, Julio Borges, told the jury: "I do not know Esther Nuhfer other than what I have read in the press." D.E. 531 at 7–8. That absence is significant because courts addressing foreign-agent statutes have recognized the importance of establishing the connection between the alleged agent and the foreign principal—there must be a foreign principal "on one end of the line." *United States v. Michel*, No. 19-148-1, 2024 WL 1603362, at *11 (D.D.C. Apr. 12, 2024) (quoting *United States v. Rafiekian*, 991 F.3d 529, 538, 540–41 (4th Cir. 2021)). The evidence also established that Esther attended only one meeting with a U.S. official, and Senator Rubio testified that she said nothing and did not lobby him. D.E. 531 at 7.

The evidence of willfulness presents an equally substantial question. The only direct discussion of FARA registration reflected Rivera, a former Member of Congress, telling Esther and Hugo Perera after consultation with an attorney that

the American-company structure did not require registration with FARA and that a contract with PDVSA Caracas would. Perera testified that he relied on that understanding, that he "did not agree to commit crimes with David Rivera or Esther Nuhfer," and that he did not "enter into an agreement to do something illegal." D.E. 531 at 5–6. The Government did not charge Perera.

Other contemporaneous evidence likewise supported an innocent inference as to Esther's state of mind. She openly researched Gazprom, posted public news articles about it, and wrote, "I see no problem with Gazprom." And when assignment of the contract to PDVSA, the course Venezuela allegedly wanted, could have generated approximately another $35 million, Esther never pushed for the transaction that would have made her millions richer. D.E. 562 at 8–9.

The Court considered these arguments and reached the contrary conclusion. It found that the Government presented evidence from which the jury could infer that Esther knew her conduct and Rivera's conduct fell within FARA and required registration. D.E. 600 at 9. The Court also emphasized evidence concerning the PDV USA agreement, the draft letter from the Venezuelan foreign minister, meetings Esther helped arrange, and her familiarity with FARA. But that conclusion does not eliminate the appellate question, it identifies it: whether those facts permitted the further inference, beyond a reasonable doubt, that Esther herself acted as an agent of Venezuela and did so with the bad purpose to disobey the law, notwithstanding the evidence that she had been told registration was unnecessary and the absence of any communication between Esther and a Venezuelan official.

That is precisely the type of inferential question that has generated substantial appellate litigation in foreign-agent cases. *See United States v. Rafiekian*, 68 F.4th 177, 189–90 (4th Cir. 2023) (recognizing that foreign-agent cases may require the Government to "weave a series of facially innocuous threads into a tapestry of unlawful conduct" through inference and emphasizing that circumstantial evidence receives no "special deference"). Esther relied extensively on *Rafiekian* in her post-trial briefing because of the analogous problem of converting facially lawful conduct into criminal foreign-agent activity through layered inferences. D.E. 531 at 2–3.

The Court resolved those inferences against Esther. The Eleventh Circuit will be entitled to review whether they were legally sufficient. Under *Giancola*, that preserved question need only be one that reasonably "could be decided the other way." 754 F.2d at 901. It is.

**B. Whether Esther Could Be Convicted of Substantive FARA Under an Aiding-and-Abetting Theory Even If She Was Not Herself an "Agent of a Foreign Principal"**

A related but distinct legal question concerns the Government's alternative theory of substantive FARA liability. The jury was instructed that Esther could be convicted of Count 2 by aiding and abetting Rivera, and this Court held that Esther could be convicted on that basis "even if she herself is not found to have acted as a foreign agent." D.E. 600 at 11 & n.1.

That question implicates the interaction between 18 U.S.C. § 2 and a specialized statutory regime in which the duty to register attaches to an "agent of a foreign principal." Esther has preserved her contention that substantive liability for

failing to register cannot simply be detached from the statutory status that creates the registration obligation in the first place.

There is a second, independent problem with the aiding-and-abetting theory: mens rea. The Eleventh Circuit pattern instruction required the Government to prove that Esther "intentionally join[ed]" another person "to commit a crime" and "intentionally associated with or participated in the crime." 11th Cir. PJI S7; 18 U.S.C. § 2; D.E. 562 at 10. Thus, even if § 2 permits liability where Esther herself was not a foreign agent, the Government still had to establish that she intentionally assisted a FARA crime *knowing that the crime was being committed*. The same evidence that makes willfulness substantial therefore bears directly on the alternative aiding-and-abetting theory.

The Court concluded that the evidence was sufficient both to establish Esther as a principal and, alternatively, to establish aiding and abetting. D.E. 600 at 10–12. But the statutory question remains preserved: whether § 2 permits substantive liability for FARA's registration offense where the defendant herself did not occupy the status giving rise to the registration duty, and, if so, whether the evidence established the intentional participation that § 2 independently requires. If Esther prevails on that question, Count 2 cannot stand on the alternative theory. And because Count 2 supplied the specified unlawful activity for her substantive § 1957 conviction, the consequences extend directly to Count 6. That makes the issue substantial and outcome-determinative under § 3143(b).

### C. Whether the Funds Used in the Charged § 1957 Transaction Were "Criminally Derived Property"

Apart from the substantial questions concerning the FARA convictions themselves, Esther's substantive money-laundering conviction presents an independent legal question concerning § 1957's requirement that the funds used in the charged transaction constitute "criminally derived property." Section 1957 does not criminalize merely spending money while committing another offense; it requires a transaction in property "derived from specified unlawful activity." 18 U.S.C. § 1957(a). The Eleventh Circuit has accordingly focused on the causal and temporal relationship between the predicate crime and the alleged proceeds. In *United States v. Christo*, the court explained that the critical inquiry is when the predicate crime becomes a "completed offense" after which laundering can occur. 129 F.3d 578, 580 (11th Cir. 1997). And *United States v. Kramer* similarly held that property acquired before the predicate unlawful act cannot be said to have been "derived from" that act. 73 F.3d 1067, 1076 (11th Cir. 1996); D.E. 531 at 9.

That doctrine presents an unusual problem here because the specified unlawful activity is failing to register under FARA. Acting as an agent on behalf of a foreign principal is not itself what makes the conduct criminal; criminal liability depends upon willfully doing so without the registration required by law. The defense therefore argued that the Government had to establish how the money used to purchase the Sadowski property was *derived from that criminal conduct*, rather than simply being compensation received under the legal underlying consulting arrangement.

There was no proof that the Interamerican contract was executed with the requirement or understanding that Interamerican or its agents would not register with FARA. Similarly, the trial evidence showed no payment by Venezuela conditioned upon Esther's failure to register, no additional payment for remaining unregistered, and no evidence that the amount she received depended upon non-registration. As Esther explained in her pre- and post-trial motions, the funds and the lack of registration existed in parallel; chronology alone, however, does not establish derivation. D.E. 531 at 9–11. Absent a condition upon the foreign agents' actions that in order to be paid they cannot register, there is no connection between the funds and the offense. A failure to register is a crime of omission, and an omission produces no revenue, no profit, no proceeds.

The Court rejected that argument, reasoning that the jury could find that the $20 million transferred to Interamerican constituted "FARA proceeds" and that Esther subsequently used more than $400,000 of those proceeds to purchase the Sadowski property. D.E. 600 at 12–13. But that reasoning brings the appellate question into sharp focus: what made the contract payments "FARA proceeds," i.e. criminally-derived property, in the first place? The fact that the money preceded a later financial transaction establishes chronology; *Christo* and *Kramer* require a causal relationship between the specified unlawful activity and the property alleged to have been derived from it. "Coming later in time is not a causal link." D.E. 562 at 11–12.

This is not simply a dispute over how the evidence should be weighed; it is a threshold legal question concerning how § 1957's "criminally derived property" requirement operates when the predicate offense is a regulatory crime of omission. If compensation for otherwise legal, compensable services automatically becomes criminal proceeds whenever the recipient should have registered under FARA, the statutes interact one way; if § 1957 requires proof that the criminal aspect of the conduct actually generated or tainted the funds, they interact another. There is ample room for "responsible and conscientious counsel" to regard that question as "not free from doubt." *Price*, 611 F. Supp. at 504. And if the Eleventh Circuit agrees with Esther, Count 6 must be vacated.

**D. Whether the Evidence Established an Agreement to Commit Money Laundering**

Count 3 presents a different deficiency: agreement. To prove the money-laundering conspiracy, the Government was required to establish "(1) an agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement." *United States v. Feldman*, 936 F.3d 1288, 1307 (11th Cir. 2019). The Court correctly identified that standard in its order. D.E. 600 at 13.

The Court found the evidence sufficient because Esther participated in chats concerning the receipt and distribution of "La Luz," including the apportionment of the $20 million, and because the record contained wire instructions for Esther's company account. *Id.* But evidence showing how money was "divided amongst"

business partners establishes movement and distribution of funds; it does not necessarily establish an agreement to launder those funds. D.E. 562 at 12.

That distinction is especially significant given the Eleventh Circuit's warning in conspiracy cases against allowing association with wrongdoers or participation in related conduct to sweep a defendant into the "conspiratorial net." *United States v. Chandler*, 388 F.3d 796, 798, 806 (11th Cir. 2004); *see also United States v. Willner*, 795 F.3d 1297, 1306–10 (11th Cir. 2015). The Government still must establish the requisite meeting of the minds. D.E. 531 at 4–5.

The Court concluded that the chats and wire instructions permitted the jury to infer that agreement. Esther will contend on appeal that they show, at most, an agreement concerning the receipt and division of compensation—not a knowing agreement to conduct transactions in criminal proceeds. Whether the former is sufficient to establish the latter beyond a reasonable doubt is at least a close question under *Giancola*. And the issue is intertwined with the preceding one. If the contract payments were not "criminally derived property" under *Christo* and *Kramer*, the premise underlying the alleged laundering agreement disappears as well.

**E. Whether Esther Received a Fair Trial Alongside David Rivera**

Finally, Esther will challenge the denial of her multiple severance motions. The issue is not simply that the Government introduced "more" evidence against Rivera. It is whether the nature, volume, irrelevance, and inflammatory character of Rivera-specific evidence created compelling prejudice that repeated limiting instructions could not realistically cure.

The Court recognized both sides of that issue. It acknowledged Esther's contention that "there was more evidence regarding Rivera's conduct," but concluded that the Government presented sufficient independent evidence against Esther and that the limiting instructions given repeatedly during trial protected against spillover. D.E. 600 at 17. That conclusion rests on the ordinary rule that cautionary instructions will generally mitigate spillover prejudice. *See Zafiro v. United States*, 506 U.S. 534, 539 (1993); *United States v. Kennard*, 472 F.3d 851, 859 (11th Cir. 2006).

Regardless of the ordinary rule, the Supreme Court has also recognized that this guideline is not absolute. There are circumstances where a limiting instruction simply will not cure the prejudice occurring. The exception that matters here: "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great" that "the practical and human limitations of the jury system cannot be ignored." *Bruton v. United States*, 391 U.S. 123, 135 (1968). The former Fifth and Eleventh Circuits likewise recognize that instructions do not invariably eliminate powerful prejudicial effects. *See United States v. Cook*, 557 F.2d 1149, 1154 (5th Cir. 1977); *United States v. Elysee*, 993 F.3d 1309, 1342 (11th Cir. 2021); *United States v. Crutchfield*, 26 F.3d 1098, 1103 (11th Cir. 1994); *United States v. Guerrero*, 650 F.2d 728, 737 (5th Cir. 1981). Those authorities recognize precisely the concern presented here: in an exceptional case, the nature and force of prejudicial evidence make it unrealistic to expect even a properly instructed jury to compartmentalize that evidence as to one defendant but disregard it as to another. D.E. 531 at 18–19.

The concern here was not merely that the evidence against Rivera was more extensive; it was that the jury spent six weeks hearing highly prejudicial evidence about Rivera that had little or nothing to do with Esther. Over six weeks, the jury heard evidence that Rivera lied to the press and colleagues and, most significantly, lied under oath in three depositions—evidence that would not have been admissible in a separate trial of Esther. Esther, by contrast, did not make false statements, and there was no evidence that she knew Rivera had made them, although the implication was that she did know and approved them. D.E. 531 at 17–19. The Government repeatedly portrayed Rivera as dishonest and racist, and someone who demonstrated disdain for the people of Venezuela. There was no evidence of this kind against Esther. Further, and perhaps most significant, the jury saw evidence that Rivera knew that his actions required registration and informed another one of his partners (Gorrin) of this knowledge. GX 445AT. The only evidence regarding FARA registration requirements as to Esther showed the opposite – that Rivera told her that FARA registration was not legally required. In a separate trial, that is all that the jury would have seen regarding Esther's knowledge and willfulness. Instead, by introducing the mass amount of irrelevant non-Nuhfer evidence at a joint trial, the jury was bombarded with so much damaging information to assume guilt by association.

The Court concluded that Esther had not carried the "heavy burden" of demonstrating compelling prejudice and relied on the repeated limiting instructions and independent evidence against her. D.E. 600 at 16–17. That is the ruling Esther

will challenge—not by arguing that limiting instructions are generally ineffective, but that this was the exceptional case in which the volume and character of inadmissible co-defendant evidence overwhelmed their ordinary curative force. The issue is therefore not whether this Court believes its limiting instructions were adequate; it plainly does. The question under § 3143(b) is whether the Eleventh Circuit could reasonably conclude otherwise after reviewing the six-week trial as a whole. Given the disparity in the evidence, the highly inflammatory Rivera-specific proof, and the Supreme Court's recognition that some prejudice exceeds the practical curative capacity of an instruction, that question too is substantial.

### F. Whether the Sentence Imposed Was Procedurally and Substantively Reasonable

Esther's appeal will also challenge her sentence. The Court imposed a sentence of 60 months, after finding that the FARA offense drove the case, not money laundering. The Court, thus, imposed the statutory maximum for a FARA violation, even though the conduct at issue falls far short of the worst FARA offender Congress could have contemplated when it selected that maximum. Esther, a first-time, nonviolent offender, received the maximum sentence Congress authorized for a FARA offense, notwithstanding that defendants in other cases who had held positions of confidence within the U.S. government and unforgivably violated the government's trust received probationary sentences. Whether that sentence properly reflects the nature and circumstances of Esther's offense, her history and characteristics, the need for the sentence imposed, and the need to avoid unwarranted sentencing

disparities under 18 U.S.C. § 3553(a) presents an additional issue for appellate review.

Esther will also challenge the Court's application of the six-level national-security enhancement under U.S.S.G. § 2S1.1(b)(1)(B)(iii). That enhancement applies only if Esther "knew or believed" that the laundered funds were the proceeds of, or intended to promote, "an offense involving . . . national security." Esther objected on two independent grounds: that a FARA registration offense is not categorically an offense "involving national security" within the meaning of that Guideline, and that the evidence did not establish that Esther herself knew or believed the funds were connected to such an offense. D.E. 577 at 15–20. As her objections emphasized, the verdict established willful non-registration; it did not itself establish the distinct mens rea required by § 2S1.1(b)(1)(B)(iii), and no witness testified that Esther believed she was financing a threat to the national security of the United States. D.E. 577 at 19–20. The Court itself stated the application of the enhancement was a close call. Whether the enhancement reaches this FARA offense, and whether the record supported its application to Esther, present additional preserved sentencing questions for appeal.

### G. Whether the FARA Prosecution Was Barred by the Statute of Limitations

Esther also adopts and intends to pursue on appeal the statute-of-limitations arguments raised in co-defendant David Rivera's post-trial motion, including the challenge to the Court's denial of a statute-of-limitations jury instruction. D.E. 543 at 5–10. Rivera argued, relying principally on *United States v. McGoff*, 831 F.2d 1071

(D.C. Cir. 1987), that the five-year limitations period for a FARA registration offense begins to run when the alleged agency relationship terminates. D.E. 543 at 6–10. That issue matters directly here because the trial record contained evidence that the alleged agency relationship ended no later than June 21, 2017; under the defense's proposed instruction and *McGoff* theory, that would place the FARA charges outside the applicable five-year limitations period. Esther adopts and preserves that substantial issue for appeal.

* * * * *

These appellate issues need not all succeed for release to be warranted. Nor must this Court retreat from any ruling it has already made. The question under *Giancola* is whether at least one preserved issue is sufficiently close that it "very well could be decided the other way," and whether a favorable ruling would produce one of the outcomes specified in § 3143(b). 754 F.2d at 901. Here, several independently meet that threshold. A favorable ruling on the sufficiency or statute-of-limitations issues would require reversal of all counts; a favorable ruling under *Christo* and *Kramer* would require reversal of the substantive money-laundering conviction; a favorable ruling on severance would require a new trial; and a favorable ruling on the sentencing issues could result in a materially reduced sentence. These are not abstract questions whose resolution would leave Esther's convictions or sentence intact. Esther therefore presents not merely one, but multiple substantial appellate questions that, if resolved in her favor, would produce precisely the consequences contemplated by § 3143(b).

## CONCLUSION

Esther Nuhfer recognizes the significance of the jury's verdict and the 60-month sentence this Court imposed. But the sentence does not erase what this Court has seen from Esther over the nearly four years she has been on release: no attempt to flee despite multiple trips; respect for the Court; and a life deeply rooted in this community. Those factors did not disappear prior to trial. They did not fade when the jury returned its verdict. They did not disappear when the Court imposed sentence. To the contrary, Esther has continued to do exactly what she has done since December 2022—remain in South Florida to take care of her family.

The Court saw the depth of those roots firsthand at sentencing. It saw the family and friends who filled the courtroom, heard about the elderly parents and newborn grandchild fighting for her life, who depend on Esther, and recognized that Esther's conduct throughout even the most difficult moments of this case reflected the character described by those who know her best. The notion that Esther would now abandon those people, the life she has built here, and her opportunity to pursue a substantial appeal to become a fugitive is at odds with everything this Court has observed from her.

Section 3143(b) requires clear and convincing evidence that Esther will not flee and substantial appellate questions that, if decided in her favor, would warrant the relief specified by the statute. Esther's appeal presents multiple such questions concerning both her convictions and sentence. This record therefore satisfies both requirements.

For these reasons, Esther respectfully requests that the Court permit her to remain on release pending resolution of her appeal.

Respectfully submitted,

MARKUS/MOSS PLLC
40 N.W. Third Street, PH 1
Miami, FL 33128
Telephone: (305) 379-6667
Facsimile: (305) 379-6668

By: /s/ David Oscar Markus
David Oscar Markus
dmarkus@markuslaw.com

/s/ A. Margot Moss
A. Margot Moss
mmoss@markuslaw.com