**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-Cr-20552-Damian/Torres**

**UNITED STATES OF AMERICA**

**vs.**

**DAVID RIVERA,**

**Defendant.**

_______________________________/

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT DAVID RIVERA'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT**

The United States of America, by and through the undersigned Assistant United States Attorneys, respectfully submits this response to David Rivera's ("Rivera") Objections to the Probation Department's Presentence Investigation Report ("PSIR") (ECF 594).

## Introduction

In his objections, Rivera raises several issues that have as a practical matter already been resolved against him by the Court's rulings at Esther Nuhfer's ("Nuhfer") sentencing hearing. These issues consist of (a) the total amount of laundered funds (more than $5 million) that is to be used to calculate the base offense level for Rivera's money laundering guidelines under USSG § 2S1.1(a)(2) and (b) the application of the six-level enhancement under § 2S1.1(b)(1) based on Rivera's knowledge or belief that "any of the laundered funds were the proceeds of or were intended to promote . . . an offense involving . . . national security."

In addition to these issues, Rivera also objects to several other aspects of the PSIR including the offense description and several of the Chapter 3 guidelines calculations. Specifically, Rivera

claims that (a) the offense description set forth in the PSIR fails to describe the trial evidence that in Rivera's view demonstrates that he is in fact innocent of the charges against him and instead presents a "mistaken, misleading, incomplete and inaccurate summary of the evidence in this case" (Mot. at p. 7); (b) the PSIR mistakenly includes a two-level adjustment for obstruction of justice under USSG § 3C1.1 based on Rivera's presentation to the jury of his false and perjurious deposition testimony from the SDNY civil case involving PDV USA, Inc. ("PDV USA"); and (c) the PSIR incorrectly recommends that he receive a two-point adjustment for his role in the offense as an organizer or leader in any criminal conduct under § 3B1.1(c). For the reasons set forth below, Rivera's objections are without merit.

## Argument

A. Rivera's Objections to the PSR's Offense Description Are Unsupported and Controverted by the Jury's Verdict

Rivera asserts that the offense description in the PSIR is "seriously flawed" and therefore he is "compelled to take the unusual step of challenging the PSIR's factual portion as whole, paragaphs 35-123, much the same as he has done in his Motion for New Trial. . . ." Mot. at p. 2. Rivera then claims that "[n]either the evidence at trial, nor the summary of that evidence provided to Probation by the prosecutors and plugged into the PSIR, prove any FARA conspiracy, FARA violation or money laundering offense." Id. at p. 3. In fact, Rivera asserts, "not a single piece of evidence at trial . . . establishes even one actual effort to help the Maduro regime stay in power or to normalize its relations with the United States as charged in the Indictment." Id.

In sum, Rivera's objections to the PSIR's offense conduct are based on his refusal to accept the jury's verdict finding him guilty of all the charges against him. Instead, Rivera persists in his claim that he is innocent of the charges against him, despite the jury's finding that he and Nuhfer

acted as agents of the Maduro regime in an effort to normalize relations with the U.S. In lodging these objections, Rivera speaks in broad terms as to what he claims the evidence showed or did not show followed by summary citations to various individual exhibits without any description of their contents or their relevance to his conclusory assertions. Indeed, Rivera expressly acknowledges this litigation tactic upfront, stating that, "to avoid turning the sentencing process into a lengthy re-litigation of the entire, trial, [he] will not set out his objections paragraph by paragraph." Id. at 2. That fundamental defect of failing to identify which specific paragraphs (or portions thereof) of the PSIR he claims are inaccurate is sufficient grounds standing alone to reject Rivera's objections to the offense description set forth in the PSIR.

More fundamentally, Rivera's objections should be denied because they run afoul of the non-contradiction principle of federal sentencing proceedings. See United States v. Slaton, 801 F.3d 1308, 1318-19 (11th Cir. 2015) (holding that the non-contradiction principle "prohibits a sentencing court from finding a fact that is inconsistent with any of the findings that are necessarily implicit in the jury's guilty verdict"). In essence, Rivera is asking this Court to sustain his factual objections to the PSIR's offense description even though doing so would be inconsistent with jury's verdict.

Here, the jury found Rivera guilty of conspiracy and substantive FARA violations based on his engaging in political activities in the United States as an agent of the Venezuelan government. The jury's verdict is accordingly fundamentally inconsistent with Rivera's various claims of innocence – including Rivera's claim that trial evidence established that he "was engaged *only* in efforts to support the Venezuelan Opposition and U.S. government officials" (Mot. at p. 3) – and his conclusory assertions that the PSIR's offense description is somehow inaccurate because

it either supports the jury's verdict (and the allegations in the Superseding Indictment) or is lacking in failing to recount what Rivera's claims to be evidence of his innocence. Either way, his conclusory objections to the PSIR's offense description should be rejected because they are inconsistent with the jury's verdict.

In fact, pending before this Court is Rivera's Motion for New Trial and for Judgment of Acquittal (ECF 543) based on the same arguments concerning his innocence that the jury rejected in finding him guilty of all of the charges against him. As a factual challenge to the jury's verdict, Rivera's pending motion for judgment of acquittal or new trial is the proper forum to address the purported factual arguments he makes in objecting to the PSIR's offense conduct, a fact Rivera seemingly implicitly acknowledges in stating that he is not trying to relitigate the entire trial in his present objections. Presumably, this Court will deny Rivera's motion for judgment of acquittal and/or a new trial for the same reasons it denied Nuhfer's motion challenging the jury's verdict—including the overwhelming amount of evidence presented at trial that Rivera and Nuhfer were to be paid up to $50 million by the Maduro regime to support its interests, not the Venezuelan opposition's. At bottom, there is no way to reconcile the jury's verdict finding Rivera and Nuhfer guilty beyond a reasonable doubt with Rivera's conclusory assertions to the contrary.

B. Rivera Should Receive a Two-Level Upward Adjustment For Obstruction of Justice

Rivera should receive a two-level upward adjustment to his base offense level for obstructing or impeding the administration of justice under USSG § 3C1.1.

In relevant part, § 3C1.1 provides for a two-level adjustment where the defendant (1) "willfully obstructed or impeded, or attempted to obstruct of impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction,

and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense. . . ."

Application Note 4 provides a non-exhaustive list of examples of the types of conduct to which this adjustment applies, including:

> (B) committing . . . perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction;
>
> (F) providing materially false information to a judge or magistrate judge; or
>
> (J) failing to comply with a restraining order or injunction issued pursuant to 21 U.S.C. § 853(e) or with an order to repatriate property issued pursuant to 21 U.S.C. § 853(p).

Here, a two-level adjustment for obstruction of justice is appropriate because (a) Rivera violated two protective orders entered in this case by Judge Gayles prohibiting Rivera from transferring title to two residential properties that he purchased with funds directly traceable to the FARA and other violations charged in the Superseding Indictment and (b) Rivera admitted into evidence during the defense case excerpts from his deposition testimony (videos and transcripts) in the SDNY civil case involving PDV USA and Interamerican Consulting, Inc. ("Interamerican Consulting") that contained perjurious and false testimony.

(1) *Rivera's Violation of Judge Gayles' Protective Orders*

a. The Pink Dogwood Property. In November 2022, a grand jury sitting in this district returned the initial Indictment in this case charging Rivera and Nuhfer with eight counts of conspiracy and substantive FARA-related charges and various money laundering violations (ECF 3). The initial Indictment also included forfeiture allegations relating to (a) a number of assets that were purchased by Rivera and Nuhfer using funds directly traceable to the FARA and other violations charged in the Superseding Indictment and (b) a number of substitute assets the

government might pursue to recover against any money judgment the Court might enter upon the conviction of the defendants. The Indictment listed the assets the grand jury found probable cause to believe were purchased, in part, with funds traceable to the FARA and money laundering violations including a single-family residence located at 1673 Pink Dogwood Way, Oviedo, Florida. Rivera and his former spouse had purchased the Pink Dogwood property in 2017 using approximately $515,238 in proceeds from the FARA and related violations charged in the Indictment.

Following the return of the Indictment, the government filed an *ex parte* application with the Court seeking a protective order to restrain and enjoin the dissipation of the assets listed in the Indictment as traceable assets in order to preserve their availability for criminal forfeiture at the conclusion of the criminal case (ECF 6). On November 21, 2022, Judge Gayles granted the government's application and entered a protective order restraining and enjoining the subject assets – including the property located 1673 Pink Dogwood Way – "in order to preserve their availability for criminal forfeiture pursuant to 21 U.S.C. § 853(e)." (ECF 8 at p. 1). Judge Gayles' order further provided that the defendants, "including their . . . family members . . . or other persons holding or with custody of any of the Subject Assets, are enjoined and restrained from selling, transferring, assigning, pledging, distributing, giving away, encumbering, or otherwise participating in the dissipation, disposal . . . removal from the jurisdiction of this Court of any of the Subject Assets . . . without prior approval of the Court and upon notice to the United States. . . ." Id. at p. 3.

Judge Gayles' protective order remained in effect throughout the litigation in this case. However, according to an official records search with the clerk of the court for Seminole County,

Florida, on or about June 17, 2025, a Quit-Claim Deed was filed (presumably by Rivera) with the clerk of the court pursuant to which Rivera and his then-spouse transferred to Diana Maria Rivera (Rivera's sister) "any interest" they had in the Pink Dogwood property "to have and to hold . . . right, title, . . . equity and claim whatsoever of [Rivera and his then spouse], either in law or in equity," to the benefit of Rivera's sister "forever" (GXS1 – copy of Quit-Claim Deed – filed herewith). The Quit-Claim Deed bears the signatures (notarized) of Rivera and his spouse and indicates that they signed the deed on April 14, 2025, roughly two-months before it was filed with clerk of the court.

Needless to say, Rivera did not provide notice to the government that he was transferring his interest in the Pink Dogwood property to his sister nor did he receive permission from this Court to do so when the Quit-Claim deed was filed in June 2025. Interestingly, Rivera has continued to pay the property taxes associated with this property, including as recently as March 12, 2026, when Rivera made a payment of $14,095.58 for the 2025 property taxes. This is not unusual for Rivera. Over the last six years or so, Rivera has placed a number of real estate properties purchased with his funds into the name of his sister (an elementary school teacher) while continuing to pay the property taxes amounting to roughly $40,000 to $50,000 per year.

On June 11, 2026, the Court held a post-conviction hearing to address various matters including Rivera's motion for bond pending sentencing. At the hearing, the government raised the issue of Rivera's violation of Judge Gayles protective order regarding the Pink Dogwood property.[1] Tr. (06/11/26) at p. 27. In response, Rivera's attorneys represented to the Court that

[1] The government had briefly mentioned Rivera's apparent violation of the protective order by transferring title to the Pink Dogwood property to his sister in its response to Rivera's motion for bond (ECF 540 at pp. 6-7).

Rivera's transfer of title to the Pink Dogwood property "was a mistake. Mr. Rivera believed that the *lis pendens* had been lifted and transferred the – he didn't monetize it. . . . It can be set aside and – I guess. It was a simple mistake." Id. at p. 41.

As of the date of this filing, Rivera has taken no corrective action to the government's knowledge and the Pink Dogwood property remains in the name of his sister as owner according to the publicly available records from Seminole County.[2]

b. 3663 S. Atlantic Avenue, #20C. As part of its forfeiture allegations, the initial Indictment returned in November 2022 also identified a number of real estate properties as potential substitute assets against which the government might proceed at the conclusion of the case pursuant to a potential forfeiture money judgment. Included among the substitute properties was a beachfront property located at 3663 S. Atlantic Avenue, #20C, New Smyrna Beach, Florida, that Rivera and his former spouse had purchased in March 2019 for approximately $301,000. To be clear, the substitute assets – including the New Smyrna Beach property – were not listed in nor subject to the protective order discussed earlier.

Following Rivera's arrest, the government and the defendant engaged in extensive forfeiture litigation regarding whether the government could place a *lis pendens* on a substitute asset, which had been the practice for many years in this district and others. Ultimately, Rivera prevailed in that litigation and the *lis pendens* on the substitute assets were lifted pursuant to the Court's ruling. However, in the interim, the government engaged in further asset-tracing analysis and concluded that Rivera had purchased the New Smyrna Beach property using, in part, proceeds

[2] The current estimated value of the Pink Dogwood property according to various real estate websites is roughly $970,000 (Zillow).

directly traceable to the FARA and other violations in the Indictment. Accordingly, the government sought, and eventually obtained on February 15, 2024, a separate protective order from Judge Gayles securing the government's interest in the amount of $141,494 in the New Smyrna Beach property (ECF 132). Judge Gayles further ordered that, because the property was now subject to criminal forfeiture, no person "shall sell, transfer, assign, pledge, distribute, give away, encumber, or otherwise dispose of the property without prior notice to the Government and approval from this Court. . . ." Further, Judge Gayles' order provided that Rivera could seek permission to "sell or mortgage the property to obtain the value of the property minus the amount of tainted funds."

Rivera then filed a motion for leave to sell the New Smyrna Beach property (ECF 135) and a motion for reconsideration (ECF 137). In his motion to sell the property, Rivera stated that the "sole purpose" of the motion was "for the Court to approve the sale or mortgage of the property and allow Rivera to obtain the value of the property minus $141,494" in order "to retain counsel to represent him" in the criminal case (ECF 135 at p. 1). After further briefing, Judge Gayles issued an Order on March 29, 2024, denying Rivera's motion for reconsideration finding once again that there was probable cause to believe that $141,494 of funds traceable to the FARA violation were used to purchase the New Smyrna Beach property (ECF 150). On March 29, 2024, Judge Gayles also issued an Order granting Rivera's motion for leave to sell the New Smyrna Beach property "to obtain the value of the property minus the amount of tainted funds ($141,949.00)" (ECF 151). Finally, the same day, Judge Gayles signed an order reassigning the case to Judge Melissa Damian "for all further proceedings" (ECF 152).

Rivera then filed an appeal with the Eleventh Circuit, contesting Judge Gayles' rulings

concerning the New Smyrna Beach property. Rivera filed his notice of appeal on April 15, 2024, and the matter was fully briefed by March 26, 2025, when Rivera filed his reply brief with the circuit court. On December 12, 2025, the Eleventh Circuit issued its judgement and opinion in the matter, denying Rivera's claims for relief and specifically finding that Judge Gayles did not err in finding that there was probable cause to believe that $141,494 of funds were traceable to the charges in the Indictment and therefore subject to pretrial restraint pursuant to 21 U.S.C. § 853(e). The mandate of the court was entered in the criminal case on January 13, 2026 (ECF 321).

Despite the extensive, ongoing litigation regarding the New Smyrna Beach property, according to an official records search with the clerk of the court for Volusia County, Florida, on or about June 17, 2025, a Quit-Claim Deed was filed with the clerk of the court pursuant to which Rivera and his then-spouse transferred to Diana Maria Rivera "any interest" they had in the New Smyrna Beach property "to have and to hold . . . forever" (GXS2 – copy of Quit-Claim Deed – filed herewith). The Quit-Claim Deed bears the notarized signatures of Rivera and his former spouse and indicates that they signed the deed on July 24, 2024, roughly one-month before Rivera was arraigned in this case.

As with the Pink Dogwood property, Rivera did not give notice to the government nor receive the permission of the court to transfer ownership of the New Smyrna Beach property to his sister. He has continued to pay the property taxes on the property including a payment in the amount of $6,763.55 on March 12, 2026, and Rivera has made no effort to the government's knowledge to rectify his transfer of ownership to his sister in violation of Judge Gayles' protective order. In fact, according to a search of various real estate sites such as Zillow and Realtor.com, the New Smyrna Beach is currently listed for sale for $489,000, a $26,000 decrease from the listing

price when it was placed on the market on June 23, 2026, twelve days after the motion hearing at which Rivera through his attorneys claimed his actions regarding the Pink Dogwood property had been a "mistake."

(2) *Rivera's False Deposition Testimony*

Rivera's false deposition testimony in the SDNY civil case with PDV USA involving the $50 million consulting contract, and Rivera's introduction of portions of that testimony at trial, provide additional grounds for a two-level adjustment for obstruction of justice.

As this Court is aware, in May 2022, PDV USA filed a civil lawsuit against Interamerican Consulting in the SDNY in which it sought to recover the $15 million it had paid to Interamerican Consulting in 2017 pursuant to the $50 million Interamerican contract. Largely in the dark at the time regarding the nature of Rivera's activities in 2017, PDV USA alleged causes of action of breach of contract and unjust enrichment against Interamerican Consulting for its (and Rivera's) failure to perform certain contractual requirements under the agreement such as providing necessary progress reports to PDV USA.

Interamerican Consulting, in turn, filed a counterclaim against PDV USA for $30 million claiming that it had fully performed under the contract and was entitled the remaining funds under the parties' agreement. To support its counterclaim, Interamerican Consulting asserted throughout the litigation in the SDNY that Citgo had been interested "in hiring Interamerican as a consultant to develop a strategic plan to create a separate and distinct identity and to disengage from its parent [PDVSA]—an oil and natural gas company owned and controlled by the Bolivarian Republic of Venezuela." See Answer to Second Amended Complaint and Counterclaim (ECF 111 (SDNY 20-Civ-03699-JGK) at p. 19). According to Interamerican, Citgo specially sought

out Interamerican Consulting and "its principal, former U.S. Congressman David Rivera, because of his exceptional experience, expertise, and skills in the U.S. public and private sectors" and offered to pay him $50 million to "entice Interamerican to accept the engagement." Id. at 19-20. Interamerican repeatedly asserted that Citgo "obviously deemed the fee reasonable" due to the "billions of dollars at stake with Citgo's public and business stature in jeopardy." Id. at 20.

In the SDNY civil litigation, Rivera sat for a total of three days of deposition testimony. First, in July 2022, Rivera, as Interamerican Consulting's representative, sat for two days of sworn testimony in Miami, Florida. Throughout his testimony, Rivera repeatedly made any number of false statements regarding the nature of the $50 million consulting contract and the activities for which he was being compensated. These included, for example, Rivera's testimony (consistent with Interamerican Consulting's counterclaim) that Citgo had hired Rivera to develop a strategic plan for Citgo executives as to how Citgo could enhance its public image in the United States by distancing itself from its parent company, PDVSA. Rivera explained at great length about how his main advice was for Citgo to engage in joint ventures with U.S. based oil and gas companies such as Exxon (something the Citgo employees who testified at trial stated Citgo had already been doing for many years) but had not put anything in writing that could corroborate his testimony because the Citgo executives he engaged with considered his services to be extremely sensitive and confidential in nature.

In addition, Rivera provided false testimony about a number of other events relevant to both the SDNY civil case and the ongoing criminal investigation including, but not limited to, that (a) Delcy Rodriguez did not have any involvement in the work Rivera did in connection with the PDV USA consulting agreement (GX653-TR at p. 109); (b) Maduro did not have any involvement

in the work Rivera did in connection with the PDV USA consulting agreement (GX653A4-TR at p. 112); (c) Gorrin was not involved to Rivera's knowledge in the hiring of Interamerican by PDV USA (GX653A8-TR at p. 143-44); (d) Rivera did not provide any language for the PDV USA contract, did not draft any portion of the PDV USA contract, and did not have any role in preparing the exhibits to the PDV USA contract that set forth scope of services to be provided by Rivera (GX653C-TR at p. 143); (d) Rivera did not use code words in his text messages from time-to-time and terms like "el sombrero" were just nicknames used by Hugo Perera (GX655D-TR at p. 414-15) and that he could not recall what "La Luz" was used for (GX655F-TR at p. 474); and (e) Rivera was not paid for his efforts to assist Carlos Erik Malpica Flores in getting Malpica Flores removed from the U.S. sanctions list, Rivera's efforts for Malpica Flores did not have anything to do with the PDV USA contract, and Rivera was helping Malpica Flores as a favor to Gorrin (TX 655I-TR at pp. 530-31).

Moreover, although Rivera's July 2022 testimony preceded the initial indictment by roughly three to four months, it is perfectly reasonable to conclude – under a preponderance of the evidence standard – that Rivera intended, in part, to influence or "impact," in Rivera's words (Mot. at p. 9), the criminal case.[3] At the time he testified, Rivera (like Nuhfer) had already been informed months before that he was a target of the government's investigation for FARA and other federal violations. In addition, Rivera was engaged at the time in sealed grand jury litigation with the government concerning the Cozen legal opinion and he had been served with (and "responded"

---

[3] To obtain a sentencing enhancement, the government must establish the facts supporting the enhancement by a preponderance of the evidence. See United States v. Fernandez, 2022 WL 3581793 at *8 (11th Cir. 2022) (applying two-level increase for obstruction of justice based on the defendant calling several family members as witnesses to provide false testimony at trial).

to) a grand jury subpoena for Interamerican Consulting requiring the production of any and all documents and records (including specifically WhatsApp messages and emails) in Interamerican Consulting's possession relating to, in part, Nuhfer, Raul Gorrin, Hugo Perera, Bertica Cabrera Morris, Brian Ballard, PDVSA, PDV USA, Citgo, Julio Borges, Delcy Rodriguez, Nicolas Maduro, Carlos Erick Malpica Flores, FARA, relations between the U.S. and Venezuela, and U.S. sanctions and other policies towards Venezuelan government officials.[4]

Based on these facts, Rivera cannot plausibly claim that he was unaware of the criminal investigation at the time he gave his sworn testimony in July 2022. And any claim that Rivera did not have the "slightest intention that his deposition testimony would impact the criminal case in any way" is similarly implausible. Mot. at p. 9. Indeed, although the government found few cases on point, the Third Circuit has held that a defendant providing false testimony in a civil case involving the same subject matter of a subsequent criminal case falls squarely within § 3C1.1's adjustment for obstruction of justice. See United States v. Healy, 451 Fed.Appx. 192, 194-95 (3rd Cir. 2011) (holding under plain error review that both the defendant's false testimony in a civil lawsuit filed by a defrauded investor and the defendant's production of false documents to the U.S. Attorney's office independently satisfied the district court's application of the § 3C1.1 obstruction of justice enhancement).

In April 2025, two and a half years after the filing of the initial Indictment (and one and a half years after the return of the Superseding Indictment), Rivera was deposed for a second time in the SDNY case to allow PDV USA to question Rivera after having received, after extensive

---

[4] The government places "responded" in quotes due to the flagrant lack of relevant text messages and emails included in Rivera's subpoena productions but that the government was able to obtain from other third-party sources.

litigation, copies of the discovery (including an imaged copy of Rivera's iPhone) that the government had provided to Rivera and his attorneys in the criminal case. Once again, Rivera provided false and perjurious testimony concerning the relevant events including, but not limited to, that Rivera had never sought to get paid for assisting Malpica Flores in getting his name removed from the sanctions list, that he never sought payment of $5 million to help him, that Interamerican Consulting did not receive a transfer of $5 million from a PDVSA account at Gazprom Bank in connection with his efforts for Malpica Flores, and that Rivera's work with respect to Malpica Flores had nothing to do with the PDV USA consulting agreement (GX657X1-TR at pp. 647-49).

During the criminal trial, both the government and Rivera admitted into evidence excerpts from his April 2025 deposition (and his earlier July 2022 deposition) in their respective cases. Rivera offered excerpts of this testimony through three transcripts that are relevant here. First, Rivera admitted into evidence DRX-820T in which Rivera provided false and otherwise evasive testimony (to put it charitably) concerning his knowledge of and reliance on FARA filings during his review and input as to the Interamerican Consulting contract. In contrast to the government exhibits consisting of the emails between Rivera and Nuhfer containing excerpts from various FARA filings and hyperlinks to those same filings that they used to draft the Scope of Services section of the $50 million contract (GX320A&B, 325, 326 & 328), Rivera falsely denied reviewing FARA registration filings when reviewing the draft contract provided by Citgo (DRX-820T a p. 617), falsely denied conducting any research regarding FARA in connection with the formation of the contract (id.), and falsely denied "consider[ing] FARA" when he reviewed the draft contract (id. at p. 618). Rivera then went on to basically hedge his testimony stating that he somewhat

recalled seeing some FARA related materials during the general time period of late 2016 and early 2017, but that he could only recall seeing some boilerplate FARA language in connection with their efforts with Ballard Partners (id.).

Second, Rivera admitted into evidence excerpts from his April 2025 testimony in which he discussed the services he allegedly provided to Citgo executives in 2017 including his advice that they engage in joint ventures with other companies and in particular Exxon. Rivera testified that the Citgo executives were "so excited about the prospect of entering into a joint venture with ExxonMobil, it was so obvious that they had never even contemplated such a scenario," (DRX-821T at p. 636), and that he had not been compensated for working to arrange a meeting with Exxon but instead was "compensated to develop a strategic plan for initially Citgo Petroleum, later on AKA PDV USA" (id. at p. 643).[5]

Third, Rivera admitted DRX-823T into evidence in which Rivera had been asked about the meetings in New York City in April 2017 involving Sessions, Delcy Rodriguez, and Julio Borges. During that testimony, Rivera claimed that the meetings in New York City had "nothing" to do with the $50 million Interamerican Consulting contract (DRX-823T at p. 677, 679). Instead, Rivera continued to insist, even when confronted with his contemporaneous text messages, that the New York City meetings were all initiated by Borges and other members of the opposition (a fact denied by Borges at trial).

This testimony was all patently false. In each instance, the evidence at trial proved that

[5] Rivera also entered into evidence as part of his defense case DRX-818T, an excerpt from his April 2025 deposition testimony in which Rivera once again falsely claimed that he had advised Citgo in 2017 to engage in joint ventures with U.S. oil companies such as ExxonMobil, but that he had left the details of those joint ventures "to be developed and implemented" by the "technocrats" at Citgo (DRX-818T at p. 609).

these were lies told by Rivera to support his false exculpatory story that he was working for the opposition the entire time in trying to oust Maduro from power. Apparently, realizing that his trial defense needed something better than his false deposition testimony that Citgo dissidents had out of the blue contacted him and offered him $50 million for three months work on a strategic plan to enhance Citgo's image in the U.S., Rivera instead offered the jury a story that in fact the Venezuelan government had agreed to pay the $50 million to bring ExxonMobil back to Veneuzuela. See also Mot. at p. 4 (stating that "the real purpose of the consulting agreement was . . . to convince Exxon to resume drilling in Venezuela"). Undeterred by the fact that this story was completely inconsistent with Rivera's own deposition testimony in the SDNY case, Rivera doubled down and paid a hired "expert" at least $35,000 to testify at trial that it would have been worth $50 million to Maduro to pay Rivera (a one-term U.S. Congressman with limited consulting experience and no connections in the international oil industry) to convince ExxonMobil to come back to Venezuela. Because of Rivera's patently false testimony in the SDNY civil case and his subsequent use of that testimony in the criminal trial, this Court should impose the two-level adjustment for obstruction of justice.

C. Rivera Should Receive a Two-Level Adjustment for his Role as An Organizer or Leader of Criminal Activity

Rivera objects to the PSIR recommending that he receive a two-level adjustment as an organizer or leader under USSG § 3B1.1(c). He argues that the evidence admitted at trial demonstrated that he was an "equal partner" with the other participants in the criminal activity and that at most Rivera discussed matters or consulted with his partners (Nuhfer, Perera, and Gorrin), but never managed or supervised them through the exertion of control over their activities. Rivera's claims are without merit.

Section 3B1.1(c) provides for a two-level aggravating role adjustment to a defendant's offense level where a defendant was an organizer or leader in any criminal activity (not involving five or more participants or that was otherwise extensive) based on the role the defendant "played in committing the offense." USSG Ch.3, Pt.B., intro. comment. This determination is to be made based on all of the defendant's relevant conduct and "not solely on the basis of elements and acts cited in the count of conviction." Id.

In order to receive an aggravating role adjustment, a defendant "must have been the organizer, leader, manager, or supervisor of one or more other participants." § 3B1.1, at comment. (n.2). For these purposes, "participant" is defined as "a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant." USSG § 3B1.1, at comment. (n.1).

To distinguish "a leadership and organizational role from one of mere management or supervision," factors for the Court to consider include: (1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others. USSG § 3B1.1, at comment. (n.4).

"Although the enhancement does not require evidence of all the factors, there must be evidence that the defendant exerted some control, influence or decision-making authority over another participant in the criminal activity." United States v. Guardarrama-Suarez, 797

Fed.Appx. 469, 474 (11th Cir. 2019) (citations and internal quotations omitted); United States v. Murray, 653 Fed.Appx. 714, 718 (11th Cir. 2016) (noting these factors "are merely considerations for the sentencing judge"). "[T]he assertion of control or influence over only one individual is enough to support a § 3B1.1(c) enhancement." United States v. Jiminez, 224 F.3d 1243, 1251 (11th Cir. 2000).

Here, Rivera easily qualifies as an organizer or leader of the criminal conduct that he and Nuhfer (a criminal participant) engaged in through their unlawful lobbying scheme on behalf of the Maduro regime. Rivera's status as a former U.S. Congressman, with connections to senior officials having significant influence during the first Trump administration (including Senator Marco Rubio, White House Advisor Kellyanne Conway,and Repr. Pete Sessions), was essential to the defendants' violation of FARA and related charges. Rivera's status in this regard was also key to the Maduro regime's decision to compensate the conspirators, in an amount up to $50 million, for their back-channel lobbying efforts to normalize U.S.-Venezuela relations.

Indeed, Rivera played a central role in all of the scheme's activities (with the agreement of his partners) from the very start, as Rivera's wholly owned company, Interamerican Consulting, was the counterparty to the $50 million contract with Venezuelan state oil company affiliate PDV USA. Moreover, each of the four $5 million installment payments that the Maduro regime caused to be made in exchange for the conspirators' illegal activities were transferred to Interamerican Consulting's bank account over which Rivera had sole control. Rivera then personally transferred the funds from each $5 million installment payment to the other participants in the FARA- and money-laundering schemes, while retaining his share of the proceeds in Interamerican Consulting's accounts. These factors, among others, differentiate Rivera from Nuhfer and reflect

his influence and decision-making authority over Nuhfer and the other partners in their scheme.

And when PDV USA stopped making payments to Interamerican Consulting in May 2017 and suggested that the contract be assigned to PDVSA, it was Rivera who emailed Nuhfer and told her that he did not think they could agree to do that (GX400AT). When PDV USA once again suggested assigning the contract in September 2017, it was Rivera who sent several text messages to the MIA chat group (including Nuhfer) stating that it would be impossible to transfer the contract to PDVSA because it would violate FARA and be a scandal of monumental proportions, but that they could amend the contract to allow PDV USA flexibility to pay the invoices for any other affiliate or they could receive payment from another source (GX15 at p. 99). And sure enough, in October 2017 (with Nuhfer's express agreement to accept the next payment from Gazprom Bank (GX26)), Interamerican Consulting received the next $5 million payment from a PDVSA account at Gazprom Bank.

That type of influence over Nuhfer (and the other partners in the scheme) is more than sufficient to justify the PSIR's two-level adjustment as an organizer of the scheme. See United States v. Vinge, 83 F.4th 1285, 1290 (9th Cir. 2023) (holding that for the organizer enhancement to apply, "what is required is the necessary influence and ability to coordinate the behavior of others so as to achieve the desired criminal result. . . These softer forms of authority or control are sufficient for a determination that a defendant is an organizer."); United States v. Hunsacker, 65 F.4th 1223, 1229 (10th Cir. 2023) (stating that in a case involving "joint partners," a defendant can receive an enhancement as an organizer without necessarily controlling a subordinate "because a defendant can organize an illegal activity without exercising control over the other participants in the activity").

In addition, the evidence at trial included many of Rivera's written communications reflecting his direct "control or influence" in the FARA scheme, including with respect to Nuhfer. For example, in a March 22, 2017, email, Rivera advised Nuhfer and the other FARA-scheme participants: "I think we are almost ready. Now I am just waiting for the first retainer in order to call Congressman Sessions and confirm the appointment in Dallas for hopefully this weekend. We need to confirm the schedules and availability of the Foreign Minister [Delcy Rodriguez] and Mr. [Julio] Borges at some point." GX339AT. Rivera also drafted the itinerary for the April 2017 New York City meetings involving Repr. Sessions and sent it to Nuhfer and others. See, e.g., GX345A. Additionally, in a July 14, 2017, text message exchange (GX24 at p. 6) Rivera instructed Nuhfer to "[t]ell Hugo [Perera] to tell his new BFF the bus driver [Nicolas Maduro] to pay us for the mtg w Marco [Rubio]. Since there will b no turkey wout him." Esther responded, "I told him."

In addition, Rivera effectively supervised Nuhfer with respect to her drafting of the $5 million invoices from Interamerican to PDV USA, and sham consultant progress reports, which Rivera submitted to PDV USA officials in order for the conspirators to obtain payments under the $50 million contract. See, e.g., GXs 357A&B, 361A&B, 378A&B, 379AT&B, 446, 447, 448A; see also GX 429 (November 2, 2017, email in which Rivera commended Nuhfer for her artful drafting of a phony progress report to PDV USA, prompting Nuhfer to respond, "Should I BS more, or is this fine? Should I work on the other 2? You need to send this in tomorrow."). And while Nuhfer assisted Rivera in drafting the Scope of Services provision for the $50 million contract by emailing Rivera excerpts from and hyperlinks to various third-party FARA filings, it was Rivera who wrote the final description from Nuhfer's excerpts that was included in the

contract signed by PDV USA and Interamerican Consulting (GXs 325, 326, 328, 329A-329B, 333A-333C, & 338A-338B). Accordingly, the evidence at trial clearly established Rivera's role as a leader or organizer of the illicit lobbying scheme and Rivera should receive a two-level enhancement as a result.

D. Rivera's Objections to the PSIR's Money Laundering <u>Calculations Are Without Merit</u>

Rivera raises a number of objections to the PSIR's calculation of the money laundering guidelines under USSG § 2S1.1. His objections, however, echo or in some instances repeat verbatim the same issues raised in Nuhfer's sentencing objections, all of which were rejected by this Court. Accordingly, the government briefly summarizes these matters below and otherwise relies to the extent necessary on the more detailed discussion contained in the government's response to Nuhfer's PSIR objections (ECF 589).

In fairness, before proceeding, the government notes that Rivera filed his objections before Nuhfer's sentencing hearing and he therefore did not have the benefit of the Court's rulings on these matters before raising them in his written objections. Moreover, defense counsel has indicated to the government that he understands that these issues are moot for all practical purposes, but that he intends to raise them at Rivera's sentencing hearing to preserve the issues for appellate review.

(i). The government does not object to the Court using the November 2026 guideline amendments at Rivera's sentencing with respect to the fraud loss table set forth at § 2B1.1(b)(1). Under those amendments to the fraud loss table (which is incorporated into the money laundering guidelines at § 2S1.1(a)(2)), the relevant levels for the amount of laundered funds include (a) a 14-level adjustment if the amount of laundered funds is more than $750,000; (b) a 16-level adjustment

if the amount of laundered funds is more than $2,000,000; (c) an 18-level adjustment if the amount of laundered funds is more than $5,000,000 and (d) a 20-level adjustment if the amount of laundered funds is more than $15,000,000.

It is the government's position (as the Court found at Nuher's sentencing hearing) that the appropriate § 2S1.1(a)(2) base offense level under the November 2026 amendments would be a Level 26 consisting of a level 8 plus an 18-level increase corresponding to the amount of funds the defendants agreed to launder as being more than $5 million. This is based not on the total amount of funds ($20 million) that Interamerican Consulting received from PDV USA and PDVSA, but instead on Rivera's and Nuhfer's agreement with their partners (Gorrin and Perera) to split the profits of their activities evenly between them. Thus, under their agreement, the parties would have each received roughly $5 million of the $20 million (minus certain expenditures such as the payments to Bertica Cabrera-Morris), which would have represented their share of the profits for lobbying on behalf the Maduro regime.

In total, the net amount that Rivera distributed from the $20 million in proceeds to Nuhfer ($4,691,333), Gorrin ($5,291,833), and Perera ($5,291,833) was approximately $13,983,166. See GX1 (summary chart reflecting the distribution of the proceeds received by Interamreican Consulting). This amount clearly falls within the 18-level increase range (more than $5 million) set forth in the fraud loss table for a total base offense level of 26 under § 2S1.1(a)(2).

(ii). Rivera objects to this basic calculation for two technical reasons. First, Rivera asserts that the funds Rivera transferred from Interamerican to Perera and Gorrin (and Cabrera-Morris) cannot be counted as laundered funds ("innocent funds" in Rivera's terminology) because none of those individuals were charged with any crimes in the Superseding Indictment. Mot. at

p. 18-19. This exact issue, however, was litigated during Nuhfer's sentencing proceedings and this Court correctly ruled that those transfers were indeed money laundering transactions under § 1957 regardless of whether Perera, Gorrin, or Cabrera-Morris were themselves charged with or guilty of violating FARA. As the Court noted, § 1957 transactions frequently involve a situation where the party that receives the dirty funds (such as a yacht broker) is not involved in the criminal activity in a culpable way, yet the party who spends the funds to buy a luxury yacht (or pay for its maintenance) is criminally liable because the guilty party knew that the money he was spending derived from illicit criminal activity.

Second, Rivera objects to the PSIR's use of the amount of funds relevant to the money laundering conspiracy charge (Count 3) to calculate his base offense level under § 2S1.1(a)(2). Rivera asserts that the relevant amount should be a mere $1.1 million based on the amount of funds charged in the substantive counts of money laundering charged in the Superseding Indictment (Counts 4-8) that total $1.1 million resulting in a 14-level increase. Rivera's argument, however, is nothing more than a mirror image of his argument against application of the amount of laundered funds being more than $5 million under Count 3 and therefore is without merit based on this Court's correct application of the 18-level adjustment at Nuhfer's sentencing.

(iii). Finally, Rivera argues that the merger doctrine identified in United States v. Santos, 553 U.S. 507 (2008), compels a finding that Rivera's distribution of funds "to his equal partners is part of the crime and . . . not money laundering under Section 1957." Mot. at pp. 14-15. In so doing, Rivera's principal complaint appears to be that the money laundering guidelines outlined in the PSIR overwhelm the statutory penalties for a substantive FARA violation (a five-year cap), an offense that Rivera asserts is about nothing more than "not filing a government registration

form. . . ." Mot. at p. 12.

Putting aside Rivera's trivialization of FARA and the offense conduct in this case (including Rivera's and Nuhfer's participation in representing the interests of a foreign dictator whose regime was literally murdering protestors in the streets of Caracas while Interamerican Consulting received $15 million from a PDVSA affiliate in the spring of 2017), Rivera makes a fair point concerning the juxtaposition of FARA's statutory cap and the guideline penalties described in the PSIR. However, as Rivera points out, the dissent in Santos clearly identified the mechanism for correcting any perceived unfair disparity as a sentencing issue that can be addressed under the advisory guideline system and application of the § 3553 sentencing factors. Mot. at p. 12.

However, to the extent Rivera suggests Santos requires this Court to find that the profit distributions Rivera made to Nuhfer, Gorrin, and Perera, are not categorically § 1957 transactions, he is just plain wrong. In Santos, the issue related to whether payments made to operate a gambling operation were "proceeds," a statutorily undefined term at the time, for purposes of promotional money laundering. A plurality of the Court held that those funds were gross receipts of the gambling operation, not profits, and therefore there was a merger of the two offenses such that the gross receipts did not constitute "proceeds" for promotional money laundering purposes.

That reasoning has no relevance here. After Santos came down, Congress in 2009 amended the money laundering statutes and expressly defined "proceeds" to include gross receipts in addition to profits. In so doing, Congress limited Santos's reach only to criminal violations that took place prior to the statute's amendment. Thus, there is no merit to Rivera's statement to the effect that Santos somehow compels the conclusion that the payments to Rivera's partners

(essentially their profit distributions) were not proceeds for purposes of the money laundering statutes.[6]

And even before Congress took action, various courts interpreted Santos narrowly to minimize or reduce its potential impact. For example, the Eleventh Circuit held that, because of the nature of the Supreme Court's plurality opinion, Santos should be strictly applied to its pertinent facts such that its "narrow holding" was that "the gross receipts of an unlicensed gambling operation were not proceeds under section 1956"—a far cry from the FARA scheme here. See United States v. Demarest, 570 F.3d 1232, 1242 (11th Cir. 2009). And even the primary post-Santos case Rivera cites in his objections does not support his argument. See United States v. Cloud, 680 F.3d 396, 406 n. 4 (4th Cir. 2012) (explaining that the "simple fact that a coconspirator was paid . . . does not result in a merger problem. Rather, [the court] must look to the nature of the payment to determine if it charges the money transactions to pay for the costs of the illegal activities;" and further noting that there is a difference between co-conspirators paying "the expenses of the fraud . . . [versus] reaping the fruits of their crimes."). Accordingly, there is no merit to Rivera's claim that the tainted funds Rivera distributed to Nuhfer, Gorrin, and Perera (which the three used for their own personal benefit in one way or another) are precluded from being considered standard § 1957 transactions due to the merger principle.

[6] In contrast to Rivera, Nuhfer's sentencing memorandum acknowledged that Congress had amended the definition of proceeds post-Santos, a fact Rivera ignores, thereby eliminating the technical legal issue. Instead, Nuhfer correctly cited Santos for the purpose of emphasizing the defense's argument that the money laundering statutes may in certain circumstances create a significant increase in a defendant's exposure that may be grounds for the Court to address at sentencing.

E. The PSR Properly Includes a Six-Point Enhancement for a Money Laundering Offense Involving National Security

Rivera argues that the PSIR mistakenly applied the six-level national security enhancement set forth at § 2S1.1(b)(1) to his guideline's calculation. In so doing, he asserts the same arguments Nuhfer made in her written objections to the PSIR. This Court, however, correctly rejected those arguments at Nuhfer's sentencing hearing and Rivera's motion offers nothing new on the subject matter so the government will be brief.

(i). First, Rivera spends several pages of his written objections arguing that FARA does not categorically involve matters of national security. The government, as it stated in its response to Nuhfer's objections, does not disagree. While FARA will often implicate matters of foreign policy and national security based on the nature of statute, see Att'y Gen. v. Wynn, 104 F.4th 348, 353 (D.C. Cir. 2024) (describing FARA enforcement as "touch[ing] on sensitive areas of national security and foreign policy"), it is not the government's position that this is categorically true in each and every case. In the end, every case stands on its own unique facts as to whether the criminal conduct related to an "offense involving . . . national security." § 2S1.1(b)(1).

(ii). Second, the Court correctly found the offense conduct in this case involved matters of national security. Rivera and Nuhfer obtained an astoundingly large contract of $50 million (and possibly ultimately $60 million) to represent the interests of the Venezuelan government itself acting through its highest-ranking officials—including Delcy Rodriguez (who was then Venezuela's foreign minister and is now its acting head of state), as well as Nicolas Maduro. Notably, Rivera's and Nuhfer's efforts to lobby politicians in the United States to "normalize relations" (a term the defendants repeatedly used to describe the ultimate objective of their efforts) included their agreement to work to lift economic and other sanctions that the United States had

been imposing in 2017 on top Maduro officials (including Maduro himself and Carlos Erik Malpica Flores—Maduro's nephew), something that was directly contrary to U.S. foreign policy and its national security interests at the time. Indeed, at trial the government introduced as exhibits several of the underlying blocking notices issued by the Department of the Treasury that added Maduro and various other Venezuelan individuals and entities to the U.S. sanctions list. See GX667 (Notice dated July 26, 2017) (adding Carlos Erik Malpica Flores and others); GX668 (Notice dated July 31, 2017) (adding Nicolas Maduro Moros); GX669 (Notice dated August 9, 2017) (adding Adan Chavez Frias and others).

In each of these instances, the 2017 Notices referenced above were expressly issued under the authority of Executive Order 13692 of March 8, 2015, entitled "Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Venezuela," in which President Obama found that the situation in Venezuela "constitute[d] an unusual and extraordinary threat to the national security and foreign policy of the United States" and "declared a national emergency to deal with that threat." See DRX761 (copy of Executive Order 13692 admitted at trial by Rivera). In other words, the entire Venezuelan sanctions program was implemented pursuant to the national security and foreign policy interests of the United States.

Based on this evidence and the other evidence admitted at trial concerning the relationship between the U.S. and Venezuela during the relevant time period, Rivera's efforts to normalize relations between the two countries directly related to the U.S.'s national security and foreign policy concerns, as this Court correctly found at Nuhfer's sentencing hearing. And Rivera cannot plausibly claim that he was unaware of the fact that they were dabbling in matters of national security. After all, sanctions relief for various Venezuelan individuals including Maduro, his

wife, and his nephew Malpica Flores was an express purpose of their efforts, particularly with the ramping up of U.S. pressure on specific members of the Maduro regime after July 2017. Indeed, it is borderline laughable for Rivera, a former U.S. Congressman with a master's degree in public administration, to even suggest a lack of awareness or knowledge of the national security implications of the illicit lobbying activities for which he was convicted. Indeed, every aspect of Rivera's and his partners' conduct reeked of international intrigue and suspense, from the secretive meetings in New York City and Washington D.C. arranged with assistance of a notoriously corrupt Venezuelan businessman and political operative (Gorrin) to the off-the-books meeting in Caracas with Maduro himself.

(iii). Rivera's position that the national security enhancement should not be applied here because his efforts were always intended to support the opposition and aligned with U.S. interests is without merit. First, the national security enhancement by its express terms is not limited to situations where a defendant acts contrary to the U.S.'s national interests. The plain text of the provision does not say that, see United States v. Hanna, 661 F.3d 271, 294 (6th Cir. 2011) ("Though no one asserts that [defendant] believed her exports would 'threaten' national security, that is not required under the sentencing provision: it merely requires that she knew the offense 'involved' national security."), and the Court correctly rejected that argument at Nuher's sentencing hearing.

Further, the government does not accept Rivera's position as a factual matter that this was the case. After all, the U.S. government had an interest in imposing sanctions on various Venezuelan government officials and acted to do so. As described in Fernando Cutz's and Brian Naranjo's testimony (summarized in the government's response to Nuhfer's objections), the

ramping up of U.S. sanctions in 2017 was a significant foreign policy initiative at the time that was undertaken because of the atrocious political conditions in Venezuela under the Maduro regime and the threat those internal matters posed to U.S. interests. It takes little more than common sense to understand that any clandestine effort to assist such individuals in having their sanctions lifted (and that the $5 million retainer fee Rivera received from PDVSA in October 2017 was not limited to just finding Malpica Flores an attorney) is by definition not acting in a manner consistent with the U.S.'s national security and foreign policy interests.

For these reasons and the other matters described in more detail in the government's response to Nuhfer's objections, this Court should impose the six-level enhancement pursuant to § 2S1.1(b)(1) in calculating Rivera's guidelines.

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court reject Rivera's objections to the PSR.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: */s/ Harold E. Schimkat*

Harold E. Schimkat, AUSA
Roger Cruz, AUSA
Court ID No. A5500567
Fla. Bar No. 157971
99 N.E. 4th Street, 4th Floor
Miami, Florida 33128
Desk: (305) 961-9298
Cell: (786) 378-4344

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on September 2, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

/s/ *Harold E. Schimkat*
Harold E. Schimkat
Assistant United States Attorney