**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-Cr-20552-Damian/Torres**

**UNITED STATES OF AMERICA**

**vs.**

**DAVID RIVERA,**

**Defendant.**
_______________________________/

**GOVERNMENT'S RESPONSE TO DAVID RIVERA'S MOTION FOR 18 U.S.C. § 3553(a) CONSIDERATION OR, IN THE ALTERNATIVE, FOR A SUBSTANTIAL DOWNWARD VARIANCE**

The United States of America, by and through the undersigned Assistant United States Attorneys, respectfully submits this response to David Rivera's ("Rivera") Sentencing Memorandum (ECF 595) and further states as follows:

**Introduction**

This Court should deny Rivera's request for a downward variance to a sentence of "[no] imprisonment, or a sentence to time served (already four months) based on the Bondi Memorandum . . . [or] a sentence of no more than one year and one day . . . under Section 3553." Mot. at p. 18. As this Court is well-aware from the six-week trial in this case and extensive post-trial litigation, Rivera was the leading participant in his and Nuhfer's scheme to secretly lobby U.S. politicians – often their personal friends – to "normalize relations" with Venezuela and the Maduro regime in return for which they received $20 million and hoped to receive tens of millions dollars more for their efforts. In so doing, they acted on behalf of a hostile foreign government,

the president of which (and his wife) now sit in a jail in New York City awaiting trial on federal narco-terrorism, drug trafficking, and related charges.

Based on his extensive educational (an undergraduate and master's degree from FIU) and professional and political background (including as a one-term U.S. Congressman and as a multi-term State Representative) Rivera knew full well that what he and Nuhfer were doing required registration under the Foreign Agents Registration Act ("FARA"). However, to this day, Rivera has never expressed any remorse for his conduct and he continues to proclaim his innocence, despite the jury's swift verdict and the overwhelming amount of evidence introduced at trial that Rivera and Nuhfer were acting as highly-paid agents of the Venezuelan government. Indeed, Rivera's continued conduct demonstrates his lack of remorse to the point that Rivera (like Nuhfer) continues to trivialize the significance of his conduct including his assertions that his FARA conviction is about nothing more than "not filing a government registration form. . . ." Def. Object. (ECF 594) at p. 12.

Rivera's unlawful conduct in this case was also not an isolated event. Rather, Rivera has a rather long history of violating or skirting the law including, but not limited to, the pending federal income tax fraud charges for 2017 and 2018 – for which a grand jury found probable cause – and the FARA and money laundering charges pending against him in the District of Columbia that relate to his having received approximately $5.5 million in the fall of 2019 from offshore sources to assist Raul Gorrin in having his name removed from the OFAC sanctions list. Indeed, in that District of Columbia case, Rivera set up shell companies in Delaware in the name of White House Advisor Kellyanne Conway, among others, as the intended target of his lobbying efforts similar to the way in which Rivera created fake banking records in the present case to make it

appear (falsely) that Rivera had transferred $500,000 to Rep. Pete Sessions' spouse from the proceeds Rivera received from PDV USA and PDVSA. And Rivera has throughout several federal court cases violated court orders or engaged in other obstructive conduct including (a) transferring title to two residential real estate properties in violation of Judge Gayles' protective orders relating to the forfeiture allegations in this case, (b) violating his discovery obligations through the spoliation of electronic evidence in the pending SDNY civil litigation between PDV USA and Interamerican Consulting for which the court in that case imposed sanctions against Interamerican Consulting in the amount of $1,374,385 (attorney fees and costs), and (c) having been found by the Honorable Marcia Cooke to have provided false and misleading testimony in the Federal Election Commission's civil lawsuit against him.

For these and the other reasons set forth below, the government believes that the § 3553(a) factors weigh heavily in favor of a significant term of incarceration for Rivera and that Rivera's request for a *de minimus* term of imprisonment should be denied.

## **Argument**

A. Section 3553(a)(1) – The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The offense conduct in this case has been covered in great detail during the defendants' six-week trial and the extensive post-trial litigation and other pleadings filed in this case. Accordingly, the government sees no point in subjecting the Court to further detailed pleadings on the underlying facts of the case and would simply rely on the prior proceedings in this matter with which the Court is already familiar.

Suffice it to say for now that Rivera's efforts to influence U.S. policy on behalf of the corrupt Maduro regime were significant, extensive and unfolded over a lengthy period of time.

Those efforts included, in part, arranging self-described back-channel meetings between Rep. Sessions and Venezuela's Foreign Minister Delcy Rodriguez and opposition leader Julio Borges in April 2017 in New York City and meetings with Senator Rubio in Washington D.C. in July 2017 and related communications with him and his staff. His efforts also included arranging for Rep. Sessions (to the point of completing Rep. Sessions' Venezuelan Visa application (GX461A) and, with Nuhfer's assistance, preparing the letter of invitation to the U.S. State Department from the Venezuelan Foreign Minister (GX462 & 463)) to travel to Caracas in April 2018 to meet with Maduro himself and members of his regime. All for the stated purpose of somehow normalizing relations between the U.S. and Venezuela and more pertinently the personal enrichment of the defendants and their co-participants to the tune of as much as $60 million.

The offense conduct here and Rivera's personal background further support that Rivera's failure to register under FARA was no innocent mistake or misunderstanding. Rivera is a sophisticated individual with substantial experience in the realm of government service having served as a one-term U.S. Congressman and many years in the Florida State Legislature. Indeed, Rivera was running for state office to represent a political district in Miami at the time he committed the FARA and money laundering violations for which he was convicted by the jury and he funded, in part, his campaign for office with the illicit proceeds he received pursuant to the $50 million consulting contract. As such, Rivera certainly understood the importance of FARA's disclosure requirements and the negative ramifications to his political ambitions that would have resulted if he had disclosed that he had received millions of dollars from Venezuela's state-owned oil company to represent the interests of the Maduro regime. In fact, in June 2018, Rivera dropped out of the race for public office rather than file with the Florida Division of Elections a candidate

financial disclosure form that would have required him to disclose the existence of the $50 million Interamerican Consulting contract and the fact that Rivera had received $20 million in 2017 from PDV USA and PDVSA.

There is also no reasonable doubt, as the jury found, that Rivera willfully violated his FARA registration obligations. In 1986, Rivera graduated from FIU with a bachelor's degree in political science. He subsequently, in 1994, received a master's degree in public administration from FIU while he worked throughout the 1990's at the United States Information Agency for Radio and TV Marti before entering state and federal politics. By his own admissions (and various government exhibits introduced at trial), Rivera was familiar with FARA and its public disclosure requirements by no later than early 2017 through his and Nuhfer's efforts to find foreign governments and political parties for Ballard Partners to potentially represent.

As to FARA's relevance to the $50 million consulting contract and Rivera's and Nuhfer's efforts on behalf of the Maduro regime, the Court need look no further than the exhibits introduced at trial including (a) the emails between Rivera and Nuhfer with links to and excerpts from various FARA filings that they exchanged in drafting the Scope of Services for the contract, (b) Rivera's emails and text messages to Nuhfer and their partners relating to the FARA and other implications ("a scandal of monumental proportions") should the contract be assigned to PDVSA (GX15 at p. 99), and (c) Rivera's email to Gorrin on December 18, 2017, in which Rivera advised Gorrin to lie to the Miami Herald about their efforts in 2017 to meet with U.S. politicians because "trying to influence US policies toward Venezuela . . . would require registration as a foreign agent" (GX445AT).

In order to conceal the true nature his and Nuhfer's activities, Rivera also lied and

obstructed justice during the course of the illegal lobbying scheme itself and after the fact when the existence of the $50 million contract became public knowledge through the filing of the SDNY civil case by PDV USA. For example, Rivera created fake banking records that falsely implied that Interamerican Consulting had transferred $500,000 in illicit proceeds to Rep. Sessions' wife in 2017 and 2018, presumably for the purpose of providing a documentary basis to support Rivera's suggestions in the MIA chat group that Rep. Sessions was being compensated for his assistance in their efforts (a suggestion the government found no evidence to support) and lied to then-Senator Rubio that Gorrin was supporting the opposition with the money Rivera received from the PDV USA contract.

Following the filing of the PDV USA lawsuit in the SDNY, Rivera also lied repeatedly in various forums about the purpose of the $50 million contract and the nature of his and Nuhfer's activities to assist the Maduro regime. Those lies included (a) his statements to the New York Times and the Miami Herald that everything having to do with the $50 million contract was done at the direction of dissidents within Citgo including the Citgo 6 and the money was used to support the opposition, (b) his text messages with Brian Ballard regarding the New York Times article in which Rivera repeated the same lies and further stated that it was all part of the "plot . . . hatched up" by Julio Borges when Rivera and Ballard met him in early 2017 in the Dominican Republic (GX82B), (c) Rivera's sworn testimony in the SDNY civil suit in which Rivera falsely claimed that the money he received was to provide business advice to Citgo executives regarding how they could distance Citgo's public image from PDVSA in the U.S. by doing joint ventures with U.S. oil companies, and (d) Rivera's June 2022 television interview with This Week in South Florida in which Rivera once again sought to convince viewers that he was really being paid $50 million

by Citgo to provide dissidents within the company business advice (GX652A1).

Indeed, to this day Rivera persists in this dissembling conduct claiming his innocence. For example, in Exhibit B to his motion (ECF 595-2 at pp. 9-12), Rivera recounts a series of events and meetings in 2017 and 2018 in general and conclusory terms as proof of his purported anti-communist and anti-Maduro activities when in fact the episodes he vaguely describes related to various events that Borges, Perera, and other witnesses testified about (and for which numerous exhibits were introduced) and which in fact established in no uncertain terms Rivera's and Nuhfer's illicit lobbying scheme was conducted at the behest of the Maduro regime for their own self-enrichment.

At bottom, Rivera's conduct in this case clarifies the extent to which Rivera was willing to trade off his personal connections and professed political beliefs when the promise of great wealth presented itself to him.

B. Section 3553(a)(2) – The Need for the Sentence to Reflect the Seriousness of the Offense and Promote Respect for the Law and Just Punishment and Afford Adequate Deterrence

Considerations of just punishment and general deterrence also weigh in favor of a significant, non-probationary sentence under the facts of this case.

As the Eleventh Circuit and other courts have repeatedly emphasized, general deterrence is especially important in white-collar cases "where the motivation [for the crime] is greed. . . . United States v. Hayes, 762 F.3d 1300, 1308 (11th Cir. 2014) (noting that the courts have "set aside sentences of little or no imprisonment because they do not constitute just punishment for the offense, do not promote respect for the law, and will not do much to deter similar criminal activity by others."). Indeed, U.S. District Judge Ruiz observed several years ago, that "[w]hite-collar criminals often calculate the financial gain and risk of loss of their crimes, and an overly lenient

sentence sends the message that . . . would-be white-collar criminals stand to lose little more than the portion of ill-gotten gains and practically none of their liberty." United States v. Patel, 19-Cr-80181-RAR (S.D. Fla. Aug. 18, 2023) (ECF 557 at 110:1-5).

Here, that is precisely what Rivera and Nuhfer did. They engaged in conduct clearly falling within the type of "political activity" that requires public disclosure under FARA but chose not to file a registration statement disclosing their efforts due to the adverse financial and reputational harm such disclosure might entail. Moreover, contrary to Rivera's and Nuher's assertions downplaying FARA's significance, their failure to disclose their efforts on behalf of a hostile government is no small matter. As Ballard testified, complying with FARA's registration and reporting requirements is part of doing business as a lobbyist and serves to "let the public know that an entity is representing a foreign government. . . . Especially a foreign government, it's important that . . . not only the government knows but the public knows." Tr. (Mar. 21) at p. 29. Similarly, Rep. Sessions testified during trial at some length regarding the importance of transparency and that as a matter of public policy it is important for lobbyists to register when they are dealing with elected officials, particularly so when they are working on behalf of a foreign government. Tr. (Apr. 27) at pp. 83-84.

Here, a probationary sentence or anything less than a significant term of imprisonment would fall far short of reflecting the seriousness of the defendants' offense conduct, would detract from respect for the law in light of specific facts of this case, and fail to provide just punishment for Rivera's actions. At the time of the offense conduct here, Rivera had clear criminal intent, motivated by avarice and reputational and other personal considerations – including a return to public office in the 2018 election cycle – and he chose to not register under FARA in carrying out

the illegal lobbying activities for the Maduro regime's benefit.

Finally, as to general deterrence, Rivera argues that he would not even be prosecuted today under the Bondi memorandum. In that regard, it is worth noting that the policies set out there were not in place during the time of the offense conduct here and the defendants' efforts to have the charges dismissed in this case were rejected by the Department of Justice and the U.S. Attorney's Office for the Southern District of Florida. What may ultimately become of the Bondi memorandum and its policies (which remain in effect) remains to be seen as policies can change or be modified from time-to-time or exceptions made in certain cases. Whatever current preference the Bondi memorandum may reflect for civil enforcement of FARA matters going forward, it is not relevant at this juncture to the egregious facts of the current matter involving the payment of $50 million to a former U.S. Congressman to serve the needs of a hostile foreign government engaged in the violent oppression of its own people

C. <u>Section 3553(a)(6) – The Need to Avoid Unwarranted Sentencing Disparities</u>

Rivera is incorrect in asserting that the need to avoid unwarranted sentencing disparities weighs in favor of a sentence of probation. In support of his request, Rivera includes summary citations to a number of recent cases involving miscellaneous offenses. Mot. at pp. 5-6. However, Rivera's inclusions of those cases in his motion – intended only to highlight the relativity short terms of imprisonment imposed on the defendants – are of little relevance here as a practical matter as the descriptions are too cursory to draw any valid comparisons with the present matter.

Rivera then goes on to adopt wholesale Nuhfer's analyses of the sentences imposed in various FARA related to cases to argue that Rivera should receive a sentence with a minimal if any term of imprisonment. Mot. at p. 6, n. 2. But, as the government previously argued and the

Court essentially found at Nuhfer's sentencing hearing, Rivera's adopted analysis is of limited value (at best) and is in fact largely superficial to the point of irrelevancy. Rivera (like Nuhfer) fails to mention that virtually all of the defendants in the cases Nuhfer labeled "ordinary" pled guilty to the charges against them. The undersigned is certainly not in a position to opine on the nature of the plea deals in those cases and the benefits that accrued to the defendants as a result. Nor can the undersigned speak to the detailed facts of those cases (including the relevant backgrounds of the individuals involved) and what the basis was for the government to not charge money laundering in those cases or other aggravating crimes. Be that as it may, Rivera's efforts to set a baseline standard of probation for a FARA violation is too superficial and conclusory to say whether the comparisons he (or Nuhfer to be more exact) makes or made have any actual bearing on the specific circumstances of Rivera's and Nuhfer's $50 million scheme.[1]

Rivera does concede that there certainly are FARA cases in which more significant sentences of five to fourteen years have been imposed including the Tongsun Park, Paul Manafort, Imaad Zuberi, and Prakazrel Michel cases. Again, however, Rivera does not provide any detailed explanation as to the "aggravating features" of those cases that takes them out of the category of "ordinary" FARA cases as he sees things or how significant the "aggravating features" were in comparison to Rivera's and Nuher's activities (whether separately charged or not) as to the illegal lobbying and money laundering scheme for which they were charged and convicted by the jury.

Finally, Rivera notes that the FARA cases cited in Nuhfer's sentencing memorandum did

[1] The two cases Rivera/Nuhfer cites as "aggravated FARA cases" resulting in modest sentences were also the result of plea deals between the government and the defendants. Again, it is difficult to assess their relevancy based on the summary information Rivera through Nuhfer's pleading provides beyond the fact that neither defendant was charged with money laundering.

not include money laundering charges and argues that this Court should therefore treat this case as a strictly FARA case without regard to the money laundering charges as this case, in his view, is something of an anomaly. Mot. at p. 8. Again, the government cannot opine on why the government did not charge money laundering in the cases cited in the charts included in Nuhfer's sentencing memorandum (despite the fact that Congress itself saw fit to make FARA a predicate offense for money laundering), but Rivera overstates the issue. Indeed, as Rivera knows from his failed motion to dismiss the money laundering charges filed earlier in this case (ECF 284, 287, & 294), at least two other criminal cases – United States v. Manafort, 318 F.Supp.3d 1 (D.D.C. 2018) and United States v. Michel, 2024 WL 1603362 (D.D.C. 2024) – have charged money laundering based on FARA as the underlying predicate offense, and Rivera himself is facing money laundering charges (including § 1957 charges) in the pending District of Columbia case based on an underlying FARA predicate.

However, to the extent this Court believes the money laundering guidelines raise a relevant sentencing issue based on the disparity between the FARA-related charges five year statutory caps (both for the substantive FARA charge and the related § 371 conspiracy), this Court can address the matter through the advisory nature of the sentencing guidelines and its consideration of the § 3553(a) sentencing factors.

D. Miscellaneous Arguments

Rivera also asserts that this Court, in applying the § 3553(a) factors, should consider his "exceptional life of community and public service." Mot. at p. 9. He then provides a forty-three item list of matters that appear to be typical of individuals who choose to engage in a career in politics and related endeavors. Mot. at p. 14-16. These range from the routine (such as

involvement in high school and college level political activities) to the perfunctory ("American Cancer Society" or "Farm Share food bank") to the more substantive (such as his years as a member of the Florida House and U.S. House of Representatives). The government does not doubt that during his career Rivera was involved in any number of legislative activities that benefited his constituents and others, but there is nothing included in the laundry list of political and community achievements that stands in the government's view as exceptional or different in kind from others who engage in such activities over the course of their careers.

Finally, Rivera presents a number of personal characteristics (his age, medical condition, and life expectancy) that he claims, buttressed with some generalized data analysis prepared by a presumably paid-for sentencing expert, warrant a substantially reduced sentence due to what he claims will be his diminished life expectancy if he is incarcerated in prison. Yet, the issues he cites to do not appear to be categorically of the type that are extraordinary or even unusual for a man of his age and there is nothing in his claims that would come remotely close to justifying the reduction he is seeking. Accordingly, the government does not believe Rivera's request for a variance to a probationary sentence or *de minimus* term of imprisonment is warranted based on his age and medical circumstances.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court deny Rivera's request for a probationary or *de minimus* sentence and impose a sentence that includes a significant term of incarceration.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: /s/ *Harold E. Schimkat*

Harold E. Schimkat, AUSA
Roger Cruz, AUSA
Court ID No. A5500567
Fla. Bar No. 157971
99 N.E. 4th Street, 4th Floor
Miami, Florida 33128
Desk: (305) 961-9298
Cell: (786) 378-43

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 14, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. A courtesy copy was provided to defense counsel on September 12, 2026.

/s/ *Harold E. Schimkat*
Harold E. Schimkat
Assistant United States Attorney