UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA, CASE NO. 22-cr-20552 -Damian/Valle
Plaintiff,
v
DAVID RIVERA,
Defendants.
_________________________________//

**DAVID RIVERA'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS MOTION FOR 18 USC § 3553(a) CONSIDERATION OR, IN THE ALTERNATIVE, FOR A SUBSTANTIAL DOWNWARD VARIANCE**

Defendant, David Rivera ("Rivera") respectfully replies to the Governments Response (DE 620) to his Motion for 18 USC Section 3553(a) Consideration or, in the Alternative, Downward Variance ("Variance Motion") (DE 595), and states:

We are fast approaching the October 2nd sentencing date in this case, a sentencing in which the government has barely hidden its intention to literally destroy the 61-year-old Rivera's remaining life. The parties have filed multiple papers arguing both sides of everything, from Rivera's Motion for New Trial, his PSR objections and his Motion for Variance. Arising above the mist of  the litigation, several crucial overarching facts about the case, facts which should preclude the imposition of any significant sentence, stand out: (1) at no point has the government identified any harm resulting from Rivera's ostensible agency for the Maduro government in Venezuela; (2) the PSR in the case, based on information presented by the government, states, without objection, that there were no victims, no losses and no harm[1]; and (3) despite repeated challenges from the defense, setting aside its very unspecific hyperbolic arguments about deceiving politicians and working secretly to aid Maduro, the government has completely failed to identify even a single piece of evidence-a single specific fact-showing even one thing that Rivera did to aid Maduro or normalize his government's relations with the United States. Not one thing! Taken together, these failures of proof render this case extraordinary and demand a re-orientation and re-appraisal of what the impact, and presumed intended impact, of the defendant's actions

[1] During the Nuhfer sentencing, the Court stated that it recognized and considered the lack of anything being accomplished in the case. "It doesn't appear that United States policies did change as a result of their actions." (Nuhfer Sent'g Tr. p. 94:18-25)

actually proved to be, recognizing that the defendants' receipt of a large payment appears to be the major factor that clouds, rather than illuminates, the work done on the ground that was closer to a common sense goal (e.g., Exxon returning to drilling in Venezuela), and thus not looked at suspiciously at the time. Doing so will reduce, if not eliminate, the serious prospect that Rivera will be largely sentenced based on false premises.

We will now expand on these and other important points.

**NO EVIDENCE OF SUPPORT FOR MADURO**

As we said above, it cannot be said strongly enough that the government has once again completely failed to take up Rivera's now oft repeated challenge of identifying even a single piece of evidence of any kind in the trial record which details an effort by Rivera to assist Nicholas Maduro in any way or in normalizing his government's relations with the U.S. They do not even mention our repeated challenges that they do so. Instead, reflecting an all-consuming desire to see Rivera severely punished by the Court regardless of the actual evidence, the government continuously resorts to its now tiresome hyperbolic rhetoric about Rivera fooling politicians while "secretly" working to help Maduro. What did he do to help Maduro? Tell us-what did he do? Clearly counting on the Court to also be unwilling to engage this crucial question, the Government merely deflects to 'Rivera is a bad guy who deserves punishment' arguments virtually all of which involve other charges pending against him, which he has denied and has a right to a trial *before* being punished, or to civil deposition testimony of unidentified significance here. Have we arrived at the point in our justice system where a jury convicted defendant planning an appeal is foreclosed from challenging that conviction at the risk of multiplying his punishment? [2] Rivera will not take the bait, almost all of which has been addressed elsewhere. Suffice it to say that Rivera remains confident of his innocence, both because the evidence at trial demonstrated his unceasing efforts to remove Maduro from power and because he intends to reverse the verdict with an appeal, which he has every right to do without being punished at sentencing for doing so. And because, through his lawyers, he has undertaken what is now a multi-faceted and specifically detailed direct challenge to the sufficiency of the trial evidence along with manifest serious errors by the Court in major jury instruction and evidentiary rulings, at least one of which, the government led the

[2] Clearly the Court did not feel that way with regard to Esther Nuhfer who insisted on her innocence and eventual vindication during her sentencing (*Id.* at 100:22-25, 101:1-5).

Court into by mispresenting the DOJ's own position on the running of the Statute of Limitations. On this point, it is the government who refused to take the bait and never responded.

**MISCHARACTERIZATIONS OF THE EVIDENCE**

Before we turn to our second observation about this case, we are constrained to comment on certain extremely misleading, if not outright false, statements made by the government at Nuhfer's sentencing about the evidence in this case. We do so in this space, so as afford both the government and the Court the opportunity to reflect on what we see as the truth about these statements before sentencing.

First, the government's attempt to sell the Court on the idea that somehow the defendant's alleged plan to normalize relations on behalf of Maduro "had to involve the opposition" is laughable. Mr. Schimkat put it this way:

> Initially, it was all about sanctions. The meeting in New York introduced Sessions to Delcy, Borges. They fully acknowledged from the beginning if they had any chance in hell of making this work, they had to involve the opposition. We pled that as overt acts in the indictment…They said, in order to resolve the situation, to normalize relations, their words, it had to involve the opposition. In fact, I don't remember if it was Rivera or Nuhfer, but as part of the MIA chat, I believe it was. They went so far to say that was a requirement of Sessions himself, that he wasn't willing to meet with the government of Venezuela unless the opposition was involved.

(*Id.* at pp. 32:24-25, 33:24-10). If this proceeding were not so deadly serious, anyone who knows the evidence admitted during the trial of this case would think this statement was a very bad joke. To begin, there was no evidence that "initially it was all about sanctions." That is just plain untrue and totally inconsistent argument in the Response that it was only after the meetings with Rubio in July, 2017 Rivera "pivoted" to sanctions. But with respect to the "opposition", the actual evidence was that *every* material thing Rivera did, *every* statement Rivera made in any of the chats or to anyone was about helping the opposition remove Maduro from power. Sessions himself testified that the New York Delcy/Borges meetings had nothing whatever to do with U.S. policy, a FARA requirement, but were his first effort, after being recruited by the Opposition to do so, to mediate between the Venezuelan government (Delcy) and the opposition (Borges) about issues between them *in Venezuela* and that is why he made it very clear that, without Borges, there would be no meeting. Secretary Rubio's testimony, aside from that Rivera *never, ever said one pro-Maduro thing to him*, was that he met with Rivera, and then agreed to meet with Gorrin and the



#112420536v1

opposition to be presented with a plan for Maduro's removal. The entire discussion was about *removing* Maduro. What does Mr. Schimkat mean by "any chance in hell of making *this* work"? What is "this"? He never says! There was no evidence-and we have repeatedly challenged the government to identify *any* evidence - that Rivera was trying to help Maduro normalize his relations while staying in power. There is no such evidence because it is not true. Rivera was singularly focused on getting rid of Maduro, even, as Sessions testified without contradiction, that the April 2018 meeting *with* Maduro in Caracas was to offer him an exit plan and to discuss that plan with Henry Ramos Allup the next day at Gorrin's home. That is what the evidence shows. In this, and in every instance to follow, the government is without the most critical evidence of all-evidence of anything, even one thing, done by Rivera to help Maduro normalize his relations with the U.S. while remaining in power. The government is perpetrating a myth that somehow Rivera was covering some covert effort to help Maduro with meetings clearly intended to foster the opposition and the removal of Maduro. There is a big problem: there is zero evidence in this case of any such covert operation and without it, the entire case is, as we have been saying, "fake news".

Second, the government told the Court that the Exxon-Mobile effort was intended to "curry favor" with Secretary of State Rex Tillerson, the former CEO of Exxon. [*Id.* at pp. 33-34: 24-6] There was no such evidence. The only substantive evidence about Tillerson at trial was on the cross-examination of Secretary Rubio who testified how Rivera helped communicate his foreign policy positions on Cuba and Venezuela to Tillerson as part of securing Tillerson's support of those policies in an effort to win then senator Rubio's support for his nomination as Secretary of State. And, by the way, both positions were strongly against communist Cuba and in support of Maduro's removal, exactly as the Rivera defense, and the evidence, portrayed his activity during the entire relevant time period of this case.

Third, the government told the Court that while meetings were arranged and held with Rubio and Sessions, Rivera and the others were "still using the back-channel trying to figure out what to do [for Maduro]." [*Id.* at 34:9-14] Again, there was zero evidence at trial of this "back channel" pro-Maduro effort and, as we have said, the government has ignored repeated requests to identify any such evidence.

Fourth, the government repeatedly has misused an MIA-Chat reference where the "partners" discuss possibly "making more money" trying to get people off of the OFAC sanctions list. Curiously, in making this reference during the Nuhfer sentencing, the government even repeats



#112420536v1

that Maduro himself told Gorrin to "F-off" when Gorrin proposed a soft-landing removal for him. [*Id.* at 35:4-10]. The misrepresentation inherent in this argument is stark. First, Maduro's response to Gorrin's proposal is proof that this was not something for which he paid, not part of the Consulting Agreement or of "normalizing relations" for him. If otherwise, why did he tell Gorrin emphatically "NO". Second, the reference to making "more money" in itself proves that the discussion had nothing to do with any existing agreement. In fact, as both the government and the Court well know, the parties were discussing new ways to possibly get paid for helping the Borges and opposition supported Eric Malpica find a lawyer in the U.S. which: (a) proves there was no agreement for that; and (b) it never came to pass either with respect to Malpica or anyone else.

Fifth, the government actually said this to the Court:

> [t]here's literally an executive order saying it's a national emergency based on national security. We're ramping up sanctions…And that's what the Maduro regime was afraid of. They knew what was coming and it was starting to happen when they embarked on this $50 million endeavor to try to nip that in the bud…But they were unsuccessful in doing that.

[*Id.* at 34:17-23] For the first time in the entire case, including trial, the prosecutor claims to the Court that the Venezuelan motive behind the Consulting Agreement was sanctions relief. There was zero evidence of this at trial. And other evidence at trial, from the government's own witnesses, was that there were no sanctions in March 2017 from which there would have been a need for relief. The only sanctions relief evidence at trial was about finding a lawyer for Malpica who, according to Borges[3], was a supporter of the Venezuelan opposition, and, as we have said, speculation about making money helping others do the same. Entirely ignored is the testimony of Secretary Rubio that Rivera was instrumental in passing along from Raul Gorrin to his staff names to be *added* to the sanctions list during and throughout the time frame of this case. Again, the government must not be allowed to misrepresent the evidence in order to punish Rivera.

Finally, and in the same vein, was the government's preposterous claim to the Court that following the July, 2017 Rubio meetings in DC, "there was a pivot in July as to their activities. I hope they get more sanctions so we can make more money." [*Id.* at 36:14-18]. The government actually told this Court that Rivera & Co, after the mid-July 2017 Rubio meetings, were no longer

[3] Borges' exact words in his July 25, 2017 text message to Raul Gorrin, are Exhibit "A" hereto.

about meeting with high-ranking U.S. officials to somehow promote Maduro's U.S. relations in exchange for tens of millions of dollars, but that they "pivoted" to "make more money" trying to help people get off of sanctions. There was no evidence in this trial that the Maduro **government**, whether Maduro himself, Delcy Rodriguez his Foreign Minister, or anyone else not acting individually (e.g., Malpica), sought out Rivera for help to obtain sanctions relief. And it cannot be allowed to get lost, that by this time, the end of July, - in fact by the end of May, 2017, the Consulting Agreement had been terminated by CITGO according to the testimony of Gina Coon and Arnaldo Arcay, two government witnesses, and had expired anyway by virtue of its own three-month term. Efforts to convince Rivera to assign the contract to PDVSA in order to get paid had also been rebuffed by Rivera. The foregoing makes it patently clear that the government continues to manipulate the record in this case to support theories it simply cannot support, stark evidence of the insufficiency of its case. This should not be tolerated!

So as an ending point, it is important to put the following fine point on what was and remains the obviously shifting sands of prosecution theories of this case. Putting aside (though it is frankly impossible to do so) the government's preposterous hypothesis that, after the July, 2017 meetings with Rubio in DC, the contractual (there was no contract then) objectives "pivoted" to lifting sanctions, we are left with only the possible claim that Rivera was paid $20m out of a promised $50m to secure a U.S. government agreement for Maduro to agree to hold 'free and fair' elections which he would certainly lose and then have a U.S. government sponsored "soft landing" in some haven with his money. Is it really to be believed that the PDVSA Board, with Delcy Rodriguez, voted to pay David Rivera for such a thing in March, 2017? There was not one wit of such evidence. And, as pointed out above, when proposed by Raul Gorrin to Maduro he was told to "F-off". To the extent such an idea may be culled from the 'purple haze' of government theories, it is an evidentiary myth.

But, unfortunately and respectfully, this Court also appears to be a victim of misconceptions about the evidence due to misrepresentations perpetrated by the prosecution:

First, the Court made this factual statement during the Nuhfer sentencing: "Had they achieved their goals, which included permitting the Venezuelan oil company to pretty freely, right, do business with the United States and…transact with the United States." [*Id.* at 28:13-17] There was no evidence of any such "goal". The evidence was that, with Texas Congressman Session's assistance, the U.S. oil company Exxon-Mobile would agree to commence oil production in

Venezuela, such production having been stopped years earlier by Hugo Chavez. This involved doing an end run around ongoing arbitration proceedings between Exxon and Venezuela resulting from Chavez' seizure of Exxon's assets. At the time in early 2017, Venezuelan heavy oil was being imported at record levels into the United States without sanction or restriction and was being refined by CITGO, a subsidiary of PDVSA. In fact, the trial evidence proved that, at the time of the Consulting Agreement, March 21, 2017, both countries had full diplomatic relations, fully functioning embassies and there were no sanctions. Sanctions commenced only at the end of July after Maduro disbanded the opposition led National Assembly and created a sycophantic "Constituent Assembly". In other words, though Maduro was certainly no friend, there was nothing on a diplomatic level to be normalized. This is largely why the contract did not "involve national security" within the meaning of the USSG.

Later, the Court said this: "Well it was discussed. But Secretary Rubio himself said, I had no idea what was happening. So its not really in line with [sic] he was being told it was in line with what he wanted." [*Id.* at 26-27: 24-3] Secretary Rubio said no such thing. He only testified he was not told about the contract, which had already ended more than a month before the Rubio meetings according to the government's own evidence, and that had he been told he would have been "shocked". Over strenuous defense objection, the Court allowed the government to ask pernicious and misleading hypothetical questions, both on direct examination and at the very end of the redirect examination: essentially "what would your reaction be had you known that Rivera had a $50m contract with the Maduro government?" They were wrongly permitted to pose these inapposite hypothetical questions with zero detail about the contract or its intended purposes. Given that the purpose of the contract was a highly contested issue at trial, the defense contention and the evidence being that the Rubio events were only about removing Maduro, which the contract was never and could never have been about, this hypothetical was particularly inappropriate and unfairly prejudicial. This is particularly true inasmuch, as we have said, there was no contract at the time of the Rubio meetings. Rivera has preserved this important issue in his Motion for New Trial. But even more importantly, just as we predicted the jury would do, the Court itself has now apparently elevated the question and the answer to actual *proof* the Rivera was concealing the truth from Rubio when there was zero evidence of exactly what was concealed from Rubio.

There was this observation by the Court:



#112420536v1

> But I will just sum it up by saying it is a serious offense any time someone is misleading officials at the highest levels of our government. This conspiracy made it all the way up the chain to the White House and to the now Secretary of State, at the time he was a United States Senator, and to the attorney general or the attorney general of the United States.

(*Id.* at 93:16-22) Neither the Court nor the government has ever identified one fact, one piece of evidence or one statement, about which Rubio or any other U.S. official "was deceived". What did the evidence show that Rivera did to help Maduro behind the back or in deception of any U.S. official? Nothing! This is why there is an overwhelming concern that Rivera (as, frankly, was Esther Nuhfer) will be sentenced based on hyperbolic mischaracterizations of the evidence. Devoid of any actual evidence of a covert effort to support the Maduro regime as charged, this case is woefully deficient. This is why we are putting these issues on the table now.

**NO HARM**

**"**One of the foundational rules of our criminal justice system is that punishment should be commensurate with the crime—its threat to society. The need to tailor sentences to the dangers and needs of the individual being sentenced (and his family and community) are also foundational. Proportionality in sentencing encourages a fair system." *United States v. R.V.,* Case No. 1:14-cr-00316-JBW, DE 53, at p. 1 (E.D.N.Y. Jan. 22, 2016) (Weinstein, J.) (not a FARA case).

A second crucial point, also mentioned above, must be placed on the table and addressed: the government repeatedly asserts how serious it was for Rivera to be an unregistered agent for the Government of Venezuela. But aside from conclusory assertions, they never make the case as to any ACTUAL HARM that was produced or could have produced to national security or otherwise. The PSR finds that there was no harm, nothing was accomplished. (PSR ¶ 123), there were no victims (PSR ¶ 150) and no losses. Indeed, no such evidence was presented in the government's case demonstrating any harm that resulted from Rivera's actions. This is largely due to the fact that evidence presented at trial highlighted Rivera's efforts to remove Maduro from power at every instance. For sure, no evidence of harm or threat to the U.S. was any part of the government's case. And the government did not object to the PSR's lack of very specific findings of no victims, no success and no harm and, as such, has waived any argument of harm. In fact, if any harm is to be attributed it should be harm against the Maduro regime itself, given the myriad efforts by Rivera in evidence at trial to support the Venezuelan opposition in removing Maduro from power and placing sanctions on the Maduro regime and its cronies.

The point is this: Rivera was accused of being an unregistered agent of a country with which the United States, unlike Iran, Cuba, or North Korea, had full diplomatic and commercial relations at the time the PDV USA contract commenced. Though we clearly opposed the Maduro regime's repressive government, the United States had full diplomatic relations and did not have any sanctions imposed on either the Venezuelan government, PDVSA, or Maduro. In other words, there was no diplomatic relationship to "normalize" and there were no sanctions to lift. Furthermore, it would be one thing if Rivera had acted against US national security interest at any time. The evidence at trial demonstrated that this was never the case. Despite the Court's statement otherwise regarding Esther Nuhfer (ID: 95:19-20 ), Rivera never "turned his back on this country. In fact, quite the opposite. As the government was forced to admit in their closing arguments, Rivera's efforts at all times were intended to remove Maduro from power. Which was most certainly in concert with US interest, as evidenced by the recent capture of Maduro by the United States. In context, such an offense does not rise to the level of someone who failed to register for activities that ran counter to US interest or which were conducted on behalf of a country which was actively being sanctioned diplomatically or economically by the United States. Neither of which was the case with Venezuela in March 2017 when the PDV USA contract commenced.

So where does all this leave Rivera's Variance Motion? The Government opposes Rivera's request for a "time served" or "no more than a year and a day" sentence without ever actually addressing, at least not in its Response, his arguments adopted from his PSR Objections that the Money Laundering guidelines grossly overrepresent this FARA case and that, as a result of there being no FARA guideline, Section 3553 controls. And, based on the Court's ruling during the Nuhfer sentencing the court apparently agrees that the money laundering guidelines seriously overrepresent the offense conduct in what "…is a FARA case." Specifically, the Court found:

> I do agree that this is really a FARA case. I'm not saying I don't think the guilty verdict on the money laundering counts was not supported by the evidence. It absolutely was. And their [sic] was surely money laundering by the statute at issue here. So it is not inappropriate to use the guidelines tied to the money laundering offenses. But at the end of the day, this is a FARA case. The predicate act for the money laundering was FARA, and FARA does have a five-year max. And I think that Congress deemed that appropriate as the maximum term of imprisonment and the maximum sentence for the FARA violations. And I agree that's where we should be starting at the [five year][sic] max.
>
> So that point is well taken and I will grant the request for a variance to start to get her down to a statutory maximum term of imprisonment would start at the

> maximum sentence of 60 months, which would be in the level 25 range. So that is a granting of the variance in part.

(*Id.* at 97-98: 25-15). As a result of this "law of the case," it is Rivera's contention that, whether viewed as a necessary downward variance from what are patently draconian and overrepresenting money laundering guidelines, or as the appropriate starting point under Section 3353(a), at worst, any downward variance based on Rivera's "history and characteristics" should begin at the FARA statutory cap of sixty months.[4] To be clear, however, the statutory cap, while a limitation, is not the same as a determination of a proper pre-variance sentence using the 3553(a) factors and the mandate in that statute that any sentence "be sufficient, but not greater than necessary" to accomplish the statutory purposes.

**OTHER FACTORS**

The Response also entirely fails to address a number of factors raised by Rivera in his Variance Motion including his age, his prostate cancer and relevant sentencing statistics which should inform the Court's decision, including a life expectancy of no more than 8 years in prison. The government does not dispute any of this, saying only that there is nothing unusual about any of it. Sentencing is supposed to be individualized and simply ignoring the identified "characteristics of the defendant" which are mandatory considerations under section 3553(a)(1) is inappropriate and callous. *Gall v. United States,*552 U.S. 38 (2007) (Sentencing judge "must make an individualized assessment based on the facts presented").

**UNWARRANTED SENTENCING DISPARTITIES**

Regarding sentencing disparities, Rivera advanced two arguments. First, that under the 3553(a) requirement that the Court consider the "Nature and Circumstances of the Case" a comparison of this case, which is undisputedly a victimless crime with no losses and which accomplished nothing, with sentences in other very recent cases which caused severe damage and losses, the nature and circumstances of this case argue strongly for a sentence "sufficient but not greater than necessary" to reflect the lesser seriousness of the FARA offense.

---

[4] To the extent, if at all, that the Court considered its ruling for Nuhfer that the five-year FARA statutory maximum sentence rather than the 135-month money laundering guideline was a variance in her favor, we do not agree with the proposition that this constitutes a variance. It is Rivera's position that, based upon USSG § 2X5.1, the guidelines require the court to set the upper level of the sentencing range at 60 months. It is from this point that any variance should **begin** and not end.



#112420536v1

Then there is the impact of the Bondi Memorandum directing that cases such as this one not even be prosecuted much less sentenced. (Mot. pp. 2-3)(DE 595). The government ignores this fact. It is difficult to conceive a more obvious unwarranted sentencing disparity than that created by the government's own directive that cases such as this are no longer serious enough to be investigated or prosecuted. This flies directly in the face of any suggestion that this FARA case is a particularly serious one.

Regarding "Unwarranted Sentencing Disparities", a factor mandated for consideration under Section 3553(a)(6), the government attempts to sweep this consideration aside by saying either that the defendants in the cited case pled guilty and that they are in no position to evaluate the plea agreements or that we only presented general references to the cases and not sufficient information to compare them to this case. This is untrue because the description of the nature of each cited case and the resulting sentence, while it may not tell everything, is more than sufficient to underscore that FARA cases both with and without a trial generally result in probation or short sentences. Some of the cited cases involved clearly more egregious and more harmful FARA violations than this one. These are the very unwarranted disparity cases compared to the double digit year, record setting FARA sentences for which both Probation and the Government are pushing in this case. Consider what we do know about those cases: One of them, *United States v. Higginbotham*, involved a U.S. prosecutor sentenced to probation for created fake consulting agreements and other false documents in order to conceal foreign lobbying work on behalf of Ukrainian interests, allowing foreign individuals to take control of bank accounts with foreign funds in order to disguise their ownership. Another, *United States v. El-Siddig*, involved lobbying on behalf of the International *Islamic Relief Organization*, in a matter where the broader investigation involved allegations of terrorism financing and national-security concerns. Can it possibly be said that the *El-Siddig* case was not worse than this one? He was sentenced to probation. Then there are these cases:

- *United States v. Bendler*, **one year and one day imprisonment** for a CIA contractor (and former CIA agent) who worked on behalf of foreign nationals, illegally searched classified government databases, and unlawfully obtained and removed classified information for them.
- *United States v. Ben Israel*, **7 months' imprisonment** involving efforts to lobby U.S. officials to lift sanctions imposed on Zimbabwe and President Robert Mugabe.
- *United States v. Siljander*, **one year and one day imprisonment** for former Congressman Siljander, who acted as an unregistered foreign agent on behalf of the



#112420536v1

> International Islamic Relief Agency and obstructed the ensuing investigation, despite government request of 36-48 months on FARA count.

Two other FARA cases we cited, both involving other crimes of conviction, resulted in only 24 month sentences. All of these cases are obviously more egregious than this one even accounting for this one being tried and possibly involving more money. The government's 'insufficient evidence to compare' (and, frankly, the Court's "apples and oranges" analogy[5]) are manifestly unfair as some distinctions can always be found in practically any case held up for disparity consideration. This is obviously not what Congress intended when it mandated in Section 3553(a)(6) that "unwarranted" disparities be considered and avoided. The use of the word "unwarranted" in the statute reflects an understanding that every case will have distinguishing factors. And the government has had plenty of time to get the details of the cases and provide something more than guilty pleas as a 'sweep-them away' argument. As it stands, this Court has already meted out what appears to be an extraordinarily, possibly even, record long FARA sentence (at the statutory maximum of 60 months despite expressly stating the this is not the most serious FARA case ever (*Id.* at 94:10) and clearly believes that Rivera deserves worse. Unwarranted sentencing disparities, reflecting uniformly low sentences in FARA cases, is a serious consideration in this case.

**CONCLUSION**

Rivera Variance Motion lays out a number of Section 3553(a) factors for consideration by the Court, or, if the Court considers the clearly draconian advisory money laundering guidelines controlling in "this [] FARA case", a law of the case basis for a substantial downward variance from such guidelines just as was done for Esther Nuhfer, however finally determined by the Court. Many of the factors/reasons put forward by Rivera were entirely ignored by the government or simply swept away without addressing them as "typical" or "not unusual". But as his presentation here demonstrates, this case rests on a foundation of largely non-existent evidence, a foundation which needs to be corrected as we have endeavored to do and as to which Rivera's lifetime of community and national interest work at extraordinary levels stands out.

---

[5] *Id.* at p. 93:7-8)

Respectfully submitted on September 25, 2026.

**EDWARD R. SHOHAT, PA**
201 S. Biscayne Blvd., Suite 3000
Miami, FL 33131
Tel: (786) 525-3621
By: *<u>/s/ Edward R. Shohat</u>*
**Edward R. Shohat**
Florida Bar No. 152634
ed@edwardrshohat.com

**JONES WALKER LLP**
201 S. Biscayne Blvd., Suite 3000
Miami, FL 33131
Tel: (305) 679-5700
By: *<u>/s/ David S. Weinstein</u>*
**David S. Weinstein**
Florida Bar No. 749214
dweinstein@joneswalker.com

*Counsel for David Rivera*