**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CR-20552-DAMIAN**

**UNITED STATES OF AMERICA**

**v.**

**DAVID RIVERA,**

**Defendant.**
________________________________/

**UNITED STATES' OPPOSED MOTION FOR**
**PRELIMINARY ORDER OF FORFEITURE**

Pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1), and the procedures set forth in 21 U.S.C. § 853 and Rule 32.2 of the Federal Rules of Criminal Procedure, the United States moves for the entry of a Preliminary Order of Forfeiture against Defendant **DAVID RIVERA** in the above-captioned matter.

The United States seeks a forfeiture money judgment in the amount of $20 million pursuant to 18 U.S.C. § 981(a)(1)(C), a forfeiture money judgment in the amount of $15 million pursuant to 18 U.S.C. § 982(a)(1)—to be subsumed with the other forfeiture money judgment—and the forfeiture of certain property in satisfaction thereof. Alternatively, the United States seeks a general order of forfeiture to be entered at sentencing, and amended as forfeiture proceedings progress post-sentencing.

In support of this motion, the United States provides the following factual and legal bases.[1]

[1] All amounts and dates in this motion are approximate.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

1. On November 16, 2022, a federal grand jury sitting in the Southern District of Florida returned an Indictment charging Defendant Rivera in Count 1 with conspiracy to commit an offense against the United States, that is, failure to register as a foreign agent, in violation of 18 U.S.C. § 371 and 22 U.S.C. §§ 612(a), 618(a)(1), in Count 2 with failure to register as a foreign agent, in violation of 22 U.S.C. §§ 612(a) and 618(a)(1), in Count 3 with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and in Counts 4, 5, 7, and 8 with engaging in transactions in criminally derived property of a value greater than $10,000, in violation of 18 U.S.C. § 1957. *See* Indictment, Dkt. No. 3.

2. The Indictment also contained forfeiture allegations, which provided that upon conviction of a violation of, or conspiracy to violate, 22 U.S.C. §§ 612(a) and 618(a)(1), Defendant Rivera shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to 18 U.S.C. § 981(a)(1)(C). *See id*. at 31. The forfeiture allegations also provided that upon conviction of a violation of 18 U.S.C. §§ 1956 and/or 1957, Defendant Rivera shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1). *See id.* The forfeiture allegations section also specifically listed certain assets subject to forfeiture. *See id*. at 31–32.

3. On December 14, 2023, a federal grand jury sitting in the Southern District of Florida returned a Superseding Indictment, maintaining the same charges as in the Indictment, but also adding tax charges against Defendant Rivera.[2] *See* Superseding Indictment, Dkt. No. 122. The Superseding Indictment also maintained the same forfeiture allegations as in the Indictment.

---

[2]Tax-related charges have since been severed. *See* Order, Dkt. No. 325.

*See id*. at 38–40.

4. The forfeiture allegations listed the following five specific assets alleged to be subject to forfeiture as directly forfeitable assets pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1):

(a) Wells Fargo account no. 6423-2614, held in the name of Esther Nuhfer;

(b) Real property located at 2665 S.W. 37th Avenue, Unit 504, Miami, Florida 33133;

(c) Real property located at 1673 Pink Dogwood Way, Oviedo, Florida 32765;

(d) Real Property located at 21 Sadowski Causeway, Key Colony Beach, Florida 33051;

(e) Real property located at 10925 N.W. 43rd Lane, Doral, Florida 33178.

*See id*. at 39–40.

5. On March 22, 2026, the United States filed an Amended Bill of Particulars, giving notice that, in addition to the property generally and specifically identified in the forfeiture allegations of the Superseding Indictment, the United States seeks the forfeiture of the following property as directly forfeitable assets, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1):

(a) Real property located at 3663 S. Atlantic Avenue, Unit 20C, New Smyrna Beach, Florida 32169;

(b) Real property located at 9425 S.W. 38th Street, Miami, Florida 33165; and

(c) Real property located at 82 Tingler Lane, Marathon, Florida 33050.

*See* Amend. Bill of Particulars, Dkt. No. 422; *see also* Bill of Particulars, Dkt. No. 123.[3]

[3] The Amended Bill of Particulars filed at Dkt. No. 422 revised the asset descriptions for certain real properties, which had previously identified specific sums of money to be preserved in place of forfeiting the corresponding real property.

6. On March 23, 2026, the case proceeded to trial. *See* Trial Minute Entries, Dkt. Nos. 424–428, 430–433, 435–436, 444–445, 447–449, 454, 456–457, 462, 480–481, 483.

7. On May 1, 2026, the petit jury empaneled in this case returned its Verdict [Dkt. No. 488] in which it found Defendant Rivera guilty of the violations charged in **Count 1** (conspiracy to violate 22 U.S.C. §§ 612(a) and 618(a)(1), in violation of 18 U.S.C. § 371), **Count 2** (failure to register as a foreign agent in violation of 22 U.S.C. §§ 612(a) and 618(a)(1)), **Count 3** (conspiracy to violate 18 U.S.C. § 1957 in violation of 18 U.S.C. § 1956(h)), and **Counts 4, 5, 7, and 8** (substantive money laundering charges, in violation of 18 U.S.C. § 1957). *See* Trial Minute Entry, Dkt. No. 487; Jury Verdict, Dkt. No. 488.

8. Continuing on May 1, 2026, upon Defendant Rivera's request to retain the jury to determine whether the requisite forfeiture nexus exists for specific property the Government sought to forfeit, the Court conducted a bifurcated forfeiture proceeding pursuant to Fed. R. Crim. P. 32.2(b)(1)(A) and (b)(5)(A) immediately following its announcement of the Verdict. *See* Trial Minute Entry, Dkt. No. 487.

9. Upon conclusion of that bifurcated forfeiture proceeding and subsequent deliberation, the same petit jury returned a Forfeiture Verdict, unanimously finding that the Government proved by a preponderance of the evidence that the real property located at 10925 N.W. 43rd Lane, Doral, Florida 33178 was involved in the money laundering offense charged in Count 4. *See* Special Verdict, Dkt. No. 490.

[Space Intentionally Left Blank]

## II. MEMORANDUM OF LAW

### A. Directly Forfeitable Property

Any property, real or personal, which constitutes or is derived from proceeds traceable to an offense constituting a "specified unlawful activity" or a conspiracy to commit such offense is subject to forfeiture to the United States. *See* 18 U.S.C. § 981(a)(l)(C) (made criminally applicable by 28 U.S.C. § 2461(c) ("[T]he court shall order the forfeiture of the property as part of the sentence in the criminal case . . . .")). Failure to Register as a Foreign Agent, in violation of 22 U.S.C. §§ 612 and 618, is a "specified unlawful activity." *See* 18 U.S.C. § 1956(c)(7)(D).

Additionally, any property, real or personal "involved in" a violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property, is subject to forfeiture to the United States. *See* 18 U.S.C. § 982(a)(1). The Eleventh Circuit has broadly interpreted the phrase "involved in" to encompass "the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." *See United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) (quoting *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998) (internal quotation marks omitted); *accord United States v. Seher*, 562 F.3d 1344, 1368 (11th Cir. 2009) (quoting *Puche*, 350 F.3d at 1153). As is relevant to Count 4 of the Superseding Indictment, real property is forfeitable as property "involved in" a money laundering transaction or money laundering conspiracy when the real property is the subject of the laundering or benefited from money laundering payments. *See United States v. Sanders*, 952 F.3d 263 (5th Cir. 2020) (court affirmed forfeiture of real property under 18 U.S.C. § 982(a)(1) as property involved in money laundering, because the § 1957 violation was based on defendant's purchase of cashier's check that was used to buy real property).

In any case, if a defendant is convicted of such violation, the Court "shall order" the forfeiture of property as part of the sentence. *See* 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(1). Criminal forfeiture is governed by the preponderance standard. *See United States v. Hasson*, 333 F.3d 1264, 1277 (11th Cir. 2003). Upon finding that property is subject to forfeiture by a preponderance, the Court:

> . . . must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria. The court must enter the order without regard to any third party's interest in the property. Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c).

*See* Fed. R. Crim. P. 32.2(b)(2)(A). To the extent there is a third-party interest to any forfeited asset, such claims are addressed after the property is preliminary forfeited, in third-party ancillary proceedings. *See* 21 U.S.C. § 853(k), (n); Fed. R. Crim. P. 32.2.

"Unless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant[.]" Fed. R. Crim. P. 32.2(b)(2)(B); *but see McIntosh v. United States*, 601 U.S. 330, 333, 338 (2024) ("district judge's failure to enter a preliminary order prior to sentencing does not deprive a judge of the power to order forfeiture"). And at sentencing, the Court "must include the forfeiture when orally announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at sentencing," and then "include the forfeiture order, directly or by reference, in the judgment." *See* Fed. R. Crim. P. 32.2(b)(4)(B).

If, however, "before sentencing, the court cannot identify all the specific property subject to forfeiture or calculate the total amount of the money judgment," the Court may enter a general order of forfeiture that: "(i) lists any identified property; (ii) describes other property in general

terms; and (iii) states that the order will be amended under Rule 32.2(e)(1) when additional specific property is identified or the amount of the money judgment has been calculated." Fed. R. Crim. P. 32.2(b)(2)(C). Under Rule 32.2(e)(1), "the court may at any time enter an order of forfeiture or amend an existing order of forfeiture" when additional, specific property is identified, or to forfeit any substitute property under 21 U.S.C. § 853(p).

### B. Forfeiture Money Judgments

A forfeiture order may be sought as a money judgment. *See* Fed. R. Crim. P. 32.2(b)(1)(A), (2)(A); *see also United States v. Padron*, 527 F.3d 1156, 1162 (11th Cir. 2008) (holding that Federal Rules of Criminal Procedure "explicitly contemplate the entry of money judgments in criminal forfeiture cases"). The forfeiture money judgment is final as to the defendant "[a]t sentencing—or at any time before sentencing if the defendant consents." *See* Fed. R. Crim. P. 32.2(b)(4)(A). No ancillary proceeding is required when forfeiture consists solely of a money judgment. *See* Fed. R. Crim. P. 32.2(c)(1). As additional property is identified to satisfy the forfeiture money judgment, the Court must order the forfeiture of such property. *See* Fed. R. Crim. P. 32.2(e)(1) ("[T]he court may at any time enter an order of forfeiture or amend an existing order of forfeiture to include property that . . . is subject to forfeiture under an existing order of forfeiture but was located and identified after that order was entered; or . . . is substitute property . . . ."); *see also* Fed. R. Crim. P. 32.2(b)(2)(C).

The amount of the money judgment should represent the full sum of directly forfeitable property, regardless of the defendant's ability to satisfy the judgment at the time of sentencing. *See United States v. McKay*, 506 F. Supp. 2d 1206, 1211 (S.D. Fla. 2007) (adopting the majority rule); *see also United States v. Blackman*, 746 F.3d 137, 143–44 (4th Cir. 2014) ("The fact that a defendant is indigent or otherwise lacks adequate assets to satisfy a judgment does not operate to

frustrate entry of a forfeiture order."). The Court determines the amount of the money judgment "based on evidence already in the record, including any written plea agreement, and any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B).

The defendant's money judgment amount can be based on a reasonable estimate of the amount of property subject to forfeiture. *See*, *e.g.*, *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011); *United States v. Peithman*, 917 F.3d 635, 651 (8th Cir. 2019); *United States v. Vico*, 2016 WL 233407, at *7 (S.D. Fla. Jan. 20, 2016) (calculation of money judgment does not require mathematical exactitude; district court may make a reasonable extrapolation supported by a preponderance of the evidence); *accord United States v. Esformes*, 2023 WL 118497, at *11 (11th Cir. Jan. 6, 2023) (court decides money judgment amount); *United States v. Cingari*, 952 F.3d 1301, 1306 (11th Cir. 2020).

Furthermore, a defendant's forfeiture money judgment should reflect the property obtained as a result of the offense of conviction. *See* 21 U.S.C. § 853; *accord United States v. Honeycutt*, 581 U.S. 443, 450 (2017) (However, the "mastermind might receive payments directly from drug purchasers, or he might arrange to have drug purchasers pay an intermediary such as the college student. In all instances, he ultimately 'obtains' the property—whether 'directly or indirectly.'") (holding that section 853 does not authorize joint and several liability for property the defendant did not obtain).

The Eleventh Circuit has held that "conspiracy leaders or 'masterminds' who control criminal enterprises jointly acquire the proceeds of the conspiracy with their co-conspirators." *United States v. Elbeblawy*, 839 F. App'x 398, 400 (11th Cir. 2021) (citing *Cingari*, 952 F.3d 1301, 1305-06); *see also United States v. Knowles*, 819 F. App'x 781, 783 n.1 (11th Cir.

2020) (observing defendant, a "'leader' with decision-making authority and a high degree of participation in the drug conspiracy," directly or indirectly obtained full proceeds of the conspiracy); *United States v. Bane*, 948 F.3d 1290, 1297–98 (11th Cir. 2020) (finding defendant, the "mastermind behind the fraud," failed to prove he was not responsible for entire proceeds of the fraud); *accord United States v. Young*, 108 F.4th 1307, 1325–28 (11th Cir. 2024). Further, defendants that jointly acquire the proceeds of the crime of which they are convicted should be ordered to forfeit the total amount of the proceeds they jointly acquired. *See United States v. Goldstein*, 989 F.3d 1178, 1202–03 (11th Cir. 2021) (finding that the district court did not err in imposing a $1,953,974 forfeiture money judgment against both convicted defendants because the fraud proceeds were deposited into accounts that both defendants controlled) (citing *Cingari*, 952 at 1306). With that said, the Eleventh Circuit has held that *Honeycutt* does not apply to forfeiture under 18 U.S.C. § 982(a)(1). *See United States v. Waked Hatum*, 969 F.3d 1156, 1165 (11th Cir. 2020) ("because § 982(a)(1) contains neither a 'proceeds' nor an 'obtained' limitation, *Honeycutt's* 'tainted property' requirement does not apply to this case.").

### C. Property Subject to Forfeiture in Instant Criminal Case[4]

As established at trial, from February 2017 through December 2018, Defendant Rivera conspired with Defendant Nuhfer to unlawfully enrich themselves by covertly representing Nicolas Maduro's Venezuelan government to influence U.S. foreign policy in violation of the

[4] To avoid unnecessary repetition of the evidence adduced at trial in support of Defendant Rivera's convictions in Counts 1, 2, 3, 4, 5, 7, and 8, the United States adopts and incorporates by reference the full statements set forth in the following as if set forth fully herein: (1) Gov't Op. to Def. Rivera's Mot. for Acquittal & for New Trial, Dkt. No. 563; (2) Gov't Resp. to [Def.] Rivera's Mot. for [§ 3553(a)] Consideration, Dkt. No. 620; (3) Gov't Resp. in Op. to Def. Rivera's Objections to Presentence Investigation Report, Dkt. No. 615; and (4) Gov't Resp. in Op. to Def. Nuhfer's Mot. for Acquittal and for New Trial, Dkt. No. 550. This section's summary highlights only relevant facts pertinent to the Instant Motion.

Foreign Agents Registration Act ("FARA"). As the Government established at trial, and as credited by the jury in finding Defendant Rivera guilty in Counts 1 and 2 of the Superseding Indictment, Defendant Rivera and Defendant Nuhfer effectuated their scheme through a lucrative contract, totaling $50 million, nominally executed between Defendant Rivera's company, Interamerican Consulting ("Interamerican"), and PDV USA, Inc. ("PDV USA"), a U.S.-based subsidiary of Venezuela's state-owned oil company, PDVSA—thereby cloaking their unregistered lobbying activities. *See* Superseding Indictment, Dkt. No. 122; Jury Verdict, Dkt. Nos. 488, 489. Moreover, as established at trial, Defendant Rivera also conspired with Defendant Nuhfer, in Count 3, to divide the illicit proceeds derived from that conspiracy. Indeed, the trial record is replete with evidence showcasing Defendant Rivera's efforts in furtherance of the FARA-scheme, for which the Maduro regime paid him $20 million.

**1. *Defendant Rivera's Involvement in the FARA-Scheme.***

The jury heard testimony from one of Defendant Rivera's partners, Huge Perera, who stated that he initially introduced Defendant Nuhfer to Raul Gorrin, after Defendant Nuhfer expressed an interest in meeting wealthy Latin Americans in order to obtain referral fees for U.S. lobbying engagements. *See* April 7th Tr. (Perera) at pp. 58–62. Thereafter, Defendant Nuhfer introduced Defendant Rivera to Perera and Gorrin. *See id.* at pp. 8. From there, Defendant Rivera's and Defendant Nuhfer's scheme to trade convert influence for cash was off and running.

First, Gorrin was able to assist in getting this extraordinary contract "[b]ecause he was a close friend of Delcy Rodriguez and . . . Nicolas Maduro," *id.* at p. 86, while Defendant Rivera's and Defendant Nuhfer's contributions to the partnership included their political relations and contacts in the United States, *id.* at pp. 125–126. Undeniably, it was Defendant Rivera's deep ties to prominent political figures like U.S. Representative Pete Sessions, then-Senator Rubio, and

Kellyanne Conway, and his status as a former U.S. Congressman, that was the driving force in securing the lucrative contract in the first place. *See* GX[5] 15 at 5 (MIA Chat pictures of Rivera with political figures); GX 25 (Rivera-Rubio texts); Tr. (Apr. 7, Perera) at 125 (describing Rivera's contribution to the partnership as "all of his political relations and his contacts"). As Perera testified, Gorrin conveyed that the $50 million contract was for work on behalf of Venezuela's government, and the partners "discuss[ed] the possibility of in fact working on behalf of the regime." *See* Apr. 7th Tr. (Perera) at pp. 91–92. Perera further related the four partners' understanding that "Raul [Gorrin] was getting the contract so that relations between Venezuela and the U.S. could be improved." *See id.* at p. 96; *see also id.* at p. 91 (describing Maduro's desire for the contract "to improve the [U.S.-Venezuela] relationship"). Second, consistent with that understanding, Defendant Rivera, with help from Defendant Nuhfer, used FARA filings for foreign-government lobbying engagements to draft the services description for the contract under which he and his partners would be getting paid. *See* GX 133 at p. 6; GXs 326, 328.

Accordingly, in furtherance of the FARA-scheme, the $50 million agreement was formally between Defendant Rivera's company Interamerican and PDV USA—concealing that the true clients were Venezuelan Minister Delcy Rodriguez and President Nicolas Maduro, and ultimately the Venezuelan Government. *See* April 7th Tr. (Perera) at pp. 94–95 ("Q. . . . [I]s there any doubt in your mind that your client and your partners' client was the government of Venezuela? A. No."). Moreover, the evidence established at trial showed that the Venezuelan Government directed

---

[5] The Government's Trial Exhibits ("GX") are filed at Dkt. Nos. 523–28. Attached to this motion are some exhibits used to calculate the money judgment and support forfeiture involved in Court 6 of the Superseding Indictment. *See* Fed. R. Crim. P. 32.2(b)(1)(B) ("The court's determination [on forfeiture] may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable.").

executives of CITGO oil company to enter into the three-month, $50 million contract with Interamerican, which called for five installment payments of $5 million each and a final payment of $25 million. *See* Mar. 23rd Tr. (Gina Coon) at pp. 166 to 170.

In furtherance of the $50 million contract, and throughout the charged scheme, Defendant Rivera engaged in conduct on behalf of the Maduro regime that required registration under FARA. For example, the jury learned that shortly after Defendant Rivera signed the $50 million agreement on March 21, 2017, he traveled to New York with U.S. Representative Pete Sessions in early April 2017, arranging and attending separate meetings between them and Delcy Rodriguez and opposition figure Julio Borges to discuss a process for normalizing relations between the United States and Venezuela that would have supported both the Maduro regime and members of the Venezuelan opposition parties. *See* GX 345 (Rivera-Nuhfer email on New York itinerary).

In another example, trial evidence established that Defendant Rivera and Defendant Nuhfer coordinated and attended a July 12, 2017, meeting in Washington, D.C., with then-U.S. Senator Marco Rubio, Gorrin, and opposition figure Henry Ramos Allup. *See* GX 15 at pp. 76–82; GX 17 at p. 1 (Rivera-Borges text, "Esther is sending you Pete's [Rep. Sessions] information"); GX 15 at pp. 20–33 (texts in the MIA Chat reflecting Nuhfer's role in setting up the meeting and her understanding of its political context). At that time, the FARA-scheme participants' strategy for normalizing U.S.-Venezuela relations centered on a potential reconciliation framed around "postponing" the Maduro regime's plan to institute a sham, U.S.-opposed legislative body known as the "Constituent Assembly." *See* GX 15 at p. 78. Indeed, Defendant Rivera used his meeting with then-Senator Rubio to suggest that he use the speech on the Senate floor to urge "reconciliation," "no[t] vengeance" with respect to the Maduro regime. *See* GX 25.

Without a doubt, trial evidence showed that Defendant Rivera and Defendant Nuhfer were

fully aware of the political context surrounding the July 12 meeting, as participants of the MIA Chat Group discussed "postponing" rather than "canceling" the Constituent Assembly just the day before. *See* GX 15 at p. 78. Defendant Nuhfer even explicitly discussed concealing the meeting's true objective from outside scrutiny, cautioning: "So that we are all on the same page, in the event they see us in DC together…The agenda of the DC trip will be Henry Allup meeting with members of the international press. 😉" *See id*. at p. 77.

In yet another example, Defendant Rivera's efforts in furtherance of the FARA-scheme included arranging for U.S. Representative Sessions to travel to Venezuela in April 2018 to meet with Maduro himself and members of his regime with the aim of normalizing relations between the United States and Venezuela—even completing U.S. Representative Sessions' Venezuelan Visa application (*see* GX 461A) and joining Defendant Nuhfer in drafting correspondence to be sent by senior Venezuelan officials to their American counterparts regarding U.S.-Venezuela relations in anticipation of a trip to Venezuela. *See e.g.*, GX 200B; GX 15 p.15; GX 462, 463.

As the Government established at trial, Defendant Rivera emailed Gorrin in March 2018 sharing a draft letter—from Nicolas Maduro to President Trump—in anticipation of Rep. Sessions' travel to Caracas the following month. There, Defendant Rivera wrote (on Maduro's behalf), "I want to assure you of my good-faith desires to take steps that will facilitate the ***reestablishment of normal relations*** between the United States and Venezuela," and "it is my further hope that ***such normalization would begin immediately after a negotiated solution is achieved*** with calibrated measures from your [U.S.] government that validate the efforts of my government culminating in a democratic election, the results of which would be recognized by your government ***irrespective of outcome***." (Emphasis added). *See* GX 469AT. Furthermore, trial evidence showed that Defendant Nuhfer emailed Gorrin (and Defendant Rivera), on March 23, 2018, a draft letter of

invitation she had prepared from Venezuelan Foreign Minister Jorge Arreaza to acting U.S. Secretary of State John Sullivan, requesting that U.S. Representative Pete Sessions travel to Venezuela to meet with President Nicolás Maduro. *See* GX 463. On the very same day Defendant Nuhfer transmitted her draft, the official Venezuelan Foreign Ministry issued an invitation to U.S. Secretary Sullivan featuring text *identical* to Defendant Nuhfer's draft. *See* GX 200B; Apr. 1st Tr. (Brian Naranjo) at pp. 31–32.

Then, less than two weeks later, Defendant Rivera traveled to Venezuela with U.S. Representative Sessions to meet with Maduro, where they discussed U.S.-Venezuela relations, including Maduro's potential exit from office free from prosecution and safe passage for his family. *See* Apr. 27th Tr. (Rep. Sessions) at pp. 62–63. Those discussions included Maduro's potential interest in leaving office "under conditions that he would [not be] hounded or prosecuted," and Maduro's interest "in his wife and boys or children being able to move freely as they would choose." *See id*. at pp. 62–63. Importantly, by this point in time, the Maduro regime had paid Defendant Rivera $20 million, a portion of which he distributed to Defendant Nuhfer and his other partners. *See* GX 1 (summarizing bank records showing Def. Rivera's receipt and distribution of the $20 million); *see also* GXs 710–738, 770–780.

### 2. *The FARA-Scheme Generated $20 million in Illicit Proceeds, which were then Laundered in part to Co-Defendant Nuhfer and other partners.*

Testimony and documentary evidence at trial established that Defendant Rivera's and Defendant Nuhfer's FARA scheme generated $20 million in proceeds. *See* GXs 1, 710–722. The jurors saw how Defendant Rivera relied on Defendant Nuhfer to prepare invoices, sham progress reports, and other materials relating to the conspirators' efforts to get paid under the agreement, keeping Defendant Nuhfer closely in the loop with his interactions with CITGO and PDVSA employees. *E.g.*, GXs 320/321AT, 326, 328, 335, 446–450, 489, 504. Defendant Rivera even

commended Defendant Nuhfer for her artful drafting of a sham purported consultant progress report for their renewed efforts to collect additional payment under the agreement—stating, "Wow! This is a Michaelangelo work of art! . . . And for only $5 million. $10,000 per word. What a bargain!!!—Nuhfer responded "Exactly, that is my going rate these days. Should I BS more, or is this fine? . . . You need to send this in tomorrow." GX 429.

Notably, the jury heard from Mike Petron—a forensic accountant employed by Stout and working for the Department of Justice—who testified that he and his team reviewed voluminous banking records and prepared summary charts documenting the flow of funds from bank accounts ultimately controlled by the Venezuelan Government to Defendant Rivera-controlled bank accounts and beyond. *See* GX 1 (summarizing GXs 710–738, 770–780). Bank records and Mr. Petron's testimony established that PDV USA and PDVSA deposited $20 million, in accordance with the Interamerican "consulting" contract, into Interamerican's JP Morgan Chase bank account ending in 1682 ("JPMC Acct. 1682")—a bank account controlled by Defendant Rivera. *See* GXs 9A, 710–722. Bank records and Mr. Petron's testimony further established that Defendant Rivera systematically distributed the funds received from PDV USA and PDVSA in accordance with the FARA-scheme agreement made between him, Defendant Nuhfer, Parera, and Gorrin,[6] distributing approximately 75% of the $20 million to his partners, including Defendant Nuhfer who received a net total of $4,691,333. *See* GXs 1, 9A, 9B, 9C, 9D; *see also* GXs 710–738, 770–780; Apr. 17th Tr. (Petron) 136–145 (detailing the four $5 million wire transfers, totaling $20 million). This agreement and ultimate transfer of those illicit FARA proceeds served as the basis for Count 3,

[6] Perera testified that there were "four partners" in the charged scheme (himself, Gorrin, Rivera, and Nuhfer), and described his discussions with Rivera and Nuhfer "about how [they] were going to split the money" from the $50 million contract—including defendants' understanding that they would be getting "25 percent each." Apr. 7th Tr. (Perera) at pp. 97–98 ("Q. How do you know that? A. Because we spoke about it several times.").

which the jury found Defendant Rivera guilty of participating in. *See* Verdict.

Specifically, Defendant Rivera, through his company Interamerican, received three of the installment payments, on March 24, April 10, and April 19, 2017, for $5 million each, totaling $15 million, from bank accounts controlled by CITGO and PDV USA—the first payment coming days after executing the $50 million contract. *See* GXs 1, 9A; *see also* GXs 700, 701, 710–738, 749–752; Apr. 17th Tr. (Petron) 138:2–139:22. And, on October 27, 2017, evidence showed that Interamerican Consulting received a wire transfer in the amount of $5 million from a PDVSA account held at Gazprom Bank in Russia. *See* GX 9A; *see also* GXs 710–722; Apr. 17th Tr. (Petron) 138:2–139:22. Notably, the payment from the Russian bank came after CITGO executives in the U.S. refused to make any additional payments under Interamerican's "consulting" contract. *See* Mar. 23rd Tr. (Coon) at 202–218.

The trial evidence also established that shortly after Interamerican's bank account received each tranche of funds from PDV USA and PDVSA, Defendant Rivera transferred a portion of such funds directly to bank accounts held by his partners. For example, during the conspiracy period, bank records and Mr. Petron's testimony established that Defendant Rivera distributed a net total of $4,691,333 in illicit FARA proceeds to bank accounts held by Communication Solutions, an entity solely owned and controlled by Defendant Nuhfer. *See* GX 1, GX 9A, 9C (summarizing GXs 723–747, 770–774), GXs 710–738; Apr. 17th Tr. (Petron) 138:2–139:22, 141:2–142:15. The trial evidence further showed that between March 31 and April 24, 2017, Defendant Rivera distributed approximately $3.75 million of illicit-FARA proceeds to yacht management company on behalf of Gorrin. *See* GXs 1, 9B, 733–738. Apr. 17th Tr. (Petron) 138:2–139:22, 139:23–141:1. And, evidence shows that Defendant Rivera distributed a net total $5,291,833 in illicit FARA proceeds to various accounts controlled by Perrera. *See* GXs 1, 9D, 710–738, 770–779; Apr. 17th

Tr. (Petron) 138:2–139:22, 148:11–149:7.

Accordingly, based on the record in this case, the total value of property constituting or derived from proceeds traceable to Defendant Rivera's conviction in Count 1 and Count 2 and subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) is $20,000,000.00 in United States currency, which sum may be sought as a forfeiture money judgment pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure.

Additionally, also based on the record in this case, the total value of property involved in the money laundering conspiracy offense of conviction (Count 3), and subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1), is $15 million in United States currency, which sum may be sought as a forfeiture money judgment pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure. *See supra* §A & B.

### 3. *In a Bifurcated Forfeiture Proceeding, the Jury Finds the Requisite Forfeiture Nexus Exists Between Defendant Rivera's Real Property and Count 4.*

The Jury also found Defendant Rivera guilty of Count 4 of the Superseding Indictment, which alleged that he used more than $10,000 in illicit FARA proceeds when making a payment on an equity line of credit taken out against his property located at 10925 N.W. 43rd Lane, Doral, Florida 33178 (the "43rd Lane Property"), in violation of 18 U.S.C. § 1957. *See* Superseding Indictment 30; Verdict, Dkt. No. 488. By way of their guilty verdict, the Jury necessarily credited Mr. Petron's testimony and analysis of the relevant bank records, which showed that the charged financial transaction payment towards the equity line of credit included $50,746.56 in PDV USA derived funds. *See* SunTrust Equity Line of Credit Acct. ending in 7725, held in the name of David M. Rivera ("SunTrust Acct. 7725") (GXs 749–752); Apr. 17th Tr. (Petron) 152:13–153:18.

Specifically, trial evidence showed that Defendant Rivera took out an equity line of credit

with SunTrust Bank, collateralized by the 43rd Lane Property. *See* GX 750 (various Equity Line of Credit documents for SunTrust Acct. 7725, reflecting David M. Rivera as the borrower and listing real property located at 10925 NW 43rd Lane, Doral, Florida 33178 as collateral for the Equity Line of Credit). Records for SunTrust Acct. 7725 show Defendant Rivera made a payment of $50,746.56 via check dated December 28, 2017, drawn on Interamerican's JPMC Acct. 1682 (that is Check #1119), which paid down the equity line of credit he took out against the 43rd Lane Property—thereby removing SunTrust's encumbrance against the 43rd Lane Property. *See* GX 749 (account statements for SunTrust Equity Line of Credit Acct. 7725, held in the name of David M. Rivera); GXs 751 & 752; GX 753 (SunTrust Acct. 7725 payment history reflecting $50,746.56 payment credited towards the line of credit on Dec. 29, 2017); GX 754 (photocopy depicting Check # 1119 dated Dec. 28, 2017, for $50,745.58 drawn on JPMC Acct. 1682 and paid to the order of SunTrust).

Mr. Petron's testimony regarding his analysis of the relevant account records corroborated that Check No. 1119 drawn on Interamerican's JPMC Acct. 1682, totaling $50,746.56, was the source of funds used to pay off Defendant Rivera's SunTrust Acct. 7725. *See* Apr. 17th Tr. (Petron) 152:24–153:2; GXs 710–732, 749–752; *see also* GX 753 (SunTrust Acct. 7725 payment history reflecting $50,746.56 payment credited towards the line of credit on Dec. 29, 2017). According to Mr. Petron, his analysis of the relevant bank records showed that the total value of the check in its entirety was traceable back to the $5 million that PDV USA deposited into Defendant Rivera's JPMC Acct. 1682 on April 19, 2017. *See* 153:3–19; GX 2 (summarizing GXs 710–732, 749–752). Accordingly, ample trial evidence established that the money laundering transaction charged in Count 4 directly involved the 43rd Lane Property.

Further, after finding Defendant Rivera guilty of using more than $10,000 in criminally

derived proceeds in the financial transaction that paid down the SunTrust Bank equity line of credit taken out against the 43rd Lane Property (Count 4 of the Superseding Indictment), and upon request by Defendant Rivera, the jury returned a forfeiture verdict specifically finding that the property was "involved in the offense charged in Count 4 [ ], or is traceable to such property." *See* Forfeiture Verdict, Dkt. No. 490. The jury, thereby, found that the requite forfeiture nexus existed between the 43rd Lane Property and Count 4 of the Superseding Indictment.

Accordingly, in addition to the above, also based on the record in this case and the Jury's forfeiture verdict, the following specific property is directly subject to forfeiture, pursuant to 18 U.S.C. § 982(a)(1):

> Real property located at 10925 N.W. 43rd Lane, Doral, Florida 33178 including all buildings, fixtures, appurtenances, improvements, attachments and easements found therein or thereon,
>
> Also Known As: Lot 1, Block 13 of HAWKSNEST FIRST ADDITION, according to the Plat thereof as recorded in Plat Book 151 at Page 97 of the Public Records of Dade County, Florida.
>
> Parcel ID No.: 30-3019-019-0550

## III. CONCLUSION

Based on the record in this case, the United States essentially seeks two forfeiture money judgments, one of which to be subsumed with the other: (1) the total value of property constituting or derived from proceeds traceable to Defendant Rivera's convictions in Count 1 and Count 2 and subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) is $20,000,000 in United States currency; and (2) the total value of property involved in the money laundering conspiracy offense of conviction (Count 3) and subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1) is $15,000,000 in United States currency, both of which may be sought as a forfeiture money judgment pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure. In an effort to avoid the imposition of double counting based on the specific facts of this case, and fashion a forfeiture money judgment that is

sufficient, but not greater than necessary, the United States believes the forfeiture money judgment pursuant to Section 982(a)(1) should be subsumed with the forfeiture money judgment pursuant to Section 981(a)(1)(C). This will allow the value of any property forfeited in satisfaction of either forfeiture money judgment to applied to both judgments.

In addition to the above, also based on the record in this case and the Jury's forfeiture verdict, the following specific property is directly subject to forfeiture, pursuant to 18 U.S.C. § 982(a)(1): Real property located at 10925 N.W. 43rd Lane, Doral, Florida 33178 including all buildings, fixtures, appurtenances, improvements, attachments and easements found therein or thereon.

WHEREFORE, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1), and Fed. R. Crim. P. 32.2, the Court should issue the attached proposed order, which provides for the entry of a forfeiture money judgment against Defendant Rivera; the forfeiture of specific property; the inclusion of the forfeiture as part of the Defendant Rivera's sentence and judgment in this case; and permission to conduct discovery to locate assets ordered forfeited.

As an alternative to the above requested relief, and because the Court "shall order" the forfeiture of property as part of the sentence (*see* 18 U.S.C. § 982(a)(1) and 28 U.S.C. § 2461(c)), the Court has the ability to enter a general order of forfeiture at the time of sentencing to be amended thereafter, which will allow for the parties to fully brief the Court on any forfeiture matters. Specifically, Fed. R. Crim. P. 32.2(b)(2)(C) states that in cases where the Court cannot identify all the specific property subject to forfeiture or calculate the total amount of the money judgment, the Court may enter a forfeiture order describing the property in general terms, subject to amendment pursuant to Rule 32.2(e)(1) when the specific property is identified, or the amount of the money judgment is calculated.

[Space Intentionally Left Blank]

## LOCAL RULE 88.9 CERTIFICATION

Pursuant to Local Rule 88.9, I hereby certify that the undersigned counsel has conferred with defense counsel for Mr. Rivera, most recently, via email on September 30, 2026, and defense counsel has represented that Mr. Rivera opposes the relief sought. Specifically, defense counsel conveyed that, although they understand the statutory ability the Government has to seek the requested relief, they oppose any forfeiture and they also believe that the Count 4-related forfeiture of the real property located at 10925 N.W. 43rd Lane, Doral, Florida 33178 is limited to $50,746.56; *citing United States v. Rothstein, Rosenfeldt, Adler, P.A. (In re Rothstein, Rosenfeldt, Adler, P.A.)*, 717 F.3d 1205 (11th Cir. 2013).[7]

Respectfully submitted,

**JASON A. REDING QUIÑONES**
**UNITED STATES ATTORNEY**

By: *s/ Mitchell E. Hyman*
Mitchell Evan Hyman
Assistant United States Attorney
Florida Bar No. 125405
United States Attorney's Office
99 N.E. 4th Street, 7th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9283
E-mail: Mitchell.Hyman@usdoj.gov

[7] The United States believes the cited case is not applicable in the instant case and intends to respond to any arguments once briefed by Mr. Rivera.